**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | CASE NO. |
| | ) | |
| vs. | ) | CR 20-326A-JFW |
| | ) | |
| DAE YONG LEE, | ) | |
| 940, LLC, | ) | PAGES 1 TO 38 |
| DEFENDANTS. | ) | |

**REPORTER'S TRANSCRIPT OF**
**TRIAL SETTING CONFERENCE VIA VIDEOCONFERENCE**
**TUESDAY, DECEMBER 8, 2020**
**8:05 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

```
 1                    APPEARANCES OF COUNSEL:

 2


 3    FOR THE PLAINTIFF:

 4         NICOLA T. HANNA
           UNITED STATES ATTORNEY
 5         BY:  VERONICA DRAGALIN
           BY:  MACK JENKINS
 6         BY:  MELISSA MILLS
           Assistant United States Attorneys
 7         United States Courthouse
           312 North Spring Street
 8         Los Angeles, California 90012

 9

10    FOR THE DEFENDANTS:

11         BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG &
           RHOW, P.C.
11         BY:  ARIEL NEUMAN
12         BY:  JIMMY THREATT
           1875 Century Park East
13         23rd Floor
           Los Angeles, California 90067

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 8, 2020

 2                             8:05 A.M.

 3                               ---

 4

 5              THE COURT:  We are on the record.  The clerk will

 6    call the case.

 7              THE CLERK:  United States District Court, Central

 8    District of California, Honorable John F. Walter presiding.

 9    Case No. CR 20-326, United States of America versus

10    Dae Yong Lee.

11              Counsel, please state your appearances.

12              MS. DRAGALIN:  Good morning, Your Honor.

13              Veronica Dragalin on behalf of the United States,

14    and appearing with me this morning are AUSA's Mack Jenkins and

15    Melissa Mills.

16              MR. NEUMAN:  Good morning, Your Honor.

17              Ariel Neuman and Jimmy Threatt specially

18    appearing for Mr. Lee this morning.  And I couldn't hear the

19    Court clerk.  I'm not sure if the Court is also calling this

20    matter to 940 Hill, LLC, this morning.  If so, we are also

21    specially appearing for them.

22              THE COURT:  Yes.  We also are calling the matter

23    for 940, LLC.  You indicate you're specially appearing?

24              MR. NEUMAN:  Yes, Your Honor.  We are in the

25    process of finalizing some retention issues and should have
```

1    that all done hopefully by the end of today.

2                    THE COURT:  All right.

3                    MR. NEUMAN:  Your Honor, if I --

4                    THE COURT:  This is on the Court's calendar for a

5    Trial Setting Conference for Mr. Lee and for 940 Hill, the LLC,

6    which, according to paragraph 22 of the First Superseding

7    Indictment, is a California limited liability company that was

8    registered in June 2008 and in that same year acquired property

9    that was located at 940 South Hill Street.  Mr. Lee, as alleged

10   in paragraph 23, is a real estate owner and developer who was

11   also the majority owner of 940, LLC.

12                    Before I go on, however, does -- Mr. Neuman, does

13   Mr. Lee require the services of an interpreter?

14                    MR. NEUMAN:  Yes, Your Honor.  That is what I was

15   going to note.  He does, and as I understand --

16                    THE COURT:  We do have an interpreter present.

17   Would that interpreter please announce her appearance.

18                    THE INTERPRETER:  Yes, Your Honor.  This is

19   Catheline Jung, Korean interpreter appearing.

20                    THE COURT:  Would you spell your name for the

21   record, please?

22                    MR. NEUMAN:  Your Honor, may I make a request

23   regarding the interpreter, please?

24                    THE COURT:  Yes.

25                    MR. NEUMAN:  Yesterday during the initial

1    appearance, afterwards I learned that, because of the

2    technology issues that we are dealing with, Mr. Lee could not

3    understand who was talking at what point since he is just

4    hearing the voice of the interpreter.  So if there is any way

5    that, as people talk today, they can just identify themselves,

6    I think that would help him identify who is speaking.

7              THE COURT:  All right.  Well, we are going to

8    have very few participants today.  It is going to be myself and

9    the prosecutor who is going to speak on behalf of the

10   Government.  So I'm sure that the interpreter can -- will be

11   able to interpret that and Mr. Lee will be able to hear the

12   proceedings.

13             So would the interpreter please spell her name

14   for the record.

15             THE INTERPRETER:  Yes.  Catheline Jung, last name

16   Jung, J-u-n-g, Catheline, C-a-t-h-e-l-i-n-e.

17             THE COURT:  All right.  Thank you very much.  And

18   I will continue.

19             I was discussing that, based upon paragraph 23 of

20   the First Superseding Indictment, Mr. Lee was or is alleged to

21   be the majority owner of the 940, LLC, and the property that

22   was going to be developed or was developed -- I'm not sure the

23   status -- was a 14,000 square foot commercial space and

24   200 residential units.

25             Before I discuss with Mr. Neuman the dates that

1  the Court has previously set in this action and the Criminal

2  Trial Order as modified by docket No. 63, I'm going to ask the

3  prosecutor to advise us of what the Government expects to prove

4  with respect to these defendants.

5              Before I continue, however, I want to advise

6  everyone who is listening on this call this morning --

7  apparently there was some confusion with respect to whether or

8  not the proceedings can be recorded either audio or video.  I

9  want to make it clear that they cannot be recorded either audio

10 or video.  Our local rule prohibits such a recording.

11             So who is going to speak for the Government this

12 morning?

13             MS. DRAGALIN:  I will, Your Honor.

14             THE COURT:  Pardon me?

15             MS. DRAGALIN:  I will, Veronica Dragalin.

16             THE COURT:  All right.  Let's begin.

17             My observations with respect to the First

18 Superseding Indictment is that, unlike the discussion of the

19 circumstantial evidence that the Government intends to offer

20 against Mr. Chan we had on Friday with Mr. Jenkins, it appears,

21 based upon the cooperation plea agreements that have been

22 entered into by Mr. Kim and Mr. Esparza that, as to Mr. Lee and

23 940 Hill Street, LLC, there appears to be direct evidence of

24 bribery relating to an appeal filed by what is described in the

25 First Superseding Indictment as Labor Organization A.  And that

1    appeal apparently was filed in August of 2016, and that appeal,

2    according to the allegations of the First Superseding

3    Indictment, threatened the development of the Hill Street

4    project.

5              Obviously I want to hear from the Government with

6    respect to all of the circumstances surrounding that appeal and

7    the disposition of that appeal.  But I also want to confirm

8    that, with respect to the other schemes that are alleged in the

9    RICO conspiracy as well as the mail fraud, the L.A. Grand Hotel

10   bribery scheme, the Luxe Hotel bribery scheme, the Project M

11   bribery scheme, and the Businessperson A scheme, that the --

12   that Mr. Lee and Defendant 940 Hill, LLC, are not involved in

13   any of those schemes; is that correct?

14             MS. DRAGALIN:  Yes, Your Honor, as to the latter

15   point.  Those two defendants are only charged in one scheme.

16             THE COURT:  I'm sorry.  I didn't hear the last

17   part.  The quality of the microphone that you are speaking from

18   is awful.  So you are going to have to get closer to it.  I

19   wish that the Government would invest in some decent

20   microphones for these Zoom conferences.

21             So is my statement correct?

22             MS. DRAGALIN:  Yes, Your Honor.

23             THE COURT:  All right.  So why don't you tell us

24   then what the Government expects to prove with respect to the

25   allegations in the First Superseding Indictment.

1          I guess the first question I have is who are the

2    other members of the LLC, and what is the name of the Labor

3    Organization A that is alleged to have filed the appeal, and

4    describe the relationship between Justin Kim and Mr. Lee and

5    City Staffer A who apparently prepared a memorandum for

6    Mr. Huizar with respect to the appeal, whether or not he was

7    aware of the alleged bribe and Mr. Lee's business associate

8    that met with Mr. Huizar, Mr. Esparza, and Mr. Kim on

9    January 17th, 2017 at city hall, and also what was Lobbyist C's

10   involvement in or knowledge of the bribe that the Government

11   alleges the $500,000 bribe that was paid, and who was the close

12   associate of the -- or who was the executive director of the

13   Labor Organization who apparently had the close relationship

14   with Lobbyist C?

15          So, in any event, I will let you tell us what the

16   Government expects to prove in this case.

17          MS. DRAGALIN:  Yes, Your Honor.

18          As to the minority owners of the LLC, there are

19   two -- as far as the Government understands it currently, there

20   are two additional owners, individuals, who own less than

21   50 percent of the interest in the LLC.  The U.S. Attorney's

22   Office and FBI have interviewed both of those individuals, and

23   we expect their testimony will be that those two individuals

24   had no knowledge about a $500,000 payment being made to

25   George Esparza and Jose Huizar to help with this appeal.

1          Regarding City Staffer A-2 who is mentioned in

2   overt act 87, there is no evidence to suggest that City

3   Staffer A-2 knew about any of the bribe payments or agreements

4   made in this scenario.

5          In terms of associates of David Lee,

6   Defendant Lee, and individuals who worked on the 940 Hill

7   project, again, at this time there is no evidence that those

8   associates or individuals had knowledge of a corrupt bribery

9   agreement.

10          The Government's allegations at this time is that

11   there were four co-conspirators involved in this corrupt

12   agreement.  Those would be Jose Huizar, George Esparza,

13   Justin Kim, and Defendant Lee.

14          Justin Kim operated as a consultant, albeit, in

15   an informal matter.  Records produced by the LLC do not

16   indicate that there was a formal consulting agreement or that

17   there were formal documented payments to Justin Kim.  However,

18   e-mail correspondence, text message correspondence all

19   corroborate that Justin Kim was functioning as some type of

20   consultant primarily representing him to have direct access to

21   Jose Huizar.  He coordinated and scheduled meetings with

22   Jose Huizar including --

23          THE COURT:  Is this before the Labor Organization

24   in August of 2016 appeal?  Because it looks like, based upon

25   the chronology, that the property was acquired for $9 million

1    in June 2008.  When was the actual development commenced for

2    which Mr. Kim's services as a consultant were used?

3              MS. DRAGALIN:  Mr. -- we expect Justin Kim to

4    testify that he had been working for years to try to become a

5    hired consultant for David Lee on his various projects in

6    Los Angeles.  However, it was not until around August 2016 that

7    Defendant Lee reached out to Justin Kim to seek his help with

8    this particular project.  So there is --

9              THE COURT:  Okay.  And that particular help was

10   with respect to the August 8, 2016, appeal that was filed by

11   Labor Organization A; correct?

12             MS. DRAGALIN:  That is correct, Your Honor.  The

13   appeal --

14             THE COURT:  What was the nature of that appeal?

15             MS. DRAGALIN:  The project had passed one of the

16   hearings in approvals by the Planning Department.  The next

17   step was for the project to move on in its hearings before the

18   City, and at that time, after the Planning Department had

19   approved the project, the Labor Organization filed an appeal on

20   environmental grounds.

21             THE COURT:  It was an alleged violation or an

22   allegation that the project was not in compliance with the

23   California Environmental Control Act?

24             MS. DRAGALIN:  That is correct, Your Honor.

25             THE COURT:  All right.  And so Mr. Lee, according

```
 1    to the Government's theory, reached out to Mr. Kim in order to
 2    obtain assistance in connection with that appeal; is that
 3    correct?
 4              MS. DRAGALIN:  Yes, Your Honor.  As demonstrated
 5    by an e-mail from Defendant Lee to Justin Kim forwarding a copy
 6    of the appeal, and that e-mail serves as the basis for the wire
 7    fraud on a services fraud count in the Indictment.  That e-mail
 8    was then forwarded from Justin Kim to George Esparza.
 9              THE COURT:  All right.  So it looks like there
10    were, according to the First Superseding Indictment, several
11    calls, meetings between Mr. Lee and Mr. Kim, Mr. Huizar and
12    Mr. Esparza including the dinner meeting and the visit to a
13    karaoke bar in September of 2016.
14              When was the, according to the Government's
15    evidence, agreement reached with respect to what Mr. Lee and
16    his company were going to provide to the other co-conspirators
17    with respect to -- not the other but Mr. Huizar in terms of the
18    $500,000 bribe that has been alleged by the Government?
19              MS. DRAGALIN:  Your Honor, the negotiations,
20    according to the evidence, took several months of
21    back-and-forth in terms of initial offers and counteroffers,
22    and ultimately the $500,000 amount -- we expect George Esparza
23    and Justin Kim will testify that that final agreement was
24    reached in sometime late January or early February 2017.
25              THE COURT:  Who arrived at the conclusion, if
```

1    they did, that the favorable resolution of the labor

2    organization's appeal would have saved Mr. Lee's company

3    $30 million?

4              MS. DRAGALIN:  We expect George Esparza to

5    testify that he had conversations with a lobbyist referred to

6    as Lobbyist C with experience in the City who represented to

7    George Esparza that a Labor Organization appeal requiring a

8    company to use labor unions on its construction project could

9    increase the cost of the project of up to $30 million.

10             THE COURT:  All right.  So the ultimate amount of

11   the bribe that is alleged in overt act No. 96 took the form of

12   a counteroffer by Mr. Kim that was conveyed to Mr. Esparza and

13   allegedly was approved or agreed to by Mr. Lee for $500,000 in

14   cash, and that was going to be divided 300,000 to Mr. Huizar

15   and $200,000 to Mr. Kim.

16             Is that the Government's theory?

17             MS. DRAGALIN:  That is correct, Your Honor.

18             THE COURT:  Mr. Huizar, according to allegations

19   in the Indictment, expected that the appeal would be denied in

20   the PLUM Committee of which Mr. Huizar was on that committee,

21   and he may have even been the head of that committee.  But what

22   I don't understand, on March 3rd, 2017, the appeal was --

23   according to the Government's allegations, the appeal was

24   dropped.  Did Mr. Huizar vote on the appeal in the

25   PLUM Committee, or was the appeal somehow dropped without the

1   necessity of a vote?

2              MS. DRAGALIN:  Your Honor, we expect

3   George Esparza to testify and his contemporaneous

4   communications confirm that George Esparza and Jose Huizar

5   agreed to make the appeal go away, and they had various options

6   of how to make that happen.  Their last resort option was that,

7   if the appeal came before the PLUM Committee, Jose Huizar had

8   the power to deny the appeal in that committee.  However,

9   Jose Huizar also had relationships and influence over persons

10  associated with the Labor Organization, and the ultimate road

11  or option they chose to make the appeal go away was to ask

12  people close to the Labor Organization to drop the appeal for

13  various business reasons and in negotiations with that

14  Labor Organization.

15              THE COURT:  That is what is confusing to me.  Who

16  are involved in those negotiations?  It looked like it was

17  Lobbyist C according to the allegations in the First

18  Superseding Indictment --

19              MS. DRAGALIN:  That is correct.

20              THE COURT:  -- that were involved in those

21  negotiations.  And apparently Lobbyist C -- has his name been

22  disclosed or her name been disclosed?

23              MS. DRAGALIN:  It has not been publicly disclosed

24  yet, Your Honor.  It was disclosed in the under seal filing

25  that the Government filed last week.

1          THE COURT:  Right.  I understand that.  I just

2   want to be careful because I do have that.

3          It appears -- and correct me if I'm wrong -- that

4   the Government's evidence is going to show that Lobbyist C was

5   a close associate of executive -- the executive director of

6   Labor Organization A.

7          MS. DRAGALIN:  That is correct.

8          THE COURT:  And that it was the result of

9   Lobbyist C's efforts that ultimately resulted in the appeal

10  being dropped by this Labor Organization A.

11          MS. DRAGALIN:  Your Honor, Lobbyist C was

12  actually the lobbyist for Labor Organization A.  So not only

13  was it a close associate, Lobbyist C, in fact, in effect

14  represented Labor Organization A.  And so, when George Esparza

15  and Jose Huizar were meeting with and dealing with Lobbyist C,

16  they were in effect negotiating with or dealing with the

17  Labor Organization who filed the appeal.

18          THE COURT:  All right.  And what was the

19  consideration, if any, that was paid to either Lobbyist C or

20  the executive director or the Labor Organization A?  Was there

21  any monies that were paid in connection with the dropping of

22  the appeal?

23          MS. DRAGALIN:  There is no evidence to suggest

24  that any money or other form of consideration was paid to the

25  organization or the lobbyist.

```
 1              THE COURT:  And why would they drop the appeal?
 2              MS. DRAGALIN:  We expect George Esparza to
 3  testify that part of the negotiation was Jose Huizar and
 4  George Esparza promising that they would lobby for the
 5  Labor Organization for a future project, in other words,
 6  essentially equivalent to political logrolling.  So the
 7  Government's theory is not that that aspect of the negotiations
 8  was itself corrupt.
 9              THE COURT:  All right.  So in any event what the
10  Government's theory, as I understand it, is corrupt is that,
11  after the appeal was dropped on March 3rd of 2017, that there
12  was the payment of cash, specifically Mr. Kim will testify, as
13  I understand it, that Mr. Lee provided him with cash on
14  March 14 of 2017 in the amount of $400,000 and there was a
15  discussion between Mr. Lee and Mr. Kim that the additional
16  $100,000 would be paid at a later date.  Somehow -- I can't
17  remember how -- Mr. Esparza ends up with a portion of that
18  $400,000.  So why don't you tell me what the Government's
19  evidence is with respect to that.
20              MS. DRAGALIN:  Yes, Your Honor.
21              As to March 14th, in particular, data seized from
22  George Esparza's phone shows that he drove to the location of
23  Defendant Lee's office in downtown Los Angeles, and text
24  messages show that George Esparza and Justin Kim met outside of
25  that office in George Esparza's car.  Shortly after that
```

1    meeting, there are photographs that were taken on

2    George Esparza's phone showing sums of cash in $100 bills

3    stacked in stacks of $10,000.  Metadata on those photographs

4    shows that they were -- the photographs were taken just a

5    couple hours after George Esparza drove to Defendant Lee's

6    office.  In addition, metadata from the phone shows that

7    George Esparza then took cash to Jose Huizar's home and --

8                    THE COURT:  How much cash did Mr. -- I take it it

9    was Mr. Kim that provided the cash to Mr. Esparza?

10                   MS. DRAGALIN:  Yes.  Both Justin Kim and

11   George Esparza will testify that they exchanged cash in the

12   car.

13                   THE COURT:  How much cash did Mr. Kim give to

14   Mr. Esparza?

15                   MS. DRAGALIN:  In total, George Esparza received

16   about 200- to $250,000 from Justin Kim.

17                   THE COURT:  And out of the $400,000 Mr. Kim was

18   to -- he was going to keep how much?  200,000?

19                   MS. DRAGALIN:  Between 150- and 200,000.

20                   THE COURT:  Okay.  So what does Mr. Esparza do

21   with the -- I take it the Government has the photographs that

22   you just referred to from the phone of the cash?

23                   MS. DRAGALIN:  Yes, Your Honor.

24                   THE COURT:  They will be introduced into

25   evidence?

1           MS. DRAGALIN:  Yes, Your Honor.

2           THE COURT:  All right.  So what happens --

3    Mr. Kim takes -- Mr. Kim is now in the possession of a certain

4    amount of cash, 150- to $200,000.  Mr. Esparza now has

5    $200,000.  What does Mr. Esparza do with respect to the

6    $200,000 in cash, vis-à-vis, Mr. Huizar, if anything?

7           MS. DRAGALIN:  George Esparza puts some of the

8    cash, about 100- to $130,000, in a liquor bottle.  He then took

9    photographs and videos --

10          THE COURT:  Wait a minute.  A liquor bottle?

11          MS. DRAGALIN:  Sorry.  I misspoke, Your Honor.  A

12   liquor bottle box.  So --

13          THE COURT:  Okay.  I was going to say it's pretty

14   hard to get that much cash into the liquor bottle.

15          MS. DRAGALIN:  Yes.  No.  It was a box of which

16   we also have photo evidence.  He then documented via

17   photographs and video himself taking the box of cash to

18   Jose Huizar's residence.  In fact, at some point he takes

19   photographs of himself walking up the steps of Jose Huizar's

20   house holding the liquor box of cash.  He also takes a video

21   narrating that he is taking cash to Councilman Huizar's home at

22   his direction.

23          THE COURT:  Was he -- what month and year was

24   this?

25          MS. DRAGALIN:  This was March 2017.

```
 1              THE COURT:  And why was he documenting this
 2   delivery?  Was he cooperating with law enforcement at that
 3   time?
 4              MS. DRAGALIN:  No, Your Honor.  He was not.
 5              THE COURT:  What was his motivation for this --
 6   what appears to be a document that he was producing?
 7              MS. DRAGALIN:  Your Honor, we expect
 8   George Esparza to testify that, among the various different
 9   things he agreed to do with Jose Huizar and for Jose Huizar,
10   this to him felt the most dangerous and criminal.  He,
11   therefore, wanted to document it so that, if some day he got
12   caught, there would be documentary evidence of the fact that he
13   was following his boss's orders and doing these things for
14   Jose Huizar.  We expect he will testify that was his
15   motivation.
16              THE COURT:  So he was building himself a defense?
17              MS. DRAGALIN:  It's hard to maybe fully
18   understand the motivation of someone engaged in this type of
19   behavior, but we expect that to be his testimony.
20              THE COURT:  All right.  Well, what happens with
21   this -- according to the Government's evidence, and I guess
22   it's through the testimony of Mr. Esparza.  What happens at the
23   meeting with Mr. Huizar?  Does Mr. Esparza leave any of the
24   cash with Mr. Huizar?
25              MS. DRAGALIN:  No, Your Honor.  George Esparza
```

will testify that, after showing Jose Huizar the cash to prove

that Justin Kim and Defendant Lee came through with their side

of the bargain, Jose Huizar asked George Esparza to hold on to

the cash at George Esparza's residence which George Esparza

agreed to do.

THE COURT:  And ultimately what happened to that

cash?  Did Mr. Huizar end up with any of that cash?

MS. DRAGALIN:  In June and July 2017, a few

months later, the FBI reached out to George Esparza to

interview him.  After those events, George Esparza -- we expect

George Esparza to testify that he was in fear of getting

caught, so he wanted to get rid of the cash.  He then provided

the cash to a different individual, an individual identified as

Executive Director E --

THE COURT:  "E" as in Edward?

MS. DRAGALIN:  "E" as in Edward.

THE COURT:  And what did -- executive director --

whose executive director was Executive Director E?  How did

Mr. Esparza happen to pick that individual?

MS. DRAGALIN:  That individual was the right-hand

person of Chairman Wei Huang, Defendant Huang, charged in the

L.A. Grand Hotel scheme.  George Esparza and Executive

Director E developed a corrupt relationship that involved

accepting casino chips at Las Vegas casinos and other benefits.

So George Esparza chose that individual to be the one to hold

1    on to this illicit cash which Executive Director E agreed to

2    do.

3                THE COURT:  And his name has not been publicly

4    disclosed; correct?

5                MS. DRAGALIN:  Correct.  It has not, Your Honor.

6                THE COURT:  All right.  So what -- so ultimately

7    does Mr. Huizar end up with his alleged share of the bribe that

8    the Government believes was paid by Mr. Lee?

9                MS. DRAGALIN:  No, Your Honor.  Jose Huizar does

10   not ever take possession of the cash.  The cash was, in fact,

11   actually turned over to the Government as part of this

12   investigation.  And so, no, it never reached Jose Huizar.

13               THE COURT:  So Executive Director E turned over

14   the money that Mr. Huizar gave him to the Government?

15               MS. DRAGALIN:  Yes, Your Honor.

16               THE COURT:  And then what about Mr. Kim?  He's

17   now walking around with what?  Couple hundred thousand dollars

18   in his pocket from this transaction.  What happened to that

19   money?

20               MS. DRAGALIN:  Justin Kim will testify that he

21   used that cash in his -- for personal expenses and deposited

22   small amounts of that cash in bank accounts himself and through

23   family members.

24               THE COURT:  All right.  It looks like there's --

25   did Mr. Huizar express, according to the Government's evidence,

1    any concern about not receiving his share of the $200,000?

2                    MS. DRAGALIN:  Yes, Your Honor.  He sent repeated

3    text messages, some of which are described in the Indictment.

4    However, there are additional communications and additional

5    evidence to corroborate the Government's theory that

6    Jose Huizar kept asking for his share of the $200,000 cash

7    bribe including by sending -- by himself visiting

8    George Esparza's -- one of George Esparza's family members'

9    homes, something that was captured on a Ring camera asking for

10   -- to see George Esparza.

11                   According to Esparza, Jose Huizar also sent staff

12   members to come after Esparza to ask to meet with Jose Huizar,

13   and there were repeated text messages and attempts to reach

14   George Esparza including through Justin Kim in the months

15   leading up to the FBI searches of Jose Huizar's residence and

16   offices.

17                   THE COURT:  So Esparza was no longer working

18   with -- working for the City at that time?

19                   MS. DRAGALIN:  That is correct, Your Honor.  In

20   early 2018 George Esparza had left his employment as -- in

21   Council District 14.

22                   THE COURT:  All right.  So then the -- go back.

23   I lost my train of thought here.

24                   It appears, based upon the Government's theory or

25   the Government's evidence which will be presumably testified to

1    by Mr. Kim who now has had the benefit and spent the $200,000

2    that was provided to him by Mr. Lee, there's a shortfall of

3    this bribe of about $100,000.  Was there any effort by Mr. Kim

4    to obtain the balance -- the remaining $100,000 of the bribe

5    payment from Mr. Lee or anyone else associated with Mr. Lee?

6              MS. DRAGALIN:  Yes, Your Honor.  In July 2017

7    after the FBI had interviewed both Esparza and Kim, the two met

8    in a car to discuss their respective FBI interviews.  At that

9    time Justin Kim asked George Esparza if Jose Huizar wanted his

10   remaining $100,000 cash from David Lee as agreed.  At that

11   time, because of law enforcement attention, George Esparza

12   declined and said no.

13             However, Justin Kim decided to use that

14   opportunity as a way to get an additional $100,000 for himself.

15   And so he met with Defendant Lee and told Defendant Lee that

16   Huizar wanted the remaining $100,000.  Defendant Lee agreed to

17   provide the additional $100,000 to Justin Kim which Justin Kim

18   kept for himself.

19             THE COURT:  Mr. Lee -- I'm sorry.  Mr. Kim, in

20   effect, lied to Mr. Lee and ended up pocketing the remaining

21   $100,000 bribe payment?

22             MS. DRAGALIN:  That is correct.

23             THE COURT:  Is that a fair characterization?

24             MS. DRAGALIN:  Yes, Your Honor.

25             THE COURT:  All right.  Give me a moment here.

1    I'm looking at my notes.  So that it seems to me -- if there is

2    anything additional that you think may be helpful, covers

3    the -- in summary form the bribery scheme and the payment of

4    the $500,000.  Is there anything else that would be helpful to

5    understanding the bribery scheme that is alleged by the

6    Government?

7                    MS. DRAGALIN:  Not the bribery scheme itself,

8    Your Honor.  But we do also have one count of obstruction of

9    justice charge --

10                    THE COURT:  Right.  I want to get to that, but I

11   wanted to get to that after we concluded the bribery scheme

12   because I know that that is alleged in Count 38.  And I do want

13   to discuss that because there is another substantive count

14   which is Count 28 -- I'm sorry.  Not 28 -- Count 25 which is

15   the violation of Section 666(a)(2) which I think we pretty much

16   covered, have we not?

17                    MS. DRAGALIN:  Yes, Your Honor.  We have.

18                    THE COURT:  So we have the appeal being dropped,

19   no money changing hands between Mr. Lee or Lobbyist C or

20   Labor Organization A.

21                    Let me ask what is the status of the Hill Street

22   project?  Did it ever get -- was it ever developed?

23                    MS. DRAGALIN:  No, Your Honor.  Our understanding

24   is it has not yet been -- construction has not commenced, and

25   it has not yet been developed.

```
 1                THE COURT:  So construction was never commenced
 2    on that project?
 3                MS. DRAGALIN:  That is correct.
 4                THE COURT:  All right.
 5                MS. DRAGALIN:  And we believe after -- the
 6    entitlements were approved ultimately, and there were some
 7    efforts by Defendant Lee to sell the property after
 8    entitlements.
 9                THE COURT:  Did it ever comply with the
10    California environmental laws?
11                MS. DRAGALIN:  Since that appeal was dropped, it
12    was no longer something that needed to be addressed by the
13    company, and it proceeded in getting its approvals from the
14    City.
15                THE COURT:  All right.  Did the FBI execute a
16    search warrant for Mr. Kim's phone in March of 2019?
17                MS. DRAGALIN:  Yes, Your Honor.
18                THE COURT:  What was -- what was the result of
19    the -- what was captured from the forensic analysis of the --
20    of his phone?
21                MS. DRAGALIN:  There were text messages between
22    Justin Kim and George Esparza seized that matched the text
23    messages seized from George Esparza's phone.  There were
24    additional text messages seized between Justin Kim and
25    Defendant Lee as well as between Justin Kim and Jose Huizar,
```

1    various other individuals corroborating the allegations in the

2    Indictment.

3                THE COURT:  Was there any communication between

4    Mr. Kim and Mr. Lee after the FBI executed the search warrant

5    on March 5th, 2019, where Mr. Kim and Mr. Lee had a discussion

6    about the FBI's search warrant?

7                MS. DRAGALIN:  Yes, Your Honor.  There were

8    multiple conversations that took place after that date between

9    Justin Kim and --

10               THE COURT:  And what was the sum and substance of

11   those conversations that Mr. Kim intends to testify about with

12   respect to Mr. Lee?

13               MS. DRAGALIN:  Your Honor, we expect not only

14   Justin Kim's testimony regarding those conversations to be

15   introduced at trial but also recordings of the conversations as

16   well because Justin Kim began cooperating with the Government

17   shortly after the search warrant was executed and, therefore,

18   we have transcripts and recordings of the conversations between

19   Defendant Lee and Justin Kim discussing his 940 Hill bribery

20   arrangement and scheme.

21               THE COURT:  Are those conversations in English,

22   or are they in Korean?

23               MS. DRAGALIN:  They were in Korean, Your Honor,

24   and they have been translated into English.

25               THE COURT:  Okay.  Then let's conclude by talking

1    about the -- let me just make sure.  Is it the Government's

2    position that this Lobbyist C had no information or knowledge

3    with respect to the payment -- the alleged payment of the

4    bribe?

5              MS. DRAGALIN:  At this time, Your Honor, we have

6    no evidence to suggest that Lobbyist C had knowledge of the

7    bribery agreement between Jose Huizar, George Esparza,

8    David Lee, and Justin Kim.

9              THE COURT:  All right.  Well, then let's go to

10   Count No. 38, and that count charges a violation of

11   Section 1519.

12             Why don't you briefly summarize the evidence with

13   respect to the falsification or alteration of the books and

14   records of 940 Hill, LLC.  The allegation is the accounting

15   records and the tax records for calendar year 2018 were altered

16   to -- with the intent to impede a grand jury investigation.

17             So who was responsible under the Government's

18   theory for the alteration of those books and records, and were

19   tax returns filed that falsely reported a $500,000 business

20   expense?  And is the Government going to pursue any tax charges

21   in this case?

22             MS. DRAGALIN:  Yes, Your Honor.  So the person

23   responsible for making the alterations to those accounting

24   records were David Lee instructing one of his employees who

25   functioned as his in-house accountant to make those

1    alterations.  There are contemporaneous communications showing

2    that this employee was instructed by Defendant Lee to make

3    those alterations after Defendant Lee had knowledge of the

4    Government's investigation into this bribery scheme.

5              In particular, what the Government expects the

6    evidence will show is that in early March 2019, as the Court

7    mentioned, the Government executed a search warrant for

8    Justin Kim's phone.  In addition, on March 12, 2019, the FBI

9    agents personally served a grand jury subpoena on Defendant Lee

10   giving him knowledge of an ongoing investigation into

11   940 Hill, LLC.  Thereafter, a week later e-mail evidence shows

12   that Defendant Lee then instructed his employee to make

13   revisions to the tax filings that were due in April 2019 and

14   that, over the course of the next few days, the instructions

15   became more specific in how -- the amount to modify and how to

16   represent the $500,000 payment.

17             THE COURT:  And were tax returns filed containing

18   what the Government believes to be false information?

19             MS. DRAGALIN:  Yes, Your Honor.  940 Hill, LLC,

20   did submit a tax return in April 2019 with -- which included a

21   line item for a $500,000 expense.

22             THE COURT:  Is the Government going to pursue

23   charges against 940 Hill for the false return or Mr. Lee for

24   aiding and abetting the preparation of a false return?

25             MS. DRAGALIN:  At this time, Your Honor, we are

1    still investigating that aspect of the case.  But at this time

2    we do not anticipate bringing those tax charges.

3              THE COURT:  And I take it -- correct me if I'm

4    wrong -- that these accounting records, at least the accounting

5    records were provided to the grand jury in response to the

6    grand jury subpoena?

7              MS. DRAGALIN:  Yes, Your Honor.  We have copies

8    of QuickBooks records, electronic accounting records which have

9    metadata showing the dates that certain entries were made.  And

10   based on that information, the Government alleges that the

11   accounting records were altered in April 2019.

12             THE COURT:  Did Mr. Lee testify before the grand

13   jury?

14             MS. DRAGALIN:  Mr. Lee did not, Your Honor.

15             THE COURT:  Was Mr. Lee represented by counsel in

16   connection with the providing of this information to the grand

17   jury?

18             MS. DRAGALIN:  940 Hill, LLC, was the entity that

19   was subpoenaed for records, and it was represented by its

20   current counsel.

21             THE COURT:  Okay.  Is there anything else that

22   would be helpful to understanding the Government's allegations

23   in Count 38?

24             MS. DRAGALIN:  Just the recorded conversations

25   between David Lee and Justin Kim, Your Honor, corroborate the

1  fact that Defendant Lee had an intent to obstruct the

2  investigation and to hide the corrupt arrangement that was

3  made, and those recorded statements also corroborate that

4  David Lee had knowledge that the money and the arrangement

5  connected directly to Jose Huizar.

6            THE COURT:  All right.  Anything else in terms of

7  the Government's evidence either in terms of the bribery scheme

8  or the substantive Count 38 that the Government wishes to add?

9            MS. DRAGALIN:  No, Your Honor.

10            THE COURT:  All right.  Then let me ask a couple

11  questions to hopefully assist Mr. Neuman.

12            Did the defendant make any post-arrest

13  statements?

14            MS. DRAGALIN:  No post-arrest statements,

15  Your Honor.

16            THE COURT:  Was -- did the defendant participate

17  in any proffers?

18            MS. DRAGALIN:  No, Your Honor.

19            THE COURT:  And were any of the defendant's calls

20  intercepted by the Government?

21            MS. DRAGALIN:  No, Your Honor.

22            THE COURT:  So the calls that you are referring

23  to are all conversations that were consensually recorded by

24  Mr. Kim or other cooperating witnesses?

25            MS. DRAGALIN:  They were in-person meetings that

1  were recorded.

2           THE COURT:  Okay.  Were there any telephone calls

3  that were recorded?

4           MS. DRAGALIN:  No, Your Honor.

5           THE COURT:  So all these were in-person meetings.

6  Is it video or audio?

7           MS. DRAGALIN:  Only audio.

8           THE COURT:  Okay.  And searches, were any search

9  warrants executed either as to Mr. Lee or 940 Hill?

10           MS. DRAGALIN:  No.  Not as to those two

11  defendants.

12           THE COURT:  And what is the status of discovery?

13           MS. DRAGALIN:  Your Honor, we met and conferred

14  with defense counsel yesterday to facilitate the quick

15  production of documents which are prepared and ready.  Defense

16  counsel has already sent a hard drive to the Government, and we

17  will copy all of the discovery to produce.  In addition, we are

18  working through with this new defendant and additional ones

19  regarding the protective order and signing on to be bound by

20  the terms of the protective order entered in this agreement.

21  So we expect discovery to be made shortly.

22           It is very voluminous as we will be making

23  available to all defendants consistent discovery, meaning the

24  discovery that has been produced to date to Jose Huizar will be

25  made to the new defendants as well.  And that is close to

1   2 million pages of discovery as well as thousands of files of

2   audio recordings, wire interceptions, and various other

3   voluminous files.

4            THE COURT:  Mr. Lee is only involved in the

5   Hill Street bribery?

6            MS. DRAGALIN:  Correct, Your Honor.

7            THE COURT:  All right.  What's the -- is Mr. Lee

8   a citizen?

9            MS. DRAGALIN:  I believe he is, Your Honor.

10           THE COURT:  All right.  Mr. Neuman, I'm sure

11  you're aware that the trial date in this matter is set for June

12  of 2021, and there are various other dates for pretrial

13  motions.  What I am going to suggest to you is, as I suggested

14  to Mr. Braun who represents Mr. Chan, is to take the next

15  couple weeks and review the discovery in this case and then

16  meet with all counsel to review those dates.  And to the extent

17  those dates are going to be problematic or difficult to meet,

18  come to some agreement and submit that agreement to the Court

19  if a continuance is going to be necessary.

20           Is that something that sounds fair?

21           MR. NEUMAN:  Yes.  Thank you, Your Honor.

22           I'm looking at the dates now from docket 63 and

23  anticipate that some of them would be problematic.

24           THE COURT:  Okay.  So I am going to leave it up

25  to Government counsel, Mr. Braun, and you as well as

1    Mr. Huizar's lawyers from the public defender's office to meet

2    within the next couple of weeks to discuss the discovery and

3    the dates that have been set.

4               We do -- there is -- I understand from

5    Mr. Jenkins on Friday that apparently Co-defendant Mr. Huang,

6    H-u-a-n-g, is not going to join us for this proceeding, and I

7    forget -- maybe Mr. Jenkins can enlighten me or the prosecutor

8    can enlighten me.  We have Shen Zen New World One, LLC.  Is

9    that defendant going to be part of this case, and when is the

10   PIA for that defendant because I don't want to -- I don't want

11   to have all you folks get together and not have all the

12   parties.

13              When is that PIA scheduled?

14              MS. DRAGALIN:  It is scheduled for next Monday,

15   December 14th, and we have been in contact with counsel

16   representing the company.

17              THE COURT:  I don't think it's going to be

18   necessary to have a Trial Setting Conference in connection with

19   that case unless Government thinks otherwise.

20              MS. DRAGALIN:  Your Honor, counsel for the LLC is

21   relatively new in representing the company.  If they find it

22   helpful, the Government is happy to have a Trial Setting

23   Conference to go through some of the evidence that --

24   especially evidence that was not covered on Friday in terms of

25   trips to Las Vegas or any other things that have not already

1   been discussed in the most recent hearings, but I would leave

2   it up to the Court.

3                    THE COURT:  All right.  Well, I certainly think

4   you can discuss that without the necessity of a -- without the

5   necessity of a hearing.

6                    It is correct that the individual defendant

7   Mr. Huang is not going to -- he's currently in China and

8   doesn't intend to participate in this case?

9                    MS. DRAGALIN:  As of right now that is our

10  understanding, Your Honor.

11                   THE COURT:  I often have described that as

12  exercising a defendant's jurisdictional objection by not

13  showing up.

14                   All right.  Mr. Neuman, is Mr. Lee a citizen?

15                   MR. NEUMAN:  Yes, he is, Your Honor.

16                   THE COURT:  And what is his -- what is his --

17  what bond was set?

18                   MR. NEUMAN:  A $300,000 unsecured bond was set

19  signed by his wife.  Everything was taken care of and approved

20  yesterday.

21                   THE COURT:  All right.  I don't think I have

22  anything else.

23                   The -- let me ask you.  Apparently you were

24  representing at least the LLC in connection with the grand jury

25  proceedings; is that correct?

1                    MR. NEUMAN:  That is, Your Honor.

2                    THE COURT:  So you have -- you're not new to this

3    case.  You have some degree of familiarity with the case at

4    least as it existed back in 2019.  The question I have, is

5    there any dispute regarding the fact that the appeal was filed

6    by the Labor Organization in August of 2016?  It seems to me

7    that's really not in dispute in this case.

8                    MR. NEUMAN:  Whether the appeal was filed?  As

9    far as I know, there is no dispute, but I want to obviously

10   look at the Government's evidence before I concede anything.

11                   THE COURT:  I'm not asking you to concede.  I'm

12   just trying to get a sense of what's in dispute.  And, also, it

13   appears that there doesn't seem to be any real dispute that in

14   March of 2017 the appeal was dropped.  It seems to me there's a

15   lot of discovery or a lot of evidence in terms of why that

16   appeal was dropped, and I'm still not convinced in my own mind

17   why it was dropped.  But it doesn't seem to be in dispute.

18                   MR. NEUMAN:  Consistent with my understanding is

19   that approximate timing is when the appeal was dropped.

20                   THE COURT:  Let me just go back for one minute.

21                   In October -- my notes indicate and I don't know

22   where I -- I have written down overt act, but I didn't write

23   down the number.  I can't read my own handwriting.  It looks

24   like it's maybe 115 -- that Mr. Huizar and Mr. Kim had a

25   meeting and Mr. Huizar was complaining to Mr. Kim that he

1  hadn't received the $200,000 portion of the bribe that was

2  going to be paid to him because Mr. Esparza was holding on to

3  the cash.  You told me that ultimately Mr. Esparza gave it to

4  whoever this individual was, executive director.

5           But did Mr. -- I thought somewhere I had read

6  that Mr. Huizar decided that, although he was wondering where

7  his share was, that he ultimately concluded that, because of

8  the FBI investigation, that he didn't want any part of the

9  $200,000.  Am I misremembering that?

10          MS. DRAGALIN:  Your Honor may be thinking about

11 the false statements charged against Jose Huizar in which he

12 represented to the Government during proffer interviews that he

13 did not want any share of the $200,000.  The Government alleges

14 that those were false statements because his actions throughout

15 the time period were consistent with someone who continuously

16 attempted to get the $200,000.

17          THE COURT:  So he never gave up on his efforts to

18 obtain the $200,000 from Mr. Esparza?

19          MS. DRAGALIN:  Correct.  In October 2018 he was

20 still engaging in multiple efforts to get that money from

21 George Esparza, and just a month later the Government executed

22 search warrants on November 7, 2018, after which time

23 Mr. Huizar's behavior changed.

24          THE COURT:  So what I will do in the next couple

25 days, Mr. Neuman, is I'm going to issue the Criminal Trial

1    Order which I'm certain that you are familiar with, but I am

2    only going to include in there the current trial date.  I'm not

3    going to list all the other dates.

4              Based on our conversation this morning, I will

5    expect that you and other defense counsel will meet with the

6    Government hopefully by the end of December -- or early January

7    may be more realistic -- come up with some indication as to

8    whether or not the dates are going to work or, if they are not

9    going to work, what proposal everyone is making in terms of any

10   new dates.

11             MR. NEUMAN:  Understood, Your Honor.

12             THE COURT:  All right.  Anything else from

13   Mr. Neuman?  I know I didn't hear too much from you, but I hope

14   this was helpful to you in understanding what the Government's

15   theory is.

16             MR. NEUMAN:  It was.  Thank you, Your Honor.

17   Obviously we have a lot to digest and things to talk about with

18   the Government and my client, and we will come back to the

19   Court if appropriate.

20             THE COURT:  All right.  Anything else from the

21   Government?

22             MS. DRAGALIN:  No, Your Honor.  Thank you.

23             THE COURT:  All right.  Then we will close the

24   record, and thank you very much.  Everybody stay safe, and

25   hopefully we will be able to see each other in person sometime

1    after we get vaccinated.  I guess -- in any event, we will

2    close the record.

3                    MS. DRAGALIN:  Thank you, Your Honor.

4                    MR. NEUMAN:  Thank you, Your Honor.

5                    MR. JENKINS:  Thank you, Your Honor.

6                    (Proceedings concluded at 9:09 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.


                    DATED THIS  10TH  DAY OF DECEMBER, 2020.



                    /S/ MIRANDA ALGORRI
                    _____
                    MIRANDA ALGORRI, CSR NO. 12743, CRR
                    FEDERAL OFFICIAL COURT REPORTER