Exhibit A

 1              **UNITED STATES DISTRICT COURT**

 2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

 3          **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

 4

 5   **UNITED STATES OF AMERICA,**          )
                                            )
 6              **PLAINTIFF,**              )     **CASE NO.**
                                            )
 7              **vs.**                     )     **CR 20-326-JFW**
                                            )
 8   **JOSE LUIS HUIZAR, et al.,**          )
                                            )     **PAGES 1 TO 40**
 9              **DEFENDANTS.**             )
     _____)

10

11

12

13                   **REPORTER'S TRANSCRIPT OF**
                          **STATUS CONFERENCE**
14                     **MONDAY, MAY 10, 2021**
                            **8:08 A.M.**
15                   **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22
     _____
23
                 **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24               FEDERAL OFFICIAL COURT REPORTER
                 350 WEST 1ST STREET, SUITE 4455
25               LOS ANGELES, CALIFORNIA 90012
                   MIRANDAALGORRI@GMAIL.COM

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         NICOLA T. HANNA
          UNITED STATES ATTORNEY
5         BY:  MACK JENKINS
          BY:  VERONICA DRAGALIN
6         BY:  MELISSA MILLS
          Assistant United States Attorneys
7         United States Courthouse
          312 North Spring Street
8         Los Angeles, California 90012

9

     **FOR THE DEFENDANT HUIZAR:**
10
          HILARY L. POTASHNER
11        FEDERAL PUBLIC DEFENDER
          BY:  CAREL ALE
12        BY:  CHARLES SNYDER
          Deputy Federal Public Defenders
13        Central District of California
          321 East Second Street
14        Los Angeles, California 90012

15
     **FOR DEFENDANT CHAN:**
16
          BRAUN & BRAUN, LLP
17        BY:  HARLAND BRAUN
          10880 Wilshire Boulevard
18        Suite 1020
          Los Angeles, California 90024
19

20   **FOR THE DEFENDANT SHEN ZHEN NEW WORLD I:**

21        LAW OFFICES OF RICHARD M. STEINGARD
          BY:  RICHARD M. STEINGARD
22        800 Wilshire Boulevard
          Suite 1050
23        Los Angeles, California 90017

24

25

1      **APPEARANCES OF COUNSEL CONTINUED:**

2

3   **FOR THE DEFENDANTS LEE AND 940 HILL:**

4        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
         BY:  ARIEL A. NEUMAN
5        1875 Century Park East
         23rd Floor
6        Los Angeles, California 90067

7

    **KOREAN INTERPRETERS:**
8
         Julie Wagner
9        Annie Lee

10

    **ALSO PRESENT:**
11
         Special Agent Andrew Civetti
12       Special Agent Barbara Johnson
         Special Agent Tony Logan
13

14

15

16

17

18

19

20

21

22

23

24

25

1          **LOS ANGELES, CALIFORNIA; MONDAY, MAY 10, 2021**

2                        **8:08 A.M.**

3                          **---**

4

5          THE CLERK:  Calling CR 20-326(A)-JFW,

6   United States of America versus Jose Luis Huizar, et al.

7          Counsel, please state your appearances.

8          MR. JENKINS:  Good morning, Your Honor.

9          Mack Jenkins, Veronica Dragalin, Melissa Mills on

10  behalf of the United States, all at counsel table.  Also from

11  the FBI, Special Agents Andrew Civetti, Tony Logan, and

12  Barbara Johnson in the audience.

13         MS. ALÉ:  Good morning, Your Honor.

14         Carel Alé and Charles Snyder from the Federal

15  Public Defender's Office representing Mr. Jose Huizar who is

16  present and out of custody.

17         MR. BRAUN:  Good morning, Your Honor.

18         Harland Braun, B-r-a-u-n, for Mr. Chan who is

19  present.

20         THE COURT:  All right.  Mr. Braun, good to see

21  you.  I hope you're feeling better.

22         MR. BRAUN:  I am.  Thank you, Your Honor.

23         MR. STEINGARD:  Richard Steingard for Shen Zen

24  New World.

25         MR. NEUMAN:  Good morning, Your Honor.

```
 1              Ariel Neuman for Dae Yong Lee who is here being
 2   assisted by the Korean interpreter and 940 Hill, LLC.
 3              THE COURT:  Would the Korean interpreters state
 4   her appearance, spell her name, and confirm that their oaths
 5   are on file.
 6              INTERPRETER WAGNER:  Good morning.  My name is
 7   Julie Wagner, court certification number 300979.  My name is
 8   spelled J-u-l-i-e W-a-g-n-e-r.
 9              INTERPRETER LEE:  Good morning, Your Honor.  The
10   other interpreter for the Korean language, Annie Lee, 301157,
11   oath on file.  Thank you.
12              THE COURT:  All right.  Good morning to all.
13              This matter is on the Court's calendar for a
14   status conference.  At our last status conference on April 5th,
15   we discussed the stipulation that had been submitted or filed
16   by counsel in the end of March setting forth various pretrial
17   deadlines as well as a May 24th of '22 trial date.  At the
18   hearing we discussed the proposed schedule and the trial date,
19   and as a result of those discussions, we continued the matter
20   until today so that counsel can have an opportunity to meet and
21   confer and arrive at some new dates consistent with or at least
22   more consistent with what I had indicated that was my desire to
23   conclude the pretrial motion practice by the end of this year
24   and have a trial date in 2022.
25              The parties did meet and confer, and I appreciate
```

1    your efforts in that regard.  The result of that meet and

2    confer was a joint status report regarding a request for

3    setting a trial and the related dates that was filed on May 5th

4    and appears as docket No. 182.

5              The parties have agreed to various dates that are

6    set forth in the stipulation as well as the proposed order

7    which is docket No. 182-1 with the exception of four categories

8    of documents or four categories of deadlines that we will

9    discuss this morning.

10             The parties are closer to what I had discussed in

11   terms of my preference in terms of dates, but I appreciate

12   counsel's efforts, and I am agreeable to the pretrial motion

13   which you have now separated into severance motions and

14   dismissal motions and suppression motions.  As I indicated at

15   the last hearing, I viewed the suppression motions to be

16   perhaps more complex than the other motions.

17             I don't know why we have a hearing date for all

18   of the pretrial motions, the severance motions, and the motions

19   to dismiss on November 15th.  Perhaps someone can enlighten me

20   for why, if we have the severance motions that are going to be

21   filed on August 9, oppositions September 7th, and the

22   oppositions on the 27th, why we can't have a hearing on those

23   motions in October rather than waiting for the next series of

24   motions which are presumably going to be the motions to dismiss

25   and then hear all of those motions in November.

1          MR. STEINGARD:  Your Honor, I'm guilty of that.

2    This was my idea.  We thought that the Court might -- can I

3    take -- am I allowed to take this off when I talk to you?

4          THE COURT:  Sure.

5          MR. STEINGARD:  Thank you.

6          This was my idea that you would want to handle

7    all of -- the hearing on the motions at one time as opposed to

8    bifurcated due to severance and then come back and do the

9    motion to dismiss.  We for sure can set up an extra pretrial

10   motions hearing date for just the severance motions if you

11   prefer that.

12         THE COURT:  I would prefer having -- of course it

13   depends upon how many are going to be filed.  If there's one

14   severance motion, then it's easy to hear on the same date as

15   the motion to dismiss.  But since I'm not going to ask counsel

16   to commit in terms of what you're going to file, I think I

17   would rather have a separate earlier hearing date for the

18   severance motions.  That way I can start working on those

19   motions, have the hearing date, get those motions resolved and

20   decided, and then move on to the next batch of motions which

21   are going to be the motions to dismiss.

22         That hearing date of November 15th makes sense in

23   light of the fact that the replies are going to be due on

24   October 25th.  It doesn't give me a whole lot of time for the

25   hearing.  But to the extent that I find that I can't accomplish

1    what I need to accomplish to rule on the 15th, I may continue

2    it, but that date is fine.

3              So I would think that we could have perhaps an

4    October 15th hearing date on the severance motions.  Those

5    replies are due on September 27th, and October 15th should give

6    me enough time to rule on the severance motions.

7              MR. STEINGARD:  Can we do this, Your Honor, just

8    so we don't all start grabbing calendars and looking and going

9    back and forth, can we look at your October 15th hearing date

10   and submit a revised stipulation?

11             THE COURT:  Sure.  That's what I had hoped we

12   would do is talk about some of these dates and prepare a

13   revised stipulation although I don't think there will be that

14   many changes.

15             The suppression motions, the dates for filing

16   November 1st, December 6th for the oppositions, the replies

17   January 3rd, and a hearing on January 31st, I think those dates

18   make sense.  To the extent that I can hear those earlier, I

19   just may simply advance the January 31st hearing date.  But for

20   purposes for the next stipulation, why don't we just keep those

21   dates fixed.

22             Mr. Steingard, you're going to be in charge of

23   this redrafting?

24             MR. STEINGARD:  Usually it is the Government, but

25   I will take it on.

1              THE COURT:  Okay.  Lead counsel for the defense?

2              MR. STEINGARD:  Sure.

3              THE COURT:  Then why don't you remain at the

4    lectern so we can discuss these.

5              The next issues that are raised, I actually have

6    an issue with the next category.  And I hate to -- I hate to

7    talk about dates that have been agreed to, but for my own

8    purposes, I'm going to ask the Government, in terms of the

9    expert disclosure, we have December -- I'm sorry --

10   February 1st of next year.  I find that in these -- in most

11   cases, that the expert testimony typically raises a number of

12   issues that entail or involve a substantial amount of time on

13   behalf of counsel as well as the Court to resolve.

14             My question to the Government today this morning

15   is what experts do you intend to call and what subject matters,

16   how many, and why can't we have those experts designated by,

17   say, December 1st?

18             MR. JENKINS:  Yes, Your Honor.  The first way to

19   answer that question is we believe --

20             THE COURT:  You can remain seated.  Just pull the

21   microphone closer.  I know it's awkward because you're taller

22   than most to lean into the microphone.

23             MR. JENKINS:  Thank you, Your Honor.

24             The first way we would answer is part of the

25   reason we set that date is we also believe it's helpful to

generally only notice experts that we intend to use obviously, and so we had planned to schedule the notice date sometime after the suppression hearing date, and that's the first basis for why it chronologically follows the motion to suppress hearings.  For example, if the Court excluded certain phone extractions which are done via a Cellebrite program, there may not be a need for a Cellebrite expert.  So that is why chronologically it falls in there.

         To answer Your Honor's specific question, generally the experts we anticipate at this point very broadly to call would be various experts on city processes such as planning, the management and operation of city committees such as the Planning and Land Use Management Committee that Defendant Huizar chaired.

         We also would intend to call various law enforcement experts related to law enforcement executions, again, perhaps of a Cellebrite extraction, the installation of an audio/video bug in Defendant Chan and Co-defendant George Chang's office.  There will also be potentially language experts.  Defendant Chan and Defendant Lee both are intercepted speaking their native language.  So there would be authenticated or the need to authenticate transcripts.

         The others I can think of right now -- I think those are the most significant ones right now.  So generally we can outline most of that and their anticipated testimony.

1          THE COURT:  Well, the problem that I anticipate

2     with some of these experts, although the -- they don't sound

3     like they fall into what I have characterized in other cases as

4     the guilt experts, the -- I require -- after the experts are

5     disclosed, I require an offer of proof as to what the expert is

6     going to testify to, and then I require counsel to meet and

7     confer and prepare a joint statement as to what counsel

8     believes is admissible and what counsel believes is not

9     admissible.  And then I have a series of hearings to hopefully

10    resolve those issues well in advance of trial so that, when the

11    expert gets on the stand, everybody knows exactly what the

12    opinions are that that expert is going to express, and defense

13    counsel, having all of that information available to them, are

14    then prepared to conduct a cross-examination of those experts.

15          So given what you have told me, it sounds to me

16    like this is going to be a significant -- there's going to be a

17    significant number of experts, and I want to start this process

18    earlier than later because I know from experience that these --

19    that these -- this type of expert testimony is typically hotly,

20    hotly contested.

21          For example, I don't know why you need a law

22    enforcement expert to talk about the bug.  You had a law

23    enforcement person who actually did the installation.  So what

24    kind of expertise does one need in order to tell the jury on a

25    certain day pursuant to a court order whatever happened in

1    terms of how the bug was installed, it was installed.  It was

2    operational.  And the result of the bug was presumably a video

3    that you're going to offer to the jury.  I don't see that's any

4    kind of expert testimony unless I'm missing something.

5               MR. JENKINS:  I don't think, Your Honor -- that

6    is what I was going to point out.  I believe the descriptions

7    are different than many experts where largely they will be

8    noncontroversial.  And, you know, not speaking on behalf of

9    counsel, but I believe we can resolve much of this in advance

10   of trial.

11              I think it's different than sort of the guilt

12   experts, as Your Honor pointed out, that this is a racketeering

13   case against a gang alleging that they participate in

14   kidnappings and murders and we had an expert talking about the

15   gang involved in these types of activities --

16              THE COURT:  And all the coded language that goes

17   along with the --

18              MR. JENKINS:  Indeed.  And then inferring that

19   these defendants are essentially members of the enterprise

20   simply because they're a member of the gang.  We are sort of in

21   a different racketeering arena, as I see it.  So I think, as I

22   pointed out, I believe much of these are foundational experts,

23   technical experts, sort of chain-of-custody experts that can be

24   resolved.  We're certainly happy to begin that process now to

25   discuss those things and see whether or not those things can be

```
 1    reached by stipulation and then would obviate the need for any
 2    sort of additional filings or expert notice.
 3              THE COURT:  Let me ask Mr. Steingard.  Are the
 4    defense experts contemplated to be responsive to the defense --
 5    to the Government's experts, or do you have a whole -- does the
 6    defense team have a whole litany or list of experts on other
 7    issues?
 8              MR. STEINGARD:  Your Honor, to the extent that we
 9    have collaborated, we haven't even gotten to experts yet.  We
10    have had some general conversations as a team.  We have
11    broached some subjects that are mutual to all of us, but nobody
12    is putting pen to paper on who is calling which experts at this
13    juncture.  I suspect from the sounds of what Mr. Jenkins is
14    talking about, like, there will be potential issues with the
15    city -- what you call the city processes expert depending on
16    how far they go and what they have to say.  Law enforcement
17    extraction of Cellebrite, I can't imagine there would even be
18    an expert and the language expert.
19              To the extent the Government will tell us what
20    they are using, we will know well in advance whether we're
21    going to have language issues, and we can resolve those, I
22    would think, among ourselves and litigate that with Your Honor.
23              THE COURT:  Well, yeah.  In terms of any language
24    issues, with respect to translations, again, I require counsel
25    to meet and confer, go over each of the transcripts that are
```

1   going to be used at trial, and resolve any disputes if there's

2   a foreign language involved.  And if you can't resolve the

3   disputes, prepare a joint statement, and I will resolve it.

4         Again, all of this is with a view toward

5   streamlining what looks to be like a long trial.  And these

6   case management techniques eliminate a lot of the issues at

7   trial so we can really focus on what, in my view, matters in

8   this case.

9         MR. STEINGARD:  I think I'm speaking for the

10  defense.  We're in complete agreement front-ending these issues

11  now will make the trial much smoother.  We're spilling over a

12  little bit into the witness and exhibit list.  We're going to

13  get to that in a minute.  But what you're talking about doing

14  with, for instance, the language interpretations and

15  translations, we are completely in favor of.

16        So I would say, to the extent Your Honor wants to

17  advance the February 1 date, I think we can speak for all

18  defense counsel we're in agreement with that.

19        THE COURT:  What I was going to suggest, the

20  Government's expert disclosure take place on November 1st and

21  defense experts on January 1st.

22        MR. STEINGARD:  May I suggest, Your Honor, just

23  to push it away from the holiday a little bit, for the defense

24  side can we make that perhaps a January 15 date?  And, again, I

25  don't want to mislead the Court.  To the extent we have experts

```
 1    that we know we're going to call, I don't think it's an issue.
 2    That may still be in play when we get to January.  But we
 3    should have a much better idea by then.  So we would ask -- I
 4    would propose, if you don't mind, giving us a little bit of
 5    time after the holidays.
 6                As it is right now, we agreed to our reply briefs
 7    for the suppression motions to run through the holidays.  We
 8    would prefer not to have to deal with experts during that time
 9    as well.
10                THE COURT:  Mr. Jenkins, what about the
11    Government's disclosure?  If we're looking at January 15th for
12    the defense, I would assume the Government -- I would agree to
13    a December 15th disclosure for the Government.
14                MR. JENKINS:  Yes.  That would be our request,
15    Your Honor, and we can meet that date.
16                THE COURT:  All right.  Then those will be the
17    dates for the expert.  The Government disclosure December 15th
18    and the defense disclosure on January 15th.
19                And, again, these dates, if it becomes impossible
20    or if there's some extraordinary event that happens that these
21    dates need to be moved, I'm just trying to get a sense now of
22    what I view my work to be and counsel's work to be to try to
23    get this case ready for trial.
24                MR. STEINGARD:  Very good.
25                THE COURT:  The motion in limine dates are fine.
```

1   Hearing dates are fine.  The final transcript and translations,

2   those are fine.  *Jencks* Act for the Government and defendant

3   are fine.  The charts and summaries are fine.  The defense

4   witness list and the defense exhibit list are fine.  I assume

5   that the dates are close to what you have asked for in terms of

6   the commencement of the trial that that will give the

7   Government sufficient time given the trial estimate to review

8   the exhibits.

9           Although I may -- depending on when we get

10  closer, I may move up the defense exhibit list.  Again, it

11  seems -- it appears to me that, once the Government discloses

12  its exhibits and counsel have an opportunity to go through the

13  meet-and-confer process with respect to the trial exhibits,

14  it's been my experience that the defense, who may be

15  contemplating a number of exhibits, those may fall off the list

16  in light of what the Government is going to produce or is going

17  to intend to offer.  In any event, those dates are fine.  The

18  final pretrial conference, I would rather do it on May 13th

19  rather than May 16th.

20          So that then leads us to the areas that counsel

21  couldn't agree upon.  The first of those areas -- I will

22  address this to Mr. -- address to both counsel.  The Government

23  exhibit list and the witness list, I'm not going to order a

24  June deadline for the production of the exhibit list or the

25  witness list.  I'm also not going to delay those until April.

1        My thought is that the Government should be in a

2   position to provide its exhibit list by the end of January of

3   next year.  And, again, these dates are important, but to the

4   extent that the Government has expressed in the stipulation a

5   concern that they are not going to be able to know all of their

6   exhibits, I hear what you're saying.  But I think the bulk of

7   the exhibits are probably already known.

8        We've been working on this case for a long time.

9   As we get closer to trial, to the extent that the exhibit list

10  doesn't contain certain exhibits because they recently were

11  produced or recently discovered or if there was some

12  inadvertence by not including them on the list, certainly

13  you're not going to be bound by the exhibit list.

14        What we're trying to do is get the bulk of the

15  exhibits to the defense so counsel can begin the

16  meet-and-confer process which I'm going to set forth in an

17  amended Criminal Trial Order so that, as we move closer, we're

18  going to have a resolution in terms of those exhibits with the

19  hope that the majority of them will simply be stipulated to and

20  will be received into evidence on the first day of trial, and

21  then we're not going to have any issues with respect to trial

22  exhibits.

23        Obviously, if there's an objection to a trial

24  exhibit where you can't resolve it, I'll resolve it.  But it

25  seems to me in a case like this there will be very few

1  disputes.  Once the defense gets -- once the defense lawyers

2  have the exhibits and look at the exhibits and are able to

3  discuss the exhibits with their respective clients, they're

4  either going to be, okay, this is fine, we may need this or we

5  may need that but we can take it off the list of disputes and

6  then we can move the ball down the road so, as I said, when the

7  trial begins, we're going to have no disputes.

8           I will hear from Mr. Jenkins as to -- the

9  January 25th, 2022, date is earlier than the April 22nd date.

10  Go ahead.

11           MR. JENKINS:  That is correct.  And, first off,

12  we appreciate and agree with Your Honor.  Part of our concern

13  was simply trying to educate the parties and the Court of what

14  the trial is going to look like without at the same time

15  binding our hands to, as the Court pointed out, recently

16  produced, recently discovered or inadvertent lack of

17  disclosure.

18           So we are comfortable with advancing the date.  I

19  think we can meet it.  But our corollary concern is

20  particularly, if this happens prior to the motion to suppress,

21  there may be either schemes that are charged -- this is a

22  multiple scheme racketeering case.  There are multiple searches

23  executed at locations from phones.  If sort of post-loss of the

24  Government's cases -- and I'm certainly not wishing this upon

25  the Government, but if we were to lose certain portions of the

1    case, the exhibit list as to those items becomes sort of a

2    waste of time for everyone.

3            THE COURT:  It's real easy.  They just are taken

4    off the list.  They're gone.

5            MR. JENKINS:  Prior to that occasion, it would be

6    less helpful for parties to prepare on that.  I'm asking for a

7    little bit after or if the Court would advance the suppression

8    hearing so we can have some window --

9            THE COURT:  But the meet-and-confer process isn't

10   going to take place until sometime after the initial -- what

11   the amended Criminal Trial Order does is requires the

12   Government to prepare a list of trial exhibits.  Then that list

13   is given to defense counsel.  Then there's a period of time for

14   the defense counsel to review that list in which case, if I

15   made adverse rulings to the Government, that period of time you

16   can just take those exhibits off the exhibit list.  Then

17   there's the meet-and-confer process and then the preparation of

18   the joint pretrial exhibit stipulation which sets forth those

19   exhibits to which there are no objection and those exhibits to

20   which there are objections.  And then that's the working

21   document that we keep relying on as we go forward to prepare

22   for trial.

23            It may be a little extra work for the Government,

24   but I don't think that, given the strength and depth of your

25   team, I don't think it's going to be too difficult to

1  accomplish.

2              MR. JENKINS:  I appreciate that and don't

3  disagree with the last comment.  I would just point out and

4  then I would submit that the defense may be moving to exclude

5  otherwise admissible evidence that they don't have objections

6  to foundationally or otherwise but may feel that they should

7  suppress based off constitutional violations.  So it seems like

8  it would be doubling up on the defense's work as well to have

9  sort of the parallel process going on where they don't need to

10  object to exhibits that are being excluded or --

11              THE COURT:  But I will have a ruling on the

12  suppression motions on January 31st.

13              MR. JENKINS:  That is correct, Your Honor.  And

14  then the disclosure date would be --

15              THE COURT:  If you want -- I will put the

16  disclosure date February 15th.  I don't think it's going to be

17  that helpful.  But if that's what you're concerned about,

18  February 15th.

19              MR. JENKINS:  Thank you, Your Honor.  We

20  appreciate it.

21              MR. STEINGARD:  Your Honor, you're going the

22  wrong direction from the defense standpoint.  Let me just

23  explain a couple things.  One of the -- the premise I think of

24  your setting these dates may not be factually correct and that

25  is you think -- you're under the impression, I think, that the

1  defense pretty much knows what the Government's exhibits are

2  going to be.  Nothing could be further from the truth.

3             The Government has given us 93,000 line sheets.

4  We don't know which -- those are the wiretaps.  We don't know

5  which recordings they're relying on, which ones they are going

6  to use.  They have had translated or transcripts of snippets of

7  some of those wiretaps, not the complete wiretap unless they're

8  going to perhaps use the whole thing.  Right now we don't know

9  which wiretaps they're going to use.  We don't know which

10 e-mails they're going to use.  We don't know which text

11 messages they are going to use.

12             We have been given over 2 million pages of

13 documents with 452 overt acts and said essentially our case is

14 in there, and we are spending a phenomenal amount of time

15 trying to figure out what the Government is going to use.  I

16 don't mean to take up all your time, but can I give you one

17 example, Your Honor?

18             THE COURT:  Sure.

19             MR. STEINGARD:  So there was a -- the Government

20 gave us about over a million pages of documents that were given

21 to them pursuant to subpoenas during the course of their

22 investigation.  There are 83 different custodians I think who

23 produced -- either individuals or entities that produced

24 documents.  One of those entities -- most of them I have never

25 heard of.  But one of those entities is called -- it's an

1    architectural firm called Dimarzio Cato, D-i-m-a-r-z-i-o

2    C-a-t-o.  Dimarzio Cato did some work as an architecture firm

3    for my client Shen Zen.  So when I saw that name, it related to

4    my case.

5              Dimarzio Cato turned over 12,000 pages of

6    documents, primarily e-mails.  I began to review 12,000 pages

7    of e-mails.  It's not like you can search for them, and I don't

8    even know what I'm looking for.  But during that course of that

9    search -- and, by the way, I'm only halfway through it.  During

10   the course of that search, I found an e-mail from a man named

11   Jeff Dimarzio, one of the partners of the firm to Raymond Chan.

12   That e-mail Bates stamped 715172 -- that's the page number --

13   that e-mail contains an expression, a statement by Mr. Dimarzio

14   to Mr. Chan which says -- and I'm reading it --

15   "Chairman Huang's idea is to test the maximum allowable

16   development for its property."

17              Ordinarily I wouldn't even think of that as

18   having any consequence, but it just so happens that is overt

19   act 57 in the Indictment.  There is no way I could have known

20   that.  There is no way I would have found that.  In fact, it

21   was a bit of a fluke because, when you're looking at

22   12,000 pages of e-mails, you move pretty quickly.  And this one

23   I happened to stop and read, and I found overt act 57.

24              We're doing that exercise with 452 different

25   overt acts which the Government has told us is a roadmap for

their case.  For some of them, when they say a particular

person said a particular thing, we can try and expedite the

process by going to that particular wiretap for that particular

individual, and we can find it.  It's not an easy process, but

we can get there relatively quickly.

But for others, Your Honor, this is -- this is

what we're spending our time doing.  We are spending our time

not preparing the defense but trying to figure out what the

Government's case is based on.

I say all this, Your Honor, because the

Government has made this presentation to the grand jury.  They

know where every Bates stamp number, every conversation that

they're going to use is.  We are not saying to the Government

give it to us on June 15th and it's a final exhibit list.

That's what happened in *Grace*.  Your Honor actually has the

authority to do that.  That's not what we're asking for.  We're

asking for a good faith exhibit list now, a good faith witness

list now so we can begin the process of, instead of searching

constantly for the next overt act, we can begin looking for the

evidence to rebut or clarify or refute that particular overt

act.

So I'm sounding like I'm begging, and it's not

that far from it.  We are asking the Court for the earliest

possible witness and exhibit list to expedite our preparation.

It just isn't a simple process.  This is not the typical case

1    by any stretch, and we have already talked about that.

2              THE COURT:  But it's -- I hear what you're

3    saying.  I certainly sympathize with you in terms of the amount

4    of materials that have been produced and which are going to

5    require analysis.  But in the same token, the briefing schedule

6    that you have provided and based on our discussions at the last

7    hearing, even if you had all of the Government's exhibits in

8    June, which I'm not going to order, you're working on preparing

9    the various motions.  So there's going to be little time to

10   start reviewing the exhibits in light of what was discussed

11   last time.

12             You know, I guess there's a couple of different

13   ways we can do this.  I could -- I know counsel in this case

14   have worked cooperatively.  Maybe there is an alternative where

15   we could have the Government provide each defendant with the

16   documents that they expect -- without putting them on the list,

17   just a range of documents that they expect are relevant to what

18   they intend to offer at trial and walk through some of these

19   exhibits with each defense counsel to give them a little more

20   focus.  And then when the exhibit list is produced in January,

21   it will make a little more sense.

22             To satisfy your concerns, obviously, if this all

23   goes south, then any trial date that I set is going to be

24   unrealistic because you're not going to be prepared to go to

25   trial.  So it's in everybody's interest, it seems to me,

 1   starting with the Government, to start making those informal

 2   disclosures to defense with respect to these exhibits with a

 3   view that the date that I gave in January to come up with a

 4   formal list, and that at least takes steps to accomplish what I

 5   think your -- the legitimate issues that you're raising with

 6   respect to what do I do with these millions of pieces of paper.

 7   I don't have any frame of reference to them other than

 8   hopefully finding something that looks like it may be relevant

 9   and setting it aside and trying to go find out later on if it

10   is or is not relevant.

11            MR. STEINGARD:  That will work.  We will work

12   with the Government if the Government is willing to sit down

13   with us or however we want to do it to educate us on these 452

14   overt acts and the other exhibits they're going to use, the

15   transcripts they're going to rely on.  That absolutely will

16   work.  From that we will create a Government exhibit list.  We

17   will create it.  We don't need it from them at that juncture.

18   And we're more than happy to work on it that way in a more

19   informal basis, and we can start on that next week.

20            THE COURT:  Mr. Jenkins?

21            MR. JENKINS:  The short answer is yes.  But the

22   assumptions that Mr. Steingard's arguments that we have done

23   these things already, we appreciate the confidence, but that's

24   not how the grand jury process works.  And we are doing exactly

25   what the -- he would like us to do now.  So we are creating and

 1   we are prepared to, when we resolve these things -- for

 2   example, I have never heard or seen that Bates number.  But I

 3   have gone through the overt acts and looked for quotes, and so

 4   you can search by date that he referenced, the exact quote he

 5   referenced, the reference to the company and find these things.

 6   But we have to do those things ourselves and find the Bates

 7   number as well.

 8              THE COURT:  Maybe if you sit with defense counsel

 9   and explain how your process works and how you're doing it, it

10   will be easier for defense counsel than to do it on their own.

11              MR. JENKINS:  Absolutely.  We just haven't done

12   that yet.  So my only response back is that we are in the

13   process of doing that exact thing.  So we are happy to share

14   that portion of our work product because we believe it is

15   helpful for them to see the evidence in our view, the strength

16   of that evidence.  We're just trying to set the timelines as

17   the Court pointed out.

18              We will also be responding to motions at certain

19   points and writing our own motions.  And the discovery as all

20   of defense counsel -- and we would agree -- we are still trying

21   to figure out a lot of the kinks in that process.  So we are

22   doing a lot of parallel track things, but we are happy to

23   produce them.  This is not something that we are withholding or

24   we have some magic exhibit list with exact Bates numbers

25   somewhere.  That is simply not the case.

1          But we have talked to all defense counsel.  We
2  have been working productively, and I'm happy to go about that
3  with the Court's indulgence that, again, we don't have a strict
4  timeline or there is no exclusionary penalty for not meeting
5  certain deadlines.
6          THE COURT:  Until I get a sense that either the
7  Government or defense is not acting in good faith, there aren't
8  going to be any penalties.  What we're trying to do is trying
9  to -- we are trying to manage this case in the most efficient
10  way so that we have a trial that can be put on both from the
11  Government and the defense in an efficient manner and also a
12  very clear manner so the jury can focus on what is really
13  important in the case and make whatever determination.
14          So what I'm going to do is I'm going to keep the
15  Government exhibit list date -- I forgot now what the date is.
16          MR. JENKINS:  February 15, 2022.
17          THE COURT:  February 15.  Then I will ask counsel
18  to embark upon this effort to meet and confer and maybe have a
19  status conference at some point in time later to see how that
20  process is going.  Certainly by the time we are going to have a
21  hearing on the first wave of the pretrial motions, I will be --
22  I'm sure counsel will be able to inform me at that point in
23  time how the exhibit issue is progressing.  That will then
24  determine what we do with these dates.  But I think this is a
25  healthy and important step in order to have everybody on the

```
 1    same page.  I will also set the Government's witness list on
 2    the same date, February 15th.
 3                    MR. JENKINS:  Understood, Your Honor.  Thank you.
 4                    THE COURT:  All right.  Anything else you want to
 5    add, Mr. Steingard, on that issue?
 6                    MR. STEINGARD:  No, Your Honor.  We're going to
 7    work with the Government.  If there's an issue, if we feel
 8    frustrated, we're going to come back to you.
 9                    THE COURT:  Right.  And I encourage you -- I
10    don't encourage you, but if there is an issue, I would
11    encourage you to bring it to the attention of the Court as
12    early as possible so I can figure out what the problem is and
13    hopefully resolve the problem so we can move forward.
14                    MR. STEINGARD:  We won't be shy.
15                    THE COURT:  All right.  There's only two other
16    categories.  The 404(b) evidence, the Government says there's a
17    lot of things that are -- I don't see that there's going to be
18    a significant amount of 404(b) evidence, so I'm going to leave
19    the Government's proposed date of February 1st as the operative
20    date.  Do you anticipate any 404(b) evidence?  I mean, you have
21    enough witnesses and exhibits in this case that I doubt -- I
22    don't doubt.  I shouldn't say that.  I can't imagine how -- I
23    can't imagine the 404(b) evidence in this case.
24                    MR. JENKINS:  I don't anticipate -- typically in
25    corruption cases there is little amount.  Usually the
```

1    defendants have a relatively strong record.  As to

2    Defendant Huizar, he's charged -- and Defendant Chan, they're

3    charged with the racketeering offense where we alleged most of

4    the conduct we believe relevant to that enterprise.  That's not

5    to say there is not going to be a lot of 404(b) because we have

6    charged it as to them, as to the other defendants,

7    Defendant Lee.

8            There is one incident we are also aware of

9    involving allegations of money laundering which we have

10   discussed briefly with defense counsel, but I do not anticipate

11   significant additional 404(b).  However, we have interviewed

12   over hundreds of witnesses, and at some point when we go back

13   to re-interview them for trial preparation, they may make some

14   additional allegation that, if we find credible, we will seek

15   to admit.  We are not there yet.

16           The universal 404(b) I expect to be small and

17   defined, and we are, I think so far at least, on the same page

18   at least what that looks for Defendant Lee specifically.

19           THE COURT:  All right.  So I'm going to leave

20   that February 1st date.  Same thing with the *Brady* and *Giglio*.

21   I will leave the date as March 25th.

22           I assume, based on our discussion the last time,

23   that the Government -- I don't assume.  I know the Government

24   recognizes its obligations under *Brady* and is producing

25   whatever *Brady* material on an ongoing basis.  We're not going

```
 1    to wait until a certain deadline.  My idea with this deadline
 2    is almost meaningless because, by that point in time, all the
 3    Brady and Giglio information will have been produced on a
 4    rolling basis.
 5                 MR. JENKINS:  Yes.  That is how we have viewed
 6    it, and that is how we are operating, Your Honor.
 7                 THE COURT:  All right.
 8                 MR. SNYDER:  There is one thing I want to add.
 9                 THE COURT:  You have to sit, pull the microphone
10    close to you.  The court reporter can't make a record and --
11                 MR. SNYDER:  Can I take off my mask?
12                 THE COURT:  Sure.
13                 MR. SNYDER:  Just one thing about that.
14                 THE COURT:  You're still not close enough to the
15    microphone.
16                 MR. SNYDER:  I don't know if the mic is working,
17    Your Honor.
18                 So the only thing I would say about that -- and I
19    agree, in general, that our preference is obviously to work
20    together with the Government, and we think they have, you
21    know -- we have a lot of confidence that they're going to do
22    everything in good faith.
23                 There has been some differentiation between Brady
24    and Giglio material, you know, with an idea that they don't
25    know exactly who they may call in the future.  And so the
```

1   *Giglio* material would come later because they're not quite

2   sure.

3            I think we do have a pretty good sense of --

4   certainly with respect to the cooperators.  These people have

5   signed publicly disclosed cooperation agreements.  There is no

6   question that, if there is a trial, those people are going to

7   testify.

8            And so, you know, in terms of the timing of *Brady*

9   and *Giglio*, I just wanted to make sure that it was the Court's

10  understanding that all that stuff is being disclosed as it

11  happens because there is no point in waiting for several months

12  until we get 60 days out from trial, for example, to start

13  disclosing *Giglio* material.

14           THE COURT:  Yes.  But *Giglio* material is for

15  cross-examination.  I mean, that -- there's such a small amount

16  of that material that is going to be of any assistance in

17  cross-examination.  And then cross-examining a cooperating

18  witness about what he may have said to an agent in an

19  interview, I mean that's just a routine matter that you have

20  done a hundred times.

21           MR. SNYDER:  The only thing I would say is that

22  to some degree I agree which makes it -- there's no problem

23  with producing it early because, if it is routine, then there

24  shouldn't be an issue.

25           But the other thing is, you know, I think that

1    sometimes something that the Government says, you know, you're

2    just going to be using it on cross, but oftentimes it's the

3    case where we have to do additional investigation.  Someone

4    says something or we find out, you know, a hint of perhaps

5    criminality or untruthfulness somewhere else and we start

6    scratching and all of a sudden we uncover a bunch of additional

7    things.  So that's the only reason why I bring it up.

8            Again, like I said, I think we are happy to work

9    with the Government, and we are confident that they will work

10   with us.  But just that we're not having some differentiation

11   between *Brady* and *Giglio* which is actually a subset of *Brady*

12   and that things are just being turned over when they're found

13   and we're not holding things back until a certain point in time

14   when you know a witness is going to testify at trial.

15           MR. NEUMAN:  Your Honor, if I may just to add on.

16           THE COURT:  You can add on, but I'm going to

17   continue, as I indicated, the date of March 25th of 2022 for

18   the *Brady/Giglio*.  So when you do the revised stip, you can use

19   that date.

20           MR. NEUMAN:  That is fine, Your Honor.  The only

21   thing I would say on that point is, as to my client Mr. Lee and

22   940 Hill, the Government's case really is built on a single

23   cooperator.  There is no way for them to do their presentation

24   at trial without that witness.  It's Justin Kim.  So I would

25   ask for everything to be disclosed as soon as possible because

1    waiting until March 25th on that is just completely an

2    unrealistic picture of what the trial is going to look like as

3    to my clients.

4              THE COURT:  What are you talking about?  *Giglio*

5    material?  It's not going to be a -- how is it not going to be

6    a realistic picture?  I mean, Mr. Kim -- I took Mr. Kim's plea.

7    I remember sitting through the very long factual basis for the

8    plea.  So he's going to get on the stand, and Mr. Kim is going

9    to testify presumably consistent with the factual basis for his

10   plea, and I'm sure he has a lot more to say.  You will have

11   your *Giglio* material which whatever it is it is, and you will

12   be able to cross-examine him.

13             MR. NEUMAN:  Well, Your Honor, some of it is

14   actually related, as I understand it from some of my

15   conversations with the Government, some of it may be even

16   related to other matters that we need to investigate.  So given

17   the importance of this witness to the presentation against my

18   client, I think I'm just asking -- and I will confer with the

19   Government.  We're in the middle of a meet and confer on this

20   point.  But I may come back to the Court specifically.

21             THE COURT:  That is fine.  Just meet and confer

22   with the Government, and if there's an issue that needs to be

23   resolved, raise it with me.  I hear what you're saying.

24             MR. NEUMAN:  Thank you, Your Honor.

25             THE COURT:  So the final item is the trial date

1   which was something that I thought we were going to work on and

2   have an earlier trial date.  I'm not getting any younger.

3             MR. STEINGARD:  Your Honor, we actually had

4   conversations looking at our calendars in particular as well as

5   the work --

6             THE COURT:  Let me talk about the calendars.  I

7   don't view all of the throwing in all these cases that

8   everybody is going to be in trial to be that persuasive

9   because, as we all know, many of these cases are not going to

10  go to trial that are on the list, especially the public

11  defender who has 20, 30 cases, two- or three-day cases which I

12  don't know but I assume they're not going to go to trial.

13            My goal or my -- in setting a trial date, what is

14  most important to me is that defense counsel and the Government

15  have adequate time to prepare.  All of the other stuff to me

16  is -- it's nice, and I certainly -- if somebody has a trial,

17  I'm not going to set a trial and preclude another judge from

18  going to trial.

19            But if counsel -- and I assume you're all

20  representing to me that this May 24th date is a date that is --

21  may not be the -- well, it's the same date that you picked the

22  last time, but you have now gone back, and you're all -- you

23  all believe that is a trial date that will give you an adequate

24  time -- adequate time on both sides to prepare for trial

25  assuming there is no extraordinary event that happens that

1    requires a continuance.  Is that what I'm hearing?

2                    MR. STEINGARD:  That is for my client, yes.

3                    MS. ALÉ:  Your Honor, that is not quite the case

4    for us.  We have a different case than co-defendants have.  We

5    are still going through the discovery as co-defense counsel

6    explained.  At the last hearing, the Government stated that

7    they had an additional terabyte of discovery, and that is a

8    huge amount of discovery.  In fact, they provided two terabytes

9    of discovery that we're still in the process of downloading.

10   We can't possibly know how much of -- how much work we will

11   need to do on that discovery.

12                    And I will just also note for the Court that,

13   although the Government described it as gibberish, it was, in

14   fact, hidden camera footage and the wiretap of five phones from

15   five principal defendants and witnesses.  So although --

16                    THE COURT:  Well, I guess I don't understand

17   what's so difficult about -- my memory was that there was some

18   25 or 30 additional interviews or conversations.  I understand

19   it's time-consuming, but I don't understand the difficulty in

20   reviewing those materials and making a determination as to how

21   they impact your client.  They're just interviews.  So what

22   that they're two-hour interviews and the 302 only summarizes

23   it.  It's a matter of sitting down and listening to the

24   interview, taking a 302, and making your own outline of what

25   was said or sending it to somebody in your office and having a

1    transcript prepared so you can sit down and read it.

2              I understand it's time-consuming, but if you have

3    the materials now -- and we're talking about a May trial

4    date -- there's plenty of time to accomplish a review of those,

5    if I'm hearing right, interviews and the conversations.

6              MS. ALÉ:  Your Honor, it would take my co-counsel

7    in this case and me working full time five months just sitting

8    down listening to -- and watching the video without any lunch

9    breaks or analysis or stopping it.  That's just the discovery,

10   the videos and the audio that's been produced as of last month.

11   That's not including the new production, and that's not

12   reviewing the 2 million plus pages.

13             THE COURT:  Well, there is a fast-forward button

14   on the videos.

15             MS. ALÉ:  You're right, Your Honor.  But when we

16   have somebody's liberty at stake, we wouldn't take those

17   shortcuts.

18             THE COURT:  Then you're going to have to have

19   somebody else in your office help you.

20             MS. ALÉ:  And, Your Honor, I understand that.  We

21   are the Federal Public Defender's Office, and we have a lot of

22   resources, but we do have limited amount of resources.

23             THE COURT:  Based on the -- didn't you sign a

24   joint status report?

25             MS. ALÉ:  Yes, Your Honor.

1          THE COURT:  You did sign it?

2          MS. ALÉ:  Yes, Your Honor.

3          THE COURT:  I'm going to set the trial date as

4    May 24th of 2022.

5          All right.  So I will ask counsel to -- you don't

6    need to do a -- I hate to have -- well, maybe it makes sense to

7    do a stipulation and a proposed order with the dates that we

8    talked about today.  It can't be that much.  I don't need all

9    of the 20 pages that are included in the status report.

10         MR. STEINGARD:  We will get you a -- in fact, if

11   you want, it will just be a proposed order that we can file.

12         THE COURT:  I'm not sure that's going to work.

13   Maybe it's better to have just a couple-page stipulation with a

14   proposed order.

15         MR. STEINGARD:  That is fine.

16         THE COURT:  All right.

17         MR. STEINGARD:  We have your dates, and we will

18   work on that together.  Should be able to have it by the end of

19   the week.

20         THE COURT:  All right.  Anything else?

21         MR. NEUMAN:  For ease, Your Honor, if -- rather

22   than putting it all into the stipulation, if we could just note

23   here on the record we are standing on our objections.  We will

24   sign a stipulation nonetheless.  Rather than putting in

25   footnotes, we object to this.  We asked for this date.  Just

```
1    keep it on the record right now, Your Honor.

2              THE COURT:  Your objection --

3              MR. NEUMAN:  Regarding the disclosure dates.

4    Just standing on what we had proposed.

5              THE COURT:  I'm not so sure it was an objection

6    other than just you proposed dates and the Government proposed

7    dates and I have made a determination as to what dates I think

8    are appropriate.  So you are characterizing that as an

9    objection?  You're objecting to my dates?

10             MR. NEUMAN:  I'm not agreeing to them,

11   Your Honor.  I don't want to get cute, Your Honor.

12             THE COURT:  To me that is exactly what you're

13   doing, and that is exactly what I'm trying to avoid at this

14   stage of the proceeding, and that is to have counsel work

15   cooperatively and in good faith and not play the gotcha card at

16   some point down the road.  And that's what I -- based upon what

17   you just said, that's what I think you are doing which is not

18   going to bode well in this case.

19             MR. NEUMAN:  I'm sorry --

20             THE COURT:  So whatever you want to say on the

21   record you said on the record.

22             MR. NEUMAN:  Very good.

23             MR. JENKINS:  Nothing further from the

24   Government, Your Honor.

25             MR. STEINGARD:  Nothing further from Shen Zen.
```

```
 1              MS. ALE:  Nothing further from Mr. Huizar.

 2              THE COURT:  Mr. Braun, you have been very quiet

 3   this morning.

 4              MR. BRAUN:  Nothing further, Your Honor.

 5              MR. NEUMAN:  Nothing further, Your Honor.

 6              THE COURT:  All right.  Thank you very much.

 7              (Proceedings concluded at 9:08 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5           I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                  DATED THIS  9TH  DAY OF JUNE, 2021.

16

17

18                  /S/ MIRANDA ALGORRI

19                  _____
                    MIRANDA ALGORRI, CSR NO. 12743, CRR
20                  FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```