1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,        )
                                    )
6            PLAINTIFF,             )     CASE NO.
                                    )
7            vs.                    )     CR 20-326-JFW
                                    )
8  JOSE LUIS HUIZAR, et al.,        )
                                    )     PAGES 1 TO 131
9            DEFENDANTS.            )
   _____)

10

11

12

13              REPORTER'S TRANSCRIPT OF
           MOTION HEARING VIA VIDEOCONFERENCING
14            MONDAY, JANUARY 31, 2022
                   8:03 A.M.
15            LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22
   _____
23
          MIRANDA ALGORRI, CSR 12743, RPR, CRR
24          FEDERAL OFFICIAL COURT REPORTER
           350 WEST 1ST STREET, SUITE 4455
25          LOS ANGELES, CALIFORNIA 90012
              MIRANDAALGORRI@GMAIL.COM

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4         NICOLA T. HANNA
           UNITED STATES ATTORNEY
 5         BY:  MACK JENKINS
           BY:  VERONICA DRAGALIN
 6         BY:  MELISSA MILLS
           Assistant United States Attorneys
 7         United States Courthouse
           312 North Spring Street
 8         Los Angeles, California 90012

 9

10    FOR THE DEFENDANT HUIZAR:

11         HILARY L. POTASHNER
           FEDERAL PUBLIC DEFENDER
           BY:  CAREL ALÉ
12         BY:  CHARLES SNYDER
           BY:  ADAM OLIN
13         Deputy Federal Public Defenders
           Central District of California
14         321 East Second Street
           Los Angeles, California 90012

15

16    FOR DEFENDANT CHAN:

17         BRAUN & BRAUN, LLP
           BY:  HARLAND BRAUN
18         10880 Wilshire Boulevard
           Suite 1020
19         Los Angeles, California 90024

20

21    FOR THE DEFENDANT SHEN ZHEN NEW WORLD I:

22         LAW OFFICES OF RICHARD M. STEINGARD
           BY:  RICHARD M. STEINGARD
           800 Wilshire Boulevard
23         Suite 1050
           Los Angeles, California 90017

24

25
```

1

2

**APPEARANCES OF COUNSEL CONTINUED:**

3

**FOR THE DEFENDANTS LEE AND 940 HILL:**

4

BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
5      BY:   ARIEL A. NEUMAN
       1875 Century Park East
6      23rd Floor
       Los Angeles, California 90067

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| | 1 |

**LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 31, 2022**

**8:03 A.M.**

**---**

08:03AM 5    THE CLERK:  CR 20-326(A)-JFW, United States of

6  America versus Jose Luis Huizar, et al.

7    Counsel, please state your appearances.

8    MR. JENKINS:  Good morning, Your Honor.

9    Mack Jenkins, Veronica Dragalin, and

08:03AM 10  Melissa Mills on behalf of the United States.  Also, for the

11  record, Special Agent Andrew Civetti will be available via Zoom

12  in one of our free offices.

13    MR. BRAUN:  Good morning, Your Honor.

14    Harland Braun on behalf of Raymond Chan who is

08:03AM 15  present.

16    MS. ALÉ:  Good morning, Your Honor.

17    Carel Alé, Charles Snyder, and Adam Olin on

18  behalf of Mr. Huizar who has waived his appearance for today.

19    THE COURT:  Mr. Steingard, we can't hear you.

08:03AM 20    MR. STEINGARD:  I'm sorry.  Richard Steingard for

21  Shen Zhen New World I, LLC.

22    MR. NEUMAN:  Good morning, Your Honor.

23    Ariel Neuman for defendants Dae Yong Lee, who has

24  waived his appearance, and 940 Hill LLC.

08:04AM 25    THE COURT:  All right.  Good morning to all.  We

have several motions on calendar this morning.  We have

docket No. 307, docket 275, docket No. 281, and docket No. 312.

Each of these motions have been fully briefed, and I intend to

hear argument and rule on each of the motions this morning.

08:04AM    And as I indicated at the last hearing, I will hear argument if

there's anything that you wish to add to your papers.

First one, I want to begin with the motion which

is docket No. 307, and that is Mr. Huizar's amended motion to

suppress evidence derived from the unlawful search and seizure

08:05AM    of 39 months of personal e-mails.  As I indicated, it appears

as docket No. 39.  The Government has filed its opposition

which appears as docket No. 314, and Mr. Huizar filed a reply

on January 18th and appears as docket No. 344.

In the amended motion to suppress, the defendant

08:05AM    moves for an order suppressing evidence from the 2016 search

and seizure of his personal e-mails and all derivative fruits

which are obtained pursuant to a warrant issued on July 1st of

2016 by Magistrate Judge Rosenberg.

The search warrant required Yahoo! to provide to

08:06AM    the Government certain information relating to defendant's

Yahoo! account from April 1st, 2013, to July 1st, 2016.  It

authorized the Government to search the information that Yahoo!

provided and to seize evidence of the following six crimes that

were being investigated, namely, 18 United States Code

08:06AM    Section 371; Section 666, bribery and kickbacks concerning

federal funds; Sections 1341, -43, and -46, honest services wire and mail fraud; Section 1951, extortion; Section 1956, money laundering; and 31 United States Code Section 5324(a)(3), structuring a financial transaction to evade a reporting obligation.

The warrant further narrowed the scope of the authorized seizure to evidence of violations involving five specific individuals -- Mr. Huizar, Mr. Huang, Mr. Ricky Zheng, Mr. Esparza, and Mr. Chan -- and listed the following four categories of evidence relating to the subject defenses subject to seizure:

One, information relating to who created, accessed, or used the subject account including records about their identities and whereabouts;

Two, all records relating to the individuals that I just referred to as well as Shen Zhen New World Group and New World Investment and the L.A. Hotel Downtown;

Three, all records relating to Las Vegas including any receipts, reservation confirmations, flight itineraries, photographs, and bank records relating to Southwest Airlines, the Palazzo, Caesar's Palace, the Wynn, and Cosmopolitan; and,

Four, all financial records including those relating to Mr. Huizar's relatives, his mother and his brother and their respective identified bank accounts.

1        So I will hear from counsel for Mr. Huizar if

2   there is anything that you wish to add to your papers.

3        MR. SNYDER:  Good morning, Your Honor.

4   Charles Snyder on behalf of Mr. Huizar.

08:08AM  5        So I realize that the Court only wants to hear

6   things that are additional.  There are a couple topics that I

7   want to talk about.  The first is I want to talk a little bit

8   more about the *Franks* issue, and then I want to pick up on the

9   Court's summary of what the warrant actually did because I

08:09AM  10  disagree with the summary in some of the ways it's been

11  characterized.

12       So let me start with the *Franks* issue.  And the

13  thing I really want to talk about is Agent Civetti's so-called

14  review of development projects in Mr. Huizar's district and

08:09AM  15  this supposed mixed-use mega development project that

16  Shen Zhen New World purportedly had in the pipeline at the time

17  that the warrant application was filed which, in the words of

18  the Government's opposition, would have given Mr. Huizar

19  massive sway over Shen Zhen New World and Wei Huang.

08:09AM  20       I want to be really clear about this.  That is

21  false.  Any suggestion that Shen Zhen New World or, by

22  association, Wei Huang had a development project or any other

23  business likely to reach Mr. Huizar at PLUM or Council in July

24  of 2016 or at any period covered by the warrant is untrue.  And

08:10AM  25  in the context of the --

THE COURT:  Well, let me stop you there because I

disagree with your characterization because, if you look at

docket No. 296-10, there is a -- that is a transcript of the

interview of Ricky Zheng.  And during the course of that

08:10AM   interview, he relates a conversation that he had with his boss,

Mr. Huang, discussing development plans for the future with

Mr. Chan and Mr. Huizar at a lunch meeting about building the

tallest building in Los Angeles next to the L.A. Hotel or

converting the hotel.  And he indicated that Mr. Huang was

08:11AM   going to discuss those plans with Mr. Chan and Huizar at a

lunch meeting that certainly occurred prior to 2016.

          Go ahead.

          MR. SNYDER:  One of the reasons I am so confident

in my claim that it is false is because the Government agrees

08:11AM   in an e-mail sent, you know, after we pointed this out in the

opposition that there was no project.  And there certainly was

no project in the pipeline, and certainly Agent Civetti had no

basis for saying that there was a project in the pipeline.  I

believe --

08:11AM           THE COURT:  Well, there's a difference in opinion

what the pipeline means.  That's just a -- you're equating

that, as you do in the motion, with a pending application.  And

I don't think that is a fair characterization of the words "in

the pipeline."  So I disagree with you.  And I understand your

08:12AM   argument.  I read the brief, but I just disagree.

                        MR. SNYDER:  Well, okay.  I guess I don't know

what possible basis -- so let's take the Court's definition of

"in the pipeline" as being, you know, possibly discussed at any

point in time which is contrary to what I think the

Government's express understanding is in the pipeline being

pending applications because I'm happy to file the Government's

e-mail to me.

                        But it seems like what they understood in the

pipeline to be is pending applications because they say,

actually, oh, no, even though it literally says "Shen Zhen

New World," it actually applies to other Chinese companies that

had projects in the pipeline, in the pipeline being actually in

the form of development process.

                        But even setting that aside, what possible basis

does Agent Civetti have to make this statement?  If in the

pipeline means what the Court says that it means, this

interview that the Court is referring to, which I assume is

attached to one of our filings, happened many years after the

fact.  So if he's saying that there was a mixed-use mega

development project in the pipeline, he didn't have any of this

information.  So what could he have been referring to?

                        I don't think there's any basis, in fact, for --

I don't think that that is what "in the pipeline" means as the

Government has characterized it.  But even if that's what it

means, then what basis would he have to make this claim because

it's -- he doesn't have any of that information at the time.

You know, even if -- he can't just kind of throw information out there and hope that maybe it's true.  So if the only basis for that, which the Government hasn't even pointed to -- and that's not the Government's position -- is, you know, something that was attached to a different filing.  And that's, you know, what's going to be the basis for saying, actually, this was true that something was in the pipeline. Agent Civetti didn't know that at the time, and that's -- I don't even think the Government takes that position.

So, you know, if the Court thinks that that's the basis for making that statement true, then that's one thing.  I think the Government -- and I will file the Government's e-mail because I think the Government is very clear that their position is not that this statement is true.  Their position is that, notwithstanding the literal words in the affidavit, it wasn't supposed to refer to Shen Zhen New World.

So, you know, if the Court's position is going to turn on the truth, then I'm happy to take that and file the Government's position and then, if that turns out not to be true, then I think that -- I assume that would turn the Court's decision.

If the Court's decision is not based only on the truth or falsity of that claim but it is based on anything else, then I want to talk about this issue more.  But I'm not

1    really sure what else I can say about that at this point.

2            Actually, let me say a little bit more about this

3    because --

4            THE COURT:  Wait a minute.  We have a lot to

5    cover, and I have read -- now you're just repeating what's in

6    your papers.  As I indicated, if you have anything that's not

7    in your papers, I will hear from you.  But we're going to be

8    here for a long time this morning.  I'm just not going to

9    continue to entertain argument that's already in your papers.

10           MR. SNYDER:  Understood.  So I will file the

11   Government's e-mail because I think it will show that the

12   Court's belief is inconsistent with their belief.

13           Let me move on to the second point which was --

14   which I think ties into the specificity issue which is the

15   scope of the warrant.  So I think, you know, the way that the

16   Court described the warrant was a warrant that was limited to

17   four specific categories, and I think that's consistent with

18   what the Government said in its papers.

19           I think it's important to talk both about the

20   warrant that actually issued in this case and also the way that

21   the warrant was executed because, in reading the opposition

22   again and preparing for the argument, I almost felt like the

23   Government was defending a warrant and the execution process

24   other than the one that occurred.

25           So to be clear, what the warrant actually says is

that the prosecution team can review and seize every single one
of the e-mails for 39 months.  That's what the warrant
literally says.  What happened in the real world is that, after
getting the warrant, the case agent reviewed all of the e-mails
in the account, and he seized not only the things that were
covered by the specific categories that the Court mentioned,
but he also seized other things that he deemed pertinent but
outside of those specific categories.

That is not really meaningfully distinguishable
from a general warrant on its face.  It says, "Search and seize
everything and then practice."  What the agent did in this case
is use that as authority to go through the entire account, not
looking for, you know, the specific things that were covered,
but reading everything and seizing not just those specific
categories that were listed in the warrant but other things
that he deemed pertinent.

And I do on this point want to call the Court's
attention to some of the other parts of the warrant because I
think that it helps to kind of test the Government's claim
that, notwithstanding this sweeping language that didn't have
any limits on what could be seized, and everybody really
understood it to be much more limited, and they abided by those
limits.

So paragraph 5 of the warrant says, "If the
search team encounters immediately apparent contraband or any

other evidence of a crime outside the scope of the items to be

seize, the team shall immediately discontinue its search

pending further order of the Court and shall make and retain

notes detailing how the contraband or other evidence of the

crime was encountered including how it was immediately apparent

contraband or evidence of a crime."

So what you had happen in this case was

Agent Civetti claims in Exhibit 6 to the initial filing that he

encountered evidence that he deemed pertinent but outside the

scope of the specific categories in the warrant.  What did he

do?  He didn't immediately stop and seek a court order.

Instead, he kept going, and he reviewed all 27,000 e-mails in

the account.

So the idea that he perceived some limitation by

the specific categories is inconsistent with what actually

happened in this case because obviously, if he thought he was

limited to those categories, the thing that he was supposed to

do the minute he ran into something that was pertinent but

outside of this specific categories would stop, but instead

what he did in this case was just review everything in the

account.

Paragraph 4 of the warrant says that "Law

enforcement agents or other individuals assisting law

enforcement will examine such content records pursuant to

search procedures specifically designed to identify items to be

seized under this warrant."  In this case, the search procedure

was simply to have the case agent review every single e-mail.

That's only a search procedure specifically designed to

identify items to be seized under the warrant if everything in

08:19AM   the account is fair game.

So, you know, I may be missing the point or maybe

I'm dense or something, but what you have is a warrant that

literally says that everything can be seized.  That's what it

says.  And then in practice what you have is a situation where

08:19AM   the case agent, according to Exhibit 6 also in consultation

with the lead prosecutor, is reviewing every single thing in

the account.

And when he comes across things that aren't

covered by the specific categories, he's not stopping and

08:19AM   saying, oh, oops, you know, we need to go and get another

warrant right now.  Instead, he's logging those things into

evidence.  He's doing the exact same things with those exhibits

that he's doing with the things that fall within the specific

categories.  He's burning them onto a CD, and he's putting them

08:20AM   in the FBI file.

I fail to see how that's meaningfully

distinguishable from a general warrant when it says search and

seize everything, and that's what happened.

So the only other thing that I want to make clear

08:20AM   which is not in our papers because I know that the Court, you

know, has a lot to get to, is I want to talk about what I

believe, although without having a hearing it's not possible --

I want to be clear for the record what I believe would be

suppressed as a result of this warrant being invalidated.

08:20AM

So this was the first warrant that was really

granted in the case.  This is the one that opened the door to

the other warrants and activity that came later.  So I believe

that, if this warrant were invalidated, it would invalidate the

next warrant for Mr. Huizar's e-mail account.  It would

08:21AM

invalidate the wiretap orders, and it would reach into most of

the trial evidence in this case.

So I want to make that clear, if we don't have a

hearing on, you know, what the remedy would be, I think it

would, as the kind of gateway to many of the other things that

08:21AM

happened later, it would result in suppression of much of the

trial evidence.

So with that, I don't have anything else that's

not in the papers.

THE COURT:  All right.  The Court makes the

08:21AM

following ruling:

The search warrant was supported by a 36-page

affidavit sworn to by FBI Special Agent Andrew Civetti.  The

affidavit detailed evidence from a variety of records including

several witnesses, hotel and casino records, and flight records

08:21AM

among other evidence that established that between 2014 and

2016 Huizar, a Los Angeles City Council member made at least
eight gambling trips to Las Vegas with Mr. Huang, a developer
with business in Mr. Huizar's City Council District 14.  The
affidavit noted that Huizar and Huang were at times accompanied
by -- on these trips by their respective aides, Esparza and
Zheng.

As described in the affidavit, the FBI's
investigation began after the FBI received information from the
Las Vegas Sands Corporation, owners of the Palazzo Hotel, that
Palazzo staff had detected suspicious activity involving Huang
and Huizar.

Specifically, as confirmed by surveillance
footage, gambling records, and hotel records, Mr. Huizar had
been a frequent guest of Mr. Huang at the Palazzo and received
approximately $79,000 in chips from Mr. Huang during his gaming
activities.

Mr. Huizar eventually cashed out approximately
$36,500 of those chips provided to him by Mr. Huang.  Hotel
records also indicated that Huang provided Mr. Huizar with
private jet transportation and luxury accommodations.

The affidavit set forth the statements and
observations of several Palazzo employees.  Notably, before or
during Mr. Huizar's fifth and final trip to the Palazzo on
July 7 through 8 of 2015, Jonathan Bell, the vice president of
cage and credit operations at the hotel, was notified that

1    Mr. Huizar was going to be a guest of Mr. Huang.  Mr. Bell and

2    his staff researched Mr. Huizar and discovered that he was a

3    member of the Los Angeles City Council which made him what the

4    hotel referred to as a politically-exposed person or a PEP.

08:23AM   5         This meant that Mr. Huizar had to fill out

6    certain paperwork in order to participate in gaming activities

7    at the hotel.  The paperwork was designed to identify

8    Mr. Huizar's source of the wealth and demonstrate that he had a

9    suitable, independent source of income with which to gamble and

08:24AM  10   was not using government funds to gamble.

11        When Mr. Huizar was advised that he needed to

12   fill out the PEP paperwork to continue gambling at the hotel,

13   Mr. Huizar reviewed the paperwork twice and refused to fill it

14   out on both times.  A Palazzo employee reported that, although

08:24AM  15   Mr. Huizar did not seem agitated by her request to complete the

16   paperwork, she felt that he was trying to stay under the radar.

17   Because he did not fill out the paperwork, Mr. Huizar was

18   escorted out of the hotel gaming area and left $17,800 in chips

19   on the table which Mr. Huang ultimately used and played with.

08:25AM  20        As a result of Mr. Huizar's behavior, on or about

21   July 20, 2015, Jonathan Solomon, a senior vice president and

22   global chief compliance officer for the Las Vegas Sands

23   Corporation, contacted the FBI's Los Angeles field office to

24   report the suspicious activity.

08:25AM  25        Notably, after the fifth Palazzo trip during

which Palazzo employees identified Mr. Huizar as a
politically-exposed person and asked him to certify the source
of his gambling money, Mr. Huizar did not return to the Palazzo
to engage in gaming activities with Mr. Huang.  Instead, the
08:25AM   affidavit set forth evidence indicating that Mr. Huizar
accompanied Mr. Huang on three subsequent gambling trips to
different Las Vegas casinos in the weeks before the warrant was
sought.

The affidavit cited casino transaction reports
08:26AM   showing that Huang had purchased over 475,000 in casino chips
over those three trips, airline flight records establishing
Mr. Huizar's travel to Las Vegas during the time frames of
Mr. Huang's casino chip purchases, and toll records reflecting
five telephone calls between Mr. Huizar and Mr. Huang the day
08:26AM   before one of those trips.

The affidavit also detailed
Special Agent Civetti's analysis of financial records for
Huizar, his wife, brother and mother during the times of
Mr. Huizar's known trips to Las Vegas with Mr. Huang and
08:26AM   explained how these records indicated that Mr. Huizar had
laundered the funds from the cashed-out casino chips through
the bank accounts of his family members.

The bank records revealed that on several
occasions Huizar's close family members made large cash
08:26AM   deposits into their personal bank accounts around the time of

Mr. Huizar's trips with Huang and Zheng and then used the funds from those bank accounts to pay Mr. Huizar's bills or to write checks to Mr. Huizar in large amounts.

Special Agent Civetti also noted that Huizar failed to report any of the financial benefits received from Huang as income or as a gift as he was required to do as a high-ranking public official on his California Form 700 which is referred to or characterized as the Statement of Economic Interests.

Citing all of the evidence and based upon his training and experience, Civetti concluded that there was probable cause to believe that Mr. Huizar used his close family members' bank accounts to launder the benefits and payments that he received from Huang and Zheng on the casino trips and that the benefits and payments were illegal bribes and/or kickbacks.

Special Agent Civetti candidly stated in his affidavit that it is unclear what official acts Jose Huizar has performed in exchange for the payments he received from Mr. Huang.  However, the affidavit described Huizar's role as a member of the City Council in a district that included downtown Los Angeles, his position as chairman of the City Council's Planning and Land Use Management which is referred to as the PLUM Committee, his influence over zoning in downtown Los Angeles, and his work in promoting and expanding hotel and

1    hospitality services in downtown Los Angeles.

2            It also described Mr. Huang's role as chairman of

3    the Shen Zhen New World Company, which I will refer to as SZNW,

4    and its acquisition and operation of a hotel, which is referred

08:29AM    5    to as the L.A. Downtown Hotel, in Mr. Huizar's district.

6            In addition, the affidavit explained that an SZNW

7    subsidiary was planning a mixed-use mega development project in

8    Mr. Huizar's downtown district.  The affidavit also noted that

9    in April of 2014, shortly before Mr. Huizar and Mr. Huang's

08:29AM    10    first known trip to Las Vegas, Mr. Huizar had introduced a

11    City Council resolution recognizing Mr. Huang for his

12    achievements and contributions to the economy of

13    Council District 14 resolution which was the -- which the

14    city -- Los Angeles City Council ultimately adopted.

08:29AM    15            The affidavit also explained that, in

16    Mr. Huizar's role as chairman of the PLUM Committee, Mr. Huizar

17    worked closely with Mr. Chan, former general manager of the

18    Los Angeles Department of Building and Safety.  That department

19    had jurisdiction over SZNW's L.A. Downtown Hotel, had received

08:30AM    20    several complaints about the hotel between 2013 and 2015

21    including at least one serious safety violation.  All of those

22    complaints were reportedly completely resolved, but an LADBS

23    insider reported to the FBI that some of the complaints were

24    closed before being investigated.

08:30AM    25            That same insider further informed the FBI that

the L.A. Hotel downtown was often the subject of complaints but
that the complaints never went anywhere because the owner of
the hotel was friends with Mr. Chan.  This information was
corroborated by toll records which show that between
08:30AM  June 1st, 2014 and August 7, 2015, Chan exchanged 303 calls and
225 text messages with Ricky Zheng, the executive director of
SZNW.

          The affidavit also detailed telephone toll
records showing seven calls between Mr. Huizar and Huang over
08:31AM  approximately a year-long period between their five known trips
to the Palazzo and 143 calls between Huizar and Zheng during
the same period.  In addition, the records show that Zheng was
in almost constant contact with Mr. Huizar's assistant Esparza
as well as Mr. Chan.  And according to the toll records, Huizar
08:31AM  and Huang exchanged ten calls over the four-week period
preceding the warrant.

          In short, the affidavit detailed evidence that
Mr. Huizar had accepted financial benefits from Mr. Huang,
concealed the financial benefits received from him, laundered
08:31AM  the funds received, and explained how Huang and SZNW could
benefit or could have benefited from Huizar's position on the
PLUM Committee and Mr. Huizar's relationship with Raymond Chan.

          The affidavit also demonstrated that evidence of
the subject offenses would likely be found in the subject
08:32AM  e-mail account.  For example, the affidavit explained that the

subject e-mail account had been identified as a private e-mail

account Huizar used in connection with reserving his flights to

and from Las Vegas as well as to communicate with Esparza who

accompanied Mr. Huizar on at least one of his 2014 trips to

08:32AM   Las Vegas with Mr. Huang and Mr. Zheng.

Contrary to Mr. Huizar's contention in his reply

at page 5, the statement does appear in Special Agent Civetti's

affidavit at paragraph 5 stating that "The subject account has

been identified as a private e-mail account Jose Huizar used to

08:33AM   arrange flights to and from Las Vegas as well as to communicate

with his special assistant at the City Council George Esparza,

someone who accompanied Jose Huizar on at least one of his 2014

trips to Las Vegas and where George Esparza witnessed Mr. Huang

sharing casino chips with Mr. Huizar."

08:33AM   In a report of investigation 302 which was

attached to defendant's motion, Special Agent Civetti detailed

the search team's procedures in executing the warrant.

Special Agent Civetti documented that 27,356 records were

reviewed and that of those 496 were deemed pertinent, 24,440

08:33AM   were deemed not pertinent, and 2,045 were deemed subject to

attorney/client privilege.  375 were deemed subject to the

spousal privilege.  Of the 496 pertinent records, 136 were

deemed pertinent but outside the scope of the current warrant.

In his amended motion, Huizar argues that the

08:34AM   warrant affidavit, one, failed to establish probable cause for

1    bribery; two, failed to identify a nexus between Huizar's

2    e-mails and a crime for which probable cause existed; three,

3    failed to provide probable cause for the search of all Huizar's

4    personal e-mails for 39 months including over a year before

08:34AM   5    Huizar's first known trip to Las Vegas.

6            Mr. Huizar also argues that the warrant was

7    facially overbroad and lacking in particularity, that a neutral

8    and independent judge would not have issued the warrant had

9    Special Agent Civetti truthfully disclosed all of material

08:34AM   10   facts, and finally, that the Government preservation request

11   violated the 4th Amendment.

12           The Court concludes that the warrant was

13   supported by probable cause.

14           The 4th Amendment provides that no warrants shall

08:35AM   15   issue but upon probable cause supported by oath or affirmation

16   and particularly describing the place to be searched and the

17   persons or things to be seized.  As the Supreme Court stated in

18   the *Gates* case at 462 U.S. 213, in determining whether an

19   affidavit adequately demonstrates probable cause, the Court

08:35AM   20   indicated or held as follows -- and I'm quoting -- "The task of

21   the issuing magistrate is simply to make a practical

22   common-sense determination whether, given all the circumstances

23   set forth in the affidavit before him, including the veracity

24   and the basis of knowledge a person is supplying hearsay

08:35AM   25   information, there is a fair probability that contraband or

1   evidence of a crime will be found in a particular place.  And

2   the duty of the reviewing Court is simply to ensure that the

3   magistrate had a substantial basis for concluding that probable

4   cause existed."  That's the end of the quote.

08:36AM   5          A magistrate judge's finding of probable cause

6   should be paid great deference by the reviewing courts.

7          The Court agrees with the Government that the

8   warrant was supported by ample probable cause.  More

9   specifically, the Court concludes that Special Agent Civetti's

08:36AM   10  affidavit demonstrated that there was a fair probability that

11  evidence of bribery would be found in the subject e-mail

12  account.  The evidence detailed in the affidavit clearly

13  established that:

14         One, Huizar, a Los Angeles City Council member,

08:36AM   15  took regular trips to Las Vegas with Mr. Huang, a wealthy

16  developer who had business in Mr. Huizar's district;

17         During these trips, Huang provided Huizar with at

18  least 79,000 in casino chips which Mr. Huizar cashed and

19  pocketed at least $36,500;

08:37AM   20        Three, Mr. Huizar suspiciously sought to conceal

21  his activities including by refusing to complete the PEP

22  paperwork from the Palazzo and even leaving 17,800 on the table

23  as a result, failing to report any of those funds either as

24  income or as a gift on his California Form 700 as he was

08:37AM   25  legally required to do, and laundering the funds through his

1    close relatives' bank accounts;

2              Four, SZNW could benefit financially from

3    Huizar's active work in expanding hotel and hospitality

4    services in downtown Los Angeles and through Huizar's role as

08:37AM   5    chairman of the PLUM Committee including because SZNW's

6    subsidiary had at least one mixed-use mega development in the

7    pipeline for downtown Los Angeles;

8              Five, Huizar worked closely with Chan whose

9    department had jurisdiction over SZNW's L.A. Hotel Downtown and

08:38AM  10    who appeared to have quashed safety and other complaints about

11    the hotel without resolving them; and,

12              Six, Huizar introduced a 2014 resolution honoring

13    Huang as an economic leader in Los Angeles.

14              The Court concludes that this evidence taken

08:38AM  15    collectively established probable cause to search the subject

16    e-mail account for evidence of bribery.

17              Defendant argues that the affidavit was

18    insufficient to establish probable cause because it did not

19    present any non-speculative evidence of a bribery pro or

08:38AM  20    bribery quo.  In other words, defendant argues at page 10 that

21    probable cause for federal bribery requires articulable facts

22    showing not simply that an official accepted a benefit but that

23    he or she did so in exchange for agreeing to take official

24    action on a specific matter.

08:39AM  25              The Court agrees with the Government that the

defendant is attempting to hold the Government to a standard

that is not required under the case law.  As discussed, to

establish probable cause, the Government need only demonstrate

under the totality of circumstances that there is a fair

probability that contraband or evidence of a crime will be

found in a particular place.

As the 9th Circuit has repeatedly held, the

defendant concedes the Government need not establish probable

cause for every element of the offense, in this case bribery.

While it is true that, when specific intent is a

required element of the offense, the affidavit must demonstrate

probable cause for that element.  The Court concludes that the

affidavit adequately demonstrated probable cause regarding

Huizar's specific intent.  Civetti presented evidence that:

One, Huizar failed to report financial benefits

he received from Huang as required by law;

Two, Huizar refused to comply with Palazzo's

request to complete the PEP paperwork and certify that he was

gambling with his own money;

Three, Huizar laundered the proceeds of the

financial benefits provided by Huang through family members;

and,

Four, Huizar through his position as City Council

person for Council District 14 and chairman of the

PLUM Committee and his relationship with Chan could reward

Huang for the financial benefits given to him.

Taken together, the evidence establishes a fair probability of Huizar's corrupt specific intent as required by the relevant bribery statutes.

08:40AM    Moreover, defendant's argument regarding Civetti's failure to identify specific official acts in the affidavit appears to rest on a misunderstanding of the Supreme Court's decision of the *McDonnell* case.  *McDonnell* did not address the requirements for establishing bribery under 18 United States Code Section 666, one of the bribery offenses 08:41AM listed in the warrant.

As the Court held in its order denying 940 Hill and Lee's motion to strike language from Count 25, the statutory language of Section 666 does not support importing an 08:41AM official act requirement or similar requirement into that statute.

Moreover, even if an official act was required under Section 666 or under one of the other offenses listed in the warrant, contrary to what defendant insinuates, *McDonnell* 08:41AM did not require that the question or matter be currently pending at the time of the bribe.  Rather, the statutory language in Section 201 clearly provides that the bribe may relate to any question, matter, cause, suit, proceeding, or controversy which may at any time be pending or which may by 08:42AM law be brought before a public official in the future.

In this case, the affidavit identified that
SZNW's subsidiary had at least one mixed-use mega development
in the pipeline for downtown Los Angeles.  And, finally, and
most importantly, *McDonnell* did not address the probable cause
standard for obtaining a search warrant for bribery offenses
which does not require the Government to establish probable
cause for every element of the offense.

In any event, the Court also notes that
defendant's argument focuses entirely on bribery.  However, in
addition to bribery, the warrant identified several other
subject offenses including money laundering and structuring
financial transactions to evade reporting requirements.  The
Court concludes that the probable cause requirements for those
offenses were also met by the facts presented in the affidavit.

Next, the defendant argues that the affidavit
failed to establish a nexus between a crime for which probable
cause existed and Mr. Huizar's e-mail accounts.  The Court
disagrees.

In his affidavit, Civetti stated that Huizar had
used the subject e-mail account to book his travel to and from
Las Vegas during the casino trips.  He also stated in
paragraph 5 that Huizar used the subject e-mail account to
communicate with Esparza.  The Court concludes that these two
facts sufficiently demonstrate a fair probability that evidence
of bribery or other related offenses would be found in the

subject account.

As the 9th Circuit stated in *United States versus Wong* at 334 F.3d 831, probable cause exists if it would be reasonable to seek the evidence in the place indicated in the affidavit.  Given that Huizar used his personal e-mail account to book the relevant trips to and from Las Vegas and that he communicated with Esparza using his personal e-mail account, the Court concludes that it is more than reasonable to seek the evidence in his personal e-mail account.

Next, Mr. Huizar argues that the warrant was not sufficiently particularized and was overbroad.  Huizar also argues at page 14 of docket No. 307 that the warrant affidavit failed to provide probable cause for the search of all Huizar's personal e-mails including over a year before the first known trip to Las Vegas.  This argument can be characterized as one of overbreadth, and thus I will also address this argument.

As the 9th Circuit has described, "particularity" is a requirement that the warrant must clearly state what is sought while "breadth" deals with the requirement that the scope of the warrant be limited by the probable cause in which the warrant was based.

As the 9th Circuit summarized in *United States versus Spilotro* at 800 F.2d 959 -- and I quote -- "The 4th Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be

seized.  The description must be specific enough to enable the

person conducting the search reasonably to identify the things

authored to be seized -- authorized to be seized.

"This requirement prevents general exploratory

searches and indiscriminate rummaging through a person's

belongings.  It also ensures that the magistrate issuing the

warrant is fully apprised of the scope of the search and can

thus accurately determine whether the entire search is

supported by probable cause.

"The specificity required in a warrant varies

depending upon the circumstances of the case and the type of

items involved.  Warrants which describe generic categories of

items are not necessarily invalid if a more precise description

of the items subject to seizure is not possible."  That's the

end of the quote.

As the 9th Circuit stated in *United States versus*

*Shi*, S-h-i, at 525 F.3d 709 -- and I quote -- "When determining

whether a warrant which authorizes the seizure of a category of

items is overbroad, we consider, one, whether probable cause

existed to seize all items of a category described in the

warrant; two, whether the warrant set forth objective standards

by which the executing officers could differentiate items

subject to seizure from those which were not; and, three,

whether the Government could have described the items more

particularly in light of the information available to it at the

1   time the warrant issued."  That's the end of the quote from
2   *Shi*.

3               The Court concludes that the warrant was not
4   overbroad.  The affidavit sets forth facts establishing that
08:47AM   5   probable cause existed to seize each category of information
6   described and each category of evidence was relevant and
7   tailored to the subject offenses and each of the four
8   categories set clear and objective standards for the Government
9   to seize responsive material.

08:47AM   10              The Court also concludes that the search warrant
11  was sufficiently particularized, each of the four categories
12  contained a description specific enough to enable the person
13  conducting the search reasonably to identify the things
14  authorized to be seized.

08:47AM   15              In essence, Mr. Huizar complains that the
16  Government was authorized to seize and search all of the data
17  in Huizar's account from April 1st of 2013 through
18  July 1st, 2016, when, as it turned out, only approximately
19  496 records were deemed pertinent or responsive to the warrant.
08:48AM   20  However, the 9th Circuit has upheld the constitutionality of
21  the "seize first, search second" warrants in the context of
22  electronic data.

23              In *United States versus Flores* at 802 F.3d 1028,
24  the 9th Circuit approved the search and seizure of 11,000 pages
08:48AM   25  of data in defendant's Facebook account in a drug trafficking

case where only approximately 100 pages were ultimately found

to be truly responsive to the warrant.  As the 9th Circuit

stated in *Flores*, over-seizing is an accepted reality in

electronic searching because there is no way to be sure exactly

08:48AM    what an electronic file contains without somehow examining its

contents.

Similarly, the Court concludes that the warrant

in this case was not overbroad merely because it authorized

Yahoo! to disclose and authorize the Government to search all

08:49AM    of Huizar's personal e-mails from April 1st of 2013 to

July 1st, 2016 for evidence responsive to the warrant.

Indeed, like the warrant that the 9th Circuit

concluded was not overbroad in *Flores*, the warrant in this case

allowed the Government to only search the subject e-mail

08:49AM    account associated with Huizar, authorized the Government to

permanently access only the information or data that was

relevant to the alleged violations on which the warrant

application was based, and established sufficient objective

standards for segregating responsive material from the rest of

08:49AM    Mr. Huizar's account.

Moreover, the warrant in this case was more

narrow than the warrant approved of in *Flores* as the warrant

was limited to a time frame of April 1st, 2013, through

July 1st, 2016.  Although Huizar contends that the Government

08:50AM    could have and should have limited its search by conducting

searches for specific e-mail addresses and or travel or flight
accommodations, as the 9th Circuit stated in the *Adjani* case at
452 F.3d 1140, to require such a pinpointed computer search,
restricting the search to an e-mail program or to specific
search terms would likely have failed to cast a sufficiently
wide net to capture the evidence sought.

Although the search warrant had a limited
temporal scope, Huizar argues that the warrant was overbroad
because it authorized the Government to seize his personal
e-mails for 39 months including e-mails over a year before his
first known trip with Mr. Huang to Las Vegas.  The Court
rejects Huizar's argument that the warrant was overbroad as to
its temporal scope.

Not only did complaints about SZNW's
L.A. Hotel Downtown to the LADBS originate as early as May of
2013, which were quashed before being actually resolved as set
forth in the affidavit, but common sense dictates that the
relationship between Mr. Huang and Huizar would have taken time
to evolve.

The Court concludes that the date range provided
in the warrant was reasonable in scope and that the magistrate
judge had a sufficient basis for concluding that probable cause
existed to search Mr. Huizar's personal e-mail account dating
back to April of 2013.

In any event, even if probable cause was lacking

or the warrant was somehow deficient, which I conclude it was

not, the Court concludes that the evidence obtained from the

search warrant is admissible because the executing officers

relied in good faith on the validity of the search warrant.

08:52AM

In *United States versus Leon* at 468 U.S. 897, the

Supreme Court recognized a good-faith exception to the

Exclusionary Rule.  Under this exception, for example, evidence

obtained in objectively reasonable reliance on a subsequently

invalidated warrant is not subject to suppression.  The Court

08:52AM

reasoned that the deterrent purpose of the Exclusionary Rule

necessarily assumes that the police have engaged in willful or

at least negligent conduct which has deprived the defendant of

some right and that, where the official action was pursued in

complete good faith, the deterrence rationale loses much of its

08:52AM

force.

In short, as the 9th Circuit stated in the *Barnes*

case at 895 F.3d 1194, evidence obtained pursuant to a

constitutionally infirm warrant may nonetheless be admitted so

long as the officers acting on the warrant or arrest warrant

08:53AM

were unaware of and had no reason to be unaware of the

warrant's infirmities.

The test of good faith -- the good faith test is

an objective one, and the Court must ask whether a reasonably

well-trained officer would have known that the search was

08:53AM

illegal despite the magistrate's authorization.  In the *Leon*

case, the Supreme Court identified four situations in which the good-faith exception cannot apply:

One, when the affiant knowingly or recklessly misleads the judge with false information;

Two, when the judge wholly abandons his or her neutral role;

Three, when the affidavit is so lacking in indicia of probable cause that official belief in its existence is objectively unreasonable; and,

Four, when the warrant is so facially deficient that executing officers cannot reasonably presume it to be valid, i.e., it fails to specify the place to be searched or the things to be seized.

The Court concludes that the good-faith exception applies and the Exclusionary Rule is not applicable. There is no evidence that Civetti willfully misled the magistrate judge which I will discuss in more detail in connection with the request for a *Franks* hearing.

And for the reasons already discussed, the Court concludes that there is no evidence that the magistrate wholly abandoned her judicial role that the affidavit is so lacking in indicia of probable cause that the -- that official belief in its existence is objectively reasonable or that the warrant was so facially deficient that executing officers cannot reasonably presume it to be valid.

Huizar argues in relevant part that the good-faith exception is not applicable and that he is entitled to a *Franks* hearing because Civetti intentionally omitted facts that, if disclosed, should have caused a neutral and independent magistrate judge to deny the application.

Specifically, Huizar contends that Civetti, one, failed to disclose that neither Huang, Zheng, nor Shen Zhen had any projects or business that might have reached Huizar at L.A. City Council or the PLUM Committee at any point during the search period and had nothing pending when the Government sought the warrant; and, two, failed to disclose that the Government already had six months of pen-register information for the e-mail account it was seeking to search as well as pen-register data for e-mail accounts associated with Huang and Zheng which would have revealed that Huizar had no e-mail exchanges with either Huang or Zheng during the entire six-month period preceding the application and only one e-mail exchange with Chan.

To obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that, one, the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant; and, two, the false or misleading statement or omission was material, i.e., necessary to finding probable cause.

Once the defendant makes that showing to prevail

at a subsequent hearing, he must establish both prongs by a
preponderance of the evidence.

      The Court concludes that Huizar has failed to
make a substantial preliminary showing that
Special Agent Civetti intentionally or recklessly made false or
misleading statements or omissions in support of the warrant or
that any such statements or omissions were material and, thus,
concludes that Huizar is not entitled to a *Franks* hearing.

      With respect to Civetti's alleged failure to
disclose that neither Huang, Zheng, or Shen Zhen had any
project or business that might have reached Huizar, the Court
agrees with the Government that Civetti did not repeatedly
intimate that Huang and Shen Zhen had already sought and were
continuing to seek assistance from Huizar.  Rather, Civetti
candidly admitted that it remained unclear what official acts
might have been sought from Huizar in return for the financial
benefits he received from Mr. Huang.

      Moreover, with respect to the project or business
that might have reached Huizar, all that Civetti stated was
that Shen Zhen New World Investment, Inc., a subsidiary of
Shen Zhen New World Group had a mixed-use mega development in
the pipeline for downtown Los Angeles.

      Huizar claims, without submitting any declaration
or evidence, that Civetti had no basis for this claim other
than a hunch.  However, without a declaration or evidence

demonstrating that Civetti's statement in his affidavit was in some way untruthful, Huizar does not meet the substantial preliminary showing required for a *Franks* hearing.

08:58AM      This is especially true where the allegations in the First Superseding Indictment confirm that Huang, through U.S. subsidiaries and affiliates, acquired the L.A. Grand Hotel Downtown located in Council District 14 in 2010 or 2011 and that Huang and SZNW ultimately applied to redevelop the L.A. Grand Hotel into a 77-story skyscraper featuring a mix of
08:58AM residential and commercial uses in June of 2018.  In other words, it appears that Huang and SZNW had a mixed-use mega development in the pipeline even if the actual application was not filed until June of 2018.

     Notably, evidence submitted in connection with
08:59AM another motion confirms that Huang and SZNW did, in fact, have a mixed-use mega development in the pipeline in 2016, the same year that Civetti submitted his affidavit in support of the warrant application.

     Indeed, according to Exhibit J, which is a
08:59AM transcript of the February 21st, 2019, interview of Mr. Zheng which appears as docket No. 296-10 filed in connection with Huizar's motion to suppress evidence and strike allegations due to the Government's violation of the attorney/client privilege, Ricky Zheng stated to Mr. -- stated that Mr. Huang discussed
08:59AM his development plans for the future with Raymond Chan and

Huizar at a lunch meeting about building the tallest building in Los Angeles next to the L.A. Hotel or converting the L.A. Hotel into the tallest building in Los Angeles.

Huang told Mr. Zheng prior to the lunch meeting that he would discuss these plans with Chan and Huizar at the lunch meeting and that he would get someone to make, quote, "the plans to do the blueprint." This conversation and lunch meeting occurred before Mr. Zheng ceased working at the hotel in 2016.

In his reply, Mr. Huizar attempts to rectify or remedy his failure to provide any evidence contradicting Civetti's statement by citing to the City of Los Angeles Zimas, Z-i-m-a-s, website. The Court reviewed that website and does not believe it refutes or undermines Civetti's claim that SZNW group had a mixed-use mega development in the pipeline. It appears that Huizar equates a development project being in the pipeline with one that already has some sort of application pending with the City. As I indicated earlier, the Court disagrees with that conclusion.

The Court also concludes that Huizar has failed to make a substantial preliminary showing that Civetti's failure to disclose the pen-register or toll records, trap-and-trace records for the subject account was material were necessary to the finding of probable cause. Indeed, the toll record information likely would have bolstered the

magistrate judge's finding of probable cause.

Although the toll record, pen-register, trap-and-trace data for the subject accounts show no e-mails between Huizar, Huang, and Zheng and only one e-mail between Huizar and Chan, the records reflect hundreds of e-mails between Huizar and Esparza using their personal e-mail accounts.  The warrant detailed facts demonstrating that Esparza was Huizar's aide or right-hand man, a suspected co-conspirator in the bribery scheme, companion for at least one of the gambling trips with Huang and a witness to Mr. Huang giving casino chips to Mr. Huizar.

The affidavit also demonstrated that Huizar and Zheng were in almost constant contact and, thus, that Esparza may have been the primary go-between or intermediary between Huizar and Mr. Huang and Shen Zhen.

In light of these facts, the Court concludes that the toll records did not undermine the magistrate judge's finding of probable cause that evidence of bribery would be found in a particular place, especially given that Mr. Huizar also used the subject e-mail account to book his Las Vegas flights and may even have bolstered it.

Huizar also argues that attachment B to the warrant, which stated that the agents could seize, quote, "all records and information described in Sections II(10)(a) and II(10)(b)" rendered the warrant invalid because it allowed

agents to seize all content and non-content records provided by

Yahoo! and, thus, lack specificity and was overbroad.

The Court agrees with the Government that the

search warrant's authorization had erroneously indicated that

09:03AM   agents could seize all content by the provider was an obvious

drafting error, not obvious in the sense that it was easily

discoverable but, once discovered, obviously erroneous.  It was

obviously erroneous because there would have been no need for

the warrant to specify four narrow categories of items subject

09:03AM   to seizure had the warrant truly intended to authorize agents

to seize all content and non-content records.

The Court concludes that the drafting error is

akin to a mere typographical error in the warrant which does

not render an otherwise valid warrant defective.  As stated in

09:04AM   *United States versus Alvarez* at 190 F. Supp, where the warrant

is otherwise valid, officers are permitted to correct obvious

errors.

And notably, the search team did not even seem to

be aware of the drafting error.  Indeed, in executing the

09:04AM   warrant, the search team only seized the particularized

categories of items specifically detailed in the warrant.

Accordingly, there was no resulting prejudice to Huizar.

Finally, Huizar summarily argues in a single

paragraph that the Government preservation letters to Yahoo! in

09:04AM   which the Government required Yahoo! to preserve copies of the

1   e-mail account pursuant to 18 United States Code Section

2   2703(f) constituted a warrantless seizure and violated the

3   4th Amendment.  The Court disagrees.

4          As the district court -- a recent district court

09:05AM   5   held, a preservation request pursuant to Section 2703(f)

6   notifies the online provider to take all necessary steps to

7   preserve the records of an account.  The request does not

8   interfere with the use of the account or entitle the Government

9   to obtain information without further legal process.  Because a

09:05AM   10   preservation request does not meaningfully interfere with an

11   individual's possessory interest in the property, the Court

12   concludes that the preservation request does not constitute a

13   seizure.

14          For the foregoing reasons, Mr. Huizar's amended

09:05AM   15   motion to suppress evidence derived from the unlawful seizure

16   and search of 39 months of personal e-mails which was filed on

17   December 16 is -- and appears as docket No. 307 is denied.

18          MS. MILLS:  Your Honor, Melissa Mills on behalf

19   of the United States.  May I make one minor clarification on

09:06AM   20   the Court's order that I don't believe affects the Court's

21   analysis?

22          THE COURT:  All right.

23          MS. MILLS:  This relates to what Mr. Snyder

24   raised during his argument as to the e-mail that the Government

09:06AM   25   sent him clarifying a confusing line in the Government's

opposition and a line in the affidavit as well that the Court

has referenced in the order.

It is accurate that, as the Court pointed out,

that Shen Zhen New World did in 2016 at the time of the warrant

09:06AM  have a mixed-use mega development in the pipeline.  However,

Special Agent Civetti did not have full knowledge of that fact

at the time.  What Special Agent Civetti knew was that the

L.A. Grand Hotel was owned by Shen Zhen New World, that it

could be developed similar to other properties being

09:07AM  developed -- other downtown Los Angeles hotels.  That is what

the affidavit conveyed.  The Government modeled that in its

opposition in misreading that line of the affidavit.

So I think the Court clarified that, when

something is in the pipeline, that doesn't necessarily mean

09:07AM  there is a pending application.  And so that is what the

Government understands as well.  So we don't believe that this

impacts the Court's analysis at all, but we did want to clarify

that point for the record.

THE COURT:  All right.  The next motion that I

09:07AM  will hear argument on is Shen Zhen New World and Huizar's

motion to suppress evidence, dismiss counts, and strike

allegations due to the Government's violation of the

attorney/client privilege.  That motion appears as

docket No. 75.  The Government's omnibus opposition appears as

09:08AM  docket No. 316.  Mr. Huizar filed a reply which appears as

docket 339.  Shen Zhen New World filed a reply on January 15th of 2022 as docket No. 338.

In this motion, the defendants argue that the Government flagrantly and intentionally invaded the attorney/client privilege by reviewing confidential and privileged conversations between attorney Henry Yong, Huizar, Mr. Esparza, and Ricky Zheng and by relying on those communications to interview witnesses to build its case against the defendants.

As a remedy, the defendants request that the Court suppress the privileged attorney/client communications as well as all evidence and testimony derived therefrom; and, two, dismiss the counts in the First Superseding Indictment and strike all allegations relating to the 2014 collateral and loan transaction.

The background to this motion is that in 2013 Mr. Huizar was sued by a former employee or staffer for sexual harassment.  As alleged in the First Superseding Indictment at overt acts 25, 26, and 30, Defendant Huang and chairman and president of the Chinese-based real estate development company, offered to financially assist Huizar with settling the lawsuit.

According to the First Superseding Indictment, Mr. Zheng retained attorney Henry Yong to draft and execute the necessary paperwork to effectuate the financial transactions transferring funds to Defendant Huizar.  Ultimately, Mr. Huizar

1    executed a promissory note in favor of Grace Luck Holdings,

2    Limited, a Hong Kong company, wherein Grace Luck agreed to loan

3    $600,000 to Mr. Huizar.  Those funds or that money was used as

4    collateral for a bank loan that was obtained by Huizar to

09:10AM    5    settle his sexual harassment lawsuit.

6                The defendants argue that Huang and Huizar were

7    the joint clients of Mr. Yong and his co-counsel Guodi,

8    G-u-o-d-i, Sun and that Yong's communications with them or

9    their agents, Ricky Zheng and George Esparza, are protected by

09:11AM    10    the attorney/client privilege.

11               In response, the Government argues that the

12    defendants have failed to demonstrate that they had an

13    attorney/client relationship with Yong or Sun; the

14    communications were not confidential or privileged; and, three,

09:11AM    15    the inclusion of third parties on those communications

16    destroyed any privilege; and, four, Huizar and/or Yan Yan

17    waived the privilege.

18               Finally, the Government argues that the

19    defendants have failed to demonstrate that the Government

09:11AM    20    deliberately intruded into the attorney/client relationship.

21               So I will hear from counsel if there is anything

22    you wish to add to your papers.

23               MR. STEINGARD:  Your Honor, this is

24    Richard Steingard, if I can take the lead on this.

09:12AM    25               THE COURT:  I'm sorry.  I didn't --

1        MR. STEINGARD:  This is Richard Steingard.  I was

2    going to take the lead on this if that's all right.

3        THE COURT:  Sure.  Go ahead.

4        MR. STEINGARD:  Are you having problems hearing

09:12AM  5    me, Your Honor?

6        THE COURT:  Go ahead.  I can now hear you.

7        MR. STEINGARD:  Very good.  Well, the first

8    question I have is really -- or the first comment I have is

9    really a question for the Court on whether there is anything in

09:12AM  10   the context of the motion or litigating the motion that

11   Your Honor would like me to address?  And, if so, I will go

12   right to that.  Otherwise, I do have some thoughts.

13       THE COURT:  No.  I mean, I'm prepared to rule.

14   You can argue whatever you want to argue, but make sure what

09:13AM  15   you do argue is not something that is already in your papers

16   since I have read them at least twice, maybe even more.  This

17   is a very complicated motion.  But I will hear from you.

18       MR. STEINGARD:  Your Honor, thank you.  And I'm

19   not going to repeat myself.  In preparing for today, I started

09:13AM  20   to think about this, not from, you know, being in the forest,

21   but actually from sort of a 30,000-foot viewpoint.

22       When someone -- when two people agree to a loan,

23   or in this case a collateral loan transaction, it might be

24   common for them to contact a bank, banker or a financial

09:13AM  25   analyst.  But when they reach out to a lawyer, when they say we

1   need to get a lawyer involved, it's because these are going to

2   be legal issues that are in play.  People don't usually think

3   about loans and say, as a first step, let's get a lawyer

4   involved unless there is some legalistic issue.

09:14AM   5        Lawyers aren't usually needed for loans.  And,

6   frankly, the loans or when there's lines of credit, refinance,

7   whatever you want to call it, we usually don't jump first step

8   to lawyers.

9        Ricky Zheng was the one who said, as stated in

09:14AM   10  the record, to the chairman, Chairman Wei Huang, if you're

11  going to extend the loan, you have to get a lawyer involved to

12  do it.  And Wei Huang then instructs him, okay, go ahead and

13  hire a lawyer.  That's not because they need somebody to start

14  collecting documents.  That is not to do clerical work, and

09:14AM   15  that is not to do some kind of administrative action.  That's

16  because of the perception that this has to be done legally and

17  properly via somebody with legal expertise.

18       I want to suggest to Your Honor a slightly

19  different way of looking at this.  If Ricky Zheng had said, you

09:15AM   20  need to hire a lawyer, and Wei Huang said, great, hire me a

21  lawyer, I want the best lawyer you can find at

22  O'Melveny & Myers or Latham & Watkins or Sheppard Mullin and

23  Ricky Zheng went and hired a lawyer at $1,200 an hour to

24  prepare the promissory notes and to protect this loan and

09:15AM   25  collateral transaction, I don't think the Government would be

arguing that person was hired just to collect paperwork, that person was just doing clerical work.

The clerical work that they are referring to, it may have been done by a Latham & Watkins paralegal, but that still falls within the ambit of an attorney/client privilege.

For some reason, maybe it's subconscious, but for some reason we treat Henry Yong and Guodi Sun differently than we would an attorney at Latham & Watkins, and I don't understand that.  It's the same privilege.  It's the same hiring of a lawyer, albeit, perhaps not the finest of lawyers one could find.  But it was the lawyer that they hired.

And in that context, Your Honor, I think that the attorney/client privilege applies to the legal work that Yong and Sun were hired to do.

If we agree or if the Court finds that, in fact, this was legal work that was to be performed, then we have to figure out who the client was.  The Government moves to Grace Luck, but the record establishes that Grace Luck truly can't be the client.  Henry Yong, the attorney, has zero contact with anyone from Grace Luck other than a woman named Yan Yan who we know and nobody disputes is simply a Shen Zhen employee that has never heard of Grace Luck, doesn't even know if Grace Luck exists, signs a series of documents as she is instructed to by her employer Shen Zhen New World, and Ricky Zheng is her boss.

```
 1              There is no formulation that can -- this is like

 2    trying to stick a round peg into a square hole.  There is no

 3    formulation.  Nobody can claim that Grace Luck is the actual

 4    client when the attorney has had zero contact with anyone

 5    from --

 6              THE COURT:  Why did they sign a retainer

 7    agreement?

 8              MR. STEINGARD:  Yan Yan signed a retainer

 9    agreement that somebody stuck in front of her and pointed to

10    the place for her to sign.  The retainer agreement cannot

11    simply carry the day, Your Honor.

12              THE COURT:  I understand that.  But, you know, we

13    have a -- the problem I have with the motion is I -- as I will

14    rule, I don't think it's -- this issue with respect to the --

15    there's two aspects of this motion.  One is the attorney/client

16    privilege.  The other is whether or not the Government

17    deliberately invaded the attorney/client privilege.

18              MR. STEINGARD:  Agreed.

19              THE COURT:  The problem I have and as I will

20    indicate in the ruling is I don't think the parties have

21    properly presented the first issue because we have all these

22    parties floating around.  I agree with you with respect to a

23    loan transaction that typically you go to a bank and you don't

24    need a lawyer to participate in the loan transaction.  This is

25    very simple.  Who's the bank -- the bank is going to make a
```

09:17AM (line 5)
09:18AM (line 10)
09:18AM (line 15)
09:18AM (line 20)
09:18AM (line 25)

loan, and the bank needs collateral, and the collateral is

going to be the cash that was represented by the promissory

note.

On the other hand, as you characterized the

09:19AM   relationship of parties to a loan transaction, we also know

that, having been involved in many of these transactions, you

have a lender who is willing to lend money.  And Mr. Zheng gave

him good advice that, if you're going to do this, which I

recommend that you not do because of Huizar's position, you

09:19AM   need a lawyer.

But in a loan transaction, typically a lawyer is

retained in order to provide advice to the lender and making

sure that the lender is protected in a, in this case, a very

simple promissory note that, in the event that there's a breach

09:19AM   of the note, that the lender can be repaid.

To try to bring Huizar into that joint client

relationship or having established a relationship based upon

this evidence and based upon these documents just doesn't fly

because it's clear, to me at least, that the lender -- the

09:20AM   lender side of the transaction had the lawyer that was

retained.  Now, what happens later on in terms of these various

communications is something different.

So I understand what you're saying, and I think,

given the way that I'm going to rule today, there's going to be

09:20AM   an opportunity for all sides to produce additional evidence

1   with respect to these relationships.

2           The critical analysis in these -- and it's the

3   same thing with the next motion, the Kaufman calls, is who are

4   the parties?  What is the relationship of the parties?  Was

09:20AM   5   there an attorney/client relationship established?  And, more

6   importantly, what is the confidential communication?

7           Just simply preparing a promissory note and

8   sending a note, even if it was drafted by one of these lawyers,

9   that isn't a confidential communication.  I searched long and

09:21AM   10   hard to exactly try to make a determination in terms of what is

11   the confidential communication that either Sun or Yong

12   communicated to -- in this case, I will just use the lender.

13   What was -- what was necessary to -- for a lawyer to

14   communicate or give advice on in terms of these transactions?

09:21AM   15           That's a different issue than whether or not the

16   attorney/client relationship was established and who the

17   attorney was and who the clients were.  And to the extent your

18   client wanted to hide from being the lender and use

19   Grace Holdings, that raises an additional issue.

09:22AM   20           MR. STEINGARD:  Well, you said a lot there.  One

21   of the things you said is, that I picked up on, is that there

22   will be additional briefing.  So I don't know that -- whether

23   the Court wants to engage.  I can respond.

24           THE COURT:  No.  That's why I think that you

09:22AM   25   have -- I think everybody is going to have an opportunity to

more clearly set forth a record because these attorney/client

privileges issues are really fact intensive.  What counsel are

asking me to do is take bits and pieces from 302s, from

e-mails, from letters, from correspondence and try to patch

09:22AM   together an evidentiary record in terms of who the client is,

who the attorneys are, and what the nature of the confidential

communication is.  And I am unable, based upon this record, to

do it.

MR. STEINGARD:  Understood.  And let me tell you

09:23AM   the dilemma we ran into.  We had a lot of discussions about

this about should we give the judge the e-mails themselves so

he can track almost on a day-by-day what evolved, or is the

disclosure of those kind of records in some way a waiver of the

privilege?

09:23AM   We tiptoed in preparing this, Your Honor, by

making sure that we included things that we felt would provide

the Court with the information without necessarily breaching

the privilege that we claim exists.

Now, we cited in our reply brief to a couple of

09:23AM   cases in which the courts have accepted privileged material in

camera for review without anyone claiming a violation of -- a

waiver of the privilege.  And if Your Honor feels that that

would be appropriate, we're happy to do it that way.  It would

certainly clarify the situation and make your job a lot easier

09:24AM   than trying to piece these things together through 302s.  We

don't know another way to do it.

THE COURT:  Okay.  Let me make a ruling.  As I indicated before, I'm going to give everybody an opportunity. The complexity of this motion was also -- resulted from this failure to properly identify these exhibits.  I don't know how many hours I spent trying to understand the various exhibits. I now have a good understanding of them.  It has taken me an enormous amount of time.  But let me make the following ruling:

In ruling on this motion, I'm going to set forth facts known to the Government primarily in chronological order.

During the Government's investigation from July 1st, 2016, to November of 2018, the Government obtained several search warrants for the e-mail accounts of Huizar and Esparza.

During his review of the e-mails, if Civetti identified a potentially privileged attorney/client communication, he stopped his review and consulted with the assigned prosecutor Mr. Jenkins regarding the potentially privileged nature of the e-mails based on the participants in the e-mail, a summary of the limited substance of the communication he reviewed, and his knowledge of the investigation.

If, based upon his description, the prosecutor and Civetti concluded that the e-mails were likely privileged, attorney/client communications, Civetti filtered out all of the

e-mails with those e-mail addresses from their review without reviewing the content.

For Huizar, the filter included all e-mails with the "@walsh" to include any lawyer or staff member of the legal firm of Walsh & Associates which the FBI had learned had represented Huizar in his personal capacity in connection with his sexual harassment lawsuit that had been filed against him.

The filter also included all e-mails of "@kaufman" to include all e-mails with Stephen Kaufman who agents identified as Huizar's -- Mr. Huizar's election lawyer and anyone else from the Kaufman legal group.  For Esparza the filter also included @kaufman.

During his review of e-mails, Civetti discovered e-mails with Henry Yong at an e-mail address that began with "esqimmigrationlaw" which suggested that Yong provided legal advice related to immigration.  Based on the participants and the substance of the e-mail communications, his knowledge of the investigation at the time and after consultation with Jenkins, Civetti concluded that e-mail communications with Henry Yong were not privileged attorney/client communications.

Accordingly, as part of his review pursuant to the search warrants, Civetti seized numerous communications from Yong from Huizar's e-mail account and from Esparza's e-mail account within the scope of the search warrant.

The defendants Huizar and SZNW move to suppress

these e-mails seized from Huizar and Esparza's e-mail accounts.

Defendants have filed Exhibit M under seal which is

docket No. 302-8 which is apparently different than and

supersedes docket No. 296-13 which is, in effect, a privileged

09:28AM  log prepared by counsel enumerating communications produced by

the Government relevant to this motion -- those were referred

to in Mr. Snyder's declaration at paragraph 18 -- without

identifying from which e-mail account the specific

communications were seized.

09:28AM          According to the Government, based on the Bates

numbers, 62 of the 68 e-mails that appear in Exhibit M were

seized from Esparza's e-mail account while only six were seized

from Huizar's account.

          For some unknown reason, although Mr. Steingard

09:28AM  has enlightened me, defendants failed to file any of the

alleged privileged communications with the Court.  The

Government also failed to file all of the alleged privileged

communications with the Court but at least provided a relevant

sampling, some six e-mails seized from Huizar's account and two

09:29AM  e-mails seized from Esparza's account.  Those e-mails can be

found at docket No. 327.

          The first Government's exhibit -- let me go back.

Specifically, the agents seized the following six e-mails from

Huizar's e-mail account between Huizar and Yong without any

09:29AM  other parties in the "to," "from," or "cc" line.  As I

1    indicated, those are found in docket No. 327.

2              The first is Government's Exhibit 2.  That's an

3    August 17, 2014, e-mail from Huizar to Yong writing, quote,

4    "Just got an e-mail that the plaintiff attorney is asking for a

09:30AM    5    deadline of Tuesday noon to sign settlement.  Otherwise, they

6    pull settlement offer.  Let me know as soon as possible -- let

7    me know as soon as money has been transferred and available."

8              Exhibit -- Government's Exhibit 3 is an

9    August 22nd, 2014, e-mail from Yong to Huizar asking him to

09:30AM    10    review a draft promissory note which provided that Grace Luck

11    Holdings, Limited, would pay the sum of 600,000 through the

12    attorney trust account of Mr. Sun to a yet-to-be-determined

13    individual or entity referred only to as "the maker."

14             Government's Exhibit 4 is an August 22nd, 2014,

09:30AM    15    e-mail from Huizar to Yong stating or writing, "This is the doc

16    that I will sign and have my attorney hold for 30 days and

17    execute in event I do not execute a commercial loan within

18    30 days.  Let me know if it is okay with you."

19             Government's Exhibit 5 is an August 22nd, 2014,

09:31AM    20    e-mail from Huizar to Yong which stated, "Actually, the

21    attached is what I signed and sent to my attorney attaching the

22    promissory note."

23             Government Exhibit 6 is Henry Yong's response to

24    Huizar's August 22nd e-mail in Exhibit 5 stating, in relevant

09:31AM    25    part, "I see that you have amended and post-dated the PN

promissory note.  The changes are well within the range of what we have discussed earlier.  I will be making a few rounds to local banks around the area and will let you know the result. Have a good trip."

09:31AM       And Government Exhibit 7 is Huizar's August 22nd, 2014, reply to Yong's response in Exhibit 6 stating, "Yes.  Please check with banks to see where we can get the best deal.  On Monday let's go visit a bank or two and start to process.  Thanks again for your help.  You have been
09:32AM    exceptional."

       The two e-mails seized from Esparza's account -- during their review of Esparza's account, agents seized several e-mails that included Yong had an e-mail address, as I indicated before, "esqimmigrationlaw" in the "to," "from," or
09:32AM    "cc" line.  Some of those communications were between Yong and Esparza only while others included Huizar and/or Zheng at his personal e-mail.

       Government's Exhibit 8 is an e-mail dated August 8, 2014, from Henry Yong to George Esparza in which Yong
09:32AM    stated, "In relevant part, in preparing for our impending meeting, it would perhaps be instructive for us to sort out the documents that are essential for the consummation of the transaction.

       "One, we need to obtain the retainer agreement
09:32AM    between Hong Kong company and Los Angeles attorney over the EB5

project feasibility study.

"Two, if the Hong Kong company requires collateral, then we would be moving forward with the promissory note that is secured by the second deed of trust on each of the properties.

"I look forward to working with you in this matter.  Just FYI, I am only licensed in New York."  Apparently he had been disbarred in California.  "And as such, my practice is limited to immigration only.  My California licensed partner will handle this transaction."

Government Exhibit 9 consists of e-mail exchanges on September 5th through 8th of 2014 which show that Yan Yan was the sole representative of Grace Luck in the signing of any financial and/or legal documentation associated with the loan or planned pledging of a $600,000 certificate of deposit as collateral for a loan for Mr. Huizar.

In addition, in an e-mail to Yan Yan, Henry Yong states, "Please also confirm with Ricky if our retainer is going to be paid via check or wire transfer."  Ricky undoubtedly refers to Ricky Zheng, the executive director of SZNW.

Although no additional e-mails from Exhibit M were provided to the Court other than e-mails provided pursuant to Mr. Huizar's proffer which were included in Government's Exhibit 12, the Court has reviewed the defense counsel's

1   descriptions of the e-mails in Exhibit M.  Notably, in an

2   e-mail from Henry Yong to George Esparza and Ricky Zheng dated

3   August 10, 2014, as described by defense counsel, Yong attached

4   an amended promissory note and advised that a retainer

09:34AM   5   agreement will be signed between Zheng's company in HK and his

6   office and provided a list of what Yong needed.  In another

7   e-mail dated August 21st, 2014, from Yong to George Esparza,

8   Huizar, and Ricky Zheng, Yong asks that Zheng sign the

9   retainer.

09:35AM   10           In the declaration of Mr. Snyder -- I believe

11   that was at paragraph 5 -- he represents that multiple retainer

12   agreements were drafted and different versions listed the

13   lender, i.e., Huang, SZNW, or the borrower, i.e., Huizar, as

14   the client.  Mr. Snyder admits, however, that Yan Yan, the

09:35AM   15   designated representative of Grace Luck Holdings, Limited,

16   signed the retainer agreement on behalf of Grace Luck Holdings,

17   the company that provided the funds for the collateral to

18   support the loan.

19           For some reason, the defendants did not provide

09:35AM   20   these draft retainer agreements and supposedly listed Huizar or

21   Huang/SZNW as the client.  In reviewing Exhibit M, it does not

22   appear to the Court that any of the draft retainer agreements

23   specifically listed Huizar or Huang or SZNW as the client.

24   Rather, it may be, although I can't tell without reviewing the

09:36AM   25   actual documents, that the draft retainer agreements were

standard form retainer agreements used by Yong that used the

terms "borrower" and/or "lender" without any specification of

the actual client.

In any event, within two weeks of the initial

e-mail communications in Exhibit M, it appears that it was

decided that the retainer agreement would be signed between

Zheng's company in Hong Kong and Mr. Yong's office.

Based at least on the e-mail communications

provided, the Court agrees with the Government that the e-mail

communications did not demonstrate that Huizar or Esparza had

an attorney/client relationship with Yong.  Indeed, the

communications themselves dated that the attorney/client

relationship was with Zheng's company in Hong Kong, i.e.,

Grace Luck Holdings, Limited, and that Huizar had his own

separate attorney on the sexual harassment lawsuit to whom

Huizar had referred to in at least two of the e-mails that I

referred to as "my attorney."

As part of its investigation in this case, the

Government conducted voluntary interviews with other

individuals involved in the Grace Luck transaction regarding

their involvement in arranging the loan from Grace Luck to

Huizar including Esparza and Ricky Zheng, Yan Yan, Henry Yong,

Mr. Sun, and bank employees.  The Government also received

voluntary production of documents from Huizar, Yan Yan, Sun,

and Mr. Yong.

1          The Court is going to discuss -- we will discuss

2     each of these interviews, the first of which is the

3     November 19, 2018, Zheng interview which appears as Exhibit I

4     in docket No. 302-4.

09:38AM   5          In relevant part, when Zheng was first

6     interviewed by the FBI about the settlement of the sexual

7     harassment lawsuit filed against Huizar, Zheng stated that a

8     company provided collateral to the bank which was a loan to

9     Huizar.  He did not remember the name of the company.  He

09:38AM  10     didn't know if Huang provided the money to the company.  He did

11     remember that a lawyer was involved in setting up the loan.

12     Yan Yan, an employee of Huang's company signed the documents

13     for the collateral.  And when Zheng asked if he was involved in

14     arranging the loan, he stated that "Sometimes they will have

09:38AM  15     him solve deal with these problems and that he had a lawyer.

16     He doesn't know."  He also stated that, because Huizar was a

17     government official, everything went through the bank and went

18     through the lawyer.

19          The next is the interview on November 20 of 2018.

09:39AM  20     On that date Yan Yan, the designated representative from

21     Grace Luck Holdings, Limited, forwarded to Civetti several

22     e-mails from her personal e-mail account including a

23     September 29, 2014, e-mail from Henry Yong to Yan Yan which

24     attached a partially executed promissory note and an attorney

09:39AM  25     fee agreement.  The promissory note dated August 15, 2014, was

1    signed by Yan Yan for and on behalf of Grace Luck Holdings,

2    Limited, and Huizar.

3              The attorney fee retainer agreement which was

4    signed by Yan Yan on August 15 of 2014, for and on behalf of

09:39AM  5    Grace Luck Holdings, Limited, listed the client as Grace Luck

6    Holdings, Limited, and the attorney as Mr. Sun although the

7    names were transposed, not Mr. Yong, and referred to Huizar as

8    the borrower.  The agreement set forth services to be provided

9    by the attorneys indicating that the client wished to lend

09:40AM  10    600,000 to Huizar and that the borrower Huizar would provide an

11    executed promissory note for the client.

12              On December 4 of 2018, the Government interviewed

13    Yan Yan who worked for SZNW until approximately 2016.  She told

14    the Government that Ricky Zheng instructed and authorized her

09:40AM  15    to sign a loan at East West Bank from the company SZNW to

16    Huizar.  She did not know what she was signing and only knew it

17    was a loan to Huizar.  Yan did not know who the loan was from

18    but knew she was there on behalf of the company.

19              On December 18 of 2018, Huizar was interviewed

09:40AM  20    pursuant to a proffer agreement.  Huizar voluntarily disclosed

21    the information regarding his financial transaction, and of

22    course, he was represented with counsel who was present during

23    that proffer.

24              He stated that he worked with Zheng and an

09:41AM  25    attorney named Henry to figure out how the money was going to

be provided.  At no point did Huizar or his counsel invoke the attorney/client privilege with respect to those communications or claim that a waiver of any privilege would be necessary to provide that information.

09:41AM            I will also note that Civetti's declaration states that the interview occurred on November 18 of 2018.  His declaration is docket No. 316-1 at paragraph 10.  However, the 302 clearly indicates that the interview took place on December 18th.

09:41AM            The next is the February 21st, 2019, Zheng interview.  That is represented by Exhibits A and J.  He was re-interviewed by agents about the loan.  According to Zheng, Zheng told Huang that he could not provide the 600,000 because Huizar was a government official.  Huang said that he already had made a promise to Chan and Huizar that he would make the loan.  Zheng told Huang that he should get an attorney and make some type of contract or agreement with Huizar.  Huang told Zheng to get an attorney to help with the payment.

09:42AM            When asked if he was ever present for conversations between Huang and Huizar about the loan, he stated in relevant part, "I remember I was, but I threw the case over to the attorney, and then the attorney would directly contact Esparza and Huizar and that, if there's any mail between them, they will forward a copy of the e-mail to him because my boss needs to know and he needs to look at it."

On March 27, 2019, pursuant to the proffer
agreement, Huizar voluntarily produced to the Government many
of the e-mail communications the defendant now seeks to
suppress.  As I indicated, those are in Exhibit 12.  The
09:43AM  production included e-mails between Huizar, Esparza, Zheng, and
attorney Yong from August 10, 2014, to December 19, 2014,
multiple drafts of the promissory note, a draft attorney fee
agreement, a purported draft of a joint venture agreement.  A
draft attorney fee agreement provided Huizar referred to the
09:43AM  lender as the client and Sun & Associates -- again, the names
were transposed -- as the attorneys.

The Government, once again, interviewed Zheng
about the loan on April 8, 2019, which is reflected in
Exhibit K.  According to the 302, Zheng said that he would --
09:44AM  he told Huang not to lend the money directly and that Huang
should utilize a lawyer to effect the loan.

None of the interviews up to this point suggest
that Huizar or Esparza were the actual clients of Mr. Yong.
Rather, in the Court's view, it appeared that either Grace Luck
09:44AM  Holdings, SZNW, and/or Huang were the clients.

On June 6, 2019 -- on June 6, 2019, the
Government interviewed Esparza about the collateral, and the
loan transaction and evidence of a potential attorney/client
relationship between Huizar and Yong first appeared.  According
09:45AM  to the 302, Huizar, Henry Yong, Yan Yan, Chan, Esparza, Zheng,

Huang, Tom Walsh, Rudy Estrada, the vice president of
East West Bank, and Stephen Kaufman were involved in the
settlement of the sexual harassment lawsuit against Huizar.
Walsh and Kaufman were attorneys.  It was Huizar's
understanding that Yong was also an attorney.

The Government showed Esparza 30 e-mail strings,
almost all of which were to and from Attorney Yong.

Esparza stated, in relevant part, that Yong was a
friend of Zheng and was assigned by Huang to help Huizar in the
process of working with the banks to obtain the settlement
money.  Esparza was told that Yong was an attorney and was
going to take care of the bank issues.

Zheng introduced Yong to Esparza and Huizar at a
restaurant in or about July or August of 2014.  The purpose of
the meeting was to discuss the settlement and how to wire the
money.  Esparza said that Huizar used Yong at the
recommendation of Zheng.  According to Esparza, Huang, Zheng,
and Yong were trying to get Huizar to sign the promissory note,
but Huizar was reluctant to sign anything.  Huizar thought that
it was Yong or Huang's idea to have a promissory note.

Esparza also remembered that Yan Yan was assigned
as the main person associated with Grace Luck and that she was
an employee of one of Huang's hotels.  He did not know if
Grace Luck was a real company, but it was used to transfer the
money.  Esparza said that Grace Luck was used so that the loan

was not directly associated or traceable to Huang.

Esparza said that he was Huizar's middleman and Zheng was Huang's middleman.  He also stated that Huizar at times met alone with Yong.

09:46AM   Esparza remembered that Huizar gave him $5,000 in cash to pay Yong for his services with regards to the settlement after the settlement was consummated.  Esparza did not know if Yong was paid by Huang or Zheng.  According to Esparza, if Huizar signed an attorney fee agreement, either

09:47AM   Esparza printed it and Huizar signed it or had Esparza give it to Yong or Huizar kept it himself.  However, no one has indicated that such an agreement even exists.

On September 23rd, 2019, the Government interviewed Mr. Sun.  According to the 302, Sun knew Yong to be

09:47AM   involved in financial dealings in which Yong was the middleman. If someone wanted to borrow money, Yong was the middle guy and was paid a commission.  On a few occasions Yong asked Sun to be the gatekeeper and have the money go through Sun.  Sun only acted as the gatekeeper once for the transaction with Huizar.

09:47AM   According to Sun, in approximately 2014, Yong asked Sun to receive or accept $600,000 from China and transfer the money to Huizar.  The 600,000 was transferred from China into Sun's trust account.  The money was transferred from a company called Grace Luck Holdings.  Sun ultimately provided a

09:48AM   $600,000 check to Esparza.  In exchange for the transaction,

Sun received approximately 4- to 5,000 from Esparza which may
have been split with Yong.

Notably, Sun did not recognize the retainer
agreement.  Ultimately he recalled that a promissory note was
signed by Yan Yan from Grace Luck Holdings as lender and Huizar
as the borrower.  Sun did not know Yan Yan, nor had he ever met
with Yan Yan.  Sun recalled Yong referring to his client and
the money being provided by SZNW.

During this interview, Sun looked up relevant
e-mails and an Excel spreadsheet of finances on his computer
and allowed the interviewing agents to review them on a
computer screen.  In addition, Sun printed copies of relevant
e-mails that he provided to the interviewing agents.

On October 1st the Government interviewed
attorney Henry Yong.  That's reflected in Exhibit C, docket
No. 302-3.

Notably, Yong explained that he was introduced to
Huizar by his former co-worker Simon Cao who knew Huizar
through Ricky Zheng.  In 2014, Zheng, Huizar, Esparza, and Yong
met at a restaurant, and Yong was told that Huizar needed a
loan to pay off certain things which he later found out to be
the sexual harassment claim.  Yong devised a structure for the
loan and messaged Esparza.  Yong suggested preparing a
promissory note and using property owned by Huizar as
collateral.  Esparza said that this would not be feasible.

At the next meeting Zheng, Esparza, and Esparza's girlfriend were present, which to the Court suggests that, to the extent any privileged communication was discussed during that meeting, that privilege was destroyed.

09:50AM

In any event, Zheng informed Yong that Huizar did not want his name in public records. Later Huizar said he wanted to borrow money from Huang and asked Yong if the money from Huang could be used in a CD as collateral. Yong advised that he would contact banks to ask. Yong contacted banks to determine if this was feasible and prepared a promissory note. The parties to the note were Huizar and Grace Luck.

Yong stated that he and Sun worked together on Huizar's case. He and Sun were paid between 5,000 and 6,000 in cash for their services preparing a promissory note and completing the transfer and that the cash was provided to Yong in person by either Esparza or Yan Yan at the time of the transfer.

As far as the attorney/client privilege is concerned, as the 9th Circuit stated in *United States versus Ruehle*, R-u-e-h-l-e, at 583 F.3d 600, the attorney/client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice as well as an attorney's advice in response to such disclosures.

As the 9th Circuit stated in *United States versus Christensen* at 828 F.3d 763, the purpose of the attorney/client

privilege is to encourage full and frank communication between
attorneys and their clients and thereby promote broader public
interest in the observance of law and administration of
justice.  Clients must be able to consult their lawyers
candidly, and the lawyers in turn must be able to provide
candid legal advice.

However, as the 9th Circuit stated in *Ruehle*, the
fact that a person is a lawyer does not make all communications
with that person privileged.  Because it impedes full and free
disclosure of the truth, the attorney/client privilege is
strictly construed.

As the 9th Circuit stated in the *Graf* case at
610 F.3d, an eight-part test determines whether information is
covered by the attorney/client privilege.  And I quote:

"One, where legal advice of any kind is sought;

"Two, from a professional legal advisor in his
capacity as such;

"Three, communications relating to that purpose;

"Four, made in confidence;

"Five, by the client;

"Six, are at his insistence permanently
protected;

"Seven, from disclosure by himself or legal
advisor;

"Eight, unless the protection be waived."

1          That's the end of the quote.

2          A party asserting the attorney/client privilege

3    has the burden of establishing the relationship and the

4    privileged nature of the communication.  Notably, as the

09:52AM   5    9th Circuit stated in *Christensen*, the claim of privilege must

6    be made and sustained on a question-by-question or

7    document-by-document basis.  A blanket claim of privilege is

8    unacceptable.  The scope of the privilege should be strictly

9    confined within the narrowest possible limits.

09:53AM   10          With respect to the formation of the joint

11   attorney/client relationship and the joint attorney -- the

12   joint client privilege, as the 3rd Circuit stated in the

13   *Teleglobe* case at 493 F.3d 345 -- and I quote -- "It is often

14   expedient for two or more persons to consult a single attorney.

09:53AM   15   The rules of professional conduct allow a lawyer to serve

16   multiple clients on the same matter so long as all clients

17   consent and there is no substantial risk of a lawyer being

18   unable to fulfill his duties to all of them.

19          "Just as a single client representation, the

09:53AM   20   lawyer and co-clients begin their relationship when the

21   co-clients convey their desire for representation and the

22   lawyer consents.  Like single-client representation, nothing

23   prevents joint representation from arising by implication, but

24   courts must be careful not to employ joint representation too

09:54AM   25   readily.

1          "It is important to remember that clients of the

2     same lawyer who share a common interest are not necessarily

3     co-clients.  Whether individuals have jointly consulted a

4     lawyer or have merely entered into concurrent but separate

09:54AM   5     representation is determined by the understanding of the

6     parties and the lawyer in light of the circumstances.

7          "Co-client representation must also be

8     distinguished from situations in which a lawyer represents a

9     single client but another person with allied interests

09:54AM   10    cooperates with the client and the client's lawyer."

11         Whether multiple parties have entered into a

12    joint client relationship is a flexible common-sense inquiry.

13    Courts may consider multiple factors including but not limited

14    to matters such as payment arrangements, allocation of

09:55AM   15    decision-making roles, requests for advice, attendance at

16    meetings, frequency and content of correspondence, and the

17    like.

18         As the 3rd Circuit stated in *Teleglobe*, the keys

19    in deciding the scope of joint representation are the parties'

09:55AM   20    intent and the expectations, and so a district court should

21    consider carefully, in addition to the content of the

22    communications themselves, any testimony from the parties or

23    their attorneys on those areas.

24         Defendants Huizar and SZNW have failed to meet

09:55AM   25    their burden of establishing a joint attorney/client

relationship between themselves and Yong or Sun and the

privileged nature of each of the communications on a

document-by-document basis as required by the *Christensen* case.

Indeed, not only have they failed to submit any declarations

from Huizar or Huang stating that they engaged Yong jointly for

the purpose of obtaining legal advice which would have been the

strongest, readily available evidence in support of a finding

of the existence of a joint attorney/client relationship, they

have also failed to submit each of the communications that they

contend are privileged.

Although they rely on Federal Rule of

Evidence 104(a) which provides that the Court is not bound by

the evidence rules in deciding any preliminary questions about

whether a privilege exists, they ignore Local Rule 12-1.1 which

provides as follows:

"A motion to suppress shall be supported by a

declaration on behalf of the defendant setting forth all facts

then known upon which it is contended that the motion should be

granted.  The declaration shall contain only such facts as

would be admissible in evidence and shall show affirmatively

that the declarant is competent to testify to the matters

stated therein."

As the 9th Circuit held in the *Wardlow* case at

951 F.2d 1115 and then more recently reaffirmed in *Rivera* at

832 F.3d 1166, a declaration signed by counsel is insufficient

to meet the requirements of the Court's Local Rule.  Moreover,
although the defendants submit Government interviews conducted
with relevant witnesses in support of their motion, many of the
interviewees' statements conflict with each other and do not
necessarily support a finding of a joint attorney/client
relationship.

         And interestingly, the defendants only request an
evidentiary hearing on one issue, and that is whether the
Government deliberately intruded into the defendants'
attorney/client relationship.

         However, without an evidentiary hearing on the
broader issue regarding the existence and nature of the
attorney/client relationship with Yong, the Court simply cannot
determine who even held any privilege.  And without reviewing
all of the potentially privileged communication, the Court
cannot determine what, if any, of these communications were
confidential client communications.

         I have reviewed the e-mails submitted by the
Government as well as the description of the e-mails on the
privilege log and doubts that the defendant will be able to
establish that many of these constitute confidential client
communications even if they are successful in establishing a
joint attorney/client relationship.

         For example, the e-mail in which Huizar asked
Yong to inform him when the money has been transferred and is

available does not seem to me to reveal any communication of a
confidential nature between an attorney and client.

In any event, the Court will give defendants an
opportunity to cure these deficiencies and will not rule today
on whether a joint attorney/client relationship existed or
whether Grace Luck or Huang or SZNW or Huizar was the client,
whether any specific communication constituted a confidential
client communication, or whether the privilege was destroyed or
waived.

Specifically, the Court will not rule until the
Government has made a final determination as to each exhibit it
will introduce at trial.  At that time the defendants may
re-raise this issue.  Defense counsel shall submit the required
declarations from their clients as well as declarations from
any other relevant parties and shall analyze each potentially
privileged document and demonstrate why the document
constitutes a confidential client communication.

The Court will then be able to make a more fully
informed ruling on who holds the privilege rather than
communication constituted a confidential communication, whether
the privilege was destroyed by the presence of third parties,
or whether that privilege has been waived.

The Court may then hold an evidentiary hearing
and conduct the necessary document-by-document examination of
each potentially privileged trial exhibit.

1        The Court, however, will rule today on whether

2    the Government deliberately intruded on the attorney/client

3    relationship, whether any evidence or testimony derived from

4    the potentially privileged communication should be suppressed,

10:00AM    5    and whether any counts in the First Superseding Indictment or

6    allegations relating to the 2014 loan transaction should be

7    dismissed.

8        The Court concludes that no evidentiary hearing

9    on these issues is necessary.  As the Court stated in *Howell*

10:00AM    10    and reiterated in *Cook*, an evidentiary hearing on a motion to

11    suppress need not be -- need be held only when the moving

12    papers allege facts with sufficient definiteness, clarity, and

13    specificity to enable the trial court to conclude that

14    contested issues of fact exist.

10:01AM    15        A hearing will not be held on a defendant's

16    pretrial motion merely because the defendant wants one.

17    Rather, defendant must demonstrate that a significant disputed

18    factual issue exists such that a hearing is required.  Whether

19    an evidentiary hearing is appropriate rests in the discretion

10:01AM    20    of the Court.  A hearing is not required on a motion to

21    suppress that the grounds for suppression consist solely on

22    conclusory allegation of illegality.

23        In this case, the Court concludes that, because

24    there is no significant disputed factual issues that exist with

10:01AM    25    respect to the Government -- whether the Government

1  deliberately intruded into the claimed attorney/client

2  relationship, the Court concludes that no evidentiary hearing

3  is necessary.

4              First, to the extent defendants ask the Court to

10:01AM  5  suppress any evidence derived from or the fruits of the

6  Government's review of potentially privileged e-mails without

7  establishing a 5th Amendment violation, the Court declines to

8  do so.

9              As the 9th Circuit stated in the *Marashi* case at

10:02AM  10  913 F.2d 724, no Court has ever applied the fruit of the

11  poisonous tree theory to any evidentiary privilege, and we have

12  indicated we would not be the first to do so.

13             And as the 6th Circuit more recently stated in

14  the *Warshak* case at 631 F.3d 266, we have found no subsequent

10:02AM  15  authority indicating that such derivative evidence is subject

16  to suppression, and we agree that it is unwise to extend the

17  fruit of the poisoned tree doctrine beyond the context of

18  constitutional violations.

19             However, if the Government deliberately intruded

10:02AM  20  or interfered with the defendant's attorney/client

21  relationship, it may rise to the level of outrageous Government

22  conduct cognizable as a due process violation under the

23  5th Amendment.

24             For such a violation, the 9th Circuit has

10:02AM  25  identified two remedies:  A dismissal of the Indictment which

is drastic, disfavored, and thus used only in the most

egregious cases; two, suppression at trial of evidence

improperly obtained.

As the 9th Circuit stated in the *Stringer* case at

535 F.3d 929 -- and I quote --  "A claim of Government

interference with the attorney/client relationship has three

elements:

"The Government was objectively aware of an

ongoing personal attorney/client relationship;

"Two, the Government deliberately intruded into

that relationship; and,

"Three, as a result the defendant suffered actual

or substantial prejudice."

The Government misconduct required to establish

such a due process violation must be so outrageous as to shock

the conscience.  As the 9th Circuit noted in *Stringer*, most

cases finding deliberate intrusion into the attorney/client

relationship involve Government informants who somehow

penetrate the attorney/client relationship to obtain

confidential or privileged information and then feed that

information to the Government.

Based on the evidence presented, the Court

concludes that no deliberate intrusion occurred here.  At the

time the Government seized and reviewed the potentially

attorney/client privileged communications from Huizar's e-mail

account and Esparza's e-mail account, the Court concludes the
Government was not objectively aware of an ongoing personal
attorney/client relationship between Huizar and Esparza and
Yong such that the communications would be subject to any claim
of privilege.

Indeed, upon review of the e-mails provided, it
appeared that:  Yong was an attorney who only provided legal
advice in immigration matters; Huizar had his own attorney with
respect to the promissory note loan transaction by his
references to "my attorney"; Yong and/or Sun represented Shen's
company at HK and not Huizar, Esparza; and because the e-mails
were seized from Huizar, Esparza's accounts and not from the
account of someone the Government believed was a client, the
e-mails did not constitute confidential attorney/client
communications and/or the privilege was destroyed.

Moreover, the Court also concludes that the
Government's later interviews and investigation did not
deliberately include -- intrude into the attorney/client
relationship.  Based on the retainer agreement and the facts
known to the Government at the time, the Government reasonably
believed that Grace Luck Holdings was the client and that
Yan Yan had the authority to and did waive the potential
attorney/client privilege by producing e-mail communications
and copies of the transaction documents to the Government in
November of 2018.

1          In any event, even if the Government was
2     potentially aware that Huang or SZNW was the client after its
3     interviews with Zheng and Yan Yan in November and December of
4     2018, the Government also reasonably believed, based upon the
10:06AM  5     objective facts known to it, that the communications it seized
6     were not privileged because they were seized from Huizar and
7     Esparza's accounts, not Huang or Zheng's accounts.

8          The Court concludes it was not until the
9     interview with Esparza in June of 2019 that the Government may
10:06AM  10     have been objectively aware that Huizar may have also had an
11     attorney/client relationship with Yong or had a joint
12     attorney/client relationship with Yong.  However, at that point
13     Huizar had already voluntarily disclosed information regarding
14     the financial transactions with counsel present and produced to
10:06AM  15     the Government many of the e-mail communications defendant now
16     seeks to suppress pursuant to the proffer agreement.

17          At no point did Huizar or his counsel invoke the
18     attorney/client privilege with respect to those communications
19     or claim that a waiver of any privilege would be necessary to
10:07AM  20     provide such information.

21          Moreover, to the extent defendant's claim that
22     the Government's interview with Sun on September 23rd, 2019 or
23     Yong on October 1st, 2019, constituted a deliberate intrusion,
24     the Court rejects that claim.  As the 9th Circuit stated in
10:07AM  25     *Stringer*, we have held that the Government's asking a

defendant's former attorney to turn over privileged information

does not constitute deliberate intrusion on the part of the

Government when the attorney complies.  The fact that the

attorney failed to assert his ethical obligations does not

transform the Government's investigation into Government

misconduct.

        Defendants primarily argue that the Government's

intrusion was deliberate based upon the fact that the

Government omitted Yong and Sun's involvement in the

loan/collateral loan transaction from the Government's

post-2016 warrant applications.  The Court does not view the

Government's omission as evidence of deliberate intrusion.  In

fact, that omission is consistent with the Government's

reasonable belief that Yong did not have an attorney/client

relationship with Huizar or Esparza and that the communications

were not confidential because they were not found in Huizar or

Esparza's e-mail accounts.

        Notably, all the warrant applications cited to by

the defendants predate any of the Government's interviews with

Zheng, Esparza, Huizar, Yan Yan, Sun, or Yong in which they

obtained additional information about the transaction.

        For the all of the foregoing reasons, the Court

concludes that there was no deliberate intrusion into the

attorney/client relationship, and the defendants' motion to

suppress which is docket No. 275 is denied.

1          The next motion -- Miranda, how are we doing?

2          THE REPORTER:  I can use a break.

3          THE COURT:  Okay.

4          MR. STEINGARD:  Your Honor, I heard your ruling.

10:09AM  5  The first half had to do with some additional information and

6  briefing you want from the defense.  Do you want us to handle

7  that internally with counsel and we will set dates for that, or

8  do you want to set dates for that?

9          THE COURT:  Well, as I indicated, it seems to me

10:09AM  10  that we're only dealing with suppression of individual

11  documents.  I know that the privileged log had listed that the

12  Government was -- had a checkmark that the Government was going

13  to use the document as a trial exhibit.  But until we know what

14  the Government trial exhibits are, I'm not going to be making a

10:10AM  15  determination in terms of a particular document if the

16  Government doesn't intend to use it.

17          MR. STEINGARD:  Okay.

18          THE COURT:  So I think in terms of scheduling,

19  which we will talk about at the end of the hearing, once we

10:10AM  20  know what the Government intends to use in terms of the

21  exhibits which cover this loan transaction, then you can make

22  whatever showing -- we can set it up however we're going to do

23  it.  I prefer to do it in a joint statement.  In any event --

24          MR. STEINGARD:  Sure.  Thank you.

10:10AM  25          THE COURT:  So the court reporter needs a break.

1    So everybody stay connected.  It's now ten minutes to -- it's

2    ten after 10:00.  So we will be in recess for ten minutes.

3    Everybody come back at 10:20, and we will take the remaining

4    two motions.

10:24AM    5         (A recess was taken at 10:10 a.m.)

6              THE COURT:  The next motion that we have on

7    calendar is Huizar's motion to suppress privileged

8    communications -- attorney/client -- to suppress privileged

9    attorney/client communications that was filed on November 15.

10:24AM    10   It appears as docket No. 281.  The Government filed its omnibus

11   opposition.  It appears as docket No. 316.  And Mr. Huizar

12   filed a reply on January 15.  It appears as docket No. 341.

13             In this motion, Mr. Huizar argues that the

14   Government invaded the attorney/client privilege by listening

10:25AM    15   to a wiretapped June 29, 2017, phone call between election

16   lawyer Stephen Kaufman, Huizar, Morrie Goldman, Justin Kim, and

17   George Esparza wherein Mr. Kaufman was providing legal advice

18   about forming a PAC, having Esparza and Goldman describe that

19   privileged call and other privileged communications to the

10:25AM    20   Government, and asking Esparza to read invoices describing

21   Kaufman's legal representation of Huizar.

22             As a remedy, Huizar requests that the Court

23   suppress all privileged attorney/client communications and

24   requests a hearing to require the Government to show that all

10:25AM    25   of the evidence it proposes to use at trial and all of the

```
 1   trial strategy were derived from legitimate sources.

 2              I will hear from Mr. Huizar's counsel if you have

 3   anything you wish to add to your papers.

 4              MR. OLIN:  Yes, Your Honor.  Adam Olin on behalf

 5   of Mr. Huizar.

 6              Cognizant of the Court's ruling on the prior

 7   motion, I think I will jump in directly with the Government's

 8   awareness of the attorney/client relationship.

 9              As we know, the Government was aware that

10   Mr. Kaufman was the election attorney who provided advice to

11   Mr. Huizar throughout this period.

12              So on the face of this scenario, we have the

13   Government listening in to a call to Stephen Kaufman from a

14   group of individuals who announced that they are intending on

15   forming a PAC which is a corporate entity in a very highly

16   regulated area of law.  They are trying to figure out the best

17   way to proceed forward with trading and operating that PAC from

18   an expert in this field.

19              The individuals on the call themselves are people

20   who are going to participate in the PAC.  That's their goal.

21   And the Government listened to this call and then continues to

22   invade this privilege subsequently including through discussing

23   with George Esparza invoices that Kaufman had produced and sent

24   to Mr. Huizar.

25              I know there's some ambiguity in the papers
```

about, you know, whether they were read verbatim, but I think

ultimately what could be told and what could be inferred from

the 302s and the notes themselves are that Mr. Esparza is

discussing the contents of them.  Whether or not he's reading

verbatim I think is besides the point.  What he is doing,

though, is he is relaying privileged information which he does

not have the ability -- a right to do.

Two, the Government -- I think what is

particularly concerning here as well is he seems to be

discussing some of these Kaufman invoices in response to

another area where we have asserted a privilege violation in

response to the Shen Zhen loan collateral transaction.  I guess

our concern is that there is this privilege invasion which is

being used to further another privilege invasion.

The Government doesn't argue -- do much to

respond to the assertion that there is a joint client privilege

for these individuals.  There seems to be, instead, this kind

of underlying belief that there may be a crime fraud exception.

But notably the Government never asserts a crime fraud

exception in its papers and instead makes a reference to the

fact that these individuals had a joint interest in furthering

their alleged criminal conspiracy.

But ultimately here the individuals came to

Stephen Kaufman for legal advice jointly.  They had a joint

interest in doing that and provided --

```
 1              THE COURT:  Go ahead.

 2              MR. OLIN:  So, Your Honor, I think it's clear

 3    that they went to Kaufman jointly to receive advice for their

 4    joint enterprise of forming the PAC.  The Government invaded

 5    that privilege and kept invading it.

 6              I think ultimately it's a little murky because

 7    the Government says, for at least two of these items, that they

 8    don't intend on introducing it at trial.  I don't think they

 9    take a position on the other call, the June 2018 call.

10              Nonetheless, we were asking that the Government

11    be forced to show certainly the Kastiger tracing what evidence

12    they have that does not derive from this invasion privilege.

13    It seems that they do intend on using the subject matter to

14    prove up elements of this case.  Without that tracing, it

15    seems, from our perspective, that it's maybe deriving from a

16    violation of privileged information.

17              THE COURT:  All right.  The Court rules as

18    follows:

19              The background to this motion is as follows:  As

20    alleged in the First Superseding Indictment, around May of

21    2017, Huizar, Esparza, and Huizar Associate No. 3 agree to

22    establish a PAC that publicly was purported to benefit a broad

23    array of candidates and causes but was, in fact, primarily

24    intended to benefit Huizar Relative 1's campaign to succeed him

25    as council member for the Council District 14.
```

1          Huizar agreed with Esparza, Goldman, and

2    Huizar Associate 3 to pressure developers with projects in

3    Council District 14 to contribute to the PAC in exchange for

4    favorable treatment and to avoid adverse action against their

10:31AM    5    projects in the PLUM Committee, the Economic Development

6    Committee, and the City Council.  That allegation appears as

7    overt act 340.

8          The First Superseding Indictment also alleges

9    that on June 22nd, 2017, Defendant Huizar met with Esparza,

10:31AM   10   Morrie Goldman, and Justin Kim and discussed establishing a PAC

11   to raise money for Huizar Relative 1's campaign.  During this

12   meeting, Huizar suggested having Kim find an associate to serve

13   as the face of the PAC to disguise Huizar's involvement and the

14   PAC's connection to Council District 14.  That was alleged in

10:32AM   15   overt act 344.

16         During the course of the investigation, FBI

17   agents obtained authorization for several wire interceptions

18   including on Esparza's phone.  Pursuant to a court order on

19   June 29th, 2017, agents intercepted an approximately 20-minute

10:32AM   20   conference call on Esparza's line that included Justin Kim,

21   Esparza, Morrie Goldman, Huizar, and Attorney Kaufman during

22   which the group discussed the creation of the new PAC.  That's

23   set forth or summarized in Exhibit D which is docket No. 295-4.

24         Notably, the First Superseding Indictment does

10:32AM   25   not quote or rely on this call, and the Government does not

intend to introduce the transcript or any evidence of this call

at the trial.  In contrast, the First Superseding Indictment

quotes and cites the phone calls and meetings both before and

after this call related to the formation and existence of the

PAC that had no attorney involvement.  And those are alleged in

overt acts 340, 341, 343, 344, and 345.

Huizar contends that, by listening to this call,

the Government intruded on his personal attorney/client

relationship with Kaufman and his joint attorney/client

relationship between himself, Morrie Goldman, Justin Kim, and

Kaufman in regards to the PAC.

Huizar also contends that the Government also

invaded the attorney/client privilege when it interviewed

Morrie Goldman regarding the PAC on December 5th, 2018, in the

presence of Mr. Goldman's attorney.  Specifically, the

Government asked Goldman questions such as, one, how is the PAC

established?

Two, what were the conversations regarding the

PAC?

Three, who was involved in these conversations?

Four, was Huizar's Relative 1 involved in these

conversations?

Five, why did Huizar ask Morrie Goldman to set up

the PAC?

Six, can a lobbyist run a PAC?

Those questions are set forth in Exhibit G which
are the prosecutor's notes or someone's notes of that meeting.
Most of the Government's questions do not necessarily request
or require that Goldman disclose attorney/client
communications.

Specifically, as discussed in the 302 report of
the December 5th interview, which appears as Exhibit A at
docket No. 295-4, Goldman had a meeting with Stephen Kaufman,
Huizar's election law attorney.  Kaufman told Goldman that
Goldman would set up a committee for Huizar Relative 1 but that
Goldman was bound by the $800 per person campaign limit.  If
Goldman wanted to receive larger contributions, it could not be
a candidate controlled committee and could not exist for any
one specific candidate such as Huizar's relative.

The Court agrees with the Government that the
description of this meeting does not appear to match the
substance of the June 29th, 2017, intercepted call.  Indeed,
based upon the transcript of the intercepted call, it does not
appear, for example, that Kaufman discussed the $800 per person
campaign limit.  In any event, to the extent that Kaufman and
Goldman discussed legal matters during the -- concerning the
PAC during this meeting, there is no evidence that Mr. Huizar
was present.

In addition, Goldman disclosed a conversation
that he had with Kaufman and Charlie Shoemaker, the treasurer

for the PAC in June of 2018.  According to the Government's --
the 302 report of the interview of Mr. Goldman, Exhibit A, and
the notes Exhibit G, Goldman stated, "In approximately June of
2018, Kaufman reached out to Goldman and Shoemaker.  Kaufman
stated that he was getting lots of calls from attorneys of
developers saying that Huizar was calling and asking for
contributions for a PAC for his relative.  At the time
approximately more than half was raised by Huizar; so Shoemaker
said that the amount would be spent on a candidate other than
Huizar's relative.  Goldman did not communicate this to Huizar
because Goldman did not think Huizar would listen.

          "Goldman did not think that there was anything
wrong with a company whose project was in front of the
PLUM Committee donating to a PAC created by Huizar because it
was about access, not about getting something specific in
return.  What would cross the line was if Huizar said that the
only way a consultant client would get Huizar's vote was if the
client contributed to Huizar's PAC."

          Based upon the transcript of the Goldman
interview, which appears as Exhibit 1, docket No. 349, it
appears that Kaufman may have been providing legal advice to
Mr. Kaufman {sic}.  Exhibit 1 at ECF page 11, quote, "Kaufman
was really concerned that it was potentially, besides the
optics, it was also potentially violating these provisions
relating to non-candidate control."

 1          Huizar contends that the Government also invaded

 2     the attorney/client privilege when it interviewed Esparza on

 3     December 12 of 2018 and June 6 of 2019.

 4          Huizar contends that, during the Government's

 5     interview, Esparza described or recounted the June 29, 2017,

 6     intercepted call.  Based on the 302 report of the interview,

 7     Esparza stated that, "During the initial meeting about the PAC,

 8     Huizar said that Goldman was going to set up the PAC for Huizar

 9     Relative No. 1.  Kim was also part of the initial meeting.  The

10     PAC needed a treasurer and some people to run the PAC.

11     However, Huizar and Goldman wanted someone to be the face so it

12     didn't look like it was a development -- it was development

13     driven.

14          "Huizar and Goldman discussed getting a committee

15     to allocate funds at their direction.  It was discussed that

16     they would get Kim to have a Korean guy that was away from

17     Council District 14 to disguise Huizar's involvement.  Goldman

18     also wanted an attorney to handle the filings; so they hired

19     Stephen Kaufman."

20          Contrary to Huizar's claim that Esparza recounted

21     the June 29, 2017, intercepted call, it appears, at least based

22     upon the allegations of the First Superseding Indictment at

23     overt act 344, that Esparza said description matches a meeting

24     Huizar, Goldman, and Kim had on June 22nd of 2017, one that did

25     not involve Kaufman.

Finally, Huizar contends that the Government
intruded on Huizar's attorney/client relationship with Kaufman
when it interviewed Esparza again on June 6, 2019, when
specifically Huizar contends that, during that interview,
Government asked Huizar whether or not he had any other
documents relating to the 2014 loan transaction or settlement
of the sexual harassment lawsuit.

In response, Huizar stated, in relevant part,
Huizar was copied on all invoices from Kaufman to Huizar.  The
invoices delineated the information they discussed and/or that
Kaufman was researching with records -- with regards to the
settlement as well as the timeline when they were having
conversations.

At one point one of the prosecutors advised
Esparza to refrain from expanding on any further information
related to the invoices provided by Kaufman.  The Government
notes -- the Government's notes of that interview states that
in capital letters "may be privileged," but Esparza was copied
on it.

Later in the interview, the Government asked
Esparza to review e-mail 22 which is an e-mail from Yong to
Esparza and saying -- and was entitled, "Please check and
verify," with one attachment entitled "Joint venture document."
Notably, Kaufman was not copied on this e-mail.

According to the 302 report, Esparza advised as

follows:  He said that he did not know who recommended the
joint venture, but according to billing invoices from Kaufman,
it was at the same time that Kaufman had done research on this
loan.  Esparza would think that Huizar would be prohibited from
entering into a joint venture agreement due to his position.

It is unclear from the 302 or the notes of the
interview whether Esparza reviewed the invoices to assist him
in answering the Government's questions about e-mail 22 or
whether he had looked at the invoices in preparation for the
interview.  From the phrasing of the notes, when Esparza looked
back at the Kaufman attorney invoices, Kaufman spoke about
doing research on this particular loan.  It appears to the
Court that Esparza was remembering a topic covered in the
invoices, not that he reviewed them, in response to the
Government's questions.

The Government also asked Esparza to review
e-mail 58 which was an e-mail from Esparza to Yong entitled
"Forward Grace Luck Holdings Corporate resolution."  Esparza
was merely forwarding an e-mail that he received from Krause
who was a representative from East West Bank requesting
additional information.

The Government filed a copy of this e-mail which
is identified as Exhibit 12.  As set forth in the e-mail,
Krause requested this additional information pursuant to the
know-your-customer anti-money laundering rules.  When

questioned about the e-mail, Esparza did not recall a meeting with Krause but did recall seeing anti-money laundering research and billing invoices sent by Kaufman.  There were two line items for the same period.

10:43AM        At least, based upon the phrasing of the 302 report of the interview, it again sounds like Esparza was recalling what he saw on the invoices, not that the Government asked him to review the invoices.  In any event, the Government's questions with respect to e-mail 22 and e-mail 58,

10:43AM   which did not copy Kaufman, do not appear to be designed to elicit attorney/client confidential communications.

              The legal standard applicable to this motion is the same as the prior motion, and I adopt that standard, and I will not repeat it here.

10:44AM        My ruling is that the Court concludes that Huizar has not met his burden to demonstrate the existence of the attorney/client relationship or joint attorney/client relationship with respect to these communications.

              Although Federal Rule of Evidence 104(a) provides

10:44AM   that the Court is not bound by the evidence rules of deciding any preliminary questions about whether a privilege exists, Huizar ignores that Local Rule 12-1.1, which I previously quoted and won't repeat here.

              Huizar has failed to submit any declarations from

10:44AM   himself or other relevant parties such as Kaufman, for example,

stating that he and/or Kaufman intended and believe that

Huizar, Goldman, and Kim were joint clients or explaining why

Esparza was included in these alleged confidential

communications.

Although Huizar has at least provided the content

of the communication, the Court cannot make a determination

merely based on the content of the communications themselves as

they can support multiple conclusions.  The Court can't answer

the question who was the client?  Was it Huizar alone?  Was it

Morrie Goldman alone?  Was it eventually the PAC after it was

formed?  What was Justin Kim's expected position on the PAC?

And why was he on the June 29, 2017 call?  Was he a client or

an agent of Huizar or neither?  And why specifically was

Esparza on the call or present for some of the communications?

Without any declarations, the Court cannot

determine who the client was, who held the privilege, whose

presence may have destroyed the privilege or who could have

waived the privilege.

Moreover, even assuming the Court could make a

finding that the Government violated Huizar's attorney/client

privilege, Huizar fails to analyze whether this violation rises

to the level of a constitutional violation such that a taint

analysis would even be appropriate or even set forth the

requisite legal standard.

For example, in order to establish a claim of

outrageous Government conduct premised on deliberate intrusion
into the attorney/client relationship under the 5th Amendment
due process clause, as the 9th Circuit stated in *Stringer,* a
defendant must demonstrate the Government was objectively aware
of an ongoing personal attorney/client relationship, the
Government deliberately intruded in that relationship, and as a
result the defendant suffered actual and substantial prejudice.

The Government misconduct required to establish
such a due process violation must be so outrageous as to shock
the conscience, and the defendant bears the production and
persuasion on his outrageous claim.  Huizar doesn't even
attempt to demonstrate how he has met that burden.  He jumps
almost straight to the request for a *Kastiger* hearing.

The Government's opposition to the motion fares
no better.  In its opposition, the Government spends a grand
total of 7 pages devoted to Huizar's motion to suppress the
Kaufman-related communication, and the Government's bare-bones
argument is almost entirely directed at whether Huizar met his
burden that the joint attorney/client privilege existed or
whether the presence of third parties destroyed the privilege.

The Government, however, fails to address a key
issue.  Assuming that the Court finds that the intercepted
June 29, 2017, call was privileged or that any other
communications were privileged, the Government does not address
whether the Government deliberately intruded into the

1    attorney/client relationship.

2         For example, why didn't -- why did agents

3    continue listening to the June 29th, 2017, call when Kaufman

4    was on the call, especially given that the Government had

10:48AM    5    already determined in 2016 to filter out all e-mail

6    communications between Huizar and Kaufman and Esparza and

7    Kaufman as privileged?  Did the Government conclude that the

8    June 29, 2017, call was not privileged when it initially

9    listened to the call, and if so, why?  Or is there some other

10:48AM    10    explanation?  Notably, Civetti's declaration does not even

11    discuss the Kaufman communication at issue or make any

12    representation regarding the June 29 interception.

13         The Court simply cannot make a reasoned ruling on

14    this record.  In any event, the Government does not intend to

10:48AM    15    introduce any evidence of the June 29, 2017, call at trial,

16    either the call itself or a witness description of it.  The

17    Government also represents that it doesn't intend to introduce

18    testimony about the Kaufman invoices at trial.

19         Accordingly, that portion of the motion asking

10:49AM    20    the Court to suppress the allegedly privileged June 29, 2017,

21    telephone call, the witness's description of that call, or the

22    Kaufman invoices is denied as moot.  The remainder of Huizar's

23    motion is denied without prejudice.

24         The final motion that we have on calendar today

10:49AM    25    is the motion to suppress information obtained pursuant to the

1  proffer agreement.  It appears as docket No. 312.  The

2  Government's opposition was filed on December 20th, and it

3  appears as docket No. 319, and the reply appears as 340.

4        For purposes of this motion, it is undisputed

10:50AM  5  that Defendant Huizar was not completely truthful and candid

6  during his proffer session with the Government on

7  April 10, 2019.  Huizar now seeks to escape the consequences of

8  his failure to be completely truthful during that proffer

9  session.

10:50AM  10        In the amended motion, Defendant Huizar argues

11  that the Court should preclude the Government from using

12  information obtained pursuant to the proffer agreement in its

13  case in chief on the grounds that Huizar cured his breach of

14  the proffer agreement, the Government waived the breach, the

10:50AM  15  Government violated Huizar's due process rights and its duty of

16  good faith and fair dealing by continuing to request

17  performance pursuant to the proffer agreement, and the

18  Government is estopped from offering information from Huizar

19  pursuant to the proffer agreement in its case in chief.

10:51AM  20        I will hear briefly from the defense.  I find

21  this to be a creative motion, but it's my intention to deny it.

22        MS. ALÉ:  Thank you, Your Honor.  This is

23  Carel Alé for Mr. Huizar.

24        I will start where the Court seemed to suggest

10:51AM  25  that Mr. Huizar was trying to escape the consequences.

1                   THE COURT:  You have to get closer to the

2       microphone.  I can't understand you.

3                   MS. ALÉ:  I'm sorry, Your Honor.

4                   Your Honor, this motion is a contractual-based

10:51AM  5      motion.  Its premises -- the central issue is whether the

6       Government can use in its case in chief the statements and

7       documents produced by Huizar and his prior counsel pursuant to

8       the proffer agreement.  It's not a Motion to Dismiss.  It's not

9       trying to escape the consequences of the alleged misstatement

10:52AM  10      which, again, Mr. Huizar has pled not guilty to and will defend

11      at trial.  The purposes of this motion is to hold the

12      Government to its obligations pursuant to the proffer

13      agreement.  And those are two separate analyses.

14                   Whether the allegedly false statement is criminal

10:52AM  15      for purposes of the 1001 violation, that's analyzed under the

16      statute under criminal law.  Whether the allegedly false

17      statement is a breach such that it was either waived or cured

18      or the Government's representations make it so that the

19      Government is estopped from proceeding or standing on that

10:52AM  20      breach, that is analyzed under contract law.  And that's clear.

21      That's clear from the 9th Circuit cases.

22                   And the Government here is trying to escape from

23      its obligations under the proffer agreement.  So whether the

24      Government can use the narrow statements that are necessary for

10:53AM  25      it to proceed on the 1001 violation, that's a different

1    question and whether the Government can use the broader set of

2    documents and statements in its case in chief on the other

3    substantive counts.

4            Here, the Government's conduct after it alleges a

10:53AM   5    breach is really what this motion turns on.  The Government --

6    the Government --

7            THE COURT:  I understand what it depends on.  You

8    have briefed it.  Do you have anything you wish to add other

9    than what's in your papers?  I have read all your papers.  I

10:53AM   10   understand the conduct.  I understand the comments that Jenkins

11   made to Huizar's prior counsel after they come back with the

12   attorney proffer.  I'm fully aware of all of the facts and all

13   of the law that's relevant to this motion.

14           MS. ALÉ:  Understood, Your Honor.

10:53AM   15   Well, then, I would just, again, emphasize that

16   it's the Government's conduct after that breach that is really

17   at issue here.  With that I would submit on the rest of the

18   papers.

19           Thank you, Your Honor.

10:54AM   20   THE COURT:  All right.  By way of background,

21   after the FBI executed multiple federal search warrants as part

22   of its corruption investigation into the City of Los Angeles

23   including Huizar's City Hall office and his home, on November 7

24   of 2018, Mr. Huizar's former attorneys contacted the Government

10:54AM   25   and expressed Huizar's desire to cooperate with the

 1    investigation.

 2              On December 18 of 2018, the Government entered

 3    into a proffer agreement with Mr. Huizar and his attorneys

 4    which is part of the motion at Exhibit A.  It's

10:54AM  5    docket No. 312-2.

 6              In the first paragraph of the proffer agreement,

 7    it clearly warned Huizar that, quote, "Lying to the

 8    Federal Government is a crime under 18 United States Code

 9    Section 1001" and, quote, "This agreement does not provide any

10:55AM 10    protections to your client not expressly set forth herein."

11              Paragraph 2 of the agreement provided that, "Your

12    client will respond truthfully and completely to any and all

13    questions put to your client at the meeting."

14              Paragraph three, the parties agreed that, "This

10:55AM 15    Office," meaning the U.S. Attorney's Office, "will not offer in

16    evidence in its case in chief or offer in evidence in

17    connection with any sentencing proceeding for the purposes of

18    determining an appropriate sentence any statements made by your

19    client at the meeting except as otherwise provided in

10:55AM 20    paragraphs 4, 5, and 6."

21              Paragraph 4 of the proffer agreement provided

22    that the U.S. Attorney's Office may use "information derived

23    directly or indirectly from the meeting for purposes of

24    obtaining and pursuing leads to other evidence which evidence

10:56AM 25    may be used for any purpose including any prosecution of your

client; B, statements made by you or your client at the meeting and all evidence obtained directly or indirectly from those statements for the purpose of cross-examination should your client testify or refute or counter at any stage of the proceeding including this Office's case in chief at trial any evidence, arguments, statements or representations offered by or on behalf of your client in connection with any proceedings."

Paragraph 5 of the proffer agreement provided that "This Office reserves the right to use any statements or information provided by your client in any prosecution for false statements, obstruction of justice or perjury."

And most relevant for purposes of this motion, in paragraph 6 of the proffer agreement, it provided "Your client's complete truthfulness and candor are express, material conditions to the undertakings of this office set forth in this letter.  Therefore, if this office should ever conclude your client has knowingly withheld material information from this Office or otherwise not been completely truthful and candid, this Office may use against your client for any purpose, including sentencing, any statements made or other information provided by your client during the meeting.  If this Office so concludes, it will notify you before making any use of such statements or other information."

Immediately below that paragraph, Huizar

initialled and acknowledged, "I understand that, if I lie, the

Government may use all my statements against me for any purpose

including prosecution for violation of 18 United States Code

Section 1001."

10:57AM
       The proffer agreement did not contain any

provision permitting a defendant to cure a breach for making a

false statement and did not have any provision regarding waiver

of a breach.

       Pursuant to the proffer agreement, Huizar

10:58AM
participated in three proffer sessions with the Government.

Those occurred on December 18 of 2018; January 3rd, 2019; and

April 10 of 2019.

       On December 13 of 2019, the Government formally

informed Huizar's counsel via telephone that the Government

10:58AM
believed that Mr. Huizar had not been forthcoming and had lied

about his involvement in the alleged 940 Hill project during

the third proffer session on April 10 of 2019.

       During that same conversation, defense counsel

stated, "We would like to see if Mr. Huizar could rectify any

10:58AM
perceived misstatements and continue to provide information to

the Government" -- and I emphasize this following phrase -- "in

an effort to resolve the case pre-Indictment."

       Notably, defense counsel's declaration, which was

submitted in connection with this motion which is

10:59AM
docket No. 312-1, does not state that her request was

conditioned on the Government's agreement to refrain from using

Huizar's statement if Huizar was able to rectify his

misstatements.

In addition, defense counsel's declaration does

not state that the Government made any statements or assurances

during this conversation regarding its use of Huizar's

statements in its case in chief.

Following the Government's call in December of

2019, Huizar continued to provide information to the

Government.  For example, on January 22nd of 2020, AUSA Jenkins

provided the name of four individuals to defense counsel about

whom the Government wanted Mr. Huizar to provide information.

On March 18 through 19 of 2020, defense counsel explained to

the Government that they were in the process of speaking with

our client about the subject matters you identified for us.

In an e-mail on March 19 Jenkins stated, "As we

have maintained, we remain very interested in hearing whether

your client is willing to accept responsibility regarding the

three schemes that we have repeatedly outlined and whether we

can expect an attorney proffer regarding the four additional

names we initially provided in our January 22nd, 2020, phone

call and again yesterday.  Can you please let us know by

6:00 p.m. today what information, if any, your client is

willing to provide regarding those names and what facts he is

willing to admit regarding the three schemes?

1    "For example, now that there has been a public

2    filing and a guilty plea related to the Justin Kim bribery

3    scheme, is your client finally ready to come clean on the

4    scheme?  If he still needs a factual basis for it, we direct

11:01AM  5    you to the information connected to Mr. Kim's plea."

6        The following day on March 20th, Huizar's counsel

7    spoke with the prosecutors.  On that call Huizar's counsel

8    provided the Government with information that the Government

9    requested regarding the 940 Hill scheme and the four additional

11:01AM  10   individuals.  In her declaration, defense counsel, however,

11   does not state that Huizar recanted his prior false statements

12   or that he came clean on this scheme as the Government had

13   requested.

14       Following the attorney proffer, Jenkins stated

11:01AM  15   that they were much more convinced that they would, quote,

16   "call that significant progress and that they continue to be

17   encouraged about the truthfulness and helpfulness of Huizar's

18   cooperation."

19       On March 24th, Huizar's counsel made another

11:02AM  20   attorney proffer to the Government.  Following that proffer,

21   the Government asked some follow-up questions via e-mail that

22   are reflected in Exhibit C.

23       On May 15, 2020, counsel -- Huizar's counsel

24   reached out to the Government about the status of the parties'

11:02AM  25   pre-Indictment plea negotiations.  The Government responded, in

relevant part, where we last left off with Huizar's prior

defense counsel, we had some productive attorney proffers, then

asked some follow-up questions for which we are still awaiting

answers.  We are still interested in those answers.

11:02AM   On June 22nd of 2020, the Government memorialized

its prior declaration of a breach of the proffer agreement in

writing pursuant to the terms of the proffer agreement and

stated, "In the interest of documentation, as we have stated to

you on multiple occasions, we believe Huizar intentionally

11:02AM   withheld information, misled, and lied to us regarding material

information during his proffer sessions.  The easiest, but not

only, example relates to when he denied having any interest in

or asking for any share of the bribe cash from David Lee via

Justin Kim.

11:03AM   "For that reason, per the terms of the executed

proffer agreement dated December 13, 2018, we find that he has

breached his proffer agreement, and we intend to use his

statements for all purposes including in charging documents and

against him."

11:03AM   Thereafter the grand jury returned the

Indictment, and then a First Superseding Indictment which

included a charge of violating 18 United States Code

Section 1001 for making false statements during the proffer on

October 10, 2019.

11:03AM   The legal standard applicable to this motion is,

as the 9th Circuit stated in *United States versus Chiu* at

109 F.3d 624, Courts apply contract principles to the

interpretation of a proffer agreement.  However, as the

7th Circuit stated in the *Farmer* case at 543 F.3d 363, proffer

11:04AM   agreements that are part of an ongoing criminal proceeding are

unique contracts, and the ordinary contract principles are

supplemented with a concern that the bargaining process not

violate the defendant's right to fundamental fairness under the

due process clause.  We hold the Government to the literal

11:04AM   terms of the agreement as well as the most meticulous standards

of both promise and performance to ensure the integrity of the

bargaining process involved in proffers.

In construing an agreement between the Government

and a criminal defendant, the Court proceeds in the three steps

11:04AM   as set forth in the 9th Circuit's decision in the *Orozco* case,

852 F.3d 910, which the 9th Circuit applied in the related

context of plea agreements.

"First, the Court asks whether the terms of the

proffer agreement on its face has a clear and unambiguous

11:05AM   meaning.  If it does, then the Court will not look at an

extrinsic evidence to determine its meaning.  If not, then the

Court turns to the facts of the case to determine what the

parties reasonably understood to be the terms of agreement.

Finally, if ambiguities still remain, the Court construes those

11:05AM   ambiguities against the Government."

1          In this case, in essence, Huizar argues, one,

2    that he lied; two, he got caught; and, three, because he then

3    told the Government the truth, which presumably they already

4    knew, he should be relieved of the express terms of his proffer

11:05AM    5    agreement.  The Court concludes that this would be an absurd

6    result.

7          As an initial matter, Huizar does not dispute

8    that he lied or knowingly withheld material information from

9    the Government.  Accordingly, by the express and unambiguous

11:06AM    10   terms of the proffer agreement, the Government may use against

11   Huizar for any purpose including sentencing any statements made

12   or other information provided by your client during his proffer

13   sessions.  Defendant also expressly acknowledged that I

14   understand that -- I understand that, if I lie, the Government

11:06AM    15   may use all of my statements against me for any purpose.

16          Notably, in the *Petrosian* case at

17   446 Fed.Appx. at 826, the 9th Circuit upheld the district

18   court's admission of a defendant's statements made during a

19   proffer session based upon the defendant's failure to be

11:06AM    20   completely truthful.  There is no provision in the proffer

21   agreement giving the defendant a right to cure the making of

22   false statements.  To the contrary, the proffer agreement

23   expressly states that it does not provide any protection to

24   your client not expressly set forth herein.

11:07AM    25          Contrary to Huizar's argument at page 11, the

Court concludes that the proffer agreement is not silent as to what process a party must undertake when declaring a breach or as other party's rights when a breach has occurred or been declared.

11:07AM          Paragraph 6 of the proffer agreement expressly provides, "If this office should ever conclude that your client has knowingly withheld material information from this Office or otherwise not been completely truthful and candid, this Office may use against your client for any purpose including
11:07AM statements -- including sentencing any statements made or other information provided by your client during the meeting.  If this Office so concludes, it will notify you before making any use of such statement or other information."

          In other words, the agreement spells out the
11:07AM Government's rights when a breach has occurred and the process that the Government must follow when declaring a breach.

          The Court agrees with the Government that the fact that the agreement is silent on whether the defendant had any right to remedy or cure his false statement does not create
11:08AM an ambiguity, especially in light of the nature of the breach committed by Huizar.  Indeed, provided the Government can prove willfulness at trial, making a false statement to the Government is a crime, and the Government has charged Huizar with making false statements in connection with the
11:08AM April 10, 2019, proffer session in Count 40 of the First

1   Superseding Indictment.

2          Indeed, telling the truth after getting caught in

3   a lie does not cure a knowingly false and material statement.

4   As the 9th Circuit held in *United States versus Johnson* at

5   617, 706, defendant's attempted correction of her false

6   statement is insufficient because it did not occur until

7   several hours after she gave the statement and signed a written

8   affidavit attesting to its truthfulness and after she learned

9   that the special agent already possessed the information

10  contradicting her initial statement.

11          Accordingly, as opposed to creating any

12  ambiguity, the silence of a proffer agreement regarding any

13  right to remedy or cure his false statement confirms the

14  absence of any right to cure the commission of a crime.

15          In any event, the Court agrees with the

16  Government that Huizar did not cure or remedy his false

17  statements regarding the 940 Hill scheme.  Indeed, based upon

18  the limited evidence provided including defense counsel's

19  declaration, it does not appear that Huizar unequivocally

20  recanted or retracted his untruthful statements or that he was

21  ultimately fully candid and truthful with respect to the

22  940 Hill scheme.  As the Government states, it's nonsensical to

23  argue that defendant cured a lie by telling another unrelated

24  truth.

25          Notably, Huizar never met again with the

Government after the April 10, 2019, proffer session in which

he lied.  Although defense counsel claims at page 4 that she

provided the Government with information the Government

requested regarding 940 Hill scheme and the four additional

defendants, she does not describe the substance of the call,

does not admit that -- does not admit that Huizar lied, and

does not state that Huizar came clean in the scheme as the

Government had requested.

Moreover, the prosecutor's meaningless statements

after the attorney proffers, for example, that they, quote,

"were much more convinced," close quote, that they would,

quote, "call that significant progress," close quote, and that

they, quote, "continue you to be encouraged," close quote,

whatever that is supposed to mean, about truthfulness and

helpfulness of Huizar's cooperation do not, in the Court's

view, indicate that the Government believed that Huizar had

cured his prior misstatements and certainly does not support

any reliance on these statements by Huizar.

The Court also concludes that the Government did

not waive Huizar's breach.  The Government expressly told

Huizar's counsel in December 2019 and again in June of 2020

that the Government believed that Huizar had not been

forthcoming and had lied about his involvement in the alleged

940 Hill project during the April 10, 2019, proffer session.

In other words, the Government declared a breach.  After

1   declaring the breach, the Government never made any alternative

2   statements that it would waive the breach.  The Court also

3   concludes that the Government did not somehow impliedly waive

4   the breach by continuing to allow defense counsel to proffer

11:11AM   5   pursuant to the plea agreement.  Even when a party continues to

6   accept benefits under a contract, that party is entitled to a

7   remedy for the breach.

8           In this case, the proffer agreement sets forth

9   the Government's remedy for a breach the ability to use against

11:12AM   10  Mr. Huizar for any purpose including sentencing any statements

11  he made or other information that he provided during the

12  meeting.

13          Moreover, although defense counsel chose to make

14  additional proffers to the Government, defense counsel

11:12AM   15  expressly stated that she made those proffers in an effort to

16  resolve the case pre-Indictment.  In other words, by continuing

17  to cooperate with the Government, defense counsel was hoping to

18  curry favor with the Government and get the benefit of a

19  favorable pre-Indictment plea agreement.  The Government's

11:12AM   20  subsequent communications with counsel confirm that the

21  subsequent proffers were made with the view toward Huizar

22  accepting responsibility and pleading guilty.

23          More importantly, with respect to those proffers,

24  Huizar has, in fact, received the benefit of the proffer

11:13AM   25  agreement.  Indeed, the Government has confirmed that it does

not intend to use any statements any subsequent attorney
proffers in its case in chief beyond the express terms of the
proffer agreement.

For similar reasons, the Court concludes that the
Government did not violate the covenant of good faith and fair
dealing, is not estopped from using any information pursuant to
the proffer agreement, and did not violate Huizar's due process
rights.

The Court concludes that the Government did not
commit any affirmative misconduct, did not mislead Huizar into
believing that the Government would not use any of his
statements against him during his case in chief, and did not
induce Huizar to continue to waive his 5th Amendment right to
remain silent without honoring the terms of the proffer
agreement.  In fact, the only benefit promised to Huizar in the
proffer agreement was a limit on the Government's use of
evidence as specifically set forth in the agreement.

The Government is making use of Huizar's
statements and any documents provided in accordance with the
express terms of the agreement and has not and will not use the
information beyond the express terms of the proffer agreement.
And the Government will honor the terms of the proffer
agreement with respect to any attorney proffers made subsequent
to Huizar's misstatements.  The Court concludes and believes
the Government is being more than fair.

1          For the foregoing reasons, Huizar's motion is

2    denied.

3          All right.  That concludes the hearing on the

4    motions, but there's another issue I want to discuss with

11:14AM   5    counsel.

6          That is the stipulated -- stipulation regarding a

7    request for continuance of the trial date and related

8    deadlines.  This stipulation was entered into between

9    Mr. Huizar and the Government and was filed on January 21st and

11:15AM  10    appears as docket No. 352.  There was a response to the

11    stipulation that was filed by Mr. Neuman on January 21st as

12    docket No. 354, and Mr. Steingard also filed a joinder in

13    Mr. Neuman's response.

14          So I wanted to discuss this stipulation and the

11:16AM  15    current trial date that we have in this case of May 24th.  The

16    stipulation seeks to continue that trial date to August 23rd.

17    Based on the stipulation, the Court is inclined to continue the

18    trial.  I recognize the amount of work that has been involved

19    and continues to be involved in preparation of this case for

11:17AM  20    trial.

21          The problem that I have -- first of all,

22    Mr. Neuman obviously has a calendar conflict because he has a

23    case that has been set before Judge Wright, and apparently it

24    was set with this case in mind, and it's set for

11:17AM  25    September 6, 2022.

                    1              Is that right?  Do I have the date right?

                    2              MR. NEUMAN:  I believe so, Your Honor.  I don't

                    3      have the order, but I did write two weeks when I looked at it

                    4      at the time.

11:17AM             5              THE COURT:  Okay.  I don't think -- even aside

                    6      from the conflict that's presented by Mr. Neuman, I'm not

                    7      100 percent convinced that August 23rd is an appropriate date

                    8      for a number of reasons.

                    9              I think that we should be looking at a date later

11:18AM            10      than August 23rd for a couple of reasons.  One, we obviously

                   11      hopefully are going to be able to resume jury trials at the end

                   12      of this month or hopefully earlier although I just don't know

                   13      what the court intends to do at this point in time.

                   14              The -- obviously, once we do resume jury trials,

11:19AM            15      there is a procedure that, if we continue the same procedure

                   16      that was in place before we ceased jury trials, basically is a

                   17      reservation system.  The reservation system recognizes priority

                   18      obviously for criminal cases, but it also recognizes priority

                   19      for custody cases.

11:19AM            20              Given the number of custody cases that we have to

                   21      work through in terms of the backlog that has been created as a

                   22      result of this stop and start -- I know I have tried two

                   23      criminal cases in November and December before we shut down,

                   24      both of which were -- actually, one of them was a custody case

11:20AM            25      and the other was a non-custody case.  It seems to me that it

would be safer or better scheduling to continue this trial

beyond August 23rd, and I was -- in light of Mr. Neuman's

conflict, I was thinking of late October or November of this

year.

11:20AM       So I wanted to raise that with counsel and see

what makes sense because, if we -- if we -- on the other hand,

I know the defense's response to the severance is due I think

on Monday.  If I do sever the case, the Government -- something

that I read, and it's probably the stipulation -- indicates

11:21AM  that it would be ready to proceed with the severed defendants

in May.  And, again, I don't know what May is going to hold in

terms of custody versus non-custody cases.

      But let me ask Mr. Neuman.  What's your view on

how long it would take to try the case against your clients?

11:21AM       MR. NEUMAN:  Well, Your Honor, first of all, in

terms of the conflict, we had a hearing in front of

Judge Wright last week.  He made a comment that, based on some

issues in that case, we may need to continue it, and I would

say we will know more in the next week or two on that.  So I

11:21AM  wanted to be clear with the Court on the fact that that may

still move, it turns out, on a late developing issue.

      THE COURT:  I appreciate that.  I looked at

the -- there wasn't any date I think in your response.  I

looked at the docket, and I saw the last order continuing the

11:22AM  trial.

1          MR. NEUMAN:  That's where we are at this moment.

2    Just to raise it for the Court in case it does move in the next

3    two weeks, I want to be clear.

4          In terms of the Government, I would defer to the

5    Government in terms of what their case would look like.  My

6    estimate is I would think at most a week or two, but obviously

7    the prosecutor should say that.

8          THE COURT:  Mr. Jenkins, what's your view in

9    terms of trial against Lee?  How long would it take?

10         MR. JENKINS:  First answer is I think it would

11   depend on not only the Court's ruling on severance but

12   particularly what evidence does or does not or should or should

13   not come in even in a solo trial against Mr. Lee.  But I

14   believe, regardless, Mr. Neuman's estimate I would say of two

15   weeks seems fair at this point.  Again, that may depend

16   ultimately what the Court permits or not in terms of evidence

17   against Mr. Lee and the LLC company.

18         THE COURT:  Well, I can't see how it's going to

19   take two weeks, but at least it's not 30 days.

20         There's not much to this -- not much to this

21   case.  We have already been through the facts, and they're

22   relatively discrete facts.  We've got a number of different

23   witnesses, namely, Mr. Kim and Mr. Esparza.  What more is the

24   Government going to put on?

25         MR. JENKINS:  I think that's part of the

1    question, Your Honor.  So I think as to if essentially all of

2    Huizar's -- Huizar's schemes that do not relate to defendant

3    Lee or his company, if all that is excluded or the Court does

4    not permit that, the Court is right, and I think we would be

5    able to do that version of the trial, I would say, in less than

6    a week.  Again, we haven't timed it out or anything like that.

7               But it is essentially limited to, if it's just

8    the Justin Kim, George Esparza, Jose Huizar, David Lee scheme

9    and limited to that, there's also the obstruction count which

10   there is probably a handful or less of additional witnesses

11   related to that.  But I believe we could do that trial of that

12   setup scheme by a week -- within a week.

13              THE COURT:  All right.  I guess I should hear

14   from Huizar and the Government with respect to the August date.

15              Is that -- I normally don't invite longer dates,

16   but given what we have been -- how we have been operating and

17   what we have been operating under, I'm just concerned this

18   August date -- we may find ourselves not being able to try the

19   case in August.  I think we're better off -- we have a better

20   chance in the fall although who knows.  I've given up trying to

21   predict.  What is Mr. Huizar's position with respect to a date

22   beyond August and the Government's position with a date beyond

23   August?

24              MR. OLIN:  Your Honor, speaking for Mr. Huizar,

25   we do believe a date beyond August would be appropriate.

1    Whether it's late October or early November, we would join in

2    that request.

3                THE COURT:  Mr. Jenkins?

4                MR. JENKINS:  Yes, Your Honor.  We would not

11:25AM  5    oppose and concur with the reasons that it may be the most

6    appropriate and ideally, in the interest of not setting a

7    sequence of dates that then keep getting moved for reasons

8    outside of the parties' control, late October seems the safest.

9    We have a slight preference for late October versus November,

11:26AM  10    with the extent that trial gets into several weeks, just trying

11    to keep it out of the holidays and Thanksgiving.  But we do not

12    oppose moving that for those reasons.

13                THE COURT:  Where is Mr. Steingard?  There you

14    are.  You moved your square.

11:26AM  15                MR. STEINGARD:  Not intentionally, Your Honor.  I

16    don't know how to move my square intentionally.  I'm just happy

17    to be heard.

18                THE COURT:  What's your feeling or belief?  I

19    just don't think a -- we have all worked very, very hard in

11:26AM  20    this case so far, and there's more work to be done.  I'm

21    concerned about setting an August date that's really not

22    realistic.

23                MR. STEINGARD:  We are in the same boat as

24    Mr. Neuman.  We are waiting on Your Honor to receive our

11:27AM  25    position papers on the offer of proof.  You will get that no

1   later than Monday of next week.  If the Court decides to grant

2   a severance severing Mr. Neuman's client from my client, it's a

3   slightly different dynamic.

4               We're not saying that we have to have this

11:27AM   5   extended period of time for preparation purposes.  So we

6   appreciate, of course, the backlog issue.  That's something

7   that's completely out of our control and perhaps even the

8   Court's control.

9               But I don't know what I can add that Mr. Neuman

11:28AM   10   hasn't written.  We joined in it.  I don't know if the

11   Government has a different trial estimate for Shen Zhen World

12   versus the Lee case.  Maybe that would be beneficial.

13               THE COURT:  I guess the question for you and for

14   Mr. Neuman, if we agree on a late October -- or Mr. Huizar and

11:28AM   15   the Government have agreed to a late October date, are you

16   going to agree to that date and then wait for the ruling on the

17   severance, or are you going to continue to object to that date?

18               MR. STEINGARD:  Your Honor, rather than give you

19   an off-the-cuff answer, could Mr. Neuman and I perhaps talk and

11:28AM   20   talk to our respective clients and file something in the next,

21   I don't know, 72 hours?

22               THE COURT:  Sure.  What I would suggest is that

23   Mr. Huizar and Government counsel submit a revised stipulation

24   to continue the current trial date to late October -- not late

11:29AM   25   October.  Let's say October 18th, somewhere around there.

1          MR. JENKINS:  Yes, Your Honor.

2          THE COURT:  And, Mr. Snyder, is that a date that

3    looks good for you?

4          MR. SNYDER:  That's good for us, Your Honor.

11:29AM   5          THE COURT:  All right.  What I will do is ask you

6    to enter into a revised stipulation with respect to continuing

7    the trial to October 18th of 2022.  And then Mr. Steingard --

8    Mr. Neuman, do you have anything you want to add today, or do

9    you want to confer?

11:30AM   10         MR. NEUMAN:  I need to confer with my client.

11   Honestly, I don't know that Mr. Steingard and I need to confer

12   about it, but I'm happy to always talk to him.  It's really

13   conferring with my client.

14              The only issue is that tomorrow, especially if

11:30AM   15   we're still contemplating the May date for us or somewhere near

16   there, the Government's 404(b) disclosure is due tomorrow.  I

17   think I know what's in it, but I do need some detail there.

18   And then depending on when the Court makes its severance

19   decision, the witness list and exhibit list are currently due

11:30AM   20   February 15th.

21              So I would ask that, at least as to us, while the

22   severance decision is still pending, that those dates be

23   maintained because I do need that notice if I am going to trial

24   in May.  I'm looking at the scheduling order from -- at the

11:31AM   25   revised --

 1          THE COURT:  Your voice is breaking up.  I didn't

 2    hear the last part.

 3          MR. NEUMAN:  Sorry.  I thought I was going to

 4    give the Court the docket number of the original scheduling

11:31AM    5    order, but I'm actually looking at docket 352 which has both

 6    the current and proposed dates on it.

 7          THE COURT:  I have the current dates.  The

 8    Government's 404(b) is due on February 1st.  The witness list

 9    is on the 15th.  The exhibit list is the 15th.

11:31AM   10          MR. NEUMAN:  Those are the dates I'm concerned

11    about right now, Your Honor, just while severance is pending

12    and the possibility of a May trial remains.

13          THE COURT:  Well, if we're going to otherwise

14    continue everyone to the new October date, I think that we

11:32AM   15    could -- is the Government ready to produce this -- I assume

16    you are -- the 404(b) evidence and the Government's witness

17    list and exhibit list?

18          MR. JENKINS:  As to the 404(b), yes.  As to the

19    witness and exhibit list, the Court's ordered format is taking

11:32AM   20    a significant amount of effort.  We think we are on schedule,

21    but we still have two weeks to do that.  I think we have been

22    working around the clock to get that done.

23          We believe, if the trial is continued to October,

24    ideally that provides some breathing room as to that deadline

11:32AM   25    as to the exhibit list and witness list.  So that would be our

1   request.  But we are continuing to operate as if that date

2   remains.

3            THE COURT:  I guess there's no issue with respect

4   to the 404(b).  Obviously the witness list and the Government's

11:33AM  5   exhibit list are going to change if I sever and you're going to

6   go to trial in May.

7            MR. NEUMAN:  Correct.  It looks like you're

8   looking at my square, Your Honor.  So yes, I think that's

9   right.

11:33AM  10           THE COURT:  Maybe we can -- I think the

11   Government can continue to work on the witness list, which is

12   not that difficult, but the exhibit list, but let's see what

13   happens in the next couple days when Mr. Steingard and

14   Mr. Neuman have an opportunity to advise us of what their

11:33AM  15   position is with respect to agreeing to the new date that's

16   been agreed to by Huizar and the Government.

17           MR. STEINGARD:  May I pose a question to

18   Your Honor?  Again, I don't know if this is inappropriate.  I'm

19   right here again.

11:33AM  20           Your Honor, if the Court was to continue the

21   trial to October and then grant a severance to Shen Zhen

22   New World, would it be the Court's intention to try the

23   Huizar/Chan case first and then trail or --

24           THE COURT:  I think my intention or I think it

11:34AM  25   would make more sense to first try Mr. Neuman's client because

|       |                                                                 |
|-------|-----------------------------------------------------------------|
| 1     | that to me is an easier case.  And then I would try your        |
| 2     | clients.                                                         |
| 3     | MR. STEINGARD:  Okay.  I'm just trying to get                   |
| 4     | clarification to talk to the people I need to talk to.          |
| 5     | Understood.                                                     |

THE COURT:  I didn't hear the last part.

MR. STEINGARD:  I understand.  It was just a clarification I needed so I could pass along additional information to my client.  That was helpful.  Thank you.

THE COURT:  I haven't made any decision, but that to me would make sense.  I assume that you would be prepared to go forward immediately after Mr. Neuman's clients were tried.

MR. STEINGARD:  That's what we're going to talk about.  I will file something with the Court with a position no later than the end of the week.  We will have it to you but --

THE COURT:  Let's do it earlier than that.  I would like to do it by -- have Mr. Neuman and you file whatever your position is by Wednesday because I'm going to get the response on the severance on Monday, and I want to be able to put all the pieces together and see where we are.

MR. STEINGARD:  You will have it by Wednesday.

THE COURT:  Mr. Braun, I didn't mean to not involve you in the conversation, but you had indicated that you took no position with respect to the stipulation that had been entered into by Huizar and the Government.

1     MR. BRAUN:  That's correct, Your Honor.

2     THE COURT:  Do you continue to have no position?

3     MR. BRAUN:  We will join in that stipulation,

4 Your Honor.

11:36AM 5     THE COURT:  Okay.

6     MR. JENKINS:  Your Honor, Mr. Jenkins on behalf

7 of the Government.

8     Two more housekeeping issues.  One, to answer

9 Mr. Steingard's question about the Government's trial estimate

11:36AM 10 as to Shen Zhen, we would right now estimate that that would be

11 an extensive trial, multiple weeks, probably three to four

12 weeks given the amount of evidence related to his client and

13 its CEO, just for the record.  We would approximate three to

14 four weeks to answer Mr. Steingard's question.

11:36AM 15     Number two, I think we just want to clarify as

16 to, as it stands now, the February 15 witness and exhibit list

17 which, again, we are expending a significant amount of time on,

18 it's for all defendants.  So we want to make sure we stay on

19 schedule.  It sounds like for the most part, at least as to

11:36AM 20 Defendant Huizar and Defendant Chan, they are going to agree to

21 continue that trial and then potentially Mr. Neuman and then

22 potentially Mr. Steingard but different dates.

23     So the February 15 deadline right now for the

24 exhibit list and witness list, what does the Court require of

11:37AM 25 us in the event that Mr. Neuman and his client is severed?  We

1    sort of need to know what we are working towards for those two

2    lists which are occupying time.

3            THE COURT:  Well, since there's been a -- in the

4    stipulation that was filed between Huizar and the Government,

11:37AM   5    there is a set of proposed dates for these various disclosures

6    based upon the August trial date.  I assume that, when you

7    submit -- or I would urge you -- ask you, when you submit the

8    revised stipulation with the new October trial date, that you

9    also agree upon the disclosure dates for the rest of the items

11:38AM   10    that are required such as the witness list, the exhibit list,

11    the motion in limine, and all the rest of the dates.

12            As far as the production of the Government's

13    witness list and the Government's exhibit list that's due on

14    February 15th, I hope to be able to make a decision before

11:38AM   15    then.  So I'm going to -- I'm going to allow the Government to

16    hold off on producing the witness list and the Government

17    exhibit list until we figure out what we are doing in terms of

18    whether or not it's going to be severed because, if it's

19    severed, then -- if I sever Mr. Neuman's clients and we're

11:39AM   20    headed for the May -- the current May trial date, then the

21    Government is going to be required on very, very short notice

22    to come up with the exhibits and the witnesses that are going

23    to be disclosed in connection with Mr. Neuman's case.

24            But I'm not going to require the Government --

11:39AM   25    right now the way it stands, you would be producing the entire

|   | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:39AM | 5 |

1  witness list and the entire exhibit list as if we were going to

2  trial on all defendants, and I don't think that's fair.  So why

3  don't you hold off on that, and I will put the brakes on both

4  of those dates until we can see what we are doing in terms of

11:39AM   5  which case is going to go when.

6  But the Government needs -- I would urge you to

7  continue to work on those because, if I do sever and

8  Mr. Neuman's client goes first, I would expect within a week

9  that you would be able to produce the witness list and the

11:40AM  10  exhibit list to Mr. Neuman.

11  MR. JENKINS:  Yes, Your Honor.  That all makes

12  sense.  We are sort of working on those parallel tracks and can

13  accomplish that in short order depending on how the Court

14  rules.  The only additional request would be there is also an

11:40AM  15  exchange of motions in limine on February 14th which also would

16  be impacted.  Those are things we are working on.  We had our

17  meet and confer with all counsel last week.  We are making this

18  progress.  But because we are in the limbo status, it affects

19  sort of how we prioritize our work.  So we would also ask if

11:40AM  20  that date which is the date before the current deadline of the

21  list of February 14 --

22  THE COURT:  What motions in limine -- let's

23  assume there's a separate trial, Mr. Neuman.  What motions in

24  limine are we looking at?

11:40AM  25  MR. NEUMAN:  Your Honor, it's a somewhat limited

list.  I don't think there's a problem with extending that date

out and moving the hearing a little closer to the trial than it

is currently scheduled.  If it's just -- I think these dates

were set early because of the extensive nature of in limine

practice that was contemplated.

If it's just us, I think we are talking about

four or five motions in limine that we have met and conferred

on.  I don't have the list in front of me.  It's not hugely

significant in terms of volume.

THE COURT:  We will put a hold on the motions in

limine also until we figure out what we're going to be doing.

MR. JENKINS:  Thank you, Your Honor.

MR. STEINGARD:  Your Honor -- I'm sorry,

Mr. Jenkins.  Did I cut you off?

MR. JENKINS:  Just real quick, Mr. Steingard.

Final thing from the Government, but I think the

parties would benefit, Your Honor.  Our request would be is the

Court planning to provide written orders both from the rulings

on the last set of substantive motions and the written order

for today's rulings?  We believe it's helpful -- or at least

the Government believes it's helpful for future filings and

references and conversations with defense counsel having a

written order to cite to that is beneficial.  So we would just

make that request, Your Honor.

THE COURT:  Well, you know, I only have so many

days in the week.  I'm working seven days a week as it is.  I
don't like oral rulings, but written rulings take significantly
more time to do.  So you can order a transcript and cite to the
transcript.  I'm not going to provide a written ruling.  I can
only do so much.

            MR. JENKINS:  Understood, Your Honor.  We
appreciate that, and we will do so.  Thank you.  That's all.

            MR. STEINGARD:  Your Honor, I have one more thing
I just wanted to make clear.

            At this juncture we have not moved to continue.
We have opposed the proposed continuances.  But I am telling
you that I will talk to the people that I need to talk to on
behalf of the corporation and find out our position.

            On the in limine side, we did have a meet and
confer.  The Government's list of in limines is quite small,
but our list of evidentiary issues that we and the Government
see differently was lengthier, in the neighborhood of probably
a dozen, I would say, different items.  It's all factual, I
think.  There's some legal obviously, 403, hearsay, and the
like.

            So I don't know how you wanted to handle that if
you want to put that on hold with a quick turnaround in the
event that we continue to seek a May trial date.  That's one
thing.

            The other thing I wanted to bring to your

1    attention here is that there is currently a hearing set before

2    Your Honor on February 14 on a bill of particulars motion that

3    was filed on -- that I filed on behalf of my client,

4    Mr. Huizar, and Mr. Chan.  That's set for 8:00 a.m. on

5    February 14.  We're filing our reply to the Government's

6    opposition today.  In fact, it may have already been filed.

7              I don't know if that affects your thinking in

8    that, at least potentially we're coming back before you that

9    morning, whether you want to sort things out at that point, or

10   you may decide that the motion can be decided on its papers and

11   we don't need to appear.

12             So I just wanted to bring that to your attention

13   that you have that flexibility.  If you wanted to see us again

14   on the 14th, there is something currently scheduled on that

15   date.

16             THE COURT:  Well, I would assume that the motions

17   in limine that you are referring to, a lot of those motions in

18   limine are going to be solved if your client is severed.

19             MR. STEINGARD:  I think some of them are.  But as

20   you just heard from the Government, they have what they call an

21   extensive case.  Some of what they think is admissible we

22   don't.  I don't want to get into chapter and verse right now.

23   We will work that amongst us as best we can.  But we would

24   anticipate starting that process with the Government on the

25   14th.  We can certainly hold off on that for a little while,

1   but if we are going to go in May, I think Your Honor is going

2   to want that process to resume pretty quickly.

3                THE COURT:  Well, if the -- if I sever and I try

4   Mr. Neuman's client first, that -- we're going to be in June.

5                MR. STEINGARD:  You're right.  We're probably in

6   late June before we -- understood.

7                THE COURT:  Right.  And again, I hate to -- I

8   have never been in this position in all the time I have been on

9   the bench before.  But I have a number of custody criminal

10  cases.  So all of this may be for naught.  If I have to -- if I

11  have to try these -- if I have to try the custody cases, we may

12  be trailing this case.  It's not -- it's not my preferred way

13  of managing cases, but right now we just don't have any other

14  alternative.

15               MR. STEINGARD:  Understood.  Thank you.

16               THE COURT:  All right.  So that will be it for

17  today.  We will see where we go from here.  Thank you very

18  much.

19               MR. STEINGARD:  Thank you.

20               MR. JENKINS:  Thank you, Your Honor.

21               (Proceedings concluded at 11:46 a.m.)

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15          DATED THIS  4TH  DAY OF FEBRUARY, 2022.

16

17

18          /S/ MIRANDA ALGORRI

19          _____
            MIRANDA ALGORRI, CSR NO. 12743, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25