Exhibit 1

Government's Expert Disclosure Letters



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*Veronica Dragalin*
*Phone: (213) 894-0647*
*E-mail: veronica.dragalin@usdoj.gov*

*1500 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

December 15, 2021

**<u>VIA E-MAIL</u>**

Carel Ale
Charles Snyder
Adam Olin
Office of the Federal Public Defender
321 E. 2nd Street
Los Angeles, CA 90012
Carel_Ale@fd.org
Charles_Snyder@fd.org
Adam_Olin@fd.org

Harland Braun
Braun & Braun LLP
10880 Wilshire Boulevard, Suite 1020
Los Angeles, CA 90024
harland@braunlaw.com

Richard Steingard
Law Offices of Richard M. Steingard
800 Wilshire Blvd., Suite 1050
Los Angeles, CA 90017-2672
richard@steingardlaw.com

Ariel A. Neuman
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
aneuman@birdmarella.com
rseilie@birdmarella.com

   Re: <u>United States v. Huizar, et al.</u>, CR No. 20-326(A)-JFW
     Expert Disclosure

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure and the trial scheduling order in this matter, the government hereby discloses that at trial in the above-captioned matter the government presently intends to elicit expert testimony from the following witnesses under Federal Rules of Evidence 702, 703, and 705. Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government hereby requests reciprocal disclosure from the defense of any testimony defendants intend to use at trial under Rule 702, 703 and/or 705 of the Federal Rules of Evidence.

As a courtesy, to reduce surprise, and to enhance efficiency at trial, this letter also discusses other likely areas of testimony to provide you notice, although the government does not believe the testimony qualifies as expert testimony.

  **A.**  **City of Los Angeles Development Process**

Although not all of the below topics necessarily fall within the category of expert testimony, in an abundance of caution, the government hereby gives notice that it intends to call the below

RE:  Huizar, et al. – Expert Disclosure
December 15, 2021
Page 2

individuals to testify about various aspects of the City of Los Angeles ("City") application and approval process for large development projects.

1.   Bud Ovram

The government intends to call Robert R. "Bud" Ovram, as a witness to testify about the general process for the application and approval of a large-scale development project in the City, and the roles of various public officials in that process.  Specifically, Mr. Ovram will explain that within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction.  These applications and approvals occurred in various City departments, including the City Council, the Planning and Land Use Management ("PLUM") Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety ("LADBS"), the Area Planning Commission, the City Planning Commission ("CPC"), and the Mayor's Office.  Each part of the City approval process required official actions by public officials acting pursuant to their City authority and/or in their City capacity.  These included entitlements, variances, permits, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals.  Even for projects that were not going through the City approval process, City officials could benefit a project or take adverse action against a project by advocating for or against the project, including by pressuring or seeking to influence other City officials, departments, business owners, and stakeholders.  Mr. Ovram will also testify about the developmental landscape in Downtown Los Angeles while defendant Huizar was in office, specifically the real estate boom, the timing and influx of foreign, particularly Chinese, investment, and the effect of redistricting that expanded defendant Huizar's district to cover more of Downtown.  In addition, Mr. Ovram will testify regarding the topics covered in his January 22, 2019 report of interview, produced at Casino_0365079 attached hereto.

Mr. Ovram's understanding of the City approval process is based on his education, training and experience, including as the General Manager of the Building & Safety Department from January 2010 to May 2013, Deputy Mayor of Commercial & Residential Development from July 2005 to January 2010, and Chief Executive Officer of the Community Redevelopment Agency from March 2003 to June 2005, as well as experience as the City Manager of the City of Burbank (June 1985 to February 2003) and the City of Downey (May 1983 to June 1985).

2.   Kevin Keller

The government intends to call Kevin Keller, the Executive Officer of the Department of City Planning, to testify about the various departments and City officials involved in the approval of large-scale development projects in the City, including the sequence of approvals required, the types of hearings held, and the types of official acts involved in the approval process.  In addition, Mr. Keller will testify regarding his specific opinions as reflected in his May 7, 2020 report of interview, produced at Casino_0371300 (attached hereto), including the financial benefits received by Carmel Partners on their Mateo Project as a result of changes by the City during the approval process, to include changes to affordable housing requirements made in the PLUM Committee, as well as the financial benefits provided by the City in the Hazens Luxe Hotel Project, to include Transfer of Floor Area Rights ("TFAR") requirements.

RE:  Huizar, et al. – Expert Disclosure
December 15, 2021
Page 3

Mr. Keller's understanding and opinions are based on his education, training and experience, including as Executive Officer of the Department of City Planning, Deputy Director of Long-Range Planning at the Department of City Planning, Director of Planning for City Councilmember Cindy Miscikowski, supervisor of the City Planning Commission, and Planning Advisor to Mayor Eric Garcetti.

3.   Nick Maricich

The government intends to call Nick Maricich, the Director of Planning Policy and Development, to testify about the role of the Mayor's office in the application and approval process of large-scale development projects, and the relationship between the Planning Department, Department of Building and Safety, and the City Planning Commission, and their respective roles and official acts in the development process.  In addition, Mr. Maricich will testify regarding his specific opinions as reflected in his May 29, 2020 report of interview, produced at Casino_0372284 (attached hereto), regarding the TFAR ordinance, its intended purposes, and the way it affected large-scale projects in various City Council Districts, including CD-14.

Mr. Maricich's understanding and opinions are based on his education, training and experience, including as Planning Assistant, Senior Planner, and Principal City Planner at the Department of City Planning, as well as the Director of Planning Policy and Development at the Mayor's office.

**B.    City and State Ethics Requirements**

Although not all of the below topics necessarily fall within the category of expert testimony, in an abundance of caution, the government hereby gives notice that it intends to call Professor Jessica Levinson to testify about various aspects of the City's Governmental Ethics Ordinance and corresponding state laws that apply to City officials and are relevant to the charged matters.

Ms. Levinson will testify that City's Governmental Ethics Ordinance and corresponding state laws that apply to City officials are intended to protect the integrity of the City's decision-making processes.  She will explain that the governmental ethics laws were adopted to help preserve the public trust by promoting elections and government decisions that are fair, transparent, and accountable.  To further those goals, City officials are held to appropriately high standards of conduct, to help ensure that they act in the best interests of the public and the City.  Ms. Levinson will also opine that, as a public official employed by the City, Jose Huizar and Raymond Chan each owed a fiduciary duty to the City and citizens of the City to perform the duties and responsibilities of their respective office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.

Ms. Levinson will testify about various aspects of the California Political Reform Act, its requirements, and its enforcement, including that every elected official and public employee who made or influenced governmental decisions was required to submit a Statement of Economic Interest, also known as the Form 700, annually.  She will testify how those requirements depend on the "honor code" and can be easily thwarted.  We expect Ms. Levinson will also testify how enforcement of the City Ethics Commission Ordinance has suffered difficulties during the relevant periods.   She will testify how the various relevant Political Actions Committees

RE:  Huizar, et al. – Expert Disclosure
December 15, 2021
Page 4

operate, their rules, and how they can be sometimes used improperly by donors and recipients to shield both the source of donations and the ultimate recipient of donations.

In addition, Ms. Levinson will testify that to prevent former City officials from exercising or appearing to exercise improper influence over City decisions, the Los Angeles Municipal Code contained "revolving door" restrictions.  The restrictions imposed a lifetime ban on receiving compensation to attempt to influence City action on a specific matter in which the City official personally and substantially participated in during their City service, either personally or through an agent.  The restrictions also imposed a one-year ban, or "cooling-off" period, during which the City official was prohibited from attempting to influence action, either personally or through an agent, on a matter pending before any City agency for compensation.

Ms. Levinson will also testify to the training provided City officials on the foregoing matters.

Ms. Levinson's understanding and opinions are based on her education, training and experience, including as Clinical Professor of Law Director of Loyola Law School's Public Service Institute, where she has taught courses on Election Law, Campaigns and Elections (at LMU), Money, Politics and the Supreme Court, Campaign Finance Seminar and her time as the President of the Los Angeles Ethics Commission (2013-2018.)

### C.  Casino Surveillance and Security Experts

The government intends to call Jonathan Solomon, Jonathan Bell, and Stephen Fryson from the Palazzo Casino to testify about their specific opinions that Wei Huang provided chips to Jose Huizar for Huizar's benefit, as summarized in a wire affidavit produced in discovery at Casino_0340692, at pages 0715-718 and as reflected in a September 2, 2015 interview produced at Casino_0356405 (attached hereto).

Jonathan Solomon, former Senior Vice President and Global Chief Compliance Officer for the Las Vegas Sands Corporation, will explain the procedures used by casinos to screen for and document Politically Exposed Persons (PEP) gambling at casinos, and certain terminology that applies to gambling such as "chip sharing," "chip pushing," "drop," and "buy-in," as reflected in his September 2, 2015 interview produced at Casino_0356405 (attached hereto).  Mr. Solomon's opinions are based on his training and experience as a former FBI Special Agent and his experience as a gambling industry executive, as set forth in his interview.

Jonathan Bell, Vice President of Cage and Credit Operations at the Palazzo Hotel in Las Vegas, will opine that the value of the Presidential Suite at the Palazzo is approximately $7,000 per night, and that Jose Huizar's net chip "buy-in" was approximately $79,100 while his lifetime "drop" at the hotel was $0, meaning that there was no indication that Huizar purchased chips with which he was gambling at the casino.  Mr. Bell will also explain that the casino records show that Huizar "cashed out" a total of $36,500.  Mr. Bell will also opine that Huizar cashed out $3,00 and attempted to cash out another $6,300 just 90 minutes later during the June 14, 2014 trip, that he cashed out $5,00 and an additional $8,500 the following day during the August 24, 2014 trip, and that he cashed out $20,000 during the March 13, 2015 trip.  Mr. Bell's opinions are based on his training and experience as a gambling industry executive.

RE:  Huizar, et al. – Expert Disclosure
December 15, 2021
Page 5

Stephen Fryson, the Table Games Manager at Palazzo, will give his opinion of the gaming activity of Jose Huizar and Wei Huang on July 7, 2015 at the Palazzo hotel, based on his observations of the surveillance footage.  Specifically, Mr. Fryson will opine that Huang passed Huizar $65,000 in gaming chips, which would be considered "chip sharing," meaning Huang gave the chips to Huizar with the expectation that Huizar could keep the chips and winnings.  Mr. Fryson's opinion is based on 16 years of experience working as a gambling industry professional with extensive experience observing, reviewing, and classifying gaming activity, as set forth in the affidavit excerpt.

### D.      Foreign Language Interpreters

Absent a stipulation between the parties, the government intends to call Mandarin, Cantonese, Korean, and Spanish court-certified interpreters at trial to provide official translations of recordings in foreign languages.  The experts will opine that the English translation of the foreign language recordings are reliable and accurate.  The bases and reasons for those opinions will be based on the education, training, and experience of the court-certified interpreters.  The specific foreign language experts' names and qualifications will be produced 30 days in advance of trial.

<u>Please let us know if you will agree to a stipulation on this topic and forego the need for this expert testimony</u>.

### E.      CART Examiner

Absent a stipulation between the parties, the government intends to call one or more FBI Computer Analysis and Response Team (CART) certified special agents, who will testify to the procedures followed in extracting data from and conducting a digital forensic analysis of digital devices analyzed as part of this investigation.  The CART expert will opine that the digital data to be introduced at trial (e.g., text messages, voicemails, notes, photographs, etc.) were extracted from the specified digital devices following industry accepted procedures.  The expert's bases and reasons for those opinions will be based on the education, training and experience of the expert and the extraction report generated for the respective device.  The specific CART expert's name(s) and CV will be produced 30 days in advance of trial.

<u>Please let us know if you will agree to a stipulation on this topic and forego the need for this expert testimony</u>.

RE:  Huizar, et al. – Expert Disclosure
December 15, 2021
Page 6


Please let us know if you have any questions or would like to further discuss any of the matters raised above, including any proposed stipulations.


Sincerely,

MACK E. JENKINS
VERONICA DRAGALIN
MELISSA MILLS
Assistant United States Attorneys
Public Corruption & Civil Rights Section


Enc: referenced reports



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*Veronica Dragalin*                                              *1500 United States Courthouse*
*Phone: (213) 894-0647*                                          *312 North Spring Street*
*E-mail: veronica.dragalin@usdoj.gov*                            *Los Angeles, California 90012*

March 18, 2022

**<u>VIA E-MAIL</u>**

Ariel A. Neuman
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
aneuman@birdmarella.com
rseilie@birdmarella.com

      Re:    <u>United States v. Huizar, et al.,</u> CR No. 20-326(A)-JFW
              Supplemental Government Expert Disclosure

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure and the trial scheduling order in this matter, the government previously sent a letter on December 15, 2021, disclosing that at the joint trial in the above-captioned matter the government intended to elicit expert testimony from certain witnesses under Federal Rules of Evidence 702, 703, and 705. Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government requested reciprocal disclosure from the defense of any testimony defendants intend to use at trial under Rule 702, 703 and/or 705 of the Federal Rules of Evidence.

On January 14, 2022, pursuant to the trial scheduling order and Rule 16(b)(1)(C), you provided a defense expert disclosure letter.

You recently requested that the government provide a supplemental expert notice for the trial against your clients, which was recently severed from the joint trial on March 7, 2022. The government agreed to provide a supplemental expert notice by March 18, 2022, and you agreed the defense would provide its supplemental notice by March 25, 2022.

As a courtesy, to reduce surprise, and to enhance efficiency at trial, this letter also discusses other likely areas of testimony to provide you notice, although the government does not believe the testimony qualifies as expert testimony.

      **A.**      **City of Los Angeles Development Process**

Although the below topics do not fall within the category of expert testimony, in an abundance of caution, the government hereby gives notice that it intends to call Shawn Kuk to testify about

RE:  Huizar, et al. – Supplemental Government Expert Disclosure
March 18, 2022
Page 2

various relevant aspects of the City of Los Angeles ("City") application and approval process for large development projects such as the 940 Hill Project, and the roles of various public officials in that process, including specifically JOSE HUIZAR.

Specifically, Mr. Kuk will explain that within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction.  These applications and approvals occurred in various City departments, including the City Council, the Planning and Land Use Management ("PLUM") Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety ("LADBS"), the Area Planning Commission, the City Planning Commission ("CPC"), and the Mayor's Office.  Each part of the City approval process required official actions by public officials acting pursuant to their City authority and/or in their City capacity.  These included entitlements, variances, permits, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals.  Mr. Kuk will explain JOSE HUIZAR's duties and responsibilities as the Chair of the PLUM Committee, as Councilmember for CD-14, and as a member of the Economic Development Committee.  In addition, Mr. Kuk will explain the role of labor unions in the approval of major development projects, including the practice of labor organizations such as CREED filing appeals in the City approval process, and that PLUM, among other City agencies, had jurisdiction over such appeals.

Mr. Kuk's understanding of the City approval process is based on his education, training and experience, including as the Planning Director for Council District 14.  Reports of Mr. Kuk's interviews with the government summarizing this and other topic areas were previously produced at Bates Casino_0364948, Casino_0366460, Casino_0370819, Casino_2006911.

If you believe the above testimony *does* constitute expert opinion testimony, such that it would potentially require a dual role jury instruction, please let us know as soon as possible.

### B.     Korean Translator

Absent a stipulation between the parties, the government intends to call Meena Chung, an FBI linguist, at trial to provide official translations of two Korean recordings.  The expert will opine that the English translation of the foreign language recordings are reliable and accurate.  We previously notified you that the close to final translation of the two recordings were produced at Bates Casino_2007493 and Casino_2007519.  In addition, Ms. Chung will opine that the attached English translation of Korean text in five documents is reliable and accurate.  The bases and reasons for those opinions is based on the education, training, and experience of the linguist.  In the unforeseen event that Ms. Chung is unavailable at the time of trial, we would substitute another court-certified translator.

If you dispute the accuracy of any portion of these translations, please notify us as soon as possible.  We hope to reach a stipulation on this topic and forego the need for this expert testimony at trial.  If we do not reach a stipulation, we will provide a description of Ms. Chung's certifications and qualifications no later than 30 days before trial.

RE: Huizar, et al. – Supplemental Government Expert Disclosure
March 18, 2022
Page 3

### C.      CART Examiner

Absent a stipulation between the parties, the government intends to call one or more FBI Computer Analysis and Response Team (CART) certified Special Agents, who will testify to the procedures followed in extracting data from and conducting a digital forensic analysis of digital devices analyzed as part of this investigation, including the digital devices of George Esparza, Justin Kim, and Jose Huizar. The CART expert will opine that the digital data to be introduced at trial (e.g., text messages, voicemails, notes, photographs, etc.) were extracted from the specified digital devices following industry accepted procedures. The expert's bases and reasons for those opinions will be based on the education, training and experience of the expert and the extraction report generated for the respective device.

Please let us know if you will agree to a stipulation on this topic and forego the need for this expert testimony. If we do not reach a stipulation, we will provide the specific CART expert's name(s) and qualifications no later than 30 days before trial.

### D.      Forensic Accountant

Although we do not believe this constitutes expert testimony, in an abundance of caution, we are notifying you that, absent a stipulation between the parties, the government intends to call Joan Odowd, an FBI forensic accountant, to opine that metadata for the QuickBooks produced in native form by 940 HILL LLC (Casino_0843830) shows that on April 2, 2019, QuickBooks user "Admin" posted a General Ledger journal entry numbered "YE ADJ" and dated it December 31, 2018. The journal entry debited the account "Non-Operating Expense: Entitlement: Experts" $500,000.00 and credited the account "Dae Yong Lee (Personal Loan)" $500,000.00. The memo for the journal entry was "Creed LA matter." As of June 16, 2020, the $500,000.00 liability "Dae Yong Lee (Personal Loan)" was on 940 Hill LLC's Balance Sheet.

Please let us know if you will agree to a stipulation on this topic and forego the need for this testimony.

### E.      Appraisal Value of 940 HILL

Absent a stipulation between the parties, the government intends to call Moon Hee Nam, of Best National Appraisal, Inc., located at 1543 W. Olympic Blvd., Ste 410, Los Angeles, CA 90015, to opine that the appraisal value of the 940 Hill property as of May 20, 2015 was $13.6 million, as reflected in 940 HILL's TFAR application to the City, produced by 940 HILL at 940HILL0000370, and then re-produced in discovery by the government at Bates Casino_1676779. The basis for this opinion is set forth in the report produced at Bates Casino_0367752.

Absent a stipulation between the parties, the government intends to call Steven J. Johnson and/or Chris Karlen from Newmark Knight Frank, located at 700 South Flower Street, Suite 2500, Los Angeles, CA 90017, to opine that the appraisal value of the 940 Hill property as of January 25, 2019 was $31.5 million, as reflected in 940 HILL's submission to Hanmi Bank, produced by 940 HILL at 940HILL0001436, and then re-produced in discovery by the government at Bates Casino_1677845. The basis for this opinion is set forth in the report.

RE:  Huizar, et al. – Supplemental Government Expert Disclosure
March 18, 2022
Page 4


Since these appraisals were done at the request of and for 940 HILL and submitted by the
company as accurate appraisals at these two points in time, we assume you would stipulate to the
accuracy of these appraisal reports and valuations at trial, and therefore do not foresee the need
to call these individuals as experts at trial.  However, if you disagree, please notify us as soon as
possible.

    **F.**    **Interstate Wire**

Although we do not believe this constitutes expert testimony, in an abundance of caution, we are
notifying you that, absent a stipulation, the government intends to call an FBI Special Agent to
testify about the nature of how emails are transmitted through servers, and that the August 9,
2016 email charged in Count 5 necessarily must have traveled through interstate wires because
the email originated in Los Angeles, but traveled to Google servers located outside the state,
before traveling back to the recipient also located in Los Angeles.

Please let us know if you will agree to a stipulation on this topic and forego the need for this
testimony.

The government reserves the right to designate additional experts if further developments in the
case so warrant.

Please let us know if you have any questions or would like to further discuss any of the matters
raised above, including any proposed stipulations.


Sincerely,


MACK E. JENKINS
VERONICA DRAGALIN
MELISSA MILLS
CASSIE D. PALMER
Assistant United States Attorneys
Public Corruption & Civil Rights Section



Enc: referenced draft translation

Cc:  Carel Ale, Charles Snyder, Adam Olin, Harland Braun, Richard Steingard

UNCLASSIFIED//FOUO

File Number: LA-255905
Task ID: 1451500

Abbreviations:

| | |
|---|---|
| [ ] | Exegeses |
| [TN:] | Translator's Notes |
| Primary Language | Korean (standard font Times New Roman 12) |
| Secondary Language | English *(italics)* |

[1_Casino_1699494_CasinoProd012.pdf]

Attached is a letter showing that *Creed LA* withdrew the *Appeal* that they submitted to the city, regarding *940 Hill*.

Thank you.

[2_Casino_1676432_CasinoProd012.pdf]

No decision has yet been made regarding *940 hill hearing*, correct?

[3_Casino_1676777_CasinoProd012.pdf]

Hello President,

The following is an *update* on *TFAR APPLICATION*. You said through *Justin* last time that *TFAR* purchase expenses will be used for *Stanford ave improvement*. I believe it is necessary to coordinate with the city council's office as to how to proceed.
Please see below and the attached file.

[4_Casino_1700281_CasinoProd012.pdf]

This is an email from *Creed LA*.

[5_Casino_1703352_CasinoProd012.pdf]

Mr. President,
This is what *Fred* researched regarding *CreedLa*.
Please review the email below.

1
UNCLASSIFIED
//FOUO



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*Cassie D. Palmer*
*Phone: (213) 894-0363*
*E-mail: cassie.palmer@usdoj.gov*

*1500 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

May 25, 2022

<u>**VIA E-MAIL**</u>

Ariel A. Neuman
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
aneuman@birdmarella.com
rseilie@birdmarella.com

      Re:    <u>United States v. v. Huizar, et al.</u>, CR No. 20-326(A)-JFW-5, 6
               Supplemental Government Expert Disclosure

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure and the trial scheduling
order in this matter, the government previously sent expert disclosure letters on December 15,
2021 and March 18, 2022, regarding its intent to elicit expert testimony from certain witnesses,
including for Korean Translator, Meena Chung, under Federal Rules of Evidence 702, 703, and
705.  Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government
requested reciprocal disclosure from the defense of any testimony defendants intend to use at
trial under Federal Rules of Evidence 702, 703 and/or 705.

**<u>REQUEST FOR FURTHER RECIPROCAL EXPERT DISCOVERY</u>**

You previously provided initial and supplemental defense expert disclosure letters on January
14, 2022 and March 25, 2022, respectively, including for your anticipated Korean language
translator, Professor Mary Shin Kim.

By this letter, the government supplements its expert disclosure with respect to Ms. Chung.
Based upon our meet and confer, we understand that you have spoken with Professor Shin Kim
about certain opinions and her bases for them, such as the use of the pronouns in the Korean
language, the methodology she used to create her proposed translations, and the principles she
used for the translations (e.g., verbatim versus meaning for meaning).  The government requests
that you provide a supplemental disclosure relating to Professor Shin Kim's opinions, the bases
for her opinions, and any facts she relied on in reaching her opinions, as required by Federal
Rules of Evidence 703 and 705.

RE:  Huizar, et al. – Supplemental Government Expert Disclosure
May 25, 2022
Page 2


## BACKGROUND AND EXPERIENCE

In 2000, Chung received her Bachelor of Arts from University of Southern California in in East Asian Languages and Cultures with emphasis in Korean and a minor in Teaching Profession.  In 2005, Chung received her Master of Science in Teaching English to Speakers of Other Languages from University of Southern California.

Ms. Chung has been an FBI Language Specialist for approximately 13 years and 9 months.  This includes Chung's initial employment as an FBI Language Specialist contractor for approximately 5 years.  Prior to Chung's employment with the FBI, she taught Korean at North High School in Torrance, California.  Chung also was a freelance translator for three years for KBFD-TV, where she translated Korean drama television programs from Korean to English subtitles. She also has worked as a lecturer in Korean at California State University, Los Angeles.  Chung's full resume is attached.

Chung was born in Korea and immigrated to the United States when she was 8 years old.  Korean was Chung's first language and Chung's parents only spoke Korean.  Chung translated for her parents at an early age and learned English through her schooling.

## FBI LANGUAGE ANALYST

As an FBI Language Analyst, Chung is responsible for translation and occasionally interpretation.  Translating includes reviewing source material, such as a document or audio file, and producing a document reflecting the translation in English.  Chung typically translates from Korean to English, but occasionally translates from English to Korean.  Interpretation includes source material such as a live conversation, document, or audio file and producing a verbal product in real time.  Chung occasionally provides "high profile interpretation" for executive management in meetings with delegations composed of Korean officials.

## CERTIFICATION AND TRAINING

Chung is a certified FBI Language Quality Reviewer.  This certification included at least four levels of tests, which included reading comprehension, writing comprehension, speaking comprehension, and translation comprehension. In addition to the certification tests, Chung has attended several trainings including trainings about general translation and specific Korean translation.  Chung also participated in multiple interpretation workshops as an instructor and as a participant.  She serves as an adjunct faculty and curriculum developer for FBI, serves on FBI's Korean National Language Board, and is a Peer Review for Language Professionals' cultural presentations.  As Adjunct Faculty and Curriculum Developer, Chung creates courses and teaches Korean translation/interpretation to other language analysts.

To maintain her certification and continue working as a Language Specialist at FBI, Chung is required to complete a fitness for duty examination every two years, which includes a listening

RE:  Huizar, et al. – Supplemental Government Expert Disclosure
May 25, 2022
Page 3

## TRANSLATION PROCESS

Request for Translation:  Chung's translation process includes multiple steps and layers of review before a final product is provided for use in court, post-indictment.  The process is initiated by a request from a requesting individual.  In this case, the request was provided to Chung by her supervisor.  The request typically includes both the work to be completed and a brief background of the investigation.  In this case, however, Chung was provided only the names of the individuals over the course of the full recording.  Chung translated the recordings based on the context of the recording and only information provided over the course of the full recording.  Chung had an understanding that the recordings were for a public corruption investigation.

Initial Translation Process: Chung started the translating process by first listening through the entire recording in full.  Chung did not begin translating until a full listen was completed.  Chung did this to get context of the entire recording.  After listening to the recording, Chung then methodically listened to the recording in a stop/go/rewind procedure to translate from Korean to English.  The audio recordings that Chung completed were not the best audio quality because of background noise and the physical location of the speakers to one another. At times the speech was soft and difficult to hear.  To facilitate the translation, Chung used multiple software programs that provided different features for listening.  Some of these features included minimizing background sound, changing the speed of the audio, noise canceling, and start/stop/rewind. Chung utilized noise cancelling headphones and a foot pedal, which enables the start/stop/rewind process, for review.  Chung made a notation in her transcript for unintelligible "UI" to indicate when speech was heard but not understood.  Chung errs on the side of including UI unless she was sure of what she heard.

Secondary Translation and Review: Once the initial translation was completed, Chung listened to the recording an additional time, with the translation in hand, to make any revisions and fill in anything that may not have been captured during the prior translation.  Once the translation was completed, Chung reviewed the entire English product to ensure it contextually and grammatically made sense to the reader. Chung completed reviews on different days for a fresh listen.

Operational Review: Where, as here, translations are prepared for court or use outside the FBI, an additional "Operational Review" is completed by a different Language Analyst.  This review serves as a quality check on the primary translator's work.  In this case, certified FBI Language Specialist Brandon Lee completed an Operational Review of the recordings Chung translated.  Lee provided suggested revisions to Chung's product.  After the Operational Review was completed, Chung then reviewed the final product again to accept or reject any recommendations from the Operational Reviewer.

RE:  Huizar, et al. – Supplemental Government Expert Disclosure
May 25, 2022
Page 4


In total, Chung reviewed the translation on multiple occasions. Chung completed multiple reviews for the recordings not only because Chung wanted to ensure everything was captured accurately, but also because Chung understood that her translation was evidence in court.  .

## TRANSLATIONS

<u>Meaning for Meaning:</u> Completing translations "verbatim" does not mean translating the material literally "word for word," but rather "meaning for meaning."  There often are not a literal translation from word to word and such word-for-work translations may not make sense in English.  Therefore, the language analyst must contextually capture the meaning of the speech. Per Chung's practice, translation from Korean to English must be completed in a contextual manner because words do not directly translate "word for word" and because of the omission of pronouns in Korean as discussed below.

<u>Pronouns:</u>  In Korean, pronouns not needed and often are not used when speaking, so the appropriate pronoun must be determined by the context of the conversation.  The FBI standard is to not use brackets for pronouns, but to state the pronouns in the English translation based on the context of the recording.  For the recordings Chung reviewed, only two speakers were present, which made it easier to determine to whom, contextually, the speakers were referring.  In addition, the Korean language has three forms of verb conjugation: humble, neutral, and honorific.  An individual would never use the honorific conjugation to speak about themselves. Honorifics are generally used for an individual with higher status, with elders, or to show respect.  Justin Kim used the word "I" frequently, so it was not difficult to understand to whom Kim was referring.

<u>Korean Transcript:</u> Chung translates directly from Korean audio to written English.  She does not create a transcript in Korean before translating.  Chung reviewed the Korean transcript and the proposed translations from the defense expert and noticed that her draft translations were used instead of her final versions.  Chung compared the Korean transcript to what she heard when she listened to the audio and found that portions were incorrect based on Chung's hearing, including that the defense transcript sometimes omitted interjections by the speakers.

RE:  Huizar, et al. – Supplemental Government Expert Disclosure
May 25, 2022
Page 5


The government reserves the right to designate additional experts if further developments in the
case so warrant.

Please let us know if you have any questions or would like to further discuss any of the matters
raised above, including any proposed stipulations.

Very truly yours,

*Cassie D. Palmer*

MACK E. JENKINS
VERONICA DRAGALIN
CASSIE D. PALMER
Assistant United States Attorneys
Public Corruption & Civil Rights Section

cc:   Cuauhtemoc Ortega, Carel Ale, Charles Snyder, Adam Olin, Harland Braun, Richard
       Steingard

Attachment

# Meena Chung

11000 Wilshire Boulevard, Ste. 1700, Los Angeles, CA 90024 / 562–409–1340

## Education

| | |
|---|---|
| 2000 | University of Southern California |
| | *B.A. in East Asian Languages and Cultures with emphasis in Korean* |
| | *Minor in Teaching Profession* |
| 2005 | University of Southern California |
| | *M.S. in Teaching English to Speakers of Other Languages* |

## Relevant Professional Experience

2007–
Present

Language Specialist, *Federal Bureau of Investigation*
– Translating documents and recorded materials from/to Korean
– Interpreting orally from Korean to English and vice–versa
– Reviewing translations completed by other Korean language specialists
– Mentoring or training other FBI personnel

2007–
2010

Freelance Translator, *KBFD–TV Hawaii*
– Translated drama contents from Korean to English for subtitles
– Placed the subtitles on the video to match the timing of the speakers

2006

Lecturer, *California State University, Los Angeles*
– Planned and taught lessons for Korean 100A (Beginning Korean)
– Assessed student work products

2000–
2005

Teacher, *North High School*
– Subjects taught: Korean 1, 2, 3, 4, 5, and Writer's Workshop
– Developed curriculum, assessed students' levels for placement

## Certifications and Other Roles

- Adjunct Faculty and Curriculum Developer, *FBI*
- Certified Language Quality Reviewer, *FBI*
- Korean National Language Board, *FBI*
- Peer Reviewer for Language Professionals' cultural presentations, *FBI*