1  STEPHANIE S. CHRISTENSEN
   Acting United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   MACK E. JENKINS (Cal. Bar No. 242101)
4  Assistant United States Attorney
   Chief, Public Corruption & Civil Rights Section
5  CASSIE D. PALMER (Cal Bar. No. 268383)
   Assistant United States Attorneys
6  Public Corruption & Civil Rights Section
         1500 United States Courthouse
7        312 North Spring Street
         Los Angeles, California 90012
8        Telephone: (213) 894-2091/0363
         Facsimile: (213) 894-6436
9        E-mail:   Mack.Jenkins@usdoj.gov
                   Cassie.Palmer@usdoj.gov
10
   Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,        No. CR 2:20-326(A)-JFW-5, 6

15         Plaintiff,               GOVERNMENT'S OPPOSITION TO
                                    DEFENDANTS' CONSOLIDATED MOTION
16         v.                       FOR (1) JUDGMENT OF ACQUITTAL
                                    PURSUANT TO FED. R. CRIM. P. 29(a)
17 DAE YONG LEE,                    AND 29(c) AND (2) NEW TRIAL
     aka, "David Lee,"              PURSUANT TO FED. R. CRIM. P. 33(a)
18 940 HILL, LLC,

19         Defendants.

20

21      Plaintiff United States of America, by and through its counsel

22 of record, the Acting United States Attorney for the Central District

23 of California and Assistant United States Attorneys Mack E. Jenkins

24 and Cassie D. Palmer, hereby files its Opposition to Defendants Dae

25 Yong Lee and 940 Hill, LLC's Consolidated Motion for (1) Judgment of

26 Acquittal Pursuant to Federal Rules of Criminal Procedure 29(a) and

27 (29(c) and New Trial Pursuant to Federal Rule of Criminal Procedure

28 33 (CR 627).

1    This Opposition is based upon the attached memorandum of points

2 and authorities, the files and records in this case, and such further

3 evidence and argument as the Court may permit.

4  Dated: September 9, 2022          Respectfully submitted,

5                                    STEPHANIE S. CHRISTENSEN
                                     Acting United States Attorney
6
                                     SCOTT M. GARRINGER
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9                                    _____
                                     MACK E. JENKINS
10                                   CASSIE D. PALMER
                                     Assistant United States Attorneys
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page(s)**

3    MEMORANDUM OF POINTS AND AUTHORITIES...............................1

4    I.    INTRODUCTION..................................................1

5    II.   FACTS.........................................................3

6          A.   Background.............................................3

7          B.   The Pay-to-Play Scheme................................4

8          C.   Defendant LEE's Awareness of Huizar, Esparza, and
               Kim's Roles...........................................5
9
          D.   Defendant LEE Solicited Huizar's Assistance to Resolve
10              the CREED Appeal......................................7

11         E.   Defendant LEE Participated in Bribe Negotiations and
               Paid a $500,000 Cash Bribe............................7
12
          F.   Huizar and Esparza Pressured CREED to Drop Its Appeal....10
13
          G.   Defendant's Admissions & Obstruction of Justice.........11
14
     III. THE COURT SHOULD DENY DEFENDANTS' RULE 29 MOTION.............15
15
          A.   Rule 29 Standard......................................15
16
          B.   Sufficient Evidence Supported the Honest Services Wire
17              Fraud Count (Count 5).................................17

18              1.   Elements.......................................17

19              2.   Sufficient Evidence Supported the Intent to
                    Defraud Element................................17
20
                3.   Sufficient Evidence Supported the Use of Wire to
21                   Carry Out Scheme to Defraud Element.............25

22              4.   Sufficient Evidence Supported Official Act
                    Element........................................25
23
                5.   Scheme to Deprive the Public of Honest Services.....29
24
          C.   Sufficient Evidence Supported the Bribery Count (Count
25              25)...................................................31

26              1.   Corrupt Intent.................................32

27              2.   Government Business............................32

28         D.   Sufficient Evidence Supported Defendants' Obstruction

of Justice Convictions (Count 38)..........................33

      1.    Knowing Falsity.......................................33

      2.    Intent to Impede.....................................35

IV.  The Court Should Deny Defendants' Motion for a New Trial......36

    A.    General Rule 33 Standard................................36

    B.    The Jury Was Properly Instructed........................36

      1.    Instructional Error Standard.........................37

      2.    Honest Services Wire Fraud Instruction (Count Five)................................................37

      3.    Bribery Instruction (Count 25).......................41

      4.    Defense "Theory of the Case" Instruction...........41

      5.    Cooperating Witnesses Instruction...................43

    C.    The Government's Arguments in Rebuttal Do Not Warrant a New Trial...........................................49

      1.    Relevant Facts.......................................50

      2.    The Government Did Not Improperly Shift the Burden of Proof Nor Infringe Upon Defendants' Right Not to Testify...............................56

V.    CONCLUSION....................................................66

1

**Table of Authorities**

2

**Page(s)**

3

**Federal Cases**

4

Darden v. Wainwright,
5       477 U.S. 168 (1986) ......................................... 59

6    Houston v. Roe,
        177 F.3d 901 (9th Cir. 1999) ................................ 59
7

Jackson v. Virginia,
8       443 U.S. 307 (1979) ......................... 15-16, 16, 36, 37

9    Jacobson v. United States,
        503 U.S. 540 (1992) ......................................... 48
10

McDaniel v. Brown,
11       130 S. Ct. 665 (2010) ...................................... 16

12   Puckett v. United States,
        556 U.S. 129 (2009). ....................................... 66
13

Ramirez v. Hatcher,
14       136 F.3d 1209-13 (9th Cir. 1998) .......................... 62

15   Steele v. United States,
        267 U.S. 505 (1925) ....................................... 61
16

Sun v. Castro,
17       No. CV09-4124-MMM MLG, 2009 WL 6067154 (C.D. Cal. Oct. 6, 2009) 68

18   United States v. Agostino,
        132 F.3d 1183 (7th Cir. 1997) ............................. 19
19

20   United States v. Amlani,
        111 F.3d 705 (9th Cir. 1997) .............................. 63
21

United States v. Begay,
22       673 F.3d 1038 (9th Cir. 2011) .................... 16, 17, 36-37

23   United States v. Berry,
        683 F.3d 1015 (9th Cir. 2012) ............................. 66
24

United States v. Bracy,
25       67 F.3d 1421 (9th Cir. 1995) .............................. 67

26   United States v. Brugnara,
        856 F.3d 1198 (9th Cir. 2017) ........................... 21, 22
27

28

i

United States v. Carona,
  630 F.3d 917 (9th Cir. 2011) .................................. 46

United States v. Carrillo,
  16 F.3d 1046 (9th Cir. 1994) .................................. 68

United States v. Castillo,
  866 F.2d 1071 (9th Cir. 1988) ................................. 63

United States v. Clevenger,
  733 F.2d 1356 (9th Cir. 1984) ................................. 25

United States v. Cloud,
  872 F.2d 846 (9th Cir. 1989) .................................. 17

United States v. Coleman,
  525 F.3d 665 (8th Cir. 2008) .................................. 24

United States v. Darden,
  688 F.3d 382 (8th Cir. 2012) .................................. 68

United States v. Del Toro-Barboza,
  673 F.3d 1136 (9th Cir. 2012) ............................ 16, 66

United States v. Edwards,
  154 F.3d 915 (9th Cir. 1998) ............................. 59, 60

United States v. Fera,
  616 F.2d 590 (1st Cir. 1980) .................................. 50

United States v. Frederick,
  78 F.3d 1370 (9th Cir. 1996) .................................. 69

United States v. Garcia-Guizar,
  160 F.3d 511 (9th Cir. 1998) .................................. 61

United States v. Gutierrez,
  61 F. App'x 332 (9th Cir. 2003) .............................. 68

United States v. Hoyt,
  879 F.2d 505 (9th Cir.) .................................. 49, 50

United States v. Hui Hsiung,
  778 F.3d 738 (9th Cir. 2015) .................................. 59

United States v. Johnson,
  639 F.3d 433 (8th Cir. 2011) .................................. 63

United States v. Johnson,
  No. 14-cr-00412-THE. 2015 WL 4747309 (N.D. Cal. Aug. 11, 2015)   62

United States v. Linn,
  880 F.2d 209 (9th Cir. 1989) .................................. 48

ii

United States v. Lopez-Alvarez,
   970 F.2d 583 (9th Cir. 1992) .......................... 43, 45, 60

United States v. Mack,
   362 F.3d 597 (9th Cir. 2004) ................................. 37

United States v. Mares,
   940 F.2d 455 (9th Cir. 1991) ................................. 59

United States v. Mayans,
   17 F.3d 1174 (9th Cir. 1994) ................................. 64

United States v. Mcoy,
   771 F.2d 1207 (9th Cir. 1985) ................................ 60

United States v. Mende,
   43 F.3d 1298 (9th Cir. 1995) ....................... 51, 63-64, 67

United States v. Mikhel,
   889 F.3d 1003 (9th Cir. 2018) ................................ 62

United States v. Miller,
   953 F.3d 1095 (9th Cir. 2020). ....................... 38, 39, 41

United States v. Ned,
   637 F.3d 562 (5th Cir. 2011) .............................. 18-19

United States v. Nevils,
   598 F.3d 1158 (9th Cir. 2010) (en banc) ................... passim

United States v. Newell,
   584 F. Supp. 2d 272 (D. Me. 2008) ........................... 62

United States v. Ochoa,
   286 F. App'x 982 (9th Cir. 2008) ......................... 66-67

United States v. Pelisamen,
   641 F.3d 399 (9th Cir. 2011) ............................. 16, 17

United States v. Perdomo- Espana,
   522 F.3d 983 (9th Cir. 2008) ................................. 43

United States v. Phillips,
   704 F.3d 754 (9th Cir. 2012) ................................. 67

United States v. Pimentel,
   654 F.2d 538 (9th Cir. 1981) ................................. 37

United States v. Ramirez-Robles,
   386 F.3d 1234 (9th Cir. 2004) ............................... 24

United States v. Reed,
   575 F.3d 900 (9th Cir. 2009) ................................. 61

United States v. Reyes-Alvarado,
    963 F.2d 1184 (9th Cir. 1992) ........................... 17, 36

United States v. Rojas,
    554 F.2d 938 (9th Cir. 1977) ........................ 25, 35, 37

United States v. Sanchez,
    969 F.2d 1409 (2d Cir. 1992) ............................... 38

United States v. Santos,
    527 F.3d 1003 (9th Cir. 2008) .............................. 19

United States v. Sarkisian,
    197 F.3d 966 (9th Cir. 1999) ............................... 60

United States v. Sayakhom,
    186 F.3d 928 (9th Cir. 1999) ............................... 22

United States v. Sayetsitty,
    107 F.3d 1405 (9th Cir. 1997) .............................. 60

United States v. Sells,
    No. 21-102082021, WL 6061772 (11th Cir. Dec. 20, 2021) ..... 61-62

United States v. Slaughter,
    891 F.2d 691 (9th Cir. 1989) ............................... 48

United States v. Stamper,
    507 F. App'x 723-25 (9th Cir. 2013) ....................... 35

United States v. Vaandering,
    50 F.3d 696 (9th Cir. 1995) ..................... 59, 60, 65, 66

United States v. Vaccaro,
    816 F.2d 443 (9th Cir. 1987) ............................... 58

United States v. Wahchumwah,
    710 F.3d 862 (9th Cir. 2013) ............................... 48

United States v. Warren,
    25 F.3d 890 (9th Cir. 1994) ................................ 38

United States v. Wasserteil,
    641 F.2d 704-10 (9th Cir. 1981) ............................ 64

United States v. Westbo,
    746 F.2d 1022 (5th Cir. 1984) .......................... 21, 22

United States v. Williams,
    989 F.2d 1061 (9th Cir. 1993) .............................. 68

United States v. Winslow,
    962 F.2d 845 (9th Cir. 1992) ..................... 48, 49, 50-51

iv

United States v. Wright,
   625 F.3d 583 (9th Cir. 2010) ................................... 68

United States v. Young,
   470 U.S. 1 (1985). .......................................... 59

Victor v. Nebraska,
   511 U.S. 1 (1994) .......................................... 62

**Federal Statutes**

18 U.S.C. § 666 ....................................... 1, 32, 42

18 U.S.C. § 1519 ........................................... 1

18 U.S.C. § 1343 ......................................... 1, 18

18 U.S.C. § 1346 ......................................... 1, 18

**Other**

Fed. R. Crim. P. 29................................... <u>passim</u>

Fed. R. Crim. P. 33................................... <u>passim</u>

Fed. R. Crim. P. 52 ...................................... 38

Fed. R. Evid. 106 ............................... 52, 54, 55

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On June 27, 2022, following a seven-day trial, a jury found defendants DAE YONG LEE and 940 HILL, LLC on all counts: honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346 (Count 5); bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(2) (Count 25); and obstruction of justice in violation of Title 18 U.S.C. § 1519 (Count 38).  CR[1] 587.  On June 24, 2022, after the close of the government's case-in-chief but before closing arguments, defendants filed a "Brief in Support of Rule 29 Motion to Dismiss Count Five," requesting the Court enter a judgment of acquittal on Count 5 for lack of sufficient evidence pursuant to Rule 29(a). CR 539 at 1.  The Government filed its opposition on July 6, 2022, CR 599, and defendants filed their reply on July 12, 2022, CR 605.  On July 14, 2022, the Court denied defendants' Motion to Dismiss, "concluding that the jury's verdict [on Count 5] was entirely rational and based on more than sufficient evidence to find the Defendants guilty of wire fraud beyond a reasonable doubt."  CR 611 at 3.

On August 5, 2022, defendants filed a Consolidated Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure Rule 29(a) and 29(c) and a New Trial pursuant to Federal Rule of Criminal Procedure 33(a) ("Motion").  CR 627.  In their Motion,

---

[1] "CR" refers to the Clerk's Record, which is the docket number. The page numbers that follow refer to the automatic pagination on the CM-ECF header, rather than any internal pagination appearing elsewhere in the documents.  "Trial Tr." refers to the Court Reporter's trial transcript, which is consecutively paginated. "Trial Ex." refers to the exhibits the government admitted at trial. "Def. Ex." Refers to exhibits the defense admitted at trial.

1

defendants argue that the evidence at trial was insufficient to support the jury's verdicts on all counts and accordingly request that the Court set aside the jury's guilty verdicts against them and enter judgments of acquittal.  However, when viewing the evidence in the light most favorable to the prosecution, as this Court must on a Rule 29 motion, the jury's verdicts on all counts were rational and based on sufficient evidence.

In the alternative, defendants request a new trial on all counts pursuant to Federal Rule of Criminal Procedure 33.  Defendants contend the Court mis-instructed the jury on the honest services wire fraud and bribery counts, Mot. at 16-18; erred in denying defendants' theory-of-defense instruction, Mot. at 18-20; and erred in instructing the jury regarding the government's use of law enforcement techniques and cooperating witnesses, Mot. at 20-21. Defendants also argue that the government "improperly burdened" defendant LEE's Fifth Amendment right to remain silent "by commenting on the fact that the defense did not introduce evidence to contradict the government's proposed interpretations of the recorded conversations between defendant LEE and Justin Kim."  Mot. at 21-24. Finally, defendant argues that the cumulative effect of these errors, coupled with the Court's exclusion of Exhibits 118A and 118B (self-serving conversations between defendant LEE and Kim the Court excluded as hearsay), deprived defendant of a fair trial.  Defendant fails to establish any of these were legal errors, much less errors requiring a new trial.

Accordingly, this Court should deny defendants' Motion in its entirety.

1   **II.   FACTS**

2         **A.   Background**

3         At trial, the government presented evidence that defendant LEE

4   was a sophisticated businessman, who managed a real estate portfolio

5   valued at $180 million and was an experienced, hands-on real estate

6   developer who had managed seven development projects with a total

7   projected value of $400 million.  Trial Exs. 8, 57.

8         Defendant 940 HILL owned a property located at 940 South Hill

9   Street in downtown Los Angeles, consisting of a one-story building

10  and a parking lot (the "Property").  Trial Ex. 8; Trial Tr. 1832-33,

11  1845.  Defendant LEE was the president and majority owner of

12  defendant 940 HILL and handled its day to do operations.  Trial Ex.

13  8; Trial Tr. 1221, 1832-33, 1845.  The Property was located in

14  Council District 14 (CD-14), of which Jose Huizar was the

15  Councilmember.  Trial Tr. 203, 658.

16        Defendant 940 HILL sought to develop the Property into a 20-

17  story, mixed-use high-rise that would include over 200 residential

18  units and over 20,000 square feet of commercial space, known as the

19  "940 Hill Project."  Trial Tr. 641, 655-56, 663; Trial Ex. 37.  In

20  July 2016, defendant 940 HILL received conditional approval from the

21  Los Angeles City Planning Department to redevelop the Property.  Id.

22  The 940 Hill Project was one of defendant LEE's largest development

23  projects.  Trial Tr. 1223.  In August 2016, a labor organization

24  called CREED LA appealed the Planning Department's approval, which

25  paused development on the 940 Hill Project and would mean delay,

26  increased costs, and uncertainty for the developer.  Id. at 667-68,

27  680-87, 739, 759, 778-79, 800, 1793; Trial Ex. 44.  CREED's appeal

28  ultimately could reach the Planning and Land Use Management committee

3

1  (PLUM) -- which oversaw development projects in the City of Los

2  Angeles and of which Huizar was the Chair -- and then the full City

3  Council.  Trial Tr. at 768, 775-778, 803, 806.  Councilmembers

4  typically would defer to the Councilmember in whose District a

5  development project was located when voting on such approvals.  Id.

6  at 778-79.

7  **B.   The Pay-to-Play Scheme**

8  The evidence at trial established that a pay-to-play scheme

9  existed starting in 2013, wherein Huizar, through his special

10  assistant George Esparza, regularly solicited benefits from

11  developers in exchange for official acts by Huizar to assist

12  development projects in CD-14.  See Trial Tr. 924-26 (Esparza

13  testified about a "pay-to-play scheme" that existed in the City of

14  Los Angeles, which meant "asking something in return for a vote or

15  for access," including using certain "friends of the office" on

16  projects); 1105-06 (Esparza testified on cross that "from February

17  2013 through about November of 2018" he was "a member of a criminal

18  racketeering enterprise" that operated through Huizar's office).

19  Esparza, Justin Kim, and Shawn Kuk testified that by 2016, Kim

20  was a "friend of the office," meaning a liaison for developers who

21  had a close relationship with Huizar and Esparza and direct access to

22  the office.  See Trial Tr. 780-82 (Kuk testified about "friends of

23  the office" and that Kim was a "friend of the office"); 921 (Esparza

24  testified that "in 2016, Justin [Kim] was a No. 1 fundraiser for the

25  council office.  I was in touch with him almost on a daily

26  basis[.],").  Defendant LEE was one of Kim's "top guns" in terms of

27  contributions to Huizar's campaigns and pet projects.  Id. at 923

28  (Esparza testified that defendant LEE "was one of his top guns that

4

Justin [Kim] would refer to, one of his big -- big whales that he would ask for donations for the councilmember."); 932-33 (Esparza testified that "friend of the office" meant "people who never really told us no when we had a request"; "these were folks that always said yes and always came through, no matter what the request was"; and that "Justin Kim [fell] into that category"); 1390 (Kim testified that his success rate in asking defendant LEE for political contributions to Jose Huizar was "High. More than 90 percent").

### C. Defendant LEE's Awareness of Huizar, Esparza, and Kim's Roles

The evidence at trial showed that defendant LEE was well-aware of Huizar's power and position, Esparza's role, and Kim's close relationship with and access to Huizar and Esparza.  Trial Tr. 1392-94 (Kim testified he told defendant LEE that Huizar was "the final decision maker for all developments" in CD-14 and the entire City and that Kim was "very close" to Huizar and one of his top fundraisers), 1409, 1431-32 (Kim testified he told defendant LEE that Huizar, Esparza "was the main person to contact Jose Huizar," and Kim had close relationships with both); Trial Tr. 1392-33, 1409, 1431-32 (Kim told defendant LEE that Huizar was the "final decisionmaker for all developments" in the CD-14 and the entire City, that Esparza "was the main person to contact Jose Huizar," and that Kim had close relationships with both Huizar and Esparza); Trial Tr. 1483 (Kim told defendant LEE that Huizar could help make the CREED LA appeal go away).

Kim held himself out to defendant LEE as someone with access to politicians and to Huizar specifically.  As early as 2013, Kim sent emails to developers and business owners, including defendant LEE, to

"teach them about how important politics is to what they want to accomplish."  Trial Tr. 1620-24; see, e.g., Def. Ex. 344 (in a 2013 email sent to defendant LEE, Kim directly tied a public official's "support" of a project to political donations he made to that same public official at the same meeting).  In August 2015--a year before the CREED appeal--defendant LEE sent Kim a request seeking a support letter for the EB-5 visa program.  Trial Tr. 1923; Tr. Ex. 34.  In response, Kim forwarded that email to Esparza, writing that "this request is from one of the main supporters CM Huizar," referring to defendant LEE.  Id.  Esparza responded the next day with "I'll take care of this for you."  Id.  Kim then forwarded that entire chain to defendant LEE, putting him on notice that this was how Huizar and Esparza operated--quick and positive responses for developers who were in the inner circle of "supporters" of Huizar, meaning developers who never said "no" to Huizar's requests.  Id. & Trial Tr. 1432-33.

     In addition, defendant LEE's legitimate advisers confirmed Huizar's role and power with respect to the CREED appeal.  See, e.g., Trial Ex. 44 at 3 (Fred Shaffer wrote an email, which was forwarded to defendant LEE, analyzing the CREED appeal issues and stating: "Jose Huizar strongly supports all labor unions because they gave him financial and political support in getting him elected to City Council . . . At City Council it will be up to Huizar to decide if he supports our project or CREEDLA.  From what I have learned Huizar will likely take CREEDLA's side if we fight them . . . .").

### D. Defendant LEE Solicited Huizar's Assistance to Resolve the CREED Appeal

Kim testified that he and defendant LEE had a conversation about the CREED LA appeal on August 9, 2016, the day that CREED filed their appeal.  Trial Tr. 1443; see also Trial Ex. 139A (showing numerous calls between Kim and defendant LEE that day).  During that conversation, Kim told defendant LEE that Huizar could help make the CREED appeal go away.  Trial Tr. 1483.  Defendant LEE asked Kim "to have the appeal go away or drop the appeal" and was asking "Councilman Jose Huizar" for that specific help to avoid a costly delay on the 940 Hill development project.  Id. at 1450.  From that conversation, Kim understood that his role was "to talk to Councilman Huizar to solve this appeal problem."  Id. at 1452.  Kim also described how defendant LEE believed political officials had "all the power in the world" to make happen whatever they desired within the City.  Id. at 1452-53.  After their conversation, defendant LEE forwarded Kim an email attaching the CREED appeal.  Trial Tr. 1443; Trial Ex. 40.

Kim forwarded the email to Esparza on the same evening, and Esparza and Kim then had a conversation about it.  Trial Tr. 935-36; Trial Ex. 104.  Through that conversation and email, Esparza understood that "[Kim] was asking the councilmember for help on – on this specific ask," "if the councilman could help withdraw the appeal," and, more specifically, for "Jose Huizar to help pull the labor union . . . off this project."  Trial Tr. 935-36.

### E. Defendant LEE Participated in Bribe Negotiations and Paid a $500,000 Cash Bribe

The evidence at trial showed that over the ensuing months, defendant LEE, via Kim, and Huizar, via Esparza, arranged for LEE to

7

pay Huizar a bribe to resolve the CREED LA appeal.  Defendant LEE's participation in the bribe negotiations was evident from Kim's and Esparza's testimony, the call logs, text messages, Esparza's notes and photographs, and context of the negotiations.

Kim testified that the purpose of the dinner and karaoke bar meeting he facilitated between defendant LEE and Huizar/Esparza was to discuss that defendant LEE wanted the CREED appeal withdrawn.  Trial Tr. 1453-55, 1458-59.  Kim invited defendant LEE to show LEE that "[Kim] was meeting with Councilmember Huizar . . . [a]bout help with the CREED appeal" and that Councilmember Huizar was going to "help the appeal go away."  Trial Tr. 1453-55, 1458-59, 1463 (Kim testified that "the whole point" of defendant Lee being at the karaoke bar with Huizar was the CREED appeal).  Esparza testified the CREED appeal was brought up at the karaoke bar and that Huizar expressed that the "project [could] count on" his support.  Trial Tr. 940.  The morning after the karaoke bar meeting, Kim and Esparza met in person and Esparza told Kim that Huizar wanted money to make the CREED appeal go away.  Trial Tr. 943-95 (Esparza testified that he met Kim in person to convey that Huizar "won't be doing this [that is, resolving the CREED appeal] for free"; "It was definitely in person because we had a fear that FBI or people would be listening to our conversations").  Kim then communicated to defendant LEE that Huizar "wanted money" in exchange for Huizar's help on the CREED appeal.  Trial Tr. 1467, 1469 (Kim testified: "I told Mr. Lee about Councilman Huizar's ask . . . for money.").

While LEE did not immediately respond to Huizar's request, see Trial Tr. 1473 ("Still waiting for Mr. Lee's decision on Olympic & Hill."), negotiations later began in earnest.  Kim had a private

meeting with Huizar and Esparza at City Hall in Huizar's private office regarding the CREED appeal and then met with defendant LEE in person to convey the bribe amount Huizar had requested: $1.2. to $1.4 million to make the appeal go away, which was the amount Esparza told Kim it would cost to resolve the appeal through a consultant.  Trial Tr. 1493-91; Ex. 88 (Jan. 19, 2017 Esparza Note) ("1.2mil for taking care of creed"; "Councilman Huizar told me to talk to Justin Kim to make an agreement on the Olympic and hill project.  I spoke with [Huizar] at his house earlier today. He said 1.2 million and it will go away. Creed appeal.").  Defendant LEE rejected that offer because it was "too much."  Trial Tr. 1493-91.  Defendant LEE eventually counteroffered $500,000 in cash.  Id. at 1492, 1502.  Kim testified it was defendant LEE's idea to pay the bribe in cash, and that Kim understood defendant LEE wanted to pay in cash because there would be "no trace," so "no one would know."  Id.  Esparza and Kim continued to negotiate the bribe payments.  See, e.g., id. at 1494-95, 150; Trial Exs. 99A-99S (Kim & Esparza text messages).  The messages and phone records reveal a pattern: Kim regularly would call defendant LEE before and after these meetings and would meet with LEE in person when there was something important to discuss.  See, e.g., Trial Exs. 99A-99S, 107 (Text messages between Kim and LEE); 139A-151A (call summary charts on relevant dates).

Eventually, defendant LEE agreed to pay $500,000 in cash in three drops.  Trial Tr. 958-59 (Esparza testified Kim told him the cash would come in three drops); Trial Ex. 88 at 4 (Feb. 10, 2017 Esparza Note) (stating $500,000 in cash would be paid on February 10 ($200,000), March 14 ($200,000), and April 14 ($100.000)).  After Huizar accepted, defendant LEE provided cash from his office on

Crocker Street and placed it in a paper bag.  Trial Tr. 1502, 1506.
Esparza picked up the cash from outside defendant LEE's office on
Crocker Street on February 10, 2017 and March 14, 2017.  Trial Tr.
243, 243-44, 956, 967, 1907; Trial Exs. 89 (GPS re: Feb. 10, 2017
Cash Drop), 90 (GPS re: Mar. 14, 2017 Cash Drop), 92-93 (photos and
video and related metadata of Feb. 10, 2017 Cash Drop), 94-97 (photos
and video and related metadata of Mar. 14, 2017 cash drop).  Kim
testified that he and defendant LEE discussed that the cash defendant
LEE paid was going to Huizar.  Trial Tr. 1504.  The cash drops
followed a familiar pattern: Kim would call defendant LEE before and
after the cash drops; and Esparza would do the same with Huizar.

For one cash drop, defendant LEE was taking a long time getting
the cash for Kim to deliver to Esparza, so Kim also told LEE that
Esparza was waiting outside, which Kim said seemed to expedite LEE's
delivery of the cash.  Trial Tr. 1505-06 ("It was just -- it was a
long time. But as soon as I recall mentioning George Esparza, I
receive the money from [LEE].").  In July 2017, Kim told defendant
LEE that the final $100,000 of the $500,000 cash bribe was due and
collected $100,000 in cash from defendant LEE.  Trial Tr. 1521-22.
Kim testified that he told defendant LEE that the cash was going to
Huizar as part of the agreement.  Id. at 1522-23.  Ultimately, Kim
kept the money for himself.  Id.

**F.  Huizar and Esparza Pressured CREED to Drop Its Appeal**

After defendant LEE paid the first bribe payment, Esparza
reached out to Chris Modrzejewski, at Huizar's direction, to have a
private meeting about CREED dropping its appeal.  Trial Tr. 962-63.
At the February 23, 2017 meeting, Esparza told Chris Modrzejewski:
"I'm here because the -- first, the councilman asked me to set up

10

this meeting," noting, "I always made it clear that I was – I'm speaking on behalf of the councilmember, which is why my special assistant -- they knew that when I was talking, it was coming directly from him."  Id. at 962-63.  Esparza then communicated that Huizar "would be voting against the appeal," and because "the developer's friends of the office," Huizar wanted CREED to drop the appeal.  Id. at 962-64.  Chris Modrzejewski responded that if Huizar was able to secure defendant LEE's support of CREED for the Little Tokyo Project, another of LEE's developments, Modrzejewski would see what he could do about dropping the appeal.  Id. at 964.  After that, Esparza met with Huizar, and Huizar told him, "'Just tell him yes so that we could get this development project' – 'this appeal dropped.'."  Id. at 965.  On February 27, 2017, Esparza again met with Chris Modrzejewski and told him that they had a deal.  Id. at 965; Trial Ex. 101B.  Esparza then followed up with Chris Modrzejewski via text message, Trial Ex. 101C, and on March 2, 2017, CREED withdrew its appeal.  Trial Tr. 51.  On March 3, 2017, Chris Modrzejewski texted Esparza: "Appeal dropped today."  Id.

### G.   Defendant's Admissions & Obstruction of Justice

When the FBI's investigation became overt and turned towards defendant LEE and his co-schemers, the evidence at trial showed he attempted to cover up the bribe by directing his employee to falsify accounting records and provide the same false information the defendant 940 HILL's accountant to include in state and federal tax records for 2018.

Near the end of 2018 and in early 2019, the FBI began closing in on the co-schemers.  Trial Tr. 216-18, 1882.  The FBI executed search warrants on Huizar's house and residence as well as Esparza's home,

1    which was widely reported in the media at that time.  Id.  On

2    November 19, 2018, the government subpoenaed records from one of

3    defendant LEE's companies, JOIA accessories, requesting records

4    relating to Huizar.  Trial Tr. 297-305; Trial Ex. 125.  Then, on

5    March 5, 2019, the government executed a search warrant on Kim's

6    phone.  Trial Tr. 357.

7         On March 10, 2019, Kim and defendant LEE met in person to

8    discuss the government's investigation.  Trial Tr. 1539.  At that

9    meeting, Kim told defendant LEE that the FBI seized his phone, he had

10   met with an attorney, and had told the attorney the truth, including

11   the full amount of the bribe.  Id. at 1538-41.  Kim testified that

12   defendant LEE was "upset" that Kim had told his attorney the amount

13   of the bribe because it was "huge" and encouraged Kim to fire his

14   attorney so Kim could change his story and "match" defendant LEE's

15   story.  Id. at 1541-43.

16        On March 12, 2019, the government served a subpoena on defendant

17   940 HILL requesting records relating to Huizar, Esparza, Kim, and any

18   development projects.  Trial Tr. 403; Trial Ex. 126.  Defendant LEE

19   was present when that subpoena as served.  Trial Tr. 313-14, 1884-85.

20   Within days of the FBI serving that subpoena, defendant LEE directed

21   his employee, Jason Kang, to email 940 HILL's outside accountant/tax

22   preparer that "there might be an expense in 2018 [sic] regards to an

23   entitlement."  Trial Ex. 71; Trial Tr. 1273-77, 1279.  Defendant LEE

24   was blind copied on emails Kang sent regarding this "expense."  Id.

25   Kang testified that all information regarding this "expense" came

26   from defendant LEE, including the amount, when it was paid, what it

27   was for, and how it should be categorized in the accounting records

28   and on the tax forms.  Trial Tr. 1273-77, 1282, 1316.

On March 20, 2019, Kim and defendant LEE again met in person to discuss the FBI investigation.  Trial Tr. 1543-44; Trial Exs. 118C & 118D.  Kim recorded the conversation at the government's direction. Id.  During that conversation, defendant LEE counseled Kim: "[T]ake it easy," "I think they'll just catch a few big bad guys and end it," "don't worry too much . . . . I think for the past ten years, they [Huizar/Esparza] probably pocketed tremendous amounts," "[i]ssues just work out on their own," "with government work . . . they're all employees after all," and "it's not like we committed a deadly sin." Trial Tr. 1545-51; Trial Exs. 118C.  As to the last reference, Kim testified he understood defendant LEE to be referring to the two of them committing bribery.  Trial Tr. 1549.  Defendant LEE further told Kim he "was hit by the IRS about five, four times," and thought he might have "to run away to Korea," but "after the first time, the third and fourth time, [he] became nonchalant."  Trial Tr. 1549-50. Defendant LEE reasoned, "But really, you don't know how much they know," so "don't worry and let's just wait . . . [d]on't worry too much.  Just need to wait and see."  Trial Tr. 1550-51; 118D.

Then, on March 27, 2019, defendant LEE met with Kim a third time to discuss the FBI investigation; Kim again recorded that conversation at the FBI's direction.  Trial Tr. 1551; Trial Exs. 119B-119F.  During that conversation, defendant LEE advised Kim that he had "heard surprisingly [investigators] don't know much, but they pretend to know."  Trial Tr. 1553-55; Trial Ex. 119D.  Defendant LEE coached Kim to blame Huizar: "Now, we were both played by Huizar . . . . Us two . . . We were played by Huizar . . . . So you would have to blame him."  Trial Tr. 1554-56; Trial Ex. 119E.  After all, defendant LEE reasoned, "Huizar was probably not caught with just one or two

things.  They way I look at it – we're probably [*chuckling*] just a
drop in the ocean."  Id.

        During the March 27 conversation, defendant LEE also repeatedly
clarified the amount that Kim told his attorney Lee had paid as a
bribe.  When Kim responded that he told his attorney the amount was
$400,00, defendant responded: "But it's 500,000."  Trial Ex. 119B.
That same day, Kang emailed 940 HILL's tax preparer and again blind
copied defendant Lee, stating: "I have not heard about the
entitlement cost incurred in 2018 from Mr. Lee.  Upon learning of the
update, I will forward to you."  Trial Ex. 72 (emphasis added).  On
April 2, 2019, defendant LEE directed Kang to make the entries in 940
HILL's accounting records reflecting the $500,000 he paid to Huizar.
Trial Tr. 1279-82; Trial Ex. 74.  After making those entries, Kang
sent an email to the tax preparer attaching the revised accounting
records and stating, "I looked into P&L statement and discovered . .
. Personal Loan & Entitlement: $500,000 (Dae Y. Lee)," noting "I was
advised and discovered that 940 Hill, LLC borrowed $500,000 from Dae
Yong Lee in 2018 and the fund [sic] were directly paid to take care
of the entitlement issues with Creed LA.  Therefore, there should be
increases in liability and also intangible assets (entitlement) in
the amount of $500,000."  Trial Tr. 1277-79; Trial Ex. 74 (emphases
added).  Kang admitted on the stand that he did not actually
"discover" the purported expense/loan by looking at the P&L statement
but rather "discovered" it when defendant LEE told him about it.  Id.
at 1279.  Kang further admitted that before that day, there was no
entry in defendant 940 HILL's accounting records for $500,000, Id. at
1278, which was corroborated by 940 HILL's accounting records, Trial
Tr. 67, 1884-85.  Defendant LEE caused the 940 HILL tax return to be

14

1  filed on April 8, 2019, for which he was the signatory on behalf of

2  defendant 940 HILL.  Trial Tr. 1834, 1845; Trial Exs. 80-81, 82 at 2.

3      The evidence at trial established that defendant LEE provided

4  Kang no documentation relating to the purported $500,000 entitlement

5  expense/personal loan: there were no invoices; there were no loan

6  documents; there were no consulting agreements; there were no checks

7  reflecting payments.  Trial Tr. 1319-20.  By contrast, the government

8  showed that 940 HILL had contracts with and invoices for all ten of

9  the other consultants who worked on the 940 Hill Project.  Trial Ex.

10  165.  And every single consultant was paid by check, never by cash.

11  Id.; Trial Tr. 340-41.  In other words, until defendant LEE directed

12  his employee to create the two entries, the $500,000 payment was

13  hidden from defendant 940 HILL's books.

14  **III. THE COURT SHOULD DENY DEFENDANTS' RULE 29 MOTION**

15      **A.   Rule 29 Standard**

16      Rule 29(a) requires a court to enter a judgment of acquittal "if

17  the evidence is insufficient to sustain a conviction."  Fed. R. Crim.

18  Proc. 29(a).  The sufficiency analysis is two-fold.  "First, a

19  reviewing court must consider the evidence presented at trial in the

20  light most favorable to the prosecution."  United States v. Nevils,

21  598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citing Jackson v.

22  Virginia, 443 U.S. 307, 319 (1979)).  In so doing, this Court "may

23  not usurp the role of the finder of fact by considering how it would

24  have resolved the conflicts, made the inferences, or considered the

25  evidence at trial."  Id. (citing Jackson, 443 U.S. at 318-19).  Thus,

26  when "'faced with a record of historical facts that supports

27  conflicting inferences,' a reviewing court 'must presume—even if it

28  does not affirmatively appear in the record—that the trier of fact

1    resolved any such conflicts in favor of the prosecution, and must

2    defer to that resolution.'"  Id. (quoting Jackson, 443 U.S. at 326,

3    and citing McDaniel v. Brown, 130 S. Ct. 665, 673-74 (2010)).

4        Second, because "[a] jury's verdict is not to be disturbed

5    lightly," United States v. Begay, 673 F.3d 1038, 1043 (9th Cir.

6    2011), and is afforded "great deference," United States v. Pelisamen,

7    641 F.3d 399, 409 n.6 (9th Cir. 2011), "the reviewing court must . .

8    . determine whether this evidence . . . is adequate to allow any

9    rational trier of fact [to find] the essential elements of the crime

10   beyond a reasonable doubt."  Nevils, 598 F.3d at 1164 (cleaned up).

11   At this step, "a reviewing court may not ask itself whether it

12   believes that the evidence at the trial established guilt beyond a

13   reasonable doubt . . . ."  Id. (cleaned up) (emphasis added).  "[T]he

14   government does not need to rebut all reasonable interpretations of

15   the evidence that would establish the defendant's innocence, or rule

16   out every hypothesis except that of guilt beyond a reasonable doubt."

17   Id. at 1163-64 (cleaned up); United States v. Del Toro-Barboza, 673

18   F.3d 1136, 1145 (9th Cir. 2012) ("[T]he mere fact that evidence

19   submitted by the government is wholly susceptible to innocent

20   explanations . . . is not enough to reverse a conviction on appeal.")

21   (cleaned up).  Only where "mere speculation, rather than reasonable

22   inference, supports the government's case, or where there is a total

23   failure of proof of a requisite element" is the evidence legally

24   insufficient.  Nevils, 598 F.3d at 1167 (cleaned up).

25

26

27

28

**B.   Sufficient Evidence Supported the Honest Services Wire Fraud Count (Count 5)**

1.   <u>Elements</u>

To prove defendants committed honest services wire fraud, the government was required to prove: (1) defendants knowingly participated in a scheme to deprive the City of Los Angeles or its citizens of honest services; (2) the scheme involved a bribe to Huizar or Esparza in exchange for an official act relating to the CREED appeal; (3) Huizar and Esparza owed a fiduciary duty to the City of Los Angeles or its citizens; (4) defendants acted with the intent to defraud; (5) defendants' actions were material; and (6) defendants used an interstate wire communication to carry out or attempt to carry out the scheme.  CR 584 at 23-24; <u>see</u> 18 U.S.C. §§ 1343, 1346.

Defendants primarily challenge the sufficiency of the existence of the scheme and defendants' state of mind: their knowing participation in the scheme and their knowledge that the scheme involved a bribe to Huizar or Esparza.  The government provided sufficient evidence was to both such that a rational juror could conclude that the defendants knowingly participated in the scheme to defraud involving a bribe to Huizar or Esparza.

2.   <u>Sufficient Evidence Supported the Intent to Defraud Element</u>

As to Count 5, "the central issue at trial was whether defendants, through the payment of $500,000 to Justin Kim, intended to defraud the City of Los Angeles and its citizens."  Defs' Mot at 5.  With respect to intent to defraud, the government was required to prove that defendants "acted with the intent to defraud by depriving the City of Los Angeles or its citizens of their right of honest

17

services; an intent to defraud is an intent to deceive and cheat."
CR 584 at 23-24.  The jury was permitted to "[c]onsider not only
defendant's and co-schemers' words but also the circumstances in
which they are used as a whole."  Trial Tr. 2055.  Here, there was
substantial evidence at trial from which a rational juror could
conclude that defendant LEE intended that his payment of $500,000 in
cash was intended as a bribe to Huizar or Esparza.

Defendants first claim that the evidence was insufficient to
support defendants' intent to defraud because the government failed
to present direct evidence of defendant's intent.  But "[i]ntent or
knowledge is rarely provable with direct evidence."  United States v.
Ned, 637 F.3d 562 (5th Cir. 2011) (noting that knowledge and intent
are "subjective elements" which can "rarely be proven by direct
evidence").  Accordingly, courts have routinely held that intent may
be inferred from circumstantial evidence.  See, e.g., United States
v. Santos, 527 F.3d 1003, 1009 (9th Cir. 2008) ("The government is
not required to produce direct evidence of the defendant's intent;
rather, it may provide circumstantial evidence from which the
district court can draw reasonable inferences."); United States v.
Agostino, 132 F.3d 1183, 1192-93 (7th Cir. 1997) (finding that the
timing of a challenged transaction was sufficient circumstantial
evidence to show the "requisite corrupt intent to establish a
violation of § 666(a)(2)").

Here, the government presented substantial direct and
circumstantial evidence demonstrating defendant LEE's intent to
defraud:  Esparza's and Kim's testimony, defendant LEE's admissions,
call logs, text messages, Esparza's notes, photographs, GPS data, and
the timing of the objective data.  This evidence demonstrated that

defendant LEE joined the pay-to-play scheme when he chose to ask Kim to get Huizar's help on the CREED appeal and make it "go away," at whatever cost was necessary.  In doing so, defendant LEE had the criminal intent to defraud the City of Los Angeles and its citizens of honest services.  And this evidence revealed a pattern of coordination between the co-schemers, wherein defendant LEE communicated messages to Huizar through is trusted confidant, Kim.  See Trial Exs. 99A-99S, 107 (Text messages between Kim and LEE); 139A-151A (call summary charts on relevant dates).  The evidence further established that before defendant LEE requested Huizar's help in resolving the appeal via Kim in August 2016, defendants LEE and 940 HILL had relied on Kim repeatedly to solve their real estate problems through the CD-14 office.  So, when defendant LEE forwarded the CREED appeal to Kim, it was reasonably foreseeable to LEE that Kim would use an interstate wire to seek CD-14's help on the issue, because that is exactly what Kim had done in the past in response to these types of requests from defendant LEE.  Although defendant LEE had a team of legitimate consultants who were working on the CREED appeal, he chose to follow his established pattern of reaching out to Kim for direct access to CD-14, specifically Huizar.  Defendant LEE had made contributions to Huizar over the years, and it was time to cash in on the big "ask."

The Court already concluded that this pre-execution evidence was "more than sufficient" to support the jury's conclusion that defendant LEE had the requisite criminal intent at the time of the wire communication on August 9, 2016.  And defendant LEE's words and actions after August 2016 only strength that conclusion.  See, e.g., See Trial Exs. 99A-99S, 107 (showing coordination between the co-

schemers); Trial Ex. 44 at 3 (Fred Shaffer email forwarded to
defendant LEE analyzing the CREED appeal issues including Huizar's
power over voting and relationship to unions); Trial Tr. 1453-55,
1458-59 (the purpose of the karaoke bar meeting was to discuss that
defendant LEE wanted the CREED appeal withdrawn), 1463 (the "whole
point" of defendant LEE being at the karaoke bar was the CREED
appeal); Trial Tr. 1467, 1469 ("I told Mr. Lee about Councilman
Huizar's ask or ask for money."); Trial Tr. 1492, 1502 (defendant LEE
counteroffered $500,000 in cash; it was LEE's idea to offer cash).
Thus, compelling evidence after the wire fraud execution supports
defendants' intent to defraud, including defendant LEE's close
coordination with Kim, that defendant LEE actually paid $500,000 in
cash (while otherwise paying all bills by check supported by contacts
and invoices), and that defendant LEE later attempted to cover up
this bribe by obstructing justice.  See, e.g., United States v.
Brugnara, 856 F.3d 1198, 1208 (9th Cir. 2017) ("intent to defraud
could be inferred from after-the-fact misrepresentations designed to
cover up fraudulent conduct"); United States v. Westbo, 746 F.2d
1022, 1025 (5th Cir. 1984) ("acts occurring after the use of the
wires can be evidence from which a jury could infer participation in
the scheme to defraud").

Contrary to defendants' assertion otherwise, the government
presented considerable *direct* evidence of defendant' LEE's intent to
defraud, i.e., defendant LEE's admissions and Kim's testimony.
Defendant LEE's admissions during his conversations with Kim
demonstrate his awareness of the scheme, his intent to deceive and
cheat, and his consciousness of guilt.  During these conversations,
Defendant LEE did not express surprise, confusion, or anger in

discussing payment of the bribe to Huizar.  Instead, he sought to coordinate his story with Kim's, Trial Tr. 1541-43, and to reassure Kim that the government's investigation was unlikely to uncover their crimes.  Trial Tr. 1545-51; Trial Ex. 118C ("[T]ake it easy," "[i]ssues just work out on their own," "with government work . . . they're all employees after all,"); Trial Tr. 1550-55; Trial Ex. 118D ("But really, you don't know how much they know," so "don't worry and let's just wait . . . [d]on't worry too much.  Just need to wait and see"; "surprisingly [investigators] don't know much, but they pretend to know").  In seeking to assuage Kim's fears, defendant LEE told Kim that he previously had been investigated by the government but did not face any consequences, which made him "nonchalant."  Trial Tr. 1549-50 (defendant LEE said the IRS investigated him four or five times, and that he considered fleeing to Korea but eventually "became nonchalant").  During these conversations, defendant LEE referred to his and Kim's joint misconduct, by using words like "we" and "us" and encouraged Kim to deflect the blame to Huizar when Kim talked to investigators.  Trial Tr. 1546; Trial Ex. 118C ("it's not like we committed a deadly sin"); Trial Tr. 1554-56; Trial Ex. 119E ("Now, we were both played by Huizar . . . Us two . . . We were played by Huizar . . . . So you would have to blame him.").  Further, defendant LEE's statements reflect his knowledge of the pay-to-play scheme and his and Kim's role in it.  See, e.g., Trial Tr. 1545 ("I think they'll just catch a few big bad guys and end it," "and not just one or two projects but -- I think for the past ten years, they probably pocketed tremendous amounts"); Id. at 1554-56; Trial Ex. 119E ("Huizar was probably not caught with just one or two things.  The

21

way I look at it – <u>we're probably [*chuckling*] just a drop in the ocean</u>." <u>Id.</u> (emphasis added).

Defendants contend that defendant LEE's admissions in these conversations are not "probative" of his state of mind when he paid the bribe, only his state of mind at the time he made the statements. But intent to defraud can be inferred from a defendant's statements and conduct, including after-the-fact admissions, half-truths, and "misrepresentations design to cover up fraudulent conduct." <u>United States v. Brugnara</u>, 856 F.3d 1198, 1208 (9th Cir. 2017); <u>United States v. Sayakhom</u>, 186 F.3d 928, 941 (9th Cir. 1999) (intent may be inferred from the defendant's statements and conduct, including the use of half-truths or concealment of material facts). Further, this evidence is capable of a competing inference the jury rationally could have drawn: that defendant LEE's statements reflected his continuing understanding from the time he paid the bribe.

In addition, Kim provided substantial direct of defendant LEE's intent. Kim testified that <u>before</u> defendant LEE forwarded him the CREED appeal, they had a conversation during which LEE asked Kim to get <u>Huizar</u> "to have the appeal go away or drop the appeal." <u>See, e.g.</u>, Trial Tr. 1443-50 (Kim testified that LEE was asking "Councilman Jose Huizar" for that specific help to avoid a costly delay on the 940 Hill development project); <u>see also</u> Trial Ex. 139A (call logs showing numerous calls between Kim and defendant LEE the day the appeal was filed). Importantly, the government presented substantial evidence that defendant LEE was well-aware at that time of Huizar's power and role in the City approval process and that Kim was someone with access to Huizar and was one of Huizar's top supporters. <u>See</u> Sections II.C-D <u>supra</u>; <u>see also</u> Trial Tr. 1923;

Trial Ex. 34 (email forwarded to defendant LEE in which Kim told Esparza that LEE was one of Huizar's main political supporters, when seeking favors from Huizar's on LEE's behalf).  Further, Kim testified he and defendant LEE discussed the amount of the bribe at length and that the cash was going to Huizar.  See Trial Tr. 1467 (Kim communicated to defendant LEE that Huizar "wanted money" in exchange for Huizar's help on the CREED appeal), 1469 ("I told Mr. Lee about Councilman Huizar's ask . . . for money."); see also Trial Ex. 99C at 2 (text message from Kim to Esparza: "Still waiting for Mr. Lee's decision on Olympic & Hill"); Id. at 1493-99 (Kim testified he met with defendant LEE in person to convey that Huizar's request for $1.2. to $1.4 million to make the appeal go away, which LEE rejected as "too much").  Kim testified that he and defendant LEE discussed on several occasions that cash bribe would be going to Huizar.  See id. at 1504 (after Huizar accepted defendant LEE's offer of $500,000 in cash, he and defendant LEE discussed that the cash defendant LEE paid was going to Jose Huizar; id. at 1505-06 (during one cash drop, he told defendant LEE that Esparza was waiting outside for the cash); id. at 1521-23 (Kim told defendant LEE that the final $100,000 of the $500,000 cash bribe was going to Huizar).

While defendants completely discount Kim's testimony, his testimony is sufficient to sustain the jury's conclusion as to this element.  See United States v. Ramirez-Robles, 386 F.3d 1234, 1241 (9th Cir. 2004) (holding that even "the uncorroborated testimony of a co-conspirator is sufficient evidence to sustain a conviction unless the testimony is incredible or unsubstantial on its face")(cleaned up); United States v. Coleman, 525 F.3d 665, 666 (8th Cir. 2008) ("We have repeatedly upheld jury verdicts based solely on the testimony of

co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony.").  To be clear, on cross-examination, Kim expressed some confusion about the precise wording of his conversations with defendant LEE, but his testimony was corroborated in key respects by objective evidence, including GPS data, photographs, call logs, text messages, emails, Esparza's notes, as well as the timing of the events, Esparza's testimony, and defendant LEE's own admissions.  And Kim's opinion that defendant LEE knew what the cash was intended for is consistent with the Ninth Circuit law that the "circumstances as a whole" bear on intent to defraud. Considering this, Kim's testimony certainly cannot be said to be incredible on its face; presumably, the jury could and did find it believable despite being well aware of the defense's challenges to Kim's credibility.  That was its proper prerogative.  United States v. Clevenger, 733 F.2d 1356, 1359 (9th Cir. 1984); United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) ("[I]t is the exclusive function of the jury to . . . resolve evidentiary conflicts[] and draw reasonable inferences from proven facts.").

Finally, defendants repeatedly highlight evidence that, theoretically, could support an acquittal. Defs' Mot. at 6-8.  The jury heard this evidence and did not credit it.  The Court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Nevils, 598 F.3d at 1164 (citation omitted).  "[A] court . . . may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." Id.  Thus, the government presented sufficient evidence from

1   which a rational juror could conclude that defendants LEE and 940

2   HILL possessed the requisite intent.

3        3.   <u>Sufficient Evidence Supported the Use of Wire to Carry</u>
    <u>Out Scheme to Defraud Element</u>

4       Defendants preserve the argument from their Rule 29(a) motion

5   (CR 539, 605) that they jury's verdicts on Count Five should be set

6   aside "because the evidence presented by the government is

7   insufficient to establish that the predicate interstate wire

8   communication was sent 'for the purposes of executing' a scheme to

9   defraud."  Defs' Mot. at 13.  The Court rejected this argument, CR

10  611 at 1-3, and nothing in the Motion supports revisiting that

11  ruling.

12       4.   <u>Sufficient Evidence Supported Official Act Element</u>

13      The evidence at trial was sufficient to allow a rational juror

14  to conclude that defendants paid a bribe "in exchange for at least

15  one official act by Jose Huizar or George Esparza on the CREED LA

16  appeal filed against the 940 Hill Project."  CR 584 at 24.

17  Importantly here, the "'exchange' may be express or may be implied

18  from all the surrounding circumstances."  <u>Id.</u>

19      Defendants argue that there was no evidence at trial that they

20  "knew or understood that Huizar promised the performance of an

21  'official act' in exchange for the payment" and that the "only

22  *potential* 'official act' referenced throughout the trial was Huizar's

23  theoretical vote against the CREED appeal if it reached the PLUM

24  committee."  Defs' Mot. at 14.  In framing this argument, defendants

25  (once again) omit one of the two official acts the government both

26  pleaded in the indictment and proved at trial.  As argued at length

27  in pretrial proceedings, the CREED appeal was a matter pending and

28                           25

capable of being brought before Huizar and was filed and appealable to PLUM and City Council.  Huizar and Esparza agreed to help resolve the appeal in exchange for cash and could have achieved that resolution by (1) Huizar voting to deny CREED LA's appeal against the 940 Hill Project in the PLUM Committee, of which Huizar was the Chair; *or* (2) Huizar and/or Esparza using their official positions to pressure CREED LA to dismiss its appeal against the 940 Hill Project. Huizar and Esparza did not need to specify, and the co-schemers did not need to agree upon, <u>how</u> they would accomplish that promise. Instead, an agreement to accept the bribe in exchange for resolving the appeal.

Direct and circumstantial evidence at trial established that defendants paid the bribe in exchange for Huizar or Esparza using their official positions to resolve the CREED appeal.  See, e.g., Trial Tr. 952-966 (Esparza testified that defendant LEE's ask of Huizar, via Kim, was to get rid of the CREED appeal; defendant Lee accepted Huizar's offer to get rid of the appeal in exchange for $500,000 in cash; Esparza's understanding was that the messages he communicated from Huizar to Kim were communicated to LEE; Trial Ex. 88 (Esparza's notes) at 7 ("<u>Want the appeal withdrawn</u> or <u>the commissions vote it down</u>.  <u>Either way</u>.") (emphases added), 9 ("<u>Councilmember will talk to creed and withdraw</u> and at the end of the day <u>we can kill any cpc [at PLUM/City Council]</u>.") (emphases added); Trial Tr. 1027-29, 1054-55 (Esparza testified that he communicated information in his notes to the co-schemers, including Kim; Esparza understood that that Kim would communicate the information to defendant LEE); <u>Id.</u> at 1443-50 (Kim testified that <u>before</u> defendant LEE forwarded him the CREED appeal, they had a conversation during

1   which LEE asked Kim to get Huizar "to have the appeal go away or drop

2   the appeal"); see supra Sections II.C-D (summarizing evidence that

3   defendant LEE knew of Huizar's power in PLUM, role in the City

4   approval process, and allegiance to unions generally and CREED

5   specifically); Trial Tr. 1467 (Kim testified he communicated to

6   defendant LEE that Huizar "wanted money" in exchange for Huizar's

7   help on the CREED appeal), 1469 ("I told Mr. Lee about Councilman

8   Huizar's ask . . . for money."); see also Trial Ex. 99C at 2 (text

9   message from Kim to Esparza: "Still waiting for Mr. Lee's decision on

10  Olympic & Hill"); Trial Tr. 1491-92 (Kim testified he met with

11  defendant LEE in person to convey Huizar's request for $1.2. to $1.4

12  million to make the appeal go away); Id. at 1504 (Kim testified that

13  he and defendant LEE discussed that the cash defendant LEE paid was

14  going to Jose Huizar); Id. at 1521-23 (Kim testified he told

15  defendant LEE that the final $100,000 of the $500,000 cash bribe was

16  going to Huizar).  This evidence supports the conclusion that

17  defendant LEE intended the $500,000 he paid to go to Huizar or

18  Esparza in exchange for their assistance in resolving the appeal

19  through an official act.

20      Defendants claim that "such a deal would not have made any

21  sense" because CREED could have delayed the project by challenging

22  the vote in court.  Of course, this ignores that Huizar and Esparza

23  using their official positions to pressure CREED to dismiss the

24  appeal would guarantee the result more quickly.  Further, even if

25  CREED was able to appeal PLUM's ruling, CREED may not file such a

26  lawsuit because they are costly, difficult, and something CREED must

27  pay out of pocket.  Trial Tr. 1805, 1819 (Jeff Modrzejewski

28  testimony).

1    Defendants further argue that "[n]o reasonable juror could have
2    denied that there was a far more plausible inference, which was that
3    the payment was exchanged for informal communications between Esparza
4    and CREED." Defs' Mot. at 10. But the inference defendants advanced
5    is contrary to the evidence at trial. While there is substantial
6    evidence of Kim's close relationship with Huizar and defendant LEE's
7    awareness of that relationship, there is zero evidence of any
8    connection between Kim and CREED LA. Indeed, Kim testified he had
9    never heard of CREED, never talked to anyone at CREED, did not have
10   an email address or phone number for CREED, and that defendant LEE
11   never asked him to contact CREED. Trial Tr. 1455, 1477. Defendants'
12   theory is also at odds with the flow of communication between Kim and
13   defendant LEE before and after relevant meetings and cash drops,
14   which support the reasonable inference that Kim was keeping defendant
15   LEE in the loop each step of the way. Finally, it makes little sense
16   that defendant LEE, a sophisticated businessman who had been advised
17   by his consultants at length about the legitimate means of resolving
18   the appeal both through the City process and through negotiations
19   with CREED, would have believed that he was making a deal with CREED
20   when he paid $500,000 in cash, without signing any project labor
21   agreement with CREED or memorializing the agreement any other sort of
22   contract. And, in any case, it was not unreasonable for the jury to
23   draw the inference it did here: defendants paid the bribe in exchange
24   for Huizar or Esparza using their official positions to resolve the
25   CREED appeal by whatever means necessary, including through: (1)
26   Huizar voting to deny CREED LA's appeal against the 940 Hill Project
27   in the PLUM Committee; or (2) Huizar or Esparza pressuring CREED LA
28   to dismiss its appeal against the 940 Hill Project.

5.   <u>Scheme to Deprive the Public of Honest Services</u>

Defendants next advance a novel and legally unsupported argument that the evidence at trial was insufficient to establish that defendants participated in a scheme to defraud the City of Los Angeles and its citizens of their right to the *honest services* of their public officials because "the bribery scheme alleged in this case was not one in which the citizens of Los Angeles would be deprived of Huizar's honest services." Defs' Mot at 15. Defendants argue that they could not have knowingly participated in a scheme to deprive the City of Los Angeles and its citizens of Huizar's *honest services* because Huizar was a bad actor who was not honestly conducting the duties of his office, that is, "Huizar threatened to deprive Mr. Lee and the city of his honest services without the bribe—i.e., he demanded the payment as a condition for providing honest services." <u>Id.</u> at 15-16. Defendants argue that because the 940 Hill Project would have benefited the City, "the 'honest' thing to do for the citizens of Los Angeles was to deny CREED's frivolous appeal and allow the project to proceed." <u>Id.</u> at 16.

Defendants either misapprehend or willfully misread the honest services fraud elements. The relevant questions are (1) whether defendants possessed the intent to deceive and cheat – here, the evidence demonstrates they did by paying a bribe to a public official to circumvent procedural hurdles, and (2) whether they knowingly participated in a scheme or plan to deprive the City of Los Angeles or its citizens of their right of honest services, that is, to bribe Huizar or Esparza in exchange for at least one official act – here, the evidence demonstrates they did for the reasons discussed at length above. In other words, the honest services to which the

public is entitled and of which defendants deprived them is that their public officials make decisions free from bribery.

Under defendants' theory, no one who solicited a benefit from a corrupt public official through bribery could be found guilty of honest services fraud if the required from the briber benefit the public interest.  That is, those who paid bribes to public officials on the take could evade liability simply because those officials were not rendering honest services to the public by requesting and accepting such bribes in the first place.  This argument is as nonsensical as it is circular.

That certain witnesses expressed opinions that the 940 Hill Project would have benefited the City is irrelevant.  Defs' Mot. at 10-11.  The merits of the Project did not entitle defendants to circumvent procedural requirements by paying off a public official: all developers, even those with laudable projects, are required to follow the same rules and jump through the same hoops as everyone else.  And that Huizar readily requested and accepted bribes certainly did not permit defendants to pay him to evade the same requirements every other developer has to satisfy or forgo procedural steps established by the City.

Defendants' contention that "Huizar's corruption" was "the only thing standing in [the 940 Hill Project's] way" is at odds with the facts: CREED's appeal, filed through legitimate City processes, not Huizar's corruption, paused the 940 Hill Project indefinitely and stood in the way of further development.  Like anyone else, CREED was entitled by law to file such an appeal, regardless of any witnesses'

1    opinions about its merits.[2]  Trial Ex. 113 at 2 (appeal filing

2    requirements).

3         Thus, the Court should deny defendants' motion to set aside the

4    jury's verdicts on Count 5.

5         **C.   Sufficient Evidence Supported the Bribery Count (Count 25)**

6         Count 25 charges defendants with violating the federal-funds

7    bribery statute, 18 U.S.C. § 666(a)(2).  The government was required

8    to prove that defendants gave, offered, and agreed to give Huizar,

9    George Esparza, or Justin Kim cash, intending to influence or reward

10   Huizar or Esparza in connection with the 940 Hill Project, including

11   in: (1) pressuring CREED LA to dismiss its appeal against the 940

12   Hill Project, or (2) voting to deny CREED LA's appeal against the 940

13   Hill Project in the PLUM Committee.  CR 584 at 29; Trial Tr. 2058.

14   The evidence presented by the government at trial was sufficient to

15

16        [2] Much like the witnesses' opinions about the merits 940 Hill
     Project itself, the merits of the CREED appeal have no relevance to
17   the elements here.  That said, contrary to defendants' contention,
     the evidence regarding the merits of the CREED's appeal was far from
18   settled.  See Defs' Mot. at 16 (citing evidence for the proposition
     that it was "undisputed" that CREED's appeal was "frivolous" from the
19   perspective of "Lee's own staff and the city") but see Trial Ex. 41
     (Shaffer email stating that CREED "clearly knows what they are doing"
20   and presented a "a very sophisticated argument in support of their
     appeal").  Indeed, some evidence supported the conclusion that
21   defendant 940 HILL's application substantially undervalued the 940
     Hill property and accordingly underestimated the TFAR public benefit
22   payment defendant 940 HILL was required to pay, which was one of the
     grounds CREED raised in its appeal.  Trial Ex. 113 at 10 (CREED
23   appeal) ("This means that the TFAR public benefit payment is
     undervalued and, therefore, improperly calculated."); Trial Tr. 656
24   (Shaffer testimony: "Q. So the higher -- so the higher the appraised
     value, the higher the fee; the lower the appraised value, the lower
25   the fee? A. Correct."), 671 (Shaffer testimony: CREED's appeal was
     alleging the appraisal value was "too low" and so the public benefit
26   was "too low"); compare Trial Exs. 37 at 7 (TFAR application
     estimating the value of the 940 Hill property as $13.6 million as of
27   May 2015) with Trial Tr. 1261-63 (Kang testified 940 Hill received a
     Letter of Intent offering to purchase the 940 Hill Property for $18
28   million in 2015) & Trial Ex. 28 (Letter of Intent offering to
     purchase the 940 Hill Property for $34 million for March 2016).

1    support defendants' convictions on this count because a rational

2    juror could have concluded sufficient evidence established that

3    defendants intended "to influence and reward Huizar and Esparza" when

4    they gave Justin Kim $500,000 in cash; and (2) the Court correctly

5    included the two official acts pleaded and proved by the government

6    in this case, including "pressuring CREED LA to dismiss its appeal

7    against the 940 Hill Project."

8            1.   Corrupt Intent

9        Defendants contend "[t]here is no meaningful distinction"

10   between the bribery intent requirement and the honest services fraud

11   intent requirement.  While elements are distinct, the government

12   agrees the same evidence satisfies both, such that any distinctions

13   in the elements do not result in different conclusions regarding

14   sufficiency.  In other words, for the same reasons the Court should

15   deny defendants' motion as to Count 5, it should do the same as to

16   Count 25.

17           2.   Government Business

18       Relying on their official act analysis, defendants argue "there

19   was no evidence that defendant LEE was promised a vote by Huizar or

20   any specific influence over 'government business' in connection with

21   the CREED appeal."  Defs' Mot. at 11.  As explained in Section

22   III.B.2 supra, there was substantial evidence at trial that

23   defendants intended "to influence and reward Huizar and Esparza" when

24   they gave Justin Kim $500,000 in cash, including in: (1) pressuring

25   CREED LA to dismiss its appeal against the 940 Hill Project, or (2)

26   voting to deny CREED LA's appeal against the 940 Hill Project in the

27   PLUM Committee."  Defendants again argue that "if Mr. Lee expected

28   anything in exchange for his payment, it was the voluntary withdrawal

by CREED of its appeal" but this argument is unavailing for the reasons explained above.  See Section III.B.2 supra.

The Court correctly denied defendants' Motion to Strike Language from Count 25 (CR 231), and nothing in the Motion warrants revisiting that ruling here.  Thus, the Court should deny defendants' motion to set aside the jury's verdicts on Count 25.

### D.   Sufficient Evidence Supported Defendants' Obstruction of Justice Convictions (Count 38)

To prove obstruction of justice, the government was required to prove: (1) the defendant knowingly made a false entry in a record; and (2) the defendant acted with the intent to impede an actual or contemplated federal investigation.  (CR 584 at 31.)  The government was not required to prove that defendants' sole or even primary intention was to obstruct justice so long as the government proved that one of the defendant's intentions was to obstruct justice.  (CR 584 at 31.)

Defendants claim the evidence at trial failed to establish that (1) the entry was false, (2) defendants knew that the entry false, and (3) the false entry was made "with the intent to impede a grand jury investigation into the matter."  Not so.

#### 1.   Knowing Falsity

Defendants argue that there is insufficient evidence that defendants knowingly made a false entry in a record.  In determining whether each defendant acted knowingly, the jury was permitted to consider evidence of the defendant's words, acts, or omissions along with all the evidence.  CR 584 at 34.

Here, there was substantial evidence from which a rational juror could conclude that defendants knowingly made false entries in their

accounting and tax records.  In light of the falsity of these entries on their face (i.e., the incorrect year, purporting to be an expense for "experts" and a "personal loan" from defendant LEE to defendant 940 HILL instead of a bribe); the timing of the entries (in the incorrect calendar year; nearly two years after the bribe was paid; days after the FBI served subpoenas on JOIA and 940 HILL for records relating to co-schemers); Kang's testimony about defendant LEE's instructions to him regarding the entries (defendant LEE advised Kang of the amount, what it was for, how to categorize it in the accounting records and on the taxes); the lack of any documentation supporting the expense (no invoice; no contract; no check); and defendant LEE's statements to Kim during this time period (confirming defendant LEE's knowledge of the amount of the bribe and recommending that Kim fire his attorney so the two of them could coordinate their stories), it was within the jury's power to draw reasonable inferences from this evidence and "to weigh inconsistencies in making credibility determinations."  United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) ("[I]t is the exclusive function of the jury to . . . resolve evidentiary conflicts[] and draw reasonable inferences from proven facts."); United States v. Stamper, 507 F. App'x 723, 724-25 (9th Cir. 2013).  Defendants ask the Court to draw different inferences from the record than the jury did, but "'faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  Nevils, 598 F.3d at 1164 (citing Jackson, 443 U.S.

1  326)).  Thus, the government presented sufficient evidence to support

2  this element.

3          2.   Intent to Impede

4      The government also introduced sufficient evidence that the

5  defendants made the false entries in accounting records and tax

6  returns with the intent to impede the government's investigation into

7  their conduct.  As an initial matter, the government is not required

8  to show that defendants' actions actually impeded the investigation,

9  only that defendants *intended* to impede the investigation, see CR 584

10  at 31.  Here, the government presented substantial evidence from

11  which a rational jury could infer that defendants' actions were

12  intended to impede the investigation.

13      Defendant LEE was aware of the FBI's investigation into the

14  bribery scheme and specifically investigating him personally and his

15  companies.  He was aware that Kim's phone had been seized by the FBI

16  and that Kim had disclosed the bribe, including the amount of the

17  bribe, to his attorney.  And the timing of the false entries is

18  important here: six days after defendant LEE received a subpoena, he

19  instructed Kang to make the entries.  It was not irrational for the

20  jury to infer that defendant LEE, acting on behalf of 940 HILL, was

21  attempting to create a false paper trail, that is, to legitimize his

22  illegal conduct by documenting the bribe as an expert expense and a

23  loan in 940 HILL's accounting records and on their tax returns.

24      Defendants argue that LEE's actions actually helped the

25  government by creating a record of the payment.  But the jury was

26  entitled to draw the opposite inference from this evidence, Reyes-

27  Alvarado, 963 F.2d at 1188 ("Circumstantial evidence and inferences

28  drawn from it may be sufficient to sustain a conviction."); Begay,

673 F.3d at 1045 (a "chain of logic" is "all that is required to distinguish reasonable inference from speculation"), and it was within the jury's power to weigh inconsistencies in making credibility determinations.  Rojas, 554 F.2d at 943.  .

Thus, the Court should deny defendants' motion to set aside the jury's verdicts on Count 38.

## IV.  The Court Should Deny Defendants' Motion for a New Trial

Defendants move for a new trial on several grounds.  As discussed below, none of defendants' arguments warrant a new trial, therefore their motion should be denied.

### A.  General Rule 33 Standard

"Upon the defendant's motion, the court may vacate the judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  A defendant carries the burden.  United States v. Mack, 362 F.3d 597, 600 (9th Cir. 2004).  Because a jury's verdict is presumptively valid, a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict."  United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up).  "It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'"  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

### B.  The Jury Was Properly Instructed

Defendants raise four purported instructional errors that they claim justify a new trial: three arguments relate to the formulation of instructions given, while the last argument relates to the Court's refusal to give defendants' proposed "defense theory" instruction. (Defs' Mot. at 21-26.)  When taken as a whole and reviewed in the

context of the entire year, the instructions adequately guided the jury's deliberations and accordingly did not affect substantial rights.  Thus, the Court should deny defendants' motion for a new trial on these grounds.

### 1.   Instructional Error Standard

To determine whether a new trial is warranted because of an alleged error in jury instructions, the Court must decide "whether the instructions—taken as a whole and viewed in the context of the entire trial—were misleading or confusing, or inadequately guided the jury's deliberations, or improperly intruded on the fact finding process."  United States v. Warren, 25 F.3d 890, 898 (9th Cir. 1994).  Thus, an instructional error does not automatically warrant a new trial; instead, the defendant must show that the error affects substantial rights.  See Fed. R. Crim. P. 52(a); United States v. Miller, 953 F.3d 1095, 1103 (9th Cir. 2020).

### 2.   Honest Services Wire Fraud Instruction (Count Five)

Defendants argue the honest services wire fraud jury instruction "improperly permitted the jury to convict defendants on that count even if they concluded that Jose Huizar never promised a formal vote in exchange for the alleged bribe."  Defs' Mot. at 21-22.  While defendants concede that the Court properly instructed the "jury as to the definition of an 'official act,'" they nevertheless contend that "by naming Esparza as one of the individuals who could have performed such an act, the Court could have caused jury confusion as to the actual elements of honest services fraud."  Id. at 21.

Here, the Court instructed the jury that "the scheme or plan consisted of a bribe in exchange for at least one official act by Jose Huizar or George Esparza on the CREED LA appeal filed against

the 940 Hill Project."  Trial Tr. 2054.  The Court provided the

definition of official act as follows: "An official act is a decision

or action on a question, matter, cause, suit, proceeding or

controversy involving the formal exercise of government power.  The

question, matter, cause, suit, proceeding, or controversy must be

pending or be able by law to be brought before a public official and

the question, matter, cause, suit, proceeding, or controversy must be

something specific and focused rather than a broad policy objective."

Id. 2055-56.  Importantly here, Court correctly instructed the jury

that "[t]he official's decision or action may include using his

official position to exert pressure on another official to perform an

official act or to advise another official knowing or intending that

such advice will form the basis of an official act by another

official.  <u>The bribe recipient need not be the final decision maker</u>."

Id. (emphasis added).

 Defendants argue this instruction could have caused jury

confusion because Esparza's "only role" was his conversation with

Chris Modrzejewsk "to 'trade' the 940 Hill appeal for a promise

relating to another project run by Mr. Lee," but "[t]here was no

evidence that Esparza promised to perform some other official act (or

to pressure another official to perform such an act) in exchange for

the payment.  Not so.

 The evidence at trial established that Esparza, sought to use

influence with with Huizar, to either vote against the appeal or use

his official position to pressure CREED to dismiss its appeal.  As

Special Assistant to Councilmember Huizar, Esparza was a public

official who owed a fiduciary duty to the City of Los Angeles and its

citizens.  Trial Tr. 918.  Esparza testified that his title was

important to him because when Huizar and Esparza met with "different developers or different foreign investors," the title "show[ed] the stakeholder that [Esparza] was the person that was closest to the councilmember, . . . that I was [Huizar's] trusted confidant."  Trial Tr. 917.  With respect to the bribery scheme, Esparza was Huizar's right-hand man and chosen facilitator for bribe communications, including with defendant LEE via his chosen facilitator, Justin Kim. Trial Tr. 945, 1136 ("I was the middle person between Huizar and Justin Kim.").  In this role, Esparza was intimately involved in every step of the bribe negotiations and payment of the bribes.  See Trial Ex. 88 (Esparza notes).

Esparza also directly exerted pressure on CREED to drop the appeal by invoking Huizar's office and its voting power on CREED matters.  After Esparza successfully facilitated an agreement regarding the amount of the bribe and collected the first bribe payment from defendant LEE, he then reached out to Chris Modrzejewski, at Huizar's direction, to have a private meeting about CREED dropping its appeal.  Trial Tr. 962-63.  In doing so, Esparza invoked his title and Huizar's name, noting "Councilman asked me to meet with you" and "I still need to meet with you one on one per my bosses [sic] request."  Trial Ex. 101A.  At the February 23, 2017 meeting, Esparza told Chris Modrzejewski: "I'm here because the -- first, the councilman asked me to set up this meeting," noting, "I always made it clear that I was – I'm speaking on behalf of the councilmember, which is why my special assistant -- they knew that when I was talking, it was coming directly from him."  Trial Tr. 962-63.  Esparza then communicated that Huizar "would be voting against the appeal," and because "the developer's friends of the office,"

1   Huizar wanted CREED to drop the appeal.  Trial Tr. 962-64.  Chris
2   Modrzejewski responded that if Huizar was able to secure defendant
3   LEE's support of CREED for the Little Tokyo Project, another of LEE's
4   developments, Modrzejewski would see what he could do about dropping
5   the appeal.  Id. at 964.  The reasonable inference is that HUIZAR
6   would agree to not vote (an official act) against a subsequent CREED
7   appeal on a different property in exchange for CREED dropping the
8   instant appeal that HUIZAR was going to vote against (as part of the
9   corrupt agreement with LEE/Kim).  After that, Esparza met with
10  Huizar, who agreed to those terms.   Esparza confirmed the deal with
11  Chris Modrzejewski and the next day the CREED appeal was dropped.
12  Trial Exs. 51 & 101C.

13      This evidence supported the conclusion that the scheme or plan
14  consisted of a bribe in exchange for at least one official act by
15  Huizar or Esparza on the CREED LA appeal, that is, Esparza using his
16  official position to pressure CREED to drop its appeal.  That Esparza
17  could not vote on the appeal is immaterial because "the bribe
18  recipient need not be the final decision maker."  CR 584 at 25.

19       In any case, the jury was permitted find that the scheme or
20  plan consisted of a bribe in exchange for at least one official act
21  by either Huizar or Esparza, or both.  Given the overwhelming
22  evidence that the bribe here was in exchange for at least one
23  official act by Huizar, who had the power to vote on the appeal in
24  the PLUM committee and at City Counsel, it is extraordinarily
25  unlikely that the jury would have convicted defendants based on
26  Esparza's actions alone.  Thus, the Court's inclusion of Esparza in
27  the instruction did not "leave open the possibility that defendants

28

1  were wrongly convicted." Defs' Mot. at 22. The Court should deny

2  defendants' motion for a new trial with respect to Count 5.

3         3.   Bribery Instruction (Count 25)

4       Defendants contend the bribery jury instruction was erroneous

5  because it "permitted the jury to convict defendants based on an

6  overbroad interpretation of 18 U.S.C. § 666 by instructing them that

7  they could convict defendants based on a promise by Huizar or Esparza

8  to pressure unions." Defs' Mot. at 22-23 (emphasis added). In

9  support of their position, defendants recycle arguments raised in

10 their motion to strike, which they have asserted repeatedly since.

11 See CR 231 (Defs' Mot. to Strike); 258 (Gov't Opp'n to Mots. to

12 Dismiss/Strike); 269 (Defs' Reply ISO Mot. to Strike). The Court

13 denied defendants' Motion to Strike, reasoning the conduct the

14 alleged as official acts in the bribery count, "(including the

15 payment of $500,000 in exchange for Huizar and Esparza pressuring

16 Labor Organization A to dismiss its appeal in the PLUM Committee, of

17 which Huizar was the Chair) falls *squarely* within the statutory

18 language of 666(a)." (CR 324 at 14).) Nothing in defendants'

19 Consolidated Motion supports reconsideration of that ruling. Thus,

20 the Court should deny defendants' motion for a new trial based on

21 this ground.

22        4.   Defense "Theory of the Case" Instruction

23      Defendants requested an instruction they characterized as a

24 "theory of defense" instruction. CR 484 at 38-41. The Court

25 declined to give the requested instruction, reasoning "the

26 substantive instructions for the charged offenses already provide the

27 elements that the Government must prove beyond a reasonable doubt,

28 and this instruction adds nothing new. And, moreover, defendants can

argue they're -- obviously they're going to argue their theory of the case in closing argument."  Trial Tr. 1586.  Indeed, defendants' proposed instruction described no new legal theories or concepts not otherwise included in the instructions and instead merely consisted of defense arguments.  And "the instruction need not be given in the form requested, nor if it merely duplicates what the jury has already been told."  United States v. Lopez-Alvarez, 970 F.2d 583, 597 (9th Cir. 1992).

Here, defendants' proposed instruction misstated the law and otherwise duplicated what the jury was already told.  The first portion of the proposed instruction related to the honest services fraud count: "If you conclude that either defendant intended to pay Justin Kim and/or CREED LA in exchange for dismissal of CREED LA's appeal, and did not intend for money to go to George Esparza or Jose Huizar in exchange for an official act, you must find that defendant not guilty of Count 5."  CR 484 at 38.  As to that count, the Court already intended to instruct and did instruct the jury that the government was required to prove that "the defendant devised or knowingly participated in a scheme or plan to deprive the City of Los Angeles or its citizens of their right of honest services . . . consist[ing] of a bribe in exchange for at least one official act by Jose Huizar or George Esparza on the CREED LA appeal filed against the 940 Hill Project."  Trial Tr. 2054-55.  Defendants' instruction misstates the law.  The government was *not* required to prove that defendants intended "for money to go to George Esparza or Jose Huizar" because "the bribe recipient need not be the final decision maker."  Trial Tr. 2056.  In other words, defendants could have paid Huizar, Esparza, or Kim, so long as they paid that bribe in exchange

1    for an official act by Huizar or Esparza.  Defendants' remaining

2    proposed language adds nothing new to the instruction given and

3    instead merely restates the required elements in the form of defense

4    argument.

5        The second portion of defendants' proposed instruction relates

6    to the bribery count and similarly duplicated what the jury had

7    already been instructed (again, in the form of a defense argument).

8    Defendants requested that the Court instruct the jury that it must

9    find defendants not guilty if they "did not intend for [the money

10   they paid] to influence or reward George Esparza or Jose Huizar in

11   connection with any business, transaction, or series of transactions

12   of the City of Los Angeles."  Id. at 38.  But the jury already heard

13   that the government was required to prove that "defendant gave,

14   offered, or agreed to give a thing of value to Jose Huizar, George

15   Esparza, or Justin Kim . . . with an intent to influence or reward

16   Jose Huizar or George Esparza in connection with a business of the

17   City of Los Angeles."  Trial Tr. 1910-11 (emphasis added).  Based

18   upon the instructions the Court gave, defendants were free to argue,

19   and indeed did argue, that the government's proof at trial (and the

20   factual scenarios defendants identified in their proposed

21   instruction) failed to satisfy the honest services fraud and bribery

22   elements.  Thus, the Court's instructions adequately covered the

23   elements the government was required to prove as well as the

24   defendants' proffered defense.

25        5.   Cooperating Witnesses Instruction

26       At the close of trial, the Court instructed the jury regarding

27   the government's use of lawful law enforcement tactics, including the

28   use of stealth and deception with cooperating witnesses, as follows:

43

> You have also heard testimony from Esparza and Kim who are cooperating witnesses involved in the Government's investigation in this case.  Law enforcement officials may engage in stealth and deception such as the use of cooperating witnesses in order to investigate criminal activities.

Trial Tr. 2053.  The Court formulated this instruction from Ninth Circuit Criminal Model Instruction No. 4.10,[3] which the Ninth Circuit held is an accurate statement of the law.  See United States v. Carona, 630 F.3d 917, 924 (9th Cir. 2011).  The Court modified the model instruction to reflect the facts of the case and arguments defendants made during trial.  CR 584 at 20.  Specifically, the government presented testimony and evidence from Esparza and Kim, two cooperating co-schemers who engaged in stealth and deception by surreptitiously recording conversations with co-schemers and lying to the co-schemers during those conversations.  The government admitted portions of these conversations at trial.  Throughout trial, defense counsel broadly attacked the government's tactics, including its use of these witnesses and the "secretly recorded" conversations, and specifically attacked Kim for secretly recording conversations with defendant Lee at the government's direction, noting the government encouraged Kim to extract a confession from Lee.[4]

---

[3] The model instruction reads: "You have heard testimony from [an undercover agent] [an informant] who was involved in the government's investigation in this case.  Law enforcement officials may engage in stealth and deception, such as the use of informants and undercover agents, in order to investigate criminal activities. Undercover agents and informants may use false names and appearances and assume the roles of members in criminal organizations."  Ninth Cir. Model Criminal Jury Instructions, No.  4.10 (2022 ed.).

[4] See, e.g., defense counsel argued in opening statement that defendant LEE "was taken advantage of by a liar and a thief, [Justin Kim,] who Mr. Lee thought was a trusted advisor," but who "decided to *(footnote cont'd on next page)*

1    After the close of evidence and following closing arguments, the

2    Court declined to give additional language proposed by the government

3    but determined the instruction was appropriate because defense

4    counsel "attacked the Government's use of cooperating witness[es],

5    especially during cross-examination of Mr. Kim and in the closing

6    argument."  Trial Tr. 2041, 2053.

7

8

---

9    pin it on" Lee and "agreed to secretly record conversations with Mr.
     Lee at the direction of the FBI," that "the Government hitch[ed] its
10   wagon to that liar and thief," made a "sweetheart deal" with Kim,
     "secretly recorded conversations," "rummage[d] through houses and
11   offices," and stopped investigating "as soon as [Justin Kim] told
     them what they wanted to hear," "despite knowing and confirming that
12   Justin Kim is an admitted liar" (Trial Tr. 175-178, 191, 195
     (emphases added)); defense counsel cross-examined the FBI case agent
13   regarding the government's use of "secret" tactics in the
     investigation: "You placed video bugs in rooms, secretly videotaping
14   people in their rooms? (Trial Tr. 427 (emphasis added)), "You had --
     you had people involved -- well, we talked about that -- secretly
15   recording conversations." (Trial Tr. 428 (emphasis added)), "There's
     no secretly recorded video of Mr. Lee agreeing to pay a bribe to Jose
16   Huizar?" (Trial Tr. 437 (emphasis added)), "And we talked about the
     secret recordings -- not in bedrooms -- of videos and -- of video or
17   audio in rooms, correct?" (Trial Tr. 463 (emphasis added));
     defendants' counsel cross-examined Esparza about secretly recording
18   Huizar: "The recording, the secret recording in the bathroom, Huizar
     coming to your house, he doesn't know anything about that, as far as
19   you know; right?" (Trial Tr. 1146 (emphasis added)); defense counsel
     cross-examined Kim at length regarding the government's tactics and
20   its instructions to Kim, including to attempt to get a confession
     from defendant Lee: "And, in fact, during your prior interviews with
21   the Government in 2017, they had worked to scare you; right?" (Trial
     Tr. 1596), questioning Kim about the government's instructions to Kim
22   aimed at getting a confession from defendant Lee (Trial Tr. 1716-
     1717); defendants' counsel attacked the government's use of Kim in
23   closing argument: "[Justin Kim has] been trying to get on that
     cooperation bus . . . The best way he can do it is by getting
24   something that sounds like a confession out of my client."); see
     Trial Tr. 1958, 1960, 1961 ("Now, [the recordings are] not in
25   evidence, so we can't talk about them.  But it is fair for you to
     question the Government's actions.  It is fair.  It is part of the
26   deliberative process."), 1990, 1984-1991.

27

28

45

Here, "[i]n light of [defendants'] insinuations that the government and [Kim] acted improperly," the Court did not abuse its discretion by giving this instruction "to help the jury understand the nature of [proactive cooperator] work." United States v. Winslow, 962 F.2d 845, 848 (9th Cir. 1992), as amended (May 14, 1992) (holding district court did not abuse its discretion in giving government informant instruction where defense counsel characterized the informant "as a man who had been paid to lie, warned the jury to be careful in believing his testimony, . . . likened [the informant's] actions as an undercover agent to a spider pouncing on its prey," and stated that the informant "had engaged in lies and deceit, and criticized the fact that [the government paid the informant] over $90,000"). Indeed, absent this instruction, the jury would have been left with the misleading and incorrect impression that those tactics were not lawful or permissible, which is contrary to the law. See, e.g., United States v. Wahchumwah, 710 F.3d 862, 867 (9th Cir. 2013) (government agents may make concealed audio-video recording of a suspect's statements inside the suspect's home, with the consent of the government agent, without a warrant); Jacobson v. United States, 503 U.S. 540, 548 (1992) ("[T]here can be no dispute that the Government may use undercover agents to enforce the law;" "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." (cleaned up)); United States v. Slaughter, 891 F.2d 691, 696 (9th Cir. 1989) ("The Government may use informants and pay them" and the informant who must "win a suspect's confidence . . . . must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the subject.").

46

Relying on the cursory commentary to the model instruction, defendants argue the Court gave this instruction in error because defendants did not raise an entrapment defense or otherwise contend the government or Kim acted improperly. Defs' Mot. at 20-21. As to the latter, despite defendants' arguments to the contrary now, their cross-examination of government witnesses and arguments in opening and closing certainly insinuated that the government and its agents "acted improperly." The tenor of defense counsel's attacks on the government's tactics at trial, including its use of Kim, are similar to those the Ninth Circuit repeatedly held has held open the door to this instruction. See Winslow, 962 F.2d at 848; United States v. Hoyt, 879 F.2d 505, 511 (9th Cir.), amended, 888 F.2d 1257 (9th Cir. 1989) (holding district court did not err in giving this instruction absent an entrapment instruction where defense counsel "characterized the government informant's behavior as 'improper'" in opening statement and the defense case addressed "at length to the conduct of the informer"; "In light of the [defendant's] persistent insinuation that the agent acted improperly," the district court did not error "by giving the undercover agent instruction to help the jury understand the nature of undercover police work"). Further, that defendants did not raise an entrapment defense here is of no import because the Ninth Circuit has repeatedly affirmed this instruction in the absence of an entrapment defense. See Winslow, 962 F.2d at 848; Hoyt, 879 F.2d at 511.

Defendants' argument that the Court's formulation of this instruction "placed the Court's imprimatur on the investigation itself, and on Justin Kim's actions in support thereof" is similarly misplaced. Defs' Mot. at 26. As the Ninth Circuit has recognized,

47

this instruction "serves to dispel juror concerns over the propriety of governmental undercover activity" and "does not, as [defendants] suggest[], instruct the jury that the government witnesses are to be believed in all cases." Id. And any risk of prejudice is neutralized where, as here, the court gives a cautionary instruction regarding treating the testimony of cooperating witnesses with greater caution than other witnesses because of the benefits these witnesses have received and anticipate receiving from the government. See Hoyt, 879 F.2d at 510 ("questions raised by the defendant and cautionary instructions given" supported the propriety of the government tactics instruction); United States v. Fera, 616 F.2d 590, 597 (1st Cir. 1980) (any improper suggestions arising from undercover agent instruction may be neutralized by curative instruction). Here, the Court gave such the curative instruction regarding cooperating witnesses, which specifically named Kim and Esparza, immediately before it gave the instruction defendants challenge.[5] Trial Tr. 2052-53; CR 584 at 19. Thus, even if there were any improper suggestion from the Court's formulation of this instruction, "the trial court's cautionary instruction, with regard to examining [Kim and Esparza's] testimony [with greater caution], neutralized whatever prejudicial effect" the instruction may have caused. Winslow, 962

---

[5] Specifically, the Court instructed the jury that Esparza and Kim "pleaded guilty to the crimes arising out of the same events for which the defendants are on trial and received benefits and favored treatment from the Government in connection with this case" and to use caution in evaluating their testimony: "[I]n evaluating the testimony of Mr. Esparza and Mr. Kim, you should consider the extent to which or whether their testimony may have been influenced by any of these factors. In addition, you should examine the testimony of Mr. Esparza and Mr. Kim with greater caution than that of other witnesses." Trial Tr. 2052-53.

48

F.2d at 848; <u>United States v. Mende</u>, 43 F.3d 1298, 1302 (9th Cir. 1995) (the jury is presumed to follow a judge's instructions).

### C. The Government's Arguments in Rebuttal Do Not Warrant a New Trial

Defendants contend that the government's arguments in rebuttal improperly shifted the burden of proof and commented on the defendant LEE's decision not to testify. Defs.' Mot. at 21-24. In closing argument, over the government's objection, defense counsel repeatedly asked the jury to consider evidence that the Court properly had excluded as self-serving and unreliable hearsay -- additional excerpts of defendant LEE's conversations with Kim -- and then expressly encouraged the jury to speculate about their contents. Trial Tr. 1961 ("I'm going to ask you <u>to consider what else is on these recordings</u> . . . <u>What's on the rest of the hour-long recordings that the Government didn't want you to hear?</u>") (emphasis added); <u>id.</u> 1961-62 ("Why did [the government] fight so hard -- why do they fight so hard when I try to introduce additional transcripts? <u>What could possibly be so bad for their case</u>?"); <u>id.</u> (commenting on testimony he elicited from Kim on cross: "<u>Where is that on the transcripts you're being given? You won't see it. Ask yourself why</u>."). The government responded to this argument in rebuttal, over defendants' objection, reminding the jury that the arguments of counsel were not evidence and that, according to the Court's instructions, the jury was not to speculate regarding anything that was not in evidence. In so doing, the government did not improperly shift the burden to defendants nor infringe upon their Fifth Amendment rights because the challenged arguments: (1) appropriately responded to defense arguments by highlighting weaknesses in the

defense case, namely, that their theory had many holes in it and made little sense, and (2) properly noted that defense counsel had encouraged the jury to speculate about recordings that were not in evidence, which was contrary to the law and the Court's instructions.

### 1. Relevant Facts

#### a. The Court's Exclusion of Additional Excerpts of Defendant LEE's Conversations with Kim

At trial, the government admitted certain excerpts of conversations between defendant LEE and Kim. Trial Exs. 118C-D, 119B-F; CR 476, 529, 586. Defense counsel sought to admit additional excerpts, specifically, Exhibits 118A-B & 119A. Trial Tr. 519-21; CR 524. The Court excluded the additional excerpts, reasoning they were defendant LEE's self-serving statements to Kim during the meeting and accordingly were inadmissible non-hearsay evidence, to which no exception applied, and that Federal Rule of Evidence 106 did not mandate their admission under the rule of completeness because they were neither explanatory nor relevant to the passages the government admitted. Trial Tr. 519-21, 1304-12; CR 476, 524, 529.

#### b. Defense Closing Argument

During closing argument, defense counsel repeatedly beseeched the jury to speculate about the excluded passages, contrary to the law and the Court's instruction regarding excluded evidence:

> I'm going to ask you to consider what else is on these recordings. You're getting a couple seconds here and there, snippets of conversation cherry-picked by the prosecutors. How does any conversation sound cut and snipped in this fashion? What's on the rest of the hour-long recordings that the Government didn't want you to hear?

Defs.' Mot at 27 (citing Trial Tr. 1961) (emphasis added). The government objected, but the Court overruled the objection. Trial

50

1  Tr. 1961.  Defense counsel then discussed the same topic at length:[6]

2  "Why did [the government] fight so hard -- why do they fight so hard

3  when I try to introduce additional transcripts?  What could possibly

4  be so bad for their case?"  Trial Tr. 1961-62 (emphasis added).

5  Despite mentioning in passing that the defense was not supported to

6  talk about conversations that were not in evidence, defense counsel

7  then went on to do just that and to invite the jury to speculate

8  about the recordings' contents by referencing examples of

9  inconsistent statements the defense *was* able to elicit on cross-

10 examination:

> Now, they're not in evidence, so we can't talk about
> them.  But it is fair for you to question the Government's
> actions.  It is fair.  It is part of the deliberative
> process.
>
> Yesterday you heard just one bit I was permitted to
> read in about how Justin Kim resented Mr. Lee back at the
> time of the CREED appeal.  And you saw that Justin Kim was
> telling Mr. Lee, how did I know what I was getting us into?
> How did I know this would happen, that they would act this
> way? None of that is consistent with the Government's
> presentation.
>
> And you learned -- you learned that the part the
> Government relies on so heavily -- I think the prosecutor
> even ended her closing with it or maybe right before she
> ended -- about the exchange about getting played by Huizar.
> How many times have we heard that during this trial; right?
> You learned yesterday that those were Justin Kim's words.
>
> I asked him, "You were the one who first said that you
> found out you were played by Huizar?
>
> "Yes.
>
> "You were the one who used that phrase; right?
>
> Right?
>
> "Your words, not his; right, Mr. Kim?
>
> "Yes."

---

[6] Defendants' motion omits this portion of their argument.

51

1
2
3
4

> Where is that on the transcripts you're being given? You won't see it. Ask yourself why. Those are just the two examples I was able to get into. So if you're sitting here and wondering what else about those transcripts don't help the Government's case, I say to you the things that you saw, they may sound bad out of context, but one thing we have learned is context is everything.

5  Id. (emphases added).  The government maintains these defense

6  arguments imploring the jury to consider excluded evidence are

7  improper, violate Rule 403, and are contrary to the jury instructions

8  regarding what evidence the jury may consider.

9          c.   Government's Closing Arguments

10      During rebuttal, the prosecutor correctly advised the jury that

11  reasonable doubt cannot be based purely on speculation and that the

12  Court would so instruct the jury:

13
14
15
16
17
18
19
20

> I want to focus here -- and I made it in caps lock -- speculation.  In defense counsel's argument, there is a want to focus here -- and I made it in caps lock – speculation.  In defense counsel's argument, there is a lot of speculation.  The Court is going to tell you it's in the instruction.  Reasonable doubt cannot be purely based on speculation.  But the first 30 minutes of Mr. Neuman's arguments is we don't know what's on those other recordings with the defendant because the Government wouldn't let you see them.  We don't know what my defendant said, my client said on those other recordings because the Government wouldn't let you see them.  That is pure speculation.  That is improper.  And the Court's instruction will ask you to not base your decision purely on speculation.

21  Trial Tr. 2008-09.  The government then pointed out that defense

22  counsel's argument encouraged the jury to speculate about what else

23  was in the unadmitted recordings based upon defense counsel's use of

24  the recordings in two instances to impeach a witness with a prior

25  inconsistent statement:

26
27
28

> What's even more and even more misleading is that, remember, Mr. Neuman also showed you they had an exhibit of one of the recordings.  He asked witnesses on the stand about discovery which is the evidence that is provided to them.  They have all those recordings.  He used one of those recordings in his case.

1    Trial Tr. 2009.  The government then restated the government's burden

2    of proof and reiterated the defendant's right not to put on any

3    evidence whatsoever, commenting on defense counsel's <u>argument</u> and

4    <u>invitation for the jury to speculate</u> about the recordings:

5              And don't get me wrong.  <u>The Government has the burden
          of proof.  It is beyond a reasonable doubt.  They don't</u>
6         <u>have to put on a case.  They don't have to show exhibits.</u>
          <u>They don't have to have anyone testify</u>.  But they can.  And
7         when they do, as they did here, and show you an excerpt
          from a recording and then argue, we don't know what else is
8         on the other recordings but I'm going to suggest to you
          they really help my client, that's improper, and that's
9         speculation, and you shouldn't have your verdict rely on
          it.
10

11   <u>Id.</u> (emphasis added).  Defense counsel then objected, and the Court

12   overruled that objection, at which point government counsel moved on

13   to other topics.  <u>Id.</u>

14        During closing argument and rebuttal, the government repeatedly

15   reminded the jury that the arguments of counsel were not evidence and

16   that the jury should rely on the Court's instructions regarding the

17   law.  Trial Tr. 1909-10 (government closing argument: "To the extent

18   I say anything in this argument that is inconsistent with what you

19   hear from the Court or what's in those jury instructions . . . . You

20   should pay attention to the Court's instructions."), 2006 (government

21   rebuttal argument: "The judge is going to instruct you on what

22   reasonable doubt is."), 2008 (government rebuttal argument: "Counsel

23   arguments, the one I'm making right now, the one Mr. Neuman and Ms.

24   Dragalin made earlier, they're not evidence.  We obviously hope you

25   listen to at least some of it and consider it, but it is not

26   evidence.").

27        Consistent with the Court's jury instructions, the government

28   went on to remind the juror what was and was not permissible to

                                    53

consider in reaching their verdicts: "Now, once you wipe all of that away, this is what you're left with: Testimony, exhibits, stipulations, jury instructions."  Trial Tr. 2011, <u>see also</u> <u>id.</u> Trial Tr. 2011-12 (noting the jury could consider common sense in rendering its verdicts).

### a.   The Court's Instructions

Throughout trial, the Court instructed the jury repeatedly regarding the government's burden of proof, the definition of reasonable doubt. the defendants' right not to testify or present any evidence whatsoever, and that the statements of attorneys are not evidence.

Before jury selection, the Court instructed the jury regarding the presumption of innocence: "I can tell you that in every criminal case brought in this country, it's the Government, the prosecution, that has the burden of proving defendants' guilt with respect to any charge brought, and it must be prove beyond a reasonable doubt.  A defendant is presumed to be innocent of the charges.  The defendant is not required to prove that they are innocent."  Trial Tr. 42.  In its preliminary instructions, the Court restated the government's burden to prove each element beyond a reasonable doubt and reiterated defendant's right not to testify or present evidence at trial, <u>see</u> Trial Tr. 146.[7]  The Court again repeated both instructions at the

---

[7] In full, the Court instructed the jury:

For the moment, I would just ask you to remember that, throughout the trial, the defendant is presumed innocent and the Government has the burden of proving guilt beyond a reasonable doubt.

The defendants have entered pleas of not guilty to the charges, and the defendants are presumed innocent unless and until proved guilty beyond a reasonable doubt.

*(footnote cont'd on next page)*

close of trial and provided additional detail regarding the

government's burden of proof and defendants' right not to testify.

Trial Tr. 2046-47 ("Each defendant is presumed to be innocent unless

and until the Government proves the defendant guilty beyond a

reasonable doubt.  In addition, a defendant does not have to testify

or present any evidence to prove innocence.  The defendants do not

have to prove innocence.  The Government has the burden of proving

every element of the charges beyond a reasonable doubt.  A defendant

in a criminal case has a constitutional right not to testify.  In

arriving at your verdict the law prohibits you from considering in

any manner that the defendant did not testify.").  The Court also

properly instructed the jury that "reasonable doubt is a doubt based

upon reason and common sense and is not based purely on speculation."

Trial Tr. 2047 (emphasis added); CR 584 (providing the same

instructions to the jury for use in deliberations) .  And, relevant

here, the Court properly instructed the jury that any evidence the

Court had "excluded, stricken, or instructed [the jury] to disregard

is not evidence."  Trial Tr. 2048 (emphasis added).  As such, the

jury was to "decide the case solely on the evidence received . . .

---

A defendant has a right to remain silent and never has to prove innocence or present any evidence.  This burden of proof beyond a reasonable doubt is different than the burden imposed on a plaintiff in a civil case, and it is on the Government until the very end of the case.

For the moment, I'll just say that this burden means that defendants and his lawyer need not present any evidence in this case if they chose not to do so. They could sit in silence throughout all of these proceedings without ever saying a word, and you could draw no inference against the defendants. You cannot find a defendant guilty unless and until you are unanimously convinced beyond a reasonable doubt of the defendants' guilt based upon the evidence in this case.

1   during the trial."  Trial Tr. 2048; <u>see also</u> CR 584 (providing the

2   same instructions to the jury for use in deliberations).

3         2.   <u>The Government Did Not Improperly Shift the Burden of
             Proof Nor Infringe Upon Defendants' Right Not to</u>

4             <u>Testify</u>

5             *a.  Standard*

6         "Both prosecuting attorneys and defense attorneys are allowed

7   reasonably wide latitude in closing arguments and may strike hard

8   blows based on the evidence and reasonable inferences from the

9   evidence."  <u>United States v. Vaccaro</u>, 816 F.2d 443, 451 (9th Cir.

10  1987), <u>abrogated on other grounds by</u> Huddleston v. United States, 485

11  U.S. 681 (1988).  "Even statements that exceed these bounds do not

12  constitute reversible error unless they were so gross as to have

13  probably prejudiced the defendants and the prejudice was not

14  neutralized by the trial judge."  <u>Id.</u> (citing <u>United States v.</u>

15  <u>Lester</u>, 749 F.2d 1288, 1301 (9th Cir. 1984); <u>United States v. Birges</u>,

16  723 F.2d 666, 671–72 (9th Cir. 1984).

17       While a prosecutor may not suggest during closing argument that

18  the defendant bears the burden of exculpation or of disproving any of

19  the elements of the crime charged, <u>see</u> Houston v. Roe, 177 F.3d 901,

20  909 (9th Cir. 1999).  "Comments intended to highlight the weakness of

21  a defendant's case do not shift the burden of proof to the defendant

22  where the prosecutor does not argue that a failure to explain them

23  adequately requires a guilty verdict and reiterates that the burden

24  of proof is on the government."  <u>United States v. Vaandering</u>, 50 F.3d

25  696, 701–02 (9th Cir. 1995).  Thus, the government may properly

26  challenge the defense to explain to the jury uncomfortable facts and

27  inferences; comments of this nature do not shift the burden to the

28

1    defendant.  See United States v. Mares, 940 F.2d 455, 461 (9th Cir.

2    1991).

3         Even where the government's statements in closing are deemed

4    improper, reversal is warranted only if the error was not harmless,

5    that is, where they prejudiced the defendant.  See United States v.

6    Edwards, 154 F.3d 915, 923 (9th Cir. 1998).  In determining whether

7    allegedly improper comments in rebuttal caused the defendant

8    prejudice, "[t]he prosecutors' comments must be evaluated in light of

9    the defense argument that preceded it."  Darden v. Wainwright, 477

10   U.S. 168, 179 (1986).  Thus, the government's statements in rebuttal

11   here must be analyzed in the context of "defense counsel's opening

12   salvo."  United States v. Young, 470 U.S. 1, 12 (1985); see also

13   United States v. Hui Hsiung, 778 F.3d 738, 746 (9th Cir. 2015) ("A

14   prosecutor may respond in rebuttal to an attack made in the

15   defendant's closing argument.").  Keeping such context in mind, the

16   Court then must determine whether it is more probable than not that

17   the prosecutor's comments materially affected the fairness of the

18   trial.  Edwards, 154 F.3d at 923; United States v. Mcoy, 771 F.2d

19   1207, 1212 (9th Cir. 1985).

20            b.   The Government's Arguments in Rebuttal Were
                   Permissible
21

22        In rebuttal, the government did not improperly shift the burden

23   to defendants nor infringe upon their Fifth Amendment rights.  See

24   Vaandering, 50 F.3d at 696.  Rather, the government's challenged

25   arguments: (1) appropriately responded to defense arguments by

26   highlighting weaknesses in the defense case, namely, that the defense

27   theory had many holes in it and made little sense, and (2) noted that

28   defense counsel had encouraged the jury to speculate about recordings

                                      57

1  that were excluded and not in evidence, which was contrary to the law

2  and the Court's instructions regarding the law.

3    As to the first point, prosecutors are afforded wide, but

4  reasonable, latitude in responding to defense theories of the case,

5  especially to arguments defense counsel has raised in argument.  See,

6  e.g., United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir.

7  1997) (prosecution's argument that defense counsel's characterization

8  of government's investigation as a "web of deception" was untrue, was

9  an "invited reply" to defense's argument); United States v. Lopez-

10  Alvarez, 970 F.2d 583, 598 (9th Cir.1992) ("Most of the comments

11  challenged by [defendant] were made in response to comments made by

12  the defendant's counsel.").

13    Here, over the government's objection, the defense invited the

14  jury to speculate about the contents of unadmitted exhibits and to

15  draw improper inferences from the same.  In response, the government

16  correctly pointed out that such an invitation was entirely improper.

17  See United States v. Garcia-Guizar, 160 F.3d 511, 522 (9th Cir. 1998)

18  (where "the defendant opens the door to an argument, it is fair

19  advocacy for the prosecution to enter.") (cleaned up).  After all, it

20  is well-established that "the question of the competency of the

21  evidence . . . by reason of the legality or otherwise of its seizure

22  [is] a question of fact and law for the court and not for the jury."

23  Steele v. United States, 267 U.S. 505, 511 (1925) (emphasis added).

24  Bearing this in mind, courts routinely bar counsel from attempting to

25  re-litigate or re-argue such legal issues and evidentiary rulings

26  before the jury at trial because such unadmitted evidence is

27  irrelevant and can be confusing.  See, e.g., United States v. Reed,

28  575 F.3d 900, 920 (9th Cir. 2009) ("Appellants' sole purpose in

seeking to introduce the expert testimony at trial was to reargue the issue of illegal wiretaps, which the district court had previously addressed in the pre-trial motion to suppress . . .  The legality of the wiretap was a question exclusively for the district court to answer.  Accordingly, the court did not abuse its discretion in refusing to relitigate the issue by presenting it to the jury."); see also United States v. Sells, No. 21-10208, 2021 WL 6061772, at *5 (11th Cir. Dec. 20, 2021) ; United States v. Johnson, No. 14-cr-00412-THE, 2015 WL 4747309, at *11 (N.D. Cal. Aug. 11, 2015).

Here, defense counsel's reference to exhibits that the Court had excluded was an attempt to relitigate this issue by presenting it to the jury and then asking the jury to draw certain inferences, which was improper.  This is precisely why the Ninth Circuit model instruction admonishes jurors that evidence the Court has excluded from trial is "not evidence" and may not be considered by the jury in "deciding what the facts are."  CR 584 at 8 (quoting Ninth Cir. Model Instruction No. 6.7 (2022 ed.)).  Consistent with this instruction, the Ninth Circuit has rejected defense arguments that "a jury can use speculation to find a 'reasonable doubt' in favor of the accused," which is the very sort of argument defense counsel advanced in his closing here.  United States v. Mikhel, 889 F.3d 1003, 1033 (9th Cir. 2018); see Ramirez v. Hatcher, 136 F.3d 1209, 1212-13 (9th Cir. 1998) ("[D]oubt that does not rise above pure speculation is not reasonable."); Victor v. Nebraska, 511 U.S. 1, 5, 17 (1994) ("A fanciful doubt is not a reasonable doubt"; a reasonable doubt instruction must (1) convey to the jury that it must consider only the evidence, and (2) properly state the government's burden of proof).

Thus, far from shifting the burden or commenting on the defendants' silence, the government's comments were a correct statement of the law.  And there is no error when the government does "little more than paraphrase the court's instruction."  United States v. Johnson, 639 F.3d 433, 442 (8th Cir. 2011).  In light of defense counsel's improper invitation to the jury, the government's comments aimed at bringing the jury's attention back to the Court's correct instructions regarding what is and what is not evidence and barring pure speculation as a basis for reasonable doubt were not improper. See id.

Nor did the government's arguments somehow improperly draw attention to defendant LEE's decision not to testify.  Instead, the government's comments addressed defense counsel's arguments about evidence it presented -- i.e., portions of the clips that defense counsel argued contradicted the government's evidence -- not defendant LEE's failure to testify.  While "the privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's failure to testify," United States v. Castillo, 866 F.2d 1071, 1083 (9th Cir. 1988), a prosecutor may comment on evidence a defendant chooses to admit at trial without improperly drawing attention to the defendant's decision not to testify.  See United States v. Amlani, 111 F.3d 705, 715 (9th Cir. 1997) (holding the prosecutor's characterization of the defendant as a liar did not improperly draw attention to the defendant's decision to exercise his constitutional right not to testify because the government's commentary was aimed at evidence admitted at trial, not at the defendant's failure to testify at trial); Mende, 43 F.3d at 1301 ("There is a distinction between a comment on the defendant's failure

60

to present exculpatory evidence as opposed to a comment on the defendant's failure to testify."). "[A] comment on the failure of the defense as opposed to the defendant to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege." United States v. Wasserteil, 641 F.2d 704, 709-10 (9th Cir. 1981) (quoting United States v. Dearden, 546 F.2d 622, 625 (5th Cir. 1977)). Thus, to run afoul of the Fifth Amendment, a comment must contain "clear signals that the defendant himself, rather than the defense generally, was being discussed." United States v. Mayans, 17 F.3d 1174, 1185 (9th Cir. 1994).

Here, the government's comments specifically referred to the arguments of defense counsel and the defense presented, not to defendant LEE himself. See, e.g., Trial Tr. 2008-09 ("In defense counsel's argument, there is . . . speculation. In defense counsel's argument, there is a lot of speculation."), id. ("But the first 30 minutes of Mr. Neuman's arguments is we don't know what's on those other recordings with the defendant because the Government wouldn't let you see them."); id. 2009 ("What's even more and even more misleading is that, remember, Mr. Neuman also showed you they had an exhibit of one of the recordings. He asked witnesses on the stand about discovery which is the evidence that is provided to them. They have all those recordings. He used one of those recordings in his case."); id. ("And when they do . . . show you an excerpt from a recording and then argue, we don't know what else is on the other recordings but I'm going to suggest to you they really help my client, that's improper, and that's speculation, and you shouldn't have your verdict rely on it.").

1    Here, the government's comments in rebuttal in this case were in

2    the same vein as those in Vaandering, which the Ninth Circuit held

3    neither commented on the defendant's failure to testify nor expressly

4    or implicitly shifted the burden of proof.  50 F.3d at 701-702.  In

5    Vaandering, the government argued in closing argument that there was

6    "no evidence in this case" from which the jury could determine

7    whether the defendant "ever had a job other than dealing drugs."  Id.

8    Following that statement, the government reiterated its burden but

9    then noted that the jury was "entitled to consider all of the

10   evidence in this case.  Everything that you have heard, including

11   statements of [the defendant] that he has some kind of income from

12   somewhere and you haven't seen that, have you? ... You don't have

13   that kind of evidence."  Id.  On appeal, the defendant argued these

14   comments "improperly commented on [the defendant's] failure to

15   testify and shifted the burden of proof to [the defendant] by

16   emphasizing that there was no evidence that [the defendant] was

17   employed."  Id.  The Ninth Circuit disagreed, noting its prior

18   precedent established that "'[t]he prosecutor may comment on the

19   defendant's failure to present exculpatory evidence, provided that

20   the comments do not call attention to the defendant's own failure to

21   testify.'"  Id. (quoting Mares, 940 F.2d at 461) (cleaned up)).

22   Furthermore, the comments were "intended to highlight the weaknesses

23   of a defendant's case," which "do[es] not shift the burden of proof

24   to the defendant," especially where, as here, "the prosecutor does

25   not argue that a failure to explain them adequately requires a guilty

26   verdict and reiterates that the burden of proof is on the

27   government."  Id. (citing Mares, 940 F.2d at 461 ("It is a common

28   practice for one side to challenge the other to explain to the jury

62

1  uncomfortable facts and inferences.").)  So too in this case.  The

2  government here, like the prosecutor in Vaandering, "neither

3  commented on" the defendant's "failure to testify nor expressly or

4  implicitly shifted the burden of proof."  Id. at 702.  "In fact, the

5  prosecutor expressly told the jury the burden of proof was on the

6  government.  Therefore, the prosecutor's comment on [defendant's]

7  failure to present exculpatory evidence regarding his employment was

8  permissible."  Id.; see Trial Tr. 2009 (reiterating that the

9  government bore the burden of proof and that the defendants did not

10 have to put on evidence or testify).  Therefore, the government's

11 arguments here were permissible, and the Court correctly overruled

12 defendants' objection.  Thus, the Court should deny defendant's

13 Motion for a new trial on the basis of the government's rebuttal

14 arguments.

15          *c.  Defendants Cannot Establish Prejudice*

16      Even assuming arguendo that the challenged rebuttal arguments

17 were in error, defendants cannot demonstrate prejudice to their

18 substantial rights or an adverse effect on the fairness, integrity,

19 or reputation of judicial proceedings.  See Puckett v. United States,

20 556 U.S. 129, 135 (2009); Del-Toro Barboza, 673 F.3d at 1151.

21      First, the Court's instructions made abundantly clear to the

22 jury where the burden of proof lay, that the defendant had an

23 absolute right not to testify or put on any evidence, and that the

24 arguments of counsel were not evidence.  As such, any error was

25 "neutralized by the trial judge" properly, timely, and repeatedly

26 instructing the jury before trial, at the beginning of the case, and

27 after the arguments of counsel.  See United States v. Berry, 683 F.3d

28 1015, 1024 (9th Cir. 2012); see United States v. Ochoa, 286 F. App'x

982, 984 (9th Cir. 2008) ("one inartful comment" does not warrant reversal where, as here, the Court "reiterated that the government bore the burden of proof beyond a reasonable doubt"); "The district court clearly and correctly instructed that the government had the burden of proving every element of every charge beyond a reasonable doubt.  It also instructed the jury that statements of counsel were not evidence.  In these circumstances, we cannot say that the isolated comment affected [the defendant's] substantial rights."); United States v. Phillips, 704 F.3d 754, 766 n.12 (9th Cir. 2012) ("[T]he judge had specifically instructed the jury that the statements by either attorney in closing argument were not to be considered as evidence, and that the only evidence properly considered was the testimony of the witnesses, the exhibits, and any stipulations.  This instruction also helped to ensure that any error did not affect the outcome of Phillips's trial."); United States v. Bracy, 67 F.3d 1421, 1431 (9th Cir. 1995) (holding that a district court's instruction (mirroring the instruction here) that "[q]uestions, objections, statements, and arguments of counsel are not evidence" can neutralize any purported prejudicial effect of a prosecutor's improper comments in closing).  Indeed, the jury is presumed to follow a judge's instructions.  See Mende, 43 F.3d at 1302.

Second, the government's rebuttal argument itself further ameliorated any error by reminding the jurors of these same concepts: that the government bore the burden of proof, that the defendants did not have to testify or present any evidence at all, that the arguments of counsel were not evidence, and that the jury should follow the Court's instructions regarding what is and is not evidence

1    and reasonable doubt.  Trial Tr. 2008-12; see United States v.

2    Carrillo, 16 F.3d 1046 (9th Cir. 1994) (noting that "the prosecutor

3    himself warned the jury to rely on its own recollections").

4         Third, before the government's rebuttal argument, the jurors had

5    heard seven days' worth of testimony and an impassioned closing

6    argument from defense counsel.  Defendants cannot demonstrate that

7    these isolated statements during rebuttal argument were errors at

8    all, let alone errors that "affected the jury's ability to judge the

9    evidence fairly."  United States v. Williams, 989 F.2d 1061, 1071-72

10   (9th Cir. 1993) (holding that "isolated" improper comments were

11   harmless); see also United States v. Wright, 625 F.3d 583, 613 (9th

12   Cir. 2010) (holding that the defendant could not establish prejudice

13   where "[t]he improper comments were relatively isolated incidents

14   over the course of a ten day trial").  Indeed, as set forth above,

15   the evidence of defendants' guilt as to all three crimes was strong.

16   See United States v. Darden, 688 F.3d 382, 390 (8th Cir. 2012) ("The

17   wealth of evidence of [defendant's] guilt on the counts of conviction

18   indicates that the result at trial would not have been different

19   absent the prosecutor's rebuttal comments.").  Thus, "[c]onsidered in

20   the context of the entire trial," it is not reasonably likely that

21   the jury interpreted the challenged statements as shifting the burden

22   of proof to defendants or as encouraging the jury draw improper

23   inferences from defendants' silence.  United States v. Gutierrez, 61

24   F. App'x 332, 335 (9th Cir. 2003); Sun v. Castro, No. CV09-4124-MMM

25   MLG, 2009 WL 6067154, at *6 (C.D. Cal. Oct. 6, 2009) ("The touchstone

26   of this inquiry is whether, in light of the prosecutor's comments,

27   there is a reasonable likelihood that the jury viewed the burden as

28   having shifted to the defendant." (citing Houston, 177 F.3d at 909)).

Finally, there was no cumulative error prejudicing defendants. While the Ninth Circuit has held that the cumulative effect of multiple errors may prejudice a defendant, and that in cases where the government's evidence is weak, a defendant is more likely to be prejudiced, this is not such a case. United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). First, there was no error here. Second, even if there had been, such error was not prejudicial in light of the entire trial record. Lastly, as discussed at length above, there was substantial evidence to support the jury's verdicts at trial. Thus, this is not a weak case where the defendants might otherwise suffer prejudice unless every conceivable error is accumulated and analyzed in concert. The government's case against defendants was overwhelming. Thus, the defendants suffered no prejudice through a combination of instructional and evidentiary errors, either when examining any of the alleged trial errors on its own or cumulatively.

**V.   CONCLUSION**

For the foregoing reasons, the Court should deny defendants' Motion in its entirety.