Ariel A. Neuman - State Bar No. 241594
  aneuman@birdmarella.com
Ray S. Seilie - State Bar No. 277747
  rseilie@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendants 940 Hill, LLC
and Dae Yong Lee

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,, | CASE NO. 20-CR-0326-JFW |
| Plaintiff, | **DEFENDANT DAE YONG LEE'S SENTENCING MEMORANDUM** |
| vs. | Date:     July 21, 2023 |
| JOSE LUIS HUIZAR, et al., | Time:     8:00 a.m. |
| Defendant. | Place:    Courtroom 7A |
| | Assigned to Hon. John F. Walter |

3859695.7

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ....................................................................... 2

INDEX OF EXHIBITS ......................................................................... 4

I.     INTRODUCTION ...................................................................... 6

II.    ANALYSIS OF SENTENCING FACTORS ................................... 7

    A.    The Sentencing Guidelines: 18 U.S.C. § 3553(a)(4) ............... 7

    B.    Section 3553(a)(1): Mr. Lee's History and Characteristics ........ 8

    C.    Section 3553(a)(1): The Nature and Circumstances of the Offense ........ 17

        1.    The 940 Hill Project .................................................. 18

        2.    CREED LA's Appeal .............................................. 20

        3.    The Payment to Justin Kim ...................................... 21

        4.    Trial and Conviction ............................................... 22

    D.    The Sentencing Goals Set Forth in 18 U.S.C. § 3553(a)(2). ........ 23

    E.    Sentencing Disparities [18 U.S.C. § 3553(a)(6)] ...................... 25

        1.    Other Participants in Huizar's Corrupt Scheme ................ 25

            a.    Jose Huizar ............................................. 25

            b.    Mitch Englander ....................................... 26

        2.    Other Corruption Defendants .................................... 27

        3.    Statistical Comparison to Other Corruption Defendants ........... 29

III.   CONCLUSION ...................................................................... 31

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*United States v. Borges*
No. 20-cr-00077-TSB (S.D. Ohio Mar. 9, 2023) ..............................28

*United States v. Correia*
No. 18-cr-10364 (D. Mass. Sep. 10, 2021) ........................................28

*United States v. Englander,*
No. 20-cr-00035-JFW (C.D. Cal. Mar. 27, 2020)..............................26

*United States v. Inunza et al.,*
No. 03-cr-02434 (S.D. Cal. Aug. 28, 2003) ......................................27

*United States v. McDonnell,*
No. 14-cr-00012-JRS (E.D. Val. Jan. 13, 2015) ...............................27

*United States v. Renzi et al.,*
Dkt. 1378, No. 08-cr-00212 (D. Ariz. Jan. 2, 2014) .........................28

*United States v. Ruiz-Apolonio*
657 F.3d 907 (9th Cir. 2011) ...............................................................8

*United States v. Silver*
No. 15-cr-00093 (S.D.N.Y. July 30, 2018) ........................................28

*United States v. Skelos*
No. 15-cr-00317 (S.D.N.Y Nov. 8, 2018)..........................................29

**Federal Statutes**

18 U.S.C. § 1001(a)(1) ...............................................................................26

18 U.S.C. § 3553, *et seq.* ......................................................................*passim*

USSG § 2B1.1...............................................................................................8

USSG § 2C1.1(b)(2) .....................................................................................8

USSG §5A ..................................................................................................26

3

DEFENDANT DAE YONG LEE'S SENTENCING MEMORANDUM

## INDEX OF EXHIBITS

| Ex. # | | Description |
|---|---|---|
| 1. | | Dae Yong Lee's Sentencing Statement (Korean and English-Translated Versions) |
| 2. | | Letters of Support |
| | 2-1 | Soni Lee (wife) |
| | 2-2 | Sophia Lee (daughter) |
| | 2-3 | John Lee (son) |
| | 2-4 | David Lee, Jr. (son) |
| | 2-5 | Joon Cheon |
| | 2-6 | Jason Kang |
| | 2-7 | Elizabeth Park |
| | 2-8 | Fabiana Chung |
| | 2-9 | Jason Park |
| | 2-10 | Paul Lee |
| | 2-11 | Carl Pak & Young Nak Presbyterian Church Congregants |
| | 2-12 | Caleb Kim |
| | 2-13 | Jungho Lee |
| | 2-14 | Soon Chung |
| | 2-15 | Heung Sik Park (Korean and English-Translated Versions) |
| | 2-16 | Jae Chung |
| | 2-17 | James Gomez |
| | 2-18 | Joon Ho Choe |
| | 2-19 | Kee Whan Ka |
| | 2-20 | Kevin Kang |
| | 2-21 | Richard Cho |
| | 2-22 | Robert Cho |

| | | 2-23 | Young Cho |
| --- | --- | --- | --- |
| | | 2-24 | Young "Kenny" Kim (Korean and English-Translated Versions) |
| | | 2-25 | Albert Jang |
| | | 2-26 | Young Kim |
| | | 2-27 | Samuel Lee |
| | | 2-28 | Julie Lee |
| 3. | | | Trial Transcript Excerpts (June 16, 2022 Testimony of Fred Shaffer) |
| 4. | | | Trial Transcript Excerpts (June 17, 2022 Testimony of Shawn Kuk) |
| 5. | | | Trial Transcript Excerpts (June 23, 2022 Testimony of Jeffrey Modrzejewski) |
| 6. | | | Trial Transcript Excerpts (June 22, 2022 Testimony of Justin Kim) |
| 7. | | | Trial Transcript Excerpts (June 23, 2022 Testimony of Justin Kim) |
| 8. | | | Trial Transcript Excerpts (June 21, 2022 Testimony of George Esparza) |
| 9. | | | Trial Exhibit 43 (Aug. 15, 2016 Email String) |
| 10. | | | Trial Exhibit 44 (Aug. 18, 2016 Email String) |
| 11. | | | Trial Exhibit 301 (Aug. 11, 2015 Letter from Downtown Los Angeles Neighborhood Council) |
| 12. | | | Trial Exhibit 308 (July 22, 2016 Director's Determination) |
| 13. | | | Tracey Read, *Ex-Ohio GOP Leader Gets 5 Years in Bribe Scheme*, Law360 (June 30, 2023) |
| 14. | | | Summary Chart and Sentencing Committee Reports (1996-2022) |

## I.       INTRODUCTION

Dae Yong Lee respectfully asks this Court to consider the conduct that led to his conviction not in isolation, but in the context of the nearly sixty years he has spent diligently building a good life in which he helped and lifted up family members and strangers alike. Mr. Lee's mistakes with regard to 940 Hill, while grave, were an aberration when viewed in the context of his entire life. The limited window of conduct that was presented at trial does not accurately reflect the hardworking, honest person that he has been in all other aspects of his life. Mr. Lee acknowledges that faced with the prospect of having his largest project derailed, he allowed himself to be led astray when he should have stood strong and held close to the values instilled in him by his parents and family. He knows that he failed himself, his family, and his community. Mr. Lee stands before the Court humbly, seeking forgiveness and hoping to demonstrate—through his own statements to the Court and those of his wife of over thirty years—that he is using this entire episode as an opportunity to reset his values to where he began. *See* Exs. 1 (Dae Yong Lee Statement) & 2-1 (Soni Lee).

Mr. Lee understands that just punishment is required. He accepts responsibility for his actions that led to his downfall and understands there must be consequences. First and foremost, he has asked for forgiveness from God. Mr. Lee has also asked his church congregation for forgiveness for the shame and embarrassment caused to them for his failure to serve as the kind of example the community had every right to expect from him as an ordained deacon. And most importantly, he continues to seek forgiveness from his family for the heartache and pain his actions have caused them. He is also acknowledging the responsibility he owes to his partners at 940 Hill, LLC, and has agreed to personally the fine imposed on the entity and its legal fees for this case so that they are not further financially harmed as a result of his actions.

With this foundation in mind, Mr. Lee respectfully submits his sentencing

position to the Court. As set forth below, the applicable Guidelines range here would result in a punishment greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Already, the Probation Officer has recognized that a downward departure is warranted. However, even the Probation Officer's recommended sentence fails to account for the sentencing disparities that would result if the Court followed it.

Because he was solely responsible for the conduct that led to 940 Hill's conviction, and because he will not be looking to his minority partners for contribution on the company's fine, Mr. Lee submits that the sentences for him personally and for 940 Hill as an entity should be considered together and as a single punishment imposed on him for the convictions in this case. Accordingly, for the reasons discussed herein, Mr. Lee respectfully submits that a custodial sentence of 20 months, as well as a fine of $150,000 imposed on him personally and a $600,000 fine imposed on the company, is appropriate. Based on his agreement with his partners, Mr. Lee would thus be subject to a total fine of $750,000, in addition to the period of incarceration and supervised release.

## II.   ANALYSIS OF SENTENCING FACTORS

### A.   The Sentencing Guidelines: 18 U.S.C. § 3553(a)(4)

Mr. Lee does not dispute the Guidelines calculation set forth in the PSR, and agrees that the total offense level is 30 and his criminal history category is I. Mr. Lee further notes, as does the government, Dkt. 1078 at 25, that there is a pending amendment[1] to the Guidelines that would reduce his offense level by two based on revisions to Section 4C1.1. Thus, Mr. Lee submits that the Guidelines range in this case should be 78 to 97 months in custody (consistent with the government's

---

[1]   See Amendments to the Sentencing Guidelines, (Preliminary) (Apr. 5, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

position),[2] 1 to 3 years of supervised release, and a fine of $30,000 to $300,000.

The offense level is driven largely by the 12 points which result from the amount of the payment. USSG §§ 2C1.1(b)(2), 2B1.1. For the reasons discussed below, Mr. Lee respectfully submits that this is not an appropriate metric by which to determine his sentence, and that a sentence below the Guidelines range is appropriate. The Probation Officer recognized this and recommended a sentence of 60 months incarceration. Dkt. 1026 at 1. The Probation Officer however did not consider sentencing disparities in coming up with that recommendation. *Id.* At the same time, the Probation Officer recommended the statutory maximum fine of $750,000 (and $1.5 million for 940 Hill) without analysis except as to Mr. Lee's ability to pay, even though that amount is *more than double* the high end of the Guidelines range. *Id.*

## B.     Section 3553(a)(1): Mr. Lee's History and Characteristics

Mr. Lee's history and characteristics demonstrate that the conduct for which he was convicted was an aberration: an indelible stain on a life that would otherwise represent a remarkable exemplar of the American dream. While Mr. Lee knows that he is before this Court because he made the mistake of a lifetime, his constant devotion to his family, friends, and community all support a lower sentence. As demonstrated by the many letters of support submitted by family, community members, and business partners, *see generally* Ex. 2, Mr. Lee has spent his whole life making the lives of everyone around him better, and his conviction shocked them all. He asks that the Court minimize his absence from those he holds most dear, and from those who have depended on him, in light of the good life he led before he went astray.

---

[2]   The Court "has the discretion to grant a variance from the Guidelines after promulgation but before adoption of a proposed amendment." *United States v. Ruiz-Apolonio*, 657 F.3d 907, 917 (9th Cir. 2011).

Mr. Lee has provided the Court with a lengthy written statement that he carefully prepared. Ex. 1. His wife has also provided a compelling narrative of their life together and her view of this case. Ex. 2-1. The personal background set forth in those statements tells the story of Mr. Lee's life better than counsel ever could in this filing, and many of the facts included in Mr. Lee's letter have been set forth in the PSR. *See, e.g.* Dkt. No. 1027 ("PSR") ¶ 99–119. Knowing that the Court will carefully review the two statements, those facts will not be recounted here in full. The story they tell is of a life that was full of struggle yet well-lived, with purpose and intention, focused on family, church, and business success achieved through hard work and dedication, which was all brought down through a series of critical errors that led to the convictions here. They tell a story of a man who overcame the challenges of being a first-generation immigrant and allowed his true good nature to shine through his life's work. A man who came with nothing and went on to achieve incredible heights, the true embodiment of the American dream. His wife's letter to the Court gives clarity about who Mr. Lee has been all these years and the life he has lived. Ex. 2-1. Her words paint a picture of a devoted husband, family-man and business partner, whose fall through his actions related to this case was unthinkable to those closest to him, but who is already seeking to build a path forward and redeem himself to those around him.

Mr. Lee, like most, has not lived a perfect life. Even before the facts that led to his conviction, he made mistakes that are apparent from the PSR and his own submissions to this Court: an old DUI conviction, a drinking habit that continued until he sought treatment in the leadup to sentencing, and a pursuit of business success to secure the future of his family at times at the expense of personal relationships. But at the same time, both the PSR and the letters of support submitted on his behalf make clear that at his core, Mr. Lee is a fundamentally good, trusting, and generous person who cares deeply about improving the lives of those around him. They also show that he has lived a life built around three posts: family,

religion, and work.

The letters of support demonstrate that Mr. Lee is not the person one might think he is based on the narrow slice of events at issue in the trial:

- "Honesty, Integrity, Humility, Compassionate, Hard-Working & Family are some of the words that comes to mind when I think about David."[3]

- As one of Mr. Lee's sons writes in his letter, Mr. Lee has "lived most of his life carrying on the weight and the responsibilities of many people, not just his family. I can tell you that countless people rely, depend, and give their trust to my father." [4]

- Mr. Lee "is and always [has] been a good person" and "is a kind, humble, soft spoken, considerate, generous, family oriented person that tries his best to help serve in any capacity."[5]

- "Uncle David has always gone above and beyond to show his care through his actions."[6]

- "I have come across many people in my lifetime, but few have shown the humility, generosity, and authenticity that I have experienced with David."[7]

- "To give you a small idea of how Mr. Lee is, he is always very nice and caring to everyone. Not just the people around him but even the people he doesn't know[.] Even the poor homeless people around our stores, he is always very nice to them and treats them kindly and with respect. Even people who come to sell stuff at our stores, he is nice and always good to everyone, even if they keep coming and bothering everyone. … Even when it doesn't help him, he is always there to help us out and

---

[3] Ex. 2-22 (Robert Cho).

[4] Ex. 2-4 (David Lee, Jr.).

[5] Ex. 2-11 (Rev. Carl Pak).

[6] Ex. 2-7 (Elizabeth Park).

[7] Ex. 2-19 (Kee Whan Ha).

looks out for us."[8]

As to his family, Mr. Lee and his wife have achieved resounding success. They have a lengthy, loving marriage and have built a wonderful life together. Mrs. Lee's letter to the Court provides deep insight into that life, and how the strength of their partnership and their dedication to each other has sustained them through the most challenging of times, including this moment. Ex. 2-1 at 1. They have raised "three wonderful adult children" who are each achieving their own levels of impressive accomplishment, and who cite their father's example as an inspiration for their own lives. Exs. 2-1 (Soni Lee), 2-2 (Sophia Lee), 2-3 (John Lee), 2-4 (David Lee, Jr.). Mr. Lee and his wife also demonstrate their commitment to family through their continued dedication to his mother, who is ill and who until recently lived with them in their home, and whom they both continue to care for on a daily basis. Ex. 2-1 at 3.

His family members' own words best illustrate the important role he has played, and will continue to play, in their lives:

- Mr. Lee's son David says that his father "had to live with a burning fire that would tell him if he did not keep moving forward he would be left to be burnt." David "wanted to feel the same motivation and passion he possessed," and his father taught him "to be a strong fish that can swim against the current."[9]

- Mr. Lee's son John explains that his father "pretty much taught me all the basics of a respectable man: how to respect each other, how to be responsible and take care of yourself, how to dress for all occasions, and overall survive in this tough world. I genuinely, without a doubt, would not be remotely close to where I am now without my Dad. He truly saw the bigger picture in me when no one else did."[10]

---

[8]   Ex. 2-24 (Young Kim).

[9]   Ex. 2-4 (David Lee, Jr.).

[10]   Ex. 2-3 (John Lee).

- Mr. Lee's daughter Sophia writes, "You can say the strongest drive of my dad's life is to support his family and community, to make sure we are all taken care of. … With my dad's support, encouragement, and the core values he instilled in me, I was able to achieve my dreams of becoming an attorney."[11]

- Mr. Lee's niece says, "Uncle David has always gone above and beyond to show his care through his actions."[12]

- Mr. Lee's nephew says, "[T]he well-being of the entire family (by that I mean his mother, his siblings, his nephews, and nieces) rested on his efforts. … I can't imagine the type of pressure he must have carried for decades. The stress of needing to provide for so many must have been constant."[13]

- Mr. Lee's oldest niece writes, "[Mr. Lee's] motto is always to be optimistic, pay it forward, and ask yourself, 'how can I do more to make things better?'"[14] When she experience a deep personal tragedy, "Not only did [Mr. Lee] take in the whole family, but all our friends who traveled from afar. As the busy man I know him to be, he physically took time off work to ensure my husband and I were cared for."[15]

Mr. Lee has an abiding, lifelong devotion to his faith and church. His statement to the Court recalls his parents ensuring that he attended church every week as a child in South Korea, and that upon immigrating to Sao Paolo and then New York it was in the church that he found refuge and community. Ex. 1 at 3. He is an ordained deacon for the Young Nak Presbyterian Church of Los Angeles, where he runs various church departments, and contributes substantially to annual

---

[11] Ex. 2-2 (Sophia Lee).

[12] Ex. 2-7 (Elizabeth Park).

[13] Ex. 2-9 (Rev. Jason Park).

[14] Ex. 2-8 (Fabiana Chung).

[15] *Id.*

Church fundraisers to support community projects throughout Los Angeles. Exs. 2-11 (Rev. Carl Pak), 2-12 (Caleb Kim). He has supported other communities as well as a litany of charities with both money and time, further demonstrating his inherent generosity and commitment to helping others in need. Exs. 2-14, 2-12, 2-13, 2-11 (Rev. Soon Chung, Caleb Kim, Jungho Lee, Rev. Carl Pak). The letters of support from members of his faith community demonstrate his lifelong commitment to his Christian values:

- "I have witnessed [Mr. Lee's] devotion to church and have always seen nothing but love and kindness from David and his wife."[16]

- "[Mr. Lee] is a man of faith who helps others and serves the community, growing spiritually with the opportunity."[17]

- "David is an extremely generous person whose generosity extends outside of his immediate social circle to the handicapped, elderly, and outreach ministries of churches in the LA area. … [D]uring the COVID-19 pandemic, he was instrumental in providing masks to people who were most in need. He has always deeply felt this sense of duty to help the needy and handicapped."[18]

- "I can wholeheartedly say that Mr. David Lee I have known and have grown to love as a friend and brother in Christ [is] a good man with a heart of gold."[19]

Finally, in his business pursuits, other than in the episodes at issue in this case, Mr. Lee has consistently behaved in an exemplary, community-focused manner that earned him sympathy and support from members of the business community, even among his own competitors. The letters from Mr. Lee's business associates and employees demonstrate that Mr. Lee, far from being a single-minded

---

[16] Ex. 2-12 (Caleb Kim).

[17] Ex. 2-13 (Jungho Lee).

[18] Ex. 2-14 (Rev. Soon Chung).

[19] Ex. 2-17 (James Gomez).

entrepreneur, has always won the admiration of his community by being concerned about the well-being of others, and seeking success by lifting others up with him. His generosity and selflessness shines through in the letters submitted by his business associates and employees:

- "As a man of integrity, David not only garners respect from those around him, but also gives that same respect to everyone in both personal and professional settings. A generous and thoughtful man, David is always the first to help others. David finds great pleasure in lending a hand to the community, by offering opportunities for employment. His generosity is shown through his enthusiasm to keep business open and help others to become managers and owners of their own right."[20]

- "The Fashion District was full of businesses run by Korean immigrants who were hoping to succeed in America. David was one of them, and once his business became successful, he really tried to help others climb up the same ladder than he did."[21]

- "Just like I needed help when I first started my business, David was always there for anyone, his employees or anyone he know, that wanted to start a business. He never turned down anyone who asked for help. So as David got more successful, he tried to help others succeed too."[22]

- Mr. Lee "is a type of person that will always look out for the best interest of the others than filling his own pocket. He tries to make decisions based on being fair or even more favorable for others even if he has to take a loss or be in a disadvantageous position."[23]

- "Even through the worst COVID-19 pandemic, David retained all this employees, putting their needs as priority over his profits. When the world was hoarding essential goods and PPEs (some as price g[o]uging

---

[20] Ex. 2-16 (Jae Chung).

[21] Ex. 2-5 (Joon Cheon).

[22] Ex. 2-15 (Heung Sik Park).

[23] Ex. 2-6 (Jason Kang).

opportunities), David was donating those items to the community and most in need."[24]

- "[Mr. Lee] was always the first person to lend a helping hand and give small business owners an opportunity to become property and showroom owners in the Fashion District."[25]

- "I have always known him to be a respectable businessman that treated his employees with kindness, respect, and dignity. … If ever there is a need or family situation that comes up with his employees he's the first one to offer his support."[26]

- "He was a constant presence by my side as we worked diligently to provide services, guidance, and connection for the Korean American community. Through it all, David was an enthusiastic member who was always willing and ready to lend a helping hand to get things done."[27]

- "I must strongly emphasize that of business owners that I know of, David is someone with the most dignity, honesty and integrity."[28]

- "If ever there is a need or family situation that comes up with his employees he's the first one to offer his support. I have witnessed him offering an employee support with tuition cost for school in order to receive a higher education. … He goes above and beyond to try to get to know his employees and their families."[29]

- Mr. Lee "played a vital role in revitalizing the neighborhood through the construction of new buildings and showrooms. David became a role model for many, including myself, embodying the American dream

---

[24] Ex. 2-22 (Robert Cho).

[25] Ex. 2-18 (Joon Ho Choe).

[26] Ex. 2-17 (James Gomez).

[27] Ex. 2-19 (Kee Whan Ha).

[28] Ex. 2-21 (Richard Cho).

[29] Ex. 2-17 (James Gomez).

through his determination and success."[30] He also saved a struggling business, and "[h]is primary concern was to secure employment for hundreds of employees associated with the company."

The letters submitted on his behalf observe repeatedly that the evidence of Mr. Lee's conduct presented at the trial do not reflect who Mr. Lee is as a person, and demonstrate the remorse he has shown to those who know him best:

- "David knows the wrong he did to our family and our employees and those who have helped us over the years, and he is incredibly remorseful. There is nothing that he can do to undo what he's done, but I also know he is sorry and he wants to make it right."[31]

- "I believe that his dogged determination to provide the most he could for all those he needed to support caused him to stumble along the way."[32]

- "[T]he David that we know is a far cry from the convicted felon that sits before you" and "it is evident that David is remorseful for his participation in the wrongdoing."[33]

- "I know this sounds nothing like what you have heard about him at trial but I hope you believe when I say, David is a good man with an even better heart and what he did is not who he really is."[34]

- "I firmly believe that this isolated incident is not representative of David's true character. His exemplary record as a law-abiding citizen, a devoted family man, and a deeply religious individual attest to his overall integrity."[35]

- "[I]n the 20 years I have known him, I can tell you that David is a good

---

[30] Ex. 2-20 (Kevin Kang).

[31] Ex. 2-1 (Soni Lee).

[32] Ex. 2-2 (Sophia Lee).

[33] Ex. 2-11 (Rev. Carl Pak).

[34] Ex. 2-15 (Heung Sik Park).

[35] Ex. 2-20 (Kevin Kang).

person who has always cared more about others than himself and would never hurt others just to help himself. What the jury says he did is shocking and completely out of character. … I am sure that David will never make a similar mistake again, and I am sure that he has already learned his lesson before even a single day of prison."[36]

Relying only on the ugly snapshot of Mr. Lee presented at the trial to fashion his sentence would result in a great injustice, as it would sweep away all the good he has done throughout his life. Section 3553(a) recognizes that the Court must take the full history and characteristics of a defendant into consideration when determining a sentence. Mr. Lee respectfully requests that this Court take into account his whole life and life's work in determining his sentence. After so many have leaned on him for support over the years, he now leans on the members of his family, church, and business world to show his true nature and character.

### C.      Section 3553(a)(1): The Nature and Circumstances of the Offense

The specific details of the nature and circumstances of the offenses also support a lower sentence. The evidence presented at trial established that Mr. Lee was trying to do the right thing with respect to the 940 Hill Project until he encountered other bad actors and, in grave moments of weakness, failed to follow the values he had held dear throughout his life. The nature and circumstances of Mr. Lee's conduct is especially striking compared to the allegations against others involved in Jose Huizar's criminal conspiracies. While Mr. Lee was convicted of acceding to an illegal demand for payment and then making an effort to make it appear legitimate, the others—including some who testified against Mr. Lee—were essentially career criminals. It is not an excuse to note that Mr. Lee was caught up in a morass of corruption when he failed himself, his family, and his community. The circumstances and evidence do not suggest a man who had any role in devising the scheme, but rather someone who unfortunately allowed himself to be swept along

---

[36] Ex. 2-5 (Joon Cheon).

and then made a panicked mistake when it came to light. While the conduct is certainly worthy of punishment and must be deterred, the nature and circumstances do not warrant time in prison for anything close to the Guidelines range.

### 1.   The 940 Hill Project

The evidence at trial established that the 940 Hill Project represented a capstone effort by Mr. Lee. It began first as a simple real estate investment but became an opportunity to hopefully do well while also benefiting the community.

When the property was first purchased by Mr. Lee and his partners in 2009, it represented a promising location with a stable, long-term source of income from an existing parking lot tenant. As the real estate market expanded, in 2014, Mr. Lee and his co-investors saw an opportunity: downtown Los Angeles was rapidly growing and would need more housing and commercial spaces. They set their sights on the construction of a high-rise building with commercial space on the lower floor and 232 new residential units in the remainder of the building. This was one of the most ambitious real estate projects Mr. Lee had ever embarked upon—a complete redevelopment from the ground up—and he gathered a team of unassailable professionals to assist.[37]

By all accounts, Mr. Lee and his team did not cut any corners, take any short-cuts, or otherwise seek to circumvent the proper city processes with the 940 Hill project, until the intervention by CREED LA which is addressed below. Nor did Mr. Lee seek to leverage any connections with politicians for the project's benefit until CREED's intervention, despite having made various contributions to support them over the years. Rather, the evidence at trial confirmed that Mr. Lee's team appropriately worked closely with the LA City Planning Department to come up with a development plan that would benefit the neighborhood and the city at large.

---

[37] Some of these individuals testified or were scheduled to testify at the trial, including Fred Schaffer, Julia Chang, and Joon Cheon.

At trial, all witnesses familiar with this process acknowledged that Mr. Lee and 940 Hill had obtained all of the necessary approvals for the project by the book, that the experts at the Planning Department were the ones most knowledgeable about how to ensure that the project benefited the city, and that the city representatives agreed that the project would benefit the community. Ex. 3 (Trial Tr. (Shaffer) at 720:11–728:17); Ex. 4 (Trial Tr. (Kuk) at 855:12–856:14); Ex. 11 (Trial Ex. 301); Ex. 12 (Trial Ex. 308).

The Planning Department issued a detailed report explaining the specific benefits that the project would yield for the community, including:

- That the project would help alleviate the housing shortage by "provid[ing] current and future downtown employees with housing at a convenient location" and "add[ing] a total of 232 dwelling units to the City's downtown housing stock." Ex. 12 (Trial Ex. 308-18).

- That the project would "help to eliminate and prevent the spread of blight and deterioration and to rehabilitate and redevelop the project area." Ex. 12 (Trial Ex. 308-19).

- That the project would "be located on an underutilized site and will revitalize existing underutilized lots by providing new housing and commercial uses without removing any existing residential units from the city's housing supply." Ex. 12 (Trial Ex. 308-25).

Mr. Lee and his team also obtained a letter from the Downtown Los Angeles Neighborhood Council in which the council expressed support for the project, including its request to expand to larger size. Ex. 11 (Trial Ex. 301). In other words, both the city's planning experts and members of the local community had already bought into the project without any involvement by Huizar. The improvement of the 940 Hill lot was viewed by the entire community as a project that would be an unqualified improvement to the Downtown Los Angeles area, combining robust commercial development with much needed housing. Mr. Lee was proud of it, as were others on his team.

Joon Cheon, the lead architect for the project (and a close friend of Mr. Lee)

describes Mr. Lee's devotion to and pride in his project in his letter to the Court. Ex. 2-5. He explains his long relationship with Mr. Lee and confirms Mr. Lee's generosity and commitment to improving his community. *Id.* He also says that despite the city planning process being "slow and sometimes frustrating, David never asked me to take a shortcut or to try to get around a law. He wanted to do everything right, and so did I. So we talked to the city planners. We always addressed their concerns." *Id.* Mr. Lee acted consistent with his record until that time, pursuing the project the right way and in a manner that would benefit the community while also yielding a profit.

### 2.    CREED LA's Appeal

As established at trial, the CREED appeal on the 940 Hill project posed a unique opportunity for the corrupt enterprise led by Jose Huizar and George Esparza. On the one hand, the appeal was frivolous, a blatant attempt to obtain labor concessions by mucking up the approval process for the project. Ex. 5 (Trial Tr. (Modrzejewski) 1812:12–1814:8); Ex. 3 (Trial Tr. (Shaffer) at 737:15–738:16). On the other hand, and because the issue of organized labor was involved, Mr. Lee was told by his professionals that these appeals were laden with political implications and that engagement with Jose Huizar's office was critical. Ex. 9 (Trial Ex. 43), Ex. 10 (Trial Ex. 44). With no experience of his own to guide him, Mr. Lee pursued two paths forward: having his consultants prepare to challenge the appeal and turning to the one person he knew who could get a meeting with Jose Huizar's office and hopefully resolve the issue—Justin Kim. Unbeknownst to Mr. Lee, but as Justin Kim readily admitted at trial, Justin Kim was already looking to exploit Mr. Lee for his own ambitions, and when Mr. Lee approached him for assistance on the 940 Hill Project he sought to seize the opportunity. Indeed, Justin Kim made clear that although he and Mr. Lee had what Mr. Lee thought was a relationship built on trust and friendship that went back many years Ex. 6 (Trial Tr. (Kim) 1382:7–8), Justin Kim always sought to use that relationship to seek power and access those in power,

and he hoped to leverage the financial position of Mr. Lee and others like him to climb the Los Angeles political ladder. Ex. 7 (Trial Tr. (Kim) 1639:25–1642:8). CREED LA presented the best opportunity to date.

### 3. The Payment to Justin Kim

Mr. Lee accepts full responsibility for the choices he made, and it does not diminish that acceptance to note that those choices were made in response to an on-going extortion scheme run by Jose Huizar and George Esparza, administered in this instance through Justin Kim. The Court is intimately familiar with the evidence of that scheme and so it will not be repeated here. Part of Huizar's scheme involved taking advantage of developers facing crises in their projects, or even manufacturing such crises for financial gain. In Mr. Lee's case, the government's evidence at trial clearly established that it was Jose Huizar who devised the plan to demand a bribe and George Esparza who delivered the message to Justin Kim. Mr. Lee was neither a leader nor an initiator of any illegal activity. Rather, the government's trial presentation was that Mr. Lee acceded to an extortionate demand. Indeed, as Esparza testified, he ultimately convinced CREED LA to withdraw its appeal by—unbeknownst to Mr. Lee—promising support for their cause on one of Mr. Lee's other, larger, projects. Ex. 8 (Trial Tr. (Esparza) 1183:6–1184:9). In other words, as part of the bargain to supposedly benefit Mr. Lee, Esparza struck a separate corrupt agreement to harm him even more. Although Mr. Lee is responsible for his actions, the evidence is clear that he was also a victim of Huizar and Esparza, albeit a willing victim who, in a moment of utter error, made the worst mistake of his life.

The evidence established that this was the only time Mr. Lee had ever engaged in such conduct. Unlike other defendants and developers implicated in this case, Mr. Lee had not sought to cultivate a corrupt relationship with Huizar or anyone else. Nor was this an instance where Mr. Lee sought to push through an inappropriate development via corrupt means.

Of course, just because a bribe is demanded does not mean a bribe has to be

paid, and Mr. Lee knows that none of this excuses his conduct underlying the conviction. In this case, faced with a horribly corrupt situation—a meritless appeal that could derail years of work and investment, a demand for payment by his closest trusted advisor who had never failed him before, and a city councilmember and his aide willing to do anything for financial gain—Mr. Lee fell short of his and his family's expectations for himself. He fell short of the years of good will and good faith he had spent a lifetime building. In this choice—a choice that no one who knew Mr. Lee would have ever believed him capable of making in a hundred years—Mr. Lee imperiled a life of good acts. No words can accurately convey the degree of remorse and regret Mr. Lee feels for making that choice. But he acknowledges that it was a choice and he chose wrong.

As Mrs. Lee states, Mr. Lee apparently lost his way in the blind pursuit of success. Ex. 2-1. He gave in. And with that one decision, all of the effort he had put into pursuing 940 Hill's development the right way—all of the effort he had put into creating a permanent, positive legacy in his new home city—is now likely to be washed away by a decision that contradicted everything else Mr. Lee had done in his life. He then compounded the error through his actions with respect to 940 Hill's books that led to the conviction for obstruction of justice. Mr. Lee recognizes this mistake as well and humbly acknowledges the jury's verdict.

### 4.    Trial and Conviction

Mr. Lee's actions reflect decisions that he will regret for the rest of his life, choices that will reverberate in his family, his church, and his business for many years to come. Although they are an aberration in the story of Mr. Lee's life until now, they will define his life going forward. Since the charges in this case were filed, Mr. Lee has been publicly shamed by the consistent coverage of his case in the local, national, and Korean-language press. He and his family have faced the disappointment and anger of those who trusted them. His personal relationships and business interests have been harmed in ways that are not yet even fully known.

Since his conviction, Mr. Lee has made every effort to make amends to those he has hurt. Recently, to ensure that his mistake does not affect the innocent co-owners of the 940 Hill property, Mr. Lee took full responsibility for his actions and agreed to personally pay the full amount of the fine imposed on 940 Hill (as well as its legal fees), which was convicted entirely as a result of his own conduct. He has taken steps to make sure that his children and wife will be able to run the family business during his absence but he is still most concerned about making sure that the company's longtime employees are taken care of. After Mr. Lee serves his sentence, he plans to remain in the background and focus his time and energy on the charitable organizations that he has supported throughout the years.

Possibly the only silver lining coming out of this case is that Mr. Lee has realized that no amount of success is worth sacrificing the values that form the core of himself, his faith, his family and his friends. No amount of success can fill the void that only love bestowed through loving relationships can fill. Mr. Lee wishes to make amends for his mistakes by earning back trust from his family but also by giving back to the community by way of charitable work in any capacity. He wishes to overshadow his mistakes with an abundance of good work and community service so that he can shine light back into his life and his family. His history demonstrates that he can and will do this, if given the opportunity.

The full context of Mr. Lee's conduct—his sincere efforts to make the 940 Hill project a boon to the community, his role in the offenses, and the roles of the others involved—confirms that a sentence below the Guidelines is appropriate.

### D. The Sentencing Goals Set Forth in 18 U.S.C. § 3553(a)(2).

The four sentencing goals outlined in Section 3553(a)(2) would be furthered by a 20-month sentence and significant fine, which represents a serious punishment which is sufficient to promote respect for the law, provide just punishment for the offense, and deter future would-be offenders.

Mr. Lee concedes that bribery and obstruction are serious and must be

punished, and that deterrence is required. As discussed below, the average sentence imposed in such cases is below that recommended here, a measure of the fact that Mr. Lee recognizes the seriousness of his offense, and a reflection of the fact that the recommended sentence will provide greater deterrence than has come from other sentences. *See* discussion *infra* at Section II.F. The Guidelines' approach in these cases makes little sense, as reflected by the sentencing recommendations and decisions reflected below (where the government and courts routinely depart significantly from the Guidelines ranges). Rather, in these cases the nature and circumstances of the offense, and the history and characteristics of the defendant, must play an even larger role in the sentencing determination than do the Guidelines. As the Probation Officer found, the Guidelines' rote calculation results in a penalty that is simply too severe.

Additionally, as the Court considers these factors—punishment and deterrence—the public opprobrium and attention this case has garnered must factor into the ultimate sentence. As to punishment, Mr. Lee's life and reputation are in tatters. His indictment, trial, and conviction have been covered at length in the national and local press, as well as various Korean-language newspapers. His ability to conduct normal business is stalled.[38] As Mr. Lee explains in his statement, the fact that his family has to deal with having a felon for a husband and father is severe punishment on its own; he has disappointed his family beyond anything they could have imagined. Ex. 1. His wife sat through every day of the trial and had to hear about her husband's mistakes in graphic detail. His children have to live with the fact that their father is a felon. He will be paying for these errors for the rest of his life. He is truly remorseful and regretful of his actions.

---

[38]  Indeed, in coordination with banks and with full transparency to the government, Mr. Lee has had to transfer many of his assets to his wife just to allow some continuity of operation. As indicated in the PSR, those assets remain available as needed to satisfy fines in this case. Dkt. 1027 at 30 ¶ 160(d).

As to deterrence, the investigation as a whole shined a light on corruption at the highest levels of Los Angeles city government, and the numerous convictions that resulted will hopefully have a deterrent effect going forward. However, this sentence is not the sentence which should be designed to deter public officials who may choose the path of corruption; the Court will address that in sentencing hearings for Huizar and others. Rather, this sentence must deter others who are similarly situated to Mr. Lee: confronted with a corrupt demand and the opportunity to make the right choice, or the wrong choice. The publicity around this case has likely already made significant strides towards this goal, and the recommended sentence is severe and will be seen by other developers who may one day be confronted with a similar choice as a sanction they desperately want to avoid.

The other factors are not relevant here. There is no evidence that Mr. Lee is a habitual offender or is in a position to commit similar offenses. There is no need for a longer sentence to "protect the public from further crimes of the defendant." *Id.* § 3553(a)(2)(C). And there is no indication that a longer sentence is needed to provide Mr. Lee with educational or vocational training, medical care, or other correctional treatment. *Id.* § 3553(a)(2)(D).

**E.    Sentencing Disparities [18 U.S.C. § 3553(a)(6)]**

A sentence of 20 months and a total fine of $750,000 is also appropriate in light of other sentences that have been imposed (here and elsewhere) and that may yet be imposed (here). It would avoid unwarranted sentencing disparities that would be created by a Guidelines sentence, or even the Probation Office's recommendation of 60 months.

**1.    Other Participants in Huizar's Corrupt Scheme**

**a.    Jose Huizar**

The government's plea agreement with Jose Huizar provides a starting place for the disparity analysis. As the elected city councilmember at the corrupt center of this entire case, Huizar was by far the most culpable individual involved in this

scheme and faced dozens of charges in the First Superseding Indictment. The Court is obviously very familiar with his role and actions and will ultimately fashion the sentence it deems appropriate. However, the government's position as to Huizar is informative and demonstrates that a significant departure from the Guidelines is appropriate for Mr. Lee. The government entered into an agreement whereby Huizar pleaded guilty to one count of RICO conspiracy and one count of tax evasion, with an agreed-upon Guidelines level of 39. *See* Dkt. 910 at 14. The Guidelines range for such an offense (assuming no criminal history) is 262 to 327 months. *See* U.S.S.G. ch. 5 pt. A. Recognizing that the Guidelines are not a reasonable measure of the sentences that should be imposed in this case, the government agreed that "an appropriate disposition" of the case would involve a sentence of between 108 and 156 months' custody. Dkt. 910 at 14. While the Court has yet to sentence Huizar, that agreement demonstrates that a significant departure from the Guidelines along the lines of what Mr. Lee is requesting here is appropriate.

### b.    Mitch Englander

Mr. Lee is the first individual in this case to appear before the Court for sentencing. However, the Court previously sentenced former city councilmember Mitch Englander in a related case. Englander, unlike Mr. Lee, was a sitting, elected public official at the time of his offense. According to his plea agreement, he accepted cash, hotel rooms, and other valuable benefits from business people, and then concealed material facts about it from the FBI and counseled others to lie to the FBI, but was permitted by the government to resolve his case through a guilty plea to a violation of 18 U.S.C. § 1001(a)(1). Plea Agreement for Defendant Mitchell Englander, ECF No. 24, *United States v. Englander*, No. 20-cr-00035-JFW (Mar. 27, 2020). He received a fourteen month sentence. Judgment and Commitment Order, ECF No. 62, *United States v. Englander*, No. 20-cr-00035-JFW (Jan. 25, 2021).

Mr. Lee's conduct is markedly different, even related to the obstruction count

for which he was convicted. He never tampered with witnesses or otherwise took action to stand in the way of the government's broader investigation into Huizar's activities. Mr. Lee respectfully submits that the time in custody reflective of his conviction for obstruction conduct should be considerably less than the 14 months imposed on Englander, who apparently *accepted* payments and then obstructed the investigation.

### 2.    Other Corruption Defendants

A 20-month sentence is further warranted based on the sentences imposed on convicted *politicians* in other high-profile corruption cases. In these cases, even when imposing sentences on the most culpable member of a corruption scheme—the politicians themselves—courts departed significantly downward relative to the Guidelines recommendation.

- In *United States v. McDonnell*,[39] the governor of Virginia was convicted after trial of eleven counts relating to his acceptance of donations in exchange for political favors. *See* Amended Judgment in a Criminal Case, Dkt. 627, *United States v. McDonnell,* No. 14-cr-00012-JRS (E.D. Val. Jan. 13, 2015). In competing filings, McDonnell asked for a non-custodial sentence consisting of 6,000 hours of community service, and the government requested a Guidelines sentence of 121 to 151 months of imprisonment. *See id.* at Dkt. 582 & 596. The court imposed a sentence of 24 months' imprisonment—an *80 percent downward departure* from the bottom of the Guidelines recommendation for someone who corrupted the *highest office of a state*. *Id.*, Dkt. 627.

- In *United States v. Inunza*, a former San Diego city councilman was convicted of multiple counts of extortion, wire fraud, and conspiracy to commit wire fraud for accepting money from a strip club owner in exchange for efforts to repeal city regulations that governed such clubs. *See* Indictment, Dkt. 1, *United States v. Inunza et al.*, No. 03-cr-02434 (S.D. Cal. Aug. 28, 2003); *id.*, Dkt. 469 (Verdict). Inunza was ultimately sentenced to 21 months in prison.

---

[39]   Although this case was eventually reversed, the sentence imposed on Governor McDonnell is relevant to this analysis.

1     *Id.*, Dkt. 554.

2   • In *United States v. Renzi*, a former congressman was convicted at trial of 17
3     counts related to bribery, extortion, money laundering, and making false
      statements in connection with a federal land exchange. *United States v. Renzi*
4     *et al.*, Dkt. 1378, No. 08-cr-00212 (D. Ariz. Jan. 2, 2014).[40] The government
5     requested a prison sentence of 9 to 12 years based on a loss amount
      calculation of between $733,000 and $4.6 million (an amount which was
6     disputed). *Id.*, Dkt. 1307. The Court imposed a sentence of 36 months'
7     imprisonment. *Id.*, Dkt. 1318.

8   • In *United States v. Borges*, the former chair of the Ohio Republican Party was
9     convicted of racketeering activity for participating in an electrical company's
10    scheme to bribe a former Ohio House Speaker in exchange for favorable
      legislation. Dkt. 263, No. 20-cr-00077-TSB (S.D. Ohio Mar. 9, 2023). The
11    government argued that the loss amount was almost $39 million, triggering a
12    Guidelines recommendation of 240 months (or 20 years). *Id.*, Dkt. 280-1 at 4,
      Dkt. 281 at 12. Yet the government recommended a sentence *75 percent*
13    *lower* than the Guidelines recommendation, requesting a five-to-eight year
14    sentence. *Id.*, Dkt. 280 at 1. On the very same day Mr. Lee is filing this
      memorandum, the court in the *Borges* case sentenced the defendant to five
15    years, or a mere quarter of the Guidelines recommendation. Ex. 13.
16
17  • In *United States v. Silver*, a New York state assembly member was convicted
18    *twice* (once after a successful appeal) for honest services fraud, extortion, and
      money laundering, with an amount at issue in excess of $5 million. *See* Dkt.
19    450, No. 15-cr-00093 (S.D.N.Y. July 30, 2018). The court imposed a seven-
20    year sentence for Silver's offenses, which involved amounts ten times larger
      than those involved here. *Id.* at 3.
21
22  • In *United States v. Correia*, a former mayor of Fall River, Massachusetts was
      convicted of *21 felonies related to fraud and extortion,* resulting in a
23    Guidelines recommendation of 151 to 188 months. Dkt. 298, No. 18-cr-10364
24    (D. Mass. Sep. 10, 2021). Immediately after his conviction, Correia made
      defiant public statements characterizing the result of his trial as an injustice.
25    *Id.* The government asked for 132 months' incarceration and almost $900,000
26    in restitution and forfeiture. *Id.* at 2. The court sentenced Correia to 72
27
28  _____
    [40]  Renzi was eventually pardoned by President Trump. *Id.*, Dkt. 1491.

months. *Id.*, Dkt. 313.

- In *United States v. Skelos*, the former majority leader of the New York State Senate was convicted twice (once after a successful appeal) of eight counts of wire fraud, extortion, and solicitation of bribes. Dkt. 467, No. 15-cr-00317 (S.D.N.Y Nov. 8, 2018). The government noted a Guidelines range of 151 to 188 months. *Id.*, Dkt. 458. The court imposed a 51-month sentence. *Id.*, Dkt. 467.

These cases provide important bases for comparison for several reasons. Each of these cases involves the sentencing of the central figure in each corruption scheme: the politician who either accepted or demanded payments for political acts. Each of these sentences was imposed after a trial, not a plea bargain. Yet, in each of these cases the court departed significantly downwards from the Guidelines recommendation and did not in any cases impose the sentence requested by the government. It would be a travesty of justice if Mr. Lee received sentences anywhere near the sentences imposed on some of the most prominent corrupt politicians. A 20-month sentence and significant fine would both emphasize the seriousness of Mr. Lee's offense while also remaining proportionate relative to the sentences historically imposed on much more serious offenders.

### 3.     Statistical Comparison to Other Corruption Defendants

A 20-month sentence is also more in line with sentences imposed in *all* bribery and public corruption cases throughout the country over the last two decades. Since 1996, the United States Sentencing Commission has published sourcebooks detailing the average sentence lengths and lengths of imprisonment for different "primary offense categories."[41] One of those categories is

---

[41]   As of June 29, 2023, each of these sourcebooks was accessible at https://www.ussc.gov/research/sourcebook/archive. The difference between "average sentence length" and "average length of imprisonment" is that the latter excludes sentences with zero months of prison, whereas the former includes them.

"bribery/corruption."[42] Counsel has consolidated the data from every available year in the chart on the first page of Exhibit 13 and has also included the original tables from each sourcebook in the same exhibit.[43]

Based on that data, in 2022 (the most recent year available), the mean sentence for bribery-related offenses was 19 months, and the median sentence was 12 months across all defendants, without considering criminal history category.[44] The longer-term averages across all years for which data is available are even lower. Taking the weighted average[45] of these sentences, the mean sentence length for bribery-related convictions was **17 months** between 1996 and 2022, and the median sentence length for the same was **10 months**.[46]

Mr. Lee therefore submits that it would be appropriate to impose an 20-month sentence, which is higher than the average sentence across the years for which data is available. There is no basis for Mr. Lee to be sentenced well above the national

---

[42]  In sourcebooks prior to 2018, this category was simply labeled "bribery."

[43]  In sourcebooks prior to 2018, the data on "average length of imprisonment" was contained on a separate page from the data on "average sentence length." For those years, both tables are included in the exhibit.

[44]  If zero-custody sentences are excluded, the mean term of imprisonment was 24 months and the median was 17 months.

[45]  Counsel calculated the weighted average for each statistic by assigning a "weight" to each year by dividing the number of sentences for that year by 6,242, which is the total number of sentences included across all of the sourcebooks available on the Sentencing Commission's website; multiplying the sentence length averages for each year by that year's weight; and adding the results together. The data in Exhibit 13 are sufficient to recreate that calculation, but counsel is prepared to transmit to the Court (and the government) an electronic version of the spreadsheet used to perform those calculations at the Court's request.

[46]  If zero-custody sentences are excluded—i.e., by using the Commission's "length of imprisonment" statistic—the mean term for bribery and corruption convictions is 25 months and the median length of imprisonment is 18 months.

mean or median, as the Guidelines recommend.

## III.   CONCLUSION

Mr. Lee built a reputation, family, and body of work over a lifetime, only to squander it all through a series of irreparable errors that led to his convictions here. He will forever have to live with the effects on himself, his family, his community, and his work caused by his lapse in judgment. But he does not deserve to receive a sentence on par with the worst of offenders. He is a good man who has lived a good life, but who veered from the correct path. But that does not change who Mr. Lee is. He is a loving husband and father; a committed churchgoer; a generous benefactor of charities; and a socially conscious businessperson. As a result of this case, Mr. Lee's goals have changed from one of business successes to one of service and redemption. He now seeks to make amends for his mistakes and to spend any remaining time he has giving back to the community. He acknowledges that he now faces a substantial punishment, and only asks that the Court impose a sentence that acknowledges his value to his community and restores his freedom in time for him to continue to serve the community and enhance the lives of those around him.

As Mr. Lee's wife explains in her letter,

> While waiting and preparing for the sentencing, my husband had countless days of heartaches, feeling extremely remorseful for his mistakes and for things he has not been able to see before this case. The past months have allowed him to open his eyes and find deeper meaning in his heart and life. He realized that this is not a setback. but rather. a setup for something greater. He feels in his heart tremendous passion and joy to continue to help out the community and people in need.

Ex. 2-1.

For these reasons, Mr. Lee respectfully submits that the Court should sentence him to no more than 20 months in custody and impose a fine no greater than $150,000. As set forth in the separate filing as to 940 Hill, Mr. Lee respectfully

submits that he should be subject to a total financial penalty of $750,000, imposed as a fine of $150,000 on him personally and $600,000 imposed on the company which he has an obligation to personally pay.

DATED: June 30, 2023

Ariel A. Neuman
Ray S. Seilie
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: _____

Ariel A. Neuman
Attorneys for Defendants 940 Hill, LLC
and Dae Yong Lee