E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3289
     Facsimile: (213) 894-6436
     E-mail:   Mack.Jenkins@usdoj.gov
             Cassie.Palmer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>DAE YONG LEE,<br>  aka, "David Lee,"<br>940 HILL, LLC,<br><br>       Defendants. | No. CR 20-326(A)-JFW-5, 6<br><br>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANTS DAE YONG LEE AND 940 HILL, LLC; ATTACHMENT A<br><br>[DECLARATION OF CASSIE D. PALMER AND EXHIBITS THERETO FILED SEPARATELY]<br><br>Hearing Date: July 21, 2023<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of the<br>              Hon. John F. Walter |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins and Cassie D. Palmer, hereby files its Sentencing Position Regarding Defendant Dae Yong Lee and 940 Hill, LLC.

     This position is based upon the attached memorandum of points and authorities, Attachment A, the trial exhibits referenced herein and attached to the Declaration of Cassie D. Palmer, the files and

records in this case, the Presentence Investigation Reports, the United States Probation and Pretrial Services Recommendation Letters, and such further evidence and argument as the Court may permit.

Dated: June 30, 2023                    Respectfully submitted,

                                        E. MARTIN ESTRADA
                                        United States Attorney

                                        MACK E. JENKINS
                                        Assistant United States Attorney
                                        Chief, Criminal Division

                                        CASSIE D. PALMER
                                        MACK E. JENKINS
                                        Assistant United States Attorneys

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES.............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   STATEMENT OF FACTS..........................................4

      A.   Background and Defendants LEE/940 HILL's Role in the
           Offenses...............................................4

      B.   Defendants LEE/940 HILL Paid a Bribe to Huizar via the
           Pay-to-Play Scheme When 940 HILL's Redevelopment
           Project Faced Peril....................................7

      C.   At Huizar's Urging and Vow to Vote Against CREED's
           Appeal, CREED Dropped Its Appeal......................11

      D.   Defendant LEE's Admissions & Defendants LEE/940 HILL's
           Obstruction of Justice................................11

      E.   Defendants LEE/940 HILL Sought to Conceal the Bribe
           and Evade Detection...................................16

III.  SENTENCING GUIDELINES CALCULATIONS.........................17

      A.   Defendant LEE's Guidelines Calculations...............17

           1.   PSR and Recommendation Letter....................17

           2.   Pending Revisions to the Sentencing Guidelines...18

      B.   Defendant 940 HILL's Guidelines Calculations..........19

IV.   APPLICATION OF THE § 3553(A) FACTORS.......................20

      A.   The Government's Sentencing Recommendation with
           Respect to Defendant LEE..............................20

           1.   Nature and Circumstances of the Offense..........20

           2.   Defendant LEE's History and Characteristics and
                the Need to Protect the Public Justify the
                Recommended Sentence.............................23

           3.   Just Punishment and Deterrence...................26

           4.   Avoiding Unwarranted Disparities.................30

           5.   The Court Should Impose the Maximum Fine.........32

B.   The Government's Sentencing Recommendation with
     Respect to Defendant 940 HILL............................32

     1.   The Court Should Impose the Full $1,500,000 Fine....33

     2.   The Court Should Impose a Five-Year Term of
          Probation.........................................36

          a.   Publication (Condition 13).....................36

          b.   Compliance and Ethics Program (Conditions
               13-14).........................................37

          c.   Submissions Regarding Financial Information
               (Conditions 4, 16, 17)........................38

     3.   The Court Should Impose the Costs of Prosecution....39

V.   CONCLUSION..................................................40

ATTACHMENT A......................................................i

     A.   Policies and Procedures...............................i

     B.   Proper Oversight and Independence....................ii

     C.   Training and Guidance................................ii

     D.   Internal Reporting and Investigation................iii

     E.   Enforcement and Discipline..........................iii

     F.   Third-Party Relationships............................iv

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                              <u>PAGE</u>

**Federal Cases**

<u>Gall v. United States</u>,
   552 U.S. 38 (2007) ......................................... 30

<u>United States v. Bistline</u>,
   665 F.3d 758 (6th Cir. 2012) ............................... 29

<u>United States v. Brown</u>,
   880 F.3d 399 (7th Cir. 2018) ............................... 27

<u>United States v. Bussell</u>,
   504 F.3d 956 (9th Cir. 2007) ............................... 39

<u>United States v. Danilow Pastry Co.</u>,
   563 F. Supp. 1159 (S.D.N.Y. 1983) .......................... 33

<u>United States v. Gering</u>,
   716 F.2d 615 (9th Cir. 1983) ............................... 39

<u>United States v. Kuhlman</u>,
   711 F.3d 1321 (11th Cir. 2013) ............................. 29

<u>United States v. Lowe</u>,
   654 F.2d 562 (9th Cir. 1981) ............................... 36

<u>United States v. Martin</u>,
   455 F.3d 1227 (11th Cir. 2006) ............................. 27

<u>United States v. Mitsubishi Int'l Corp.</u>,
   677 F.2d 785 (9th Cir. 1982) ........................... <u>passim</u>

<u>United States v. Mueffelman</u>,
   470 F.3d 33 (1st Cir. 2006) ................................ 28

<u>United States v. Musgrave</u>,
   761 F.3d 602 (6th Cir. 2014) ............................... 28

<u>United States v. Patel</u>,
   762 F.2d 784 (9th Cir. 1985) ............................... 39

<u>United States v. Prosperi</u>,
   686 F.3d 32 (1st Cir. 2012) ................................ 29

<u>United States v. Ruiz-Apolonio</u>,
   657 F.3d 907 (9th Cir. 2011) ............................... 18

<u>United States v. Spano</u>,
   411 F. Supp. 2d 923 (N.D. Ill. 2006) ................. 21, 23, 27

iii

United States v. Stefonek,
   179 F.3d 1030 (7th Cir. 1999) ................................. 29

United States v. Treadwell,
   593 F.3d 990-13 (9th Cir. 2010) .......................... 28, 30

**Federal Statutes**

18 U.S.C. § 666 ............................................... 3

18 U.S.C. § 1343 ............................................. 2

18 U.S.C. § 1346 ............................................. 2

18 U.S.C. § 1519 ............................................. 3

18 U.S.C. § 3553 ......................................... passim

18 U.S.C. § 3563 ............................................ 36

18 U.S.C. § 3571 ............................................ 19

21 U.S.C. § 848 ............................................. 18

28 U.S.C. § 1918 ..................................... 20, 39, 40

**Local Rules**

Local Rule 54-3 ..................................... 20, 39, 40

Local Criminal Rule 57-1 .................................... 39

**United States Sentencing Guidelines**

U.S.S.G. § 2C1.1 ....................................... 17, 19

U.S.S.G. § 2H1.1 ........................................... 18

U.S.S.G. § 3A1.1 ........................................... 18

U.S.S.G. § 3A1.4 ....................................... 17, 18

U.S.S.G. § 3A1.5 ........................................... 18

U.S.S.G. § 3B1.1 ........................................... 18

U.S.S.G. § 3C1.1 ........................................... 17

U.S.S.G. § 3C1.1 ........................................... 17

U.S.S.G. § 4C1.1 ........................................... 18

U.S.S.G. § 5E1.2 ........................................... 32

U.S.S.G. § 8B2.1 ........................................... 37

U.S.S.G. § 8C2.4 ........................................... 19

U.S.S.G. § 8C2.5 ........................................... 19

U.S.S.G. § 8C2.6 ........................................... 19

U.S.S.G. § 8D1.1 ........................................... 36

U.S.S.G. § 8D1.4 ....................................... 37, 38

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2 **I.    INTRODUCTION**

3          Defendant DAE YONG LEE, also known as "David Lee" ("defendant

4 LEE"), was a sophisticated businessman and real estate developer who

5 owned several successful businesses, had over $180 million in real

6 estate holdings, and enjoyed a lavish lifestyle.  (CR 1027 (LEE

7 Presentence Investigation Report ("LEE PSR")) ¶¶ 33, 148-68.)

8 Despite enjoying a life of privilege and abundance, defendant LEE

9 wanted more.  But instead of earning it, he wanted a guaranteed

10 shortcut to circumvent the City process and silence community

11 opponents threatening to thwart his attempts to expand his

12 substantial real estate empire.  Thus, defendant LEE chose to pay a

13 $500,000 cash bribe on behalf of defendant 940 HILL, LLC ("940 HILL")

14 (collectively, "defendants LEE/940 HILL" or "defendants"), of which

15 he was the managing member, in exchange for then-Councilmember Jose

16 Huizar using his official position to resolve a labor appeal that

17 stood in the way of defendant 940 HILL's $170 million redevelopment

18 project.

19          By paying this bribe, defendants LEE/940 HILL deprived the City

20 of Los Angeles and its citizens of their right to the honest services

21 of their public officials.  Defendants LEE/940 HILL's motivation for

22 committing the crime was simple:  money.  They stood to make tens of

23 millions simply by entitling the property and scores of millions more

24 through the development project.  Defendant LEE took great pains to

25 conceal his dealings, for instance, by contacting Huizar through his

26 intermediary, Justin Kim; paying the bribe in cash; insisting on

27 discussing matters relating to the bribe in person, rather than on

28

the phone; and avoiding putting anything relating to the bribe in writing.

Despite defendant LEE's efforts, the sprawling federal investigation into corruption at City Hall eventually ferreted out his and 940 HILL's illegal conduct.  But defendant LEE/940 HILL's crimes did not end there.  Instead of accepting responsibility, defendant LEE attempted to evade a reckoning for his and 940 HILL's criminal conduct by obstructing justice and even dragging in a subordinate to facilitate his crimes.  In response to grand jury subpoenas for records relating to Huizar, defendant LEE instructed his employee to make false entries in defendant 940 HILL's accounting and tax records in a post-hoc effort to legitimize the cash bribe. During this same period, in covertly recorded conversations with a co-schemer, defendant LEE expressed nonchalance (in his own words) about the prospect of getting caught, stating he had been "hit by the IRS about five, four times," and the first time, he thought he might have "to run away to Korea," but after "the third and fourth time, [he] became nonchalant."  (LEE PSR ¶ 60.)  Defendant LEE urged his co-schemer not to worry, reasoning the investigators were just employees and his bribe here was "probably [*chuckling*] just a drop in the ocean."  (LEE PSR ¶ 59.)  Ultimately, however, the FBI uncovered the scope of defendants LEE/940 HILL's crimes, through defendant LEE and his co-schemers' communications and the co-schemers' phone evidence and testimony, which provided a roadmap to the scheme and demonstrated defendant LEE's role in directing and carrying it out.

After a 9-day trial, a jury swiftly found defendants LEE/940 HILL guilty of all three felonies with which they were charged: honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346;

2

bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(2); and obstruction of justice – alteration or falsification of records in a grand jury investigations, in violation of 18 U.S.C. § 1519.

Guidelines sentences are imperative in this case to adequately punish defendants LEE/940 HILL, deter them and other would-be white collar defendants, and signal to the community that public corruption offenses carry meaningful consequences. Defendant LEE was a savvy businessman with an impressive real estate portfolio. His decisions, after much reflection, to pay a half-million-dollar cash bribe and continually seek to cover it up, were not borne of financial or emotional desperation--but immense, deliberate, and calculated greed and the desire to avoid justice. He had everything, and yet it was not enough. Thus, defendants LEE/940 HILL corruptly and unapologetically paid this bribe, motivated by single-minded ambition to resolve an appeal that stood on the way of their lucrative development project and to conceal their crimes--by whatever means necessary.

Having significantly undermined the public's faith in its political institutions, business communities, notions of fair play and justice, and the citizens of Los Angeles's trust in the integrity of their institutions, defendants LEE and 940 HILL have earned firm, meaningful sentences. With respect to defendant LEE, the government respectfully recommends a sentence of 84 months' (7 years') imprisonment;[1] the maximum three-year term of supervised release, the

---

[1] As discussed below in Section IIIB, the government recommends a sentence towards the low-end of the Sentencing Guidelines range, following a two-level downward variance to reflect proposed

*(footnote cont'd on next page)*

3

maximum fine of $750,000; and the special assessment of $300.  For defendant 940 HILL, the specific circumstances of this case and the "special problem" that a corporate criminal defendant like 940 HILL cannot be incarcerated, demand a comprehensive and creative sentence to serve the § 3553(a) goals of sentencing.  See United States v. Mitsubishi Int'l Corp., 677 F.2d 785, 788 (9th Cir. 1982) ("Corporate criminal defendants present a special problem because they cannot be incarcerated.").  The government respectfully recommends that the Court sentence defendant 940 HILL to the maximum five-year term of probation with the government's requested terms and conditions; the maximum fine of $1,500,000; the special assessment of $1,200; and an order to pay the costs of prosecution.

## II.   STATEMENT OF FACTS[2]

### A.   Background and Defendants LEE/940 HILL's Role in the Offenses

Defendant LEE is a sophisticated businessman, who has owned, operated, and managed several lucrative businesses and, at the time of the offenses, managed an active real estate portfolio valued at around $180 million.  (LEE PSR ¶¶ 30, 33; Trial Exs. 8, 57.)  When defendant LEE bribed Huizar to secure favorable official acts to benefit the 940 HILL redevelopment project, he had a deep knowledge of real estate development and had managed numerous development

Guidelines amendments for defendants, like defendant LEE, who have zero criminal history points.

[2] Unless otherwise indicated, the facts herein are drawn from the Presentence Investigation Reports ("PSR").  (CR 1027 ("LEE PSR"); CR 1025 ("940 HILL PSR").)  "Trial Tr." refers to the official Court Reporter Transcripts, followed by the relevant page number.  "Trial Ex." refers to the government trial exhibits admitted at trial in this matter, unless designated as "not admitted."  "CR" refers to "Court Record," which is the docket entry associated with the referenced filing.

projects, collectively worth a total projected value of over $600 million.  (Trial Ex. 57.)

Defendant 940 HILL owned the property at the heart of the bribe in this case, a one-story building and a parking lot, located at 940 South Hill Street in downtown Los Angeles (the "Property") in then-Councilmember Jose Huizar's District (Council District 14, or CD-14). (Trial Ex. 8; Trial Tr. 203, 658, 1832-33, 1845.)  Defendant LEE and his partners paid around $9 million for the Property in 2008.  (LEE PSR ¶ 31.)  Defendant LEE was the majority shareholder and managing member of defendant 940 HILL and handled its day-to-day operations, including its accounting records and tax returns.  (LEE PSR ¶ 31; Trial Ex. 8.)  Indeed, trial testimony revealed that 940 HILL's minority shareholders had little to no knowledge of what defendant LEE did with the Property or its operations and had given him unfettered discretion to make expenditures of up to $100 million on behalf of defendant 940 HILL.  (CR 1024 ("940 HILL PSR") ¶ 76; Trial Tr. 1832-33, 1845.)

After holding onto the Property for several years, in 2015, defendant 940 HILL, through defendant LEE, sought entitlements from the City of Los Angeles (the "City") to develop the Property into a lucrative 20-story, mixed-use high-rise that was to include over 200 residential units and over 20,000 square feet of commercial space, known as the "940 HILL Project."  (LEE PSR ¶¶ 32, 34; Trial Ex. 37.) Defendant LEE estimated the project cost at $170 million.  (Trial Ex. 57.)  In July 2016, defendants received conditional approval of their entitlement to redevelop the Property from the City of Los Angeles. (LEE PSR ¶ 35.)  The entitlements increased the value of the Property by tens of millions of dollars (specifically, defendants LEE/940 HILL

appraised the Property at $13.6 million as part of the entitlement application and received offers of $30 to $34 million for the Property with the entitlements; the developed Property offered an even higher financial upside).  (LEE PSR ¶ 33; Trial Exs. 28-32, 37.) The 940 Hill Project was one of defendant LEE's largest development projects.  (Trial Tr. 1223.)

But defendants LEE/940 HILL's plan to transform the huge location by entitling the Property was thwarted when, in August 2016, a labor organization called the Coalition for Responsible Equitable Economic Development ("CREED") appealed the conditional approval. (LEE PSR ¶ 36.)  As a result of the appeal, development on the 940 Hill Project was delayed indefinitely, which meant, at minimum, increased costs and uncertainty for the project's future.  (LEE PSR ¶¶ 36, 37.)  Indeed, opposition from unions to development projects in Los Angeles could result in the death of a project altogether. (Id. ¶ 37.)  CREED's appeal ultimately would have reached the powerful Planning and Land Use Management committee ("PLUM")--which oversaw development projects in the City of Los Angeles and of which Huizar served as Chair--and then the full City Council.  (Id. ¶¶ 36, 40; Trial Tr. 768, 775-778, 803, 806.)  In other words, Huizar had two significant votes relating to the appeal – one in PLUM (as Chair) and one in City Council (as the member in whose district the project sat).  Further, as a matter of typical protocol, Councilmembers almost always deferred to the Councilmember in whose District a development project sits when voting on such approvals, so Huizar's power over the fate of this appeal was particularly great.  (Trial Tr. 678-79.)  Defendant LEE was told that resolving the appeal on the

1    940 HILL Project would save an estimated $30 million in development

2    costs.  (LEE PSR ¶ 45.)

3        **B.   Defendants LEE/940 HILL Paid a Bribe to Huizar via the Pay-**
         **to-Play Scheme When 940 HILL's Redevelopment Project Faced**
4        **Peril**

5        As early as 2013, Huizar, in coordination with his special

6    assistant George Esparza and others, led a pay-to-play scheme through

7    Huizar's office, whereby real estate developers paid bribes in

8    exchange for Huizar's favorable official acts on their development

9    projects.  Defendant LEE had a close relationship with Justin Kim,

10   who was a real estate appraiser by trade and moonlighted as top

11   fundraiser for Huizar.  (LEE PSR ¶ 38.)  Huizar considered Kim "a

12   friend of the [CD-14] office," meaning Kim acted a liaison for

13   developers, like defendant LEE, who had a close relationship with

14   Huizar and Esparza and direct access to Huizar/CD-14.  (LEE PSR ¶ 48;

15   See Trial Tr. 780-82; 921 (Esparza: "[I]n 2016, Justin [Kim] was a

16   No. 1 fundraiser for the council office.  I was in touch with him

17   almost on a daily basis[.]").)  Defendant LEE was one of Huizar's

18   "top guns" in terms of contributions to Huizar's campaigns and other

19   pet projects.  (Trial Tr. 923.)  Huizar and Esparza tapped these

20   "friends of the office" for bribes, soliciting anything from concert

21   tickets to vacations to (in this case) cash.  (Trial Tr. 932-33; 1390

22   (Kim: his success rate in asking defendant LEE for political

23   contributions to Jose Huizar was "High. More than 90 percent").)

24       When CREED filed its appeal, defendant LEE knew where to go for

25   help that would be the most expedient and successful.  He was well-

26   aware of Huizar's power and position and Kim's close relationship

27   with Huizar's office, and defendant LEE leveraged those relationships

28   to resolve the CREED appeal in his favor.  For years, Kim had held

                                    7

himself out to defendant LEE as someone with special access to politicians generally and to Huizar specifically.  And defendant LEE had turned to Kim for such help previously.  In August 2015--a year before the CREED appeal--defendant LEE sent Kim a request seeking a support letter for the EB-5 visa program.  (Trial Tr. 1923; Tr. Ex. 34.)  In response, Kim forwarded that email to Esparza, explaining that defendant LEE's "request [wa]s from one of the main supporters CM Huizar."  (Id.)  Esparza promptly responded, "I'll take care of this for you," which Kim then forwarded to defendant LEE, putting him on notice that this was how Huizar and Esparza operated--with quick and favorable responses for developers like defendant LEE who never said "no" to Huizar's requests.  (Tr. Ex. 34; Trial Tr. 1432-33.)

Defendant LEE's legitimate advisors on the 940 HILL Project also told him about Huizar's relationship with labor unions and his power over the CREED appeal, reasoning that Huizar would very likely support CREED, instead of 940 HILL: "Jose Huizar strongly supports all labor unions because they gave him financial and political support in getting him elected to City Council . . . At City Council it will be up to Huizar to decide if he supports our project or CREEDLA.  From what I have learned Huizar will likely take CREEDLA's side if we fight them."  (Trial Ex. 44.)  Put simply, defendant LEE well knew that absent something to entice Huizar, Huizar would support CREED instead of 940 HILL.

In light of this, defendant LEE turned to Huizar and ultimately chose to bribe him.  The day that CREED filed the appeal, defendant LEE immediately reached out to Kim.  (LEE PSR ¶ 38; Trial Tr. 1443; see also Trial Ex. 139A.)  During their conversation, defendant LEE asked Kim "to have the appeal go away or drop the appeal" and for

1   "Councilman Jose Huizar" to help to avoid a costly delay on the 940
2   Hill project.  (Trial Tr. 1450.)  Defendant LEE believed political
3   officials had "all the power in the world" to make happen whatever
4   they desired within the City.  (Id. at 1452-53.)  After this
5   conversation, defendant LEE forwarded Kim the CREED appeal, which Kim
6   forwarded to Esparza and then followed up with a phone call.  (LEE
7   PSR ¶ 39; Trial Tr. 935-36, 1443; Trial Exs. 40, 104.)  Through those
8   communications, Esparza understood that "[Kim] was asking the
9   councilmember for help," "if the councilman could help withdraw the
10  appeal," and for "Jose Huizar to help pull the labor union . . . off
11  this project."  (Trial Tr. 935-36.)

12        Over the months that followed, defendant LEE, via Kim, and
13  Huizar, via Esparza, arranged for LEE to pay Huizar a bribe to
14  resolve the CREED appeal.  Defendant LEE actively participated in the
15  bribe negotiations as evidenced by the trial testimony, call logs,
16  text messages, Esparza's notes and photographs, and the context of
17  the negotiations.  Eventually, Kim convened a private karaoke bar
18  meeting between defendant LEE, Huizar, and Esparza to discuss that
19  defendant LEE wanted the CREED appeal withdrawn.  (LEE PSR ¶ 41;
20  Trial Tr. 1453-55, 1458-59.)  The purpose of the meeting as "[a]bout
21  help with the CREED appeal" and for Councilmember Huizar to "help the
22  appeal go away."  (LEE PSR ¶ 41; Trial Tr. 1453-55, 1458-59, 1463.)
23  When the CREED appeal was discussed at the karaoke bar, Huizar said
24  the "project [could] count on" his support.  (Trial Tr. 940.)  The
25  morning after the karaoke bar meeting, Esparza clarified that
26  Huizar's "help" would not be free: Huizar wanted money to make the
27  CREED appeal go away.  (LEE PSR ¶ 42; Trial Tr. 1467, 1469.)

28

Defendant LEE did not immediately respond to Huizar's request, but later began bribe negotiations in earnest.  Indeed, the messages and phone records reveal the now familiar pattern of communications from Huizar to Esparza to Kim to Lee and back.  Defendant LEE eventually proposed the figure and form of payment that would seal the deal for Huizar's support: $500,000 in cash.  (Trial Tr. 1492, 1502.)  It was defendant LEE's idea to pay the bribe in cash, which he had ready access to at safes at his business, JOIA Accessories, where he regularly kept $1 to $3 million in cash.  (LEE PSR ¶ 166.) Defendant LEE preferred cash because, as his co-schemer explained, there would be "no trace," so "no one would know."  (Trial Tr. 1492.)[3]

Defendant LEE agreed to pay $500,000 in cash in three drops: $200,000 in February, $200,000 in March, and $100,000 in April.  (LEE PSR ¶ 47.)  After Huizar accepted defendant LEE's offer, defendant LEE provided cash to Kim from his office and placed it in a paper bag.  (Trial Tr. 1502, 1506.)  Esparza picked up the cash from Kim

---

[3] Defendant LEE's use of and access to cash was extensive.  As this Court is aware from pretrial litigation on the issue, on September 10, 2014, as part of a separate investigation, the government executed dozens of search warrants in the Fashion District in downtown Los Angeles, targeting businesses allegedly involved with "black market peso exchange" money laundering activities for Mexican drug cartels.  (CR 439 at 6-7, 19-21; & Exs. 7-10 attached thereto.)  As part of that investigation, the government executed a search warrant at defendant LEE's office (the same office he maintained at the time of the offenses) and seized **over $4.2 million in cash** and ten money counters from his office.  (Id. & Trial Ex. 132 (photographs of the search; not admitted at trial).)  After the filing of the charges against defendants LEE/940 HILL (more than six years later), defendant LEE requested that the government return the seized cash, which the government did.  (CR 439 at 7.)

10

outside defendant LEE's office on February 10, 2017 and March 14, 2017.  (LEE PSR ¶¶ 48, 50; Trial Tr. 243, 243-44, 956, 967, 1907.)[4]

## C.   At Huizar's Urging and Vow to Vote Against CREED's Appeal, CREED Dropped Its Appeal

Defendant LEE's plan worked.  After defendant LEE made the first bribe payment to Huizar, Esparza reached out to a lobbyist for CREED at Huizar's direction, for a private meeting about CREED dropping its appeal.  (LEE PSR ¶ 48.)  At the meeting, Esparza communicated that Huizar "would be voting against the appeal," and because "the developer's friends of the office," Huizar wanted CREED to drop the appeal.  (Id.; Trial Tr. 962-64.)  The lobbyist agreed that if Huizar was able to secure work for CREED on another of LEE's major DTLA development projects, the Little Tokyo Project, the lobbyist would drop the appeal.  (LEE PSR ¶ 48; Trial Tr. 964.)  In response, Huizar told Esparza, "'Just tell him yes so that we could get this development project' – 'this appeal dropped.'"  (Trial Tr. 965.)  Days after Huizar's confirmation, CREED withdrew its appeal.  (LEE PSR ¶ 49.)  After dropping the appeal, CREED's lobbyist texted Esparza, "Appeal dropped today."  (Id.)  Esparza then informed Kim that Huizar had held up his end of the bargain, and Kim informed defendant LEE of the same.  (Id.)

## D.   Defendant LEE's Admissions & Defendants LEE/940 HILL's Obstruction of Justice

Defendant LEE's desire to leave no trace of the bribe by paying cash came back to haunt him when the FBI sought records relating to

---

[4] Defendants LEE/940 HILL paid a total of $500,000 in cash, intending for the money to go to Huizar in exchange for his official acts on the CREED appeal, but when Kim collected the final $100,000 payment from defendant LEE in July 2017, Kim kept the money for himself without defendant LEE's knowledge.  (LEE PSR ¶ 52.)

the payment.  In response this scrutiny, defendants LEE/940 HILL chose to obstruct justice, lie, and place his others in harm's way, rather than own up to his conduct.

Specifically, near the end of 2018 and in early 2019, the FBI began closing in on the co-schemers.  (Trial Tr. 216-18, 1882.)  On November 7, 2018, the FBI executed search warrants on Huizar's house and residence as well as Esparza's home, which was widely reported in the media at that time.  (LEE PSR ¶ 54.)  Just days later, on November 19, 2018, the government subpoenaed records from one of defendant LEE's companies, JOIA accessories, requesting records relating to Huizar and Esparza, among others.  (LEE PSR ¶ 55; Trial Ex. 125.)  On December 5, 2018, one of defendant LEE's consultants forwarded LEE the original CREED appeal, which had been withdrawn back on March 2, 2017.  (LEE PSR ¶ 56.)  Then, on March 5, 2019, the government executed a search warrant on Kim's phone.  (Trial Tr. 357.)

On March 10, 2019, Kim and defendant LEE met in person to discuss the government's investigation.  (Trial Tr. 1539.)  At that meeting, Kim told defendant LEE that the FBI seized his phone, he had met with an attorney, and he had told the attorney the truth, including the full amount of the bribe.  (Id. at 1538-41.)  Defendant LEE was "upset" that Kim had told his attorney the amount of the bribe because it was "huge."  (Id.)  Defendant LEE encouraged Kim to fire his attorney so Kim could change his story to "match" defendant LEE's story.  (Id. at 1541-43.)

On March 12, 2019, the government served a subpoena on defendant 940 HILL requesting records relating to Huizar, Esparza, Kim, and any benefits and donations to Huizar.  (LEE PSR ¶ 57; Trial Ex. 126.)

12

Defendant LEE was present when the subpoena as served.  (LEE PSR ¶ 57.)  Within days of the FBI serving that subpoena, defendant LEE directed his employee, Jason Kang, to email 940 HILL's outside accountant/tax preparer that "there might be an expense in 2018 [sic] regards to an entitlement."  (Trial Tr. 1273-77, 1279.)  Defendant LEE was blind copied on emails Kang sent regarding this "expense." (Id.) Kang testified that all information regarding this "expense" came from defendant LEE, including the amount, when it was paid, what it was for, and how it should be categorized in the accounting records and on the tax forms.  (Trial Tr. 1273-77, 1282, 1316.)

On March 20, 2019, Kim, who by this time was cooperating with the government, and defendant LEE again met in person to discuss the FBI investigation.  (Trial Tr. 1543-44; Trial Exs. 118C & 118D.)  Kim surreptitiously recorded the conversation at the government's direction.  (Id.)  During that conversation, defendant LEE exhibited the demeanor of someone used to government scrutiny of his business practices and someone accustomed to getting away with things. Defendant LEE demonstrated an air of nonchalance (using his own words) about their criminal conduct and reasoned it was unlikely the government workers would catch them.  Among other things, defendant LEE counseled Kim:

- "[T]ake it easy"
- "I think they'll just catch a few big bad guys and end it"
- "[D]on't worry too much . . . . I think for the past ten years, they [Huizar/Esparza] probably pocketed tremendous amounts"
- "Issues just work out on their own"

- "[W]ith government work . . . they're all employees after all"

- "[I]t's not like we committed a deadly sin."

(LEE PSR ¶ 60; Trial Ex. 118C.)  As to the last comment, Kim understood defendant LEE to be referring to the two of them committing bribery, in other words, their bribery of a public official was not "a deadly sin."  (Trial Tr. 1549.)  Defendant LEE further explained that he "was hit by the IRS about five, four times," and thought he might have "to run away to Korea," but "after the first time, the third and fourth time, [he] became nonchalant." (LEE PSR ¶ 60.)  Defendant LEE reasoned, "[Y]ou don't know how much they know," so "don't worry and let's just wait . . . [d]on't worry too much.  Just need to wait and see."  (Trial Ex. 118D.)

Then, on March 27, 2019, defendant LEE met with Kim a third time to discuss the FBI investigation; Kim again surreptitiously recorded that conversation at the FBI's direction.  (Trial Tr. 1551; Trial Exs. 119B-119F.  During that conversation, defendant LEE said he had "heard surprisingly [investigators] don't know much, but they pretend to know."  (LEE PSR ¶ 58; Trial Ex. 119D.)  Defendant LEE coached Kim to blame Huizar: "Now, we were both played by Huizar . . . Us two . . . . We were played by Huizar . . . . So you would have to blame him." (LEE PSR ¶ 59; Trial Ex. 119E.)  After all, defendant LEE reasoned, "Huizar was probably not caught with just one or two things.  The way I look at it – we're probably [*chuckling*] just a drop in the ocean." (Id.)

During the March 27 conversation, defendant LEE also repeatedly clarified the amount that Kim told his attorney Lee had paid as a bribe.  When Kim responded that he told his attorney the amount was

1   $400,00, defendant responded (correctly): "But it's 500,000."  (LEE
2   PSR ¶ 58; Trial Ex. 119B.)

3       That same day, defendant LEE directed Kang to email defendant
4   940 HILL's tax preparer, again blind copying defendant LEE, stating:
5   "I have not heard about the entitlement cost incurred in 2018 from
6   Mr. Lee.  Upon learning of the update, I will forward to you."
7   (Trial Ex. 72 (emphasis added).)  On April 2, 2019, defendant LEE
8   directed Kang to alter defendant 940 HILL's accounting records to
9   make a false entry reflecting the $500,000 paid to Huizar,
10  purportedly for "Non-Operating Expense: Entitlement: Experts" for the
11  "Creed LA matter," with an offset for a "personal loan" from
12  defendant LEE and a date of December 31, 2018.  (LEE PSR ¶ 61.)
13  After making those false entries, Kang sent an email to the tax
14  preparer attaching the revised accounting records and stating, "I
15  looked into P&L statement and discovered . . . Personal Loan &
16  Entitlement: $500,000 (Dae Y. Lee)," noting "I was advised and
17  discovered that 940 Hill, LLC borrowed $500,000 from Dae Yong Lee in
18  2018 and the fund [sic] were directly paid to take care of the
19  entitlement issues with Creed LA.  Therefore, there should be
20  increases in liability and also intangible assets (entitlement) in
21  the amount of $500,000."  (Trial Ex. 74 (emphases added).)  Kang
22  admitted on the stand that he did not actually "discover" the
23  purported expense/loan by looking at the P&L statement but rather
24  "discovered" it when defendant LEE told him about it.  (Id. at 1279.)
25  Kang further admitted that before he made the entries nearly two
26  years after the payments were made, there was no entry in defendant
27  940 HILL's accounting records for $500,000, (id. at 1278), which was
28  corroborated by 940 HILL's accounting records, (Trial Tr. 67, 1884-

85.)  Defendant LEE caused the false defendant 940 HILL tax return to be filed on April 8, 2019, which defendant LEE signed on behalf of defendant 940 HILL.  (LEE PSR ¶ 61; Trial Tr. 1834, 1845.)

The entries defendant LEE added to 940 HILL's accounting and tax records were false.  (LEE PSR ¶ 62.)  The $500,000 was not a legitimate business expense for calendar year 2018 but rather the bribe that LEE and 940 HILL paid in 2017 in exchange for Huizar resolving the CREED appeal.  (Id.)

### E.   Defendants LEE/940 HILL Sought to Conceal the Bribe and Evade Detection

Defendant LEE was a careful operator who took great pains to conceal his illegal dealings and insulate himself from detection. Defendant LEE almost exclusively contacted Huizar and Esparza through his intermediary, Kim.  He avoided directly communicating with or being seen with Huizar or Esparza, meeting with them only when the need to resolve the appeal became most desperate.  Defendant LEE came up with the idea of paying the bribe in cash, which was untraceable. And he avoided putting anything in writing, insisting on discussing matters relating to the bribe verbally, often meeting Kim in person. (Trial Tr. 1271, 1440-48, 1490-91, 1495-98, 1500-02, 1515-16; Trial Ex. 157.)  When defendant LEE learned that the FBI had been investigating his co-schemers and had seized Kim's phone, defendant LEE immediately got a new phone.  (Trial Tr. 1540-41.)  And in addition to obstructing justice through falsification of documents, defendant LEE sought to alter his co-schemer's true story to match defendant LEE's false story.  Defendant LEE was upset when Kim disclosed that he had told his attorney the full amount of bribe. (Trial Tr. 1541-43.)  Defendant LEE encouraged Kim to fire his

16

attorney so they "could change the story."  (Id.)  He further
encouraged Kim to falsely claim that he and defendant LEE had
unwittingly been played by Huizar related to the bribe.  (Trial Tr.
1556.)

## III.  SENTENCING GUIDELINES CALCULATIONS

### A.    Defendant LEE's Guidelines Calculations

#### 1.    PSR and Recommendation Letter

The USPO concluded that defendant has a total offense level of
30 based on the following calculation:

| | | |
|---|---|---|
| Base offense level | 12 | U.S.S.G. §§ 2C1.1(a) |
| Loss $250k/$550k | +12 | U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(G) |
| Bribe of Public Official | +4 | U.S.S.G. § 2C1.1(b)(3) |
| Obstruction | +2 | U.S.S.G. § 3C1.1) |
| Total offense level | 30 | |

(LEE PSR ¶¶ 76-88.)  The government agrees with these calculations.

The PSR calculates defendant's criminal history category as I,
and the government concurs.  (Id. ¶¶ 93-94.)  Defendant's resulting
Guidelines range is 97 to 121 months' imprisonment.  (Id. ¶ 172.)
The USPO, with troubling little analysis of any relevant factors, has
recommended the equivalent of a five-level downward variance from the
Guidelines resulting in a recommended total sentence of 60 months in
custody, to be followed by a three-year term of supervised release.
(CR 1026 ("LEE PSR Ltr.") at 1, 6.)  The USPO's recommendation of a
variance seems to impermissibly treat white collar defendants more
favorably than less well-heeled defendants, which is a practice
anathema to our Constitution and the statutory goals of sentencing,
as discussed further below.

17

1          2.   Pending Revisions to the Sentencing Guidelines

2          In April 2023, the United States Sentencing Commission

3    promulgated a series of amendments, that if not vetoed by Congress,

4    will come into effect on November 1, 2023.[5]   Among the revisions is

5    U.S.S.G. § 4C1.1, titled "Adjustment for Certain Zero-Point

6    Offenders."   See Amendments to the Sentencing Guidelines

7    (Preliminary) (Apr. 5, 2023),

8    https://www.ussc.gov/sites/default/files/pdf/amendment-

9    process/reader-friendly-amendments/20230405_prelim-RF.pdf

10   at 71-73.   Defendant LEE appears to be eligible for a two-level

11   reduction of his offense level if the amendments take effect.[6]   In

12   such circumstances, the Court "has the discretion to grant a variance

13   from the Guidelines after promulgation but before adoption of a

14   proposed amendment."   United States v. Ruiz-Apolonio, 657 F.3d 907,

15   917 (9th Cir. 2011).   In light of this, and provided that defendant

16

17          [5] https://www.ussc.gov/sites/default/files/pdf/amendment-
     process/reader-friendly-amendments/20230405_prelim-RF.pdf

18          [6] Part B of the proposed amendment sets forth a new Chapter Four
     guideline at § 4C1.1 (Adjustment for Certain Zero-Point Offenders).
19   New § 4C1.1 would provide a decrease of 2 levels from the offense
     level determined under Chapters Two and Three if the defendant meets
20   all of the following criteria: (1) the defendant did not receive any
     criminal history points from Chapter Four, Part A; (2) the defendant
21   did not receive an adjustment under § 3A1.4 (Terrorism); (3) the
     defendant did not use violence or credible threats of violence in
22   connection with the offense; (4) the offense did not result in death
     or serious bodily injury; (5) the instant offense of conviction is
23   not a sex offense; (6) the defendant did not personally cause
     substantial financial hardship; (7) the defendant did not possess,
24   receive, purchase, transport, transfer, sell, or otherwise dispose of
     a firearm or other dangerous weapon (or induce another participant to
25   do so) in connection with the offense; (8) the instant offense of
     conviction is not covered by § 2H1.1 (Offenses Involving Individual
26   Rights); (9) the defendant did not receive an adjustment under
     § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5
27   (Serious Human Rights Offense); and (10) the defendant did not
     receive an adjustment under § 3B1.1 (Aggravating Role) and was not
28   engaged in a continuing criminal enterprise, as defined in 21 U.S.C.
     § 848.

LEE agrees to not later seek a further reduction on this basis after the amendment is enacted,[7] the government recommends a two-level variance consistent with this amendment, which results in an advisory guidelines range of 78-97 months' imprisonment.

**B.   Defendant 940 HILL's Guidelines Calculations**

The USPO made the following guidelines calculation with respect to defendant 940 HILL:

| | | |
|---|---|---|
| Base offense level | 12 | U.S.S.G. §§ 2C1.1(a) |
| Bribe $250k/$550k | +12 | U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(G) |
| Bribe of Public Official | +4 | U.S.S.G. § 2C1.1(b)(3) |
| Total offense level | 28 | |

(940 HILL PSR ¶¶ 96-99). Based on the foregoing Offense Level of 28, USPO concluded that the base fine under U.S.S.G. §§ 8C2.4(d) is $10,000,000. (940 HILL PSR ¶ 104.) USPO also found that defendant had a total culpability score of 8[8] under U.S.S.G. § 8C2.5(e). (940 HILL PSR ¶¶ 105-112.) Because a culpability score of 8 establishes a minimum multiplier of 1.60 and a maximum multiplier of 3.20, see U.S.S.G § 8C2.6, the total fine range is **$16,000,000 to $32,000,000** prior to the limitation of the statutory maximum. (940 HILL PSR ¶ 116.)

However, the statutory maximum set forth in 18 U.S.C. § 3571(c)(3) limits the fine amount to $500,000 per count. Accordingly, based on the three counts of conviction, the total

---

[7] The government respectfully requests that the Court ask defendant LEE's counsel to confirm this on the record at sentencing.

[8] As a corporate defendant, defendant 940 HILL's obstruction of justice is accounted for in the culpability score, rather than the offense level. See U.S.S.G. § 8C2.5(e); 940 HILL PSR ¶¶ 108-09.

19

guideline fine amount is capped at **$1,500,000**.  (940 HILL PSR ¶¶ 115-116.)

The government concurs with USPO's calculations of the guidelines and base fine, culpability score, and total guideline fine amount of $1,500,000.

**IV.  APPLICATION OF THE § 3553(A) FACTORS**

Taking into account the 3353(a) factors, with respect to defendant LEE, the government believes that a near low-end sentence of 84 months' imprisonment followed by three years' supervised release, the maximum fine of $750,000, and a special assessment of $300, is "sufficient, but not greater than necessary," to comply with the purposes enumerated in 18 U.S.C. § 3553(a).  With respect to defendant 940 HILL, the government believes a sentence of a 5-year term of probation with all the terms and conditions set forth in the PSR Letter; a fine of $1,500,000; a mandatory special assessment of $1,200; and an order to pay the costs of prosecution pursuant to 28 U.S.C. § 1918(b) and Local Civil Rule 54-3, is warranted, appropriate, and achieves the sentencing goals of § 3553(a).

> **A.  The Government's Sentencing Recommendation with Respect to Defendant LEE**
>
> 1.  <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of defendant's public corruption and obstruction offenses are undoubtedly serious.  <u>See</u> 18 U.S.C. § 3553(a)(1).  Indeed, in the prior sentencing of defendant Shen Zhen New World, I ("defendant SZNW") and a related sentencing of former councilmember Mitchell Englander (20-35-JFW), this Court highlighted the significant and broad harm occasioned by public corruption offenses.

Defendant LEE's criminal conduct in this case was serious, varied, and prolonged.  He engaged in negotiations relating to the bribe for months and then made three separate cash bribe payments over a period of approximately six months.  Defendant LEE's bribery crimes were doubly pernicious because they not only violated the law but also, as with all corruption, deprived the public of their right to Huizar's honest services and eroded the public's trust in its own institutions and public servants.  See United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), affirmed, 477 F.3d 517 (7th Cir. 2006) ("Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all--not only to the average citizen, but to all elected and appointed officials.").  Second, obtaining favorable treatment on development projects through bribery harms and deters legitimate developers who must stand in line and wait for their projects to proceed through the complicated approval process.  This directly causes a legacy of economic harm to cities because it drives away these legitimate businesses who do not want to compete in corrupt environments.  Third, and relatedly, such conduct incentivizes further corruption by inviting other corrupt developers to pay to play in order to keep up and threatens to infect other politicians who come to see corruption simply as "business as usual."  This all directly harms and disrupts the local economy, costing it, not only the public trust, but also business, jobs, and meaningful real estate projects from businesses that wish to compete on a level playing field.

1      This Court aptly summarized these issues when sentencing
2   defendant SZNW: "[P]olitical corruption is a unique and infectious
3   crime with rippling and enormous consequences to society.  Keeping
4   political corruption in check has been a matter of public urgency
5   throughout our nation's history.  The crushing weight of corruption
6   on the integrity of every democratic element of our government have
7   been and will continue to be a constant concern."  05/12/23 Hr'g Tr.
8   at 16-17.

9      In further aggravation, defendants LEE/940 HILL obstructed
10  justice nearly two years after they committed bribery and engaged in
11  a course of conduct that spanned several months and involved numerous
12  lies, false statements, false entries, and false attestations.

13     Defendant LEE's crimes reveal a pattern of flouting the law for
14  financial gain.  Rather than momentary lapses in judgment, his crimes
15  were calculated risks he chose to take for self-interest and profit.
16  Indeed, defendant LEE was a savvy businessman who took his time to
17  educate himself about the options available to him to resolve the
18  CREED appeal – both legal and illegal – and then weighed them, before
19  choosing, after months of consideration, to pay a significant and
20  illegal cash bribe.  And defendant LEE's idea of paying the bribe in
21  cash was no accident: the cash payment was designed to avoid
22  detection, to leave no trace.  After the investigation turned his
23  way, instead of accepting responsibility for his misdeeds, defendant
24  LEE sought to evade responsibility as he had done so before and
25  attempted to paper over the bribe by creating a fake paper trail.  In
26  doing so, defendant LEE enlisted an unwitting employee and an
27  unwitting accountant and placed both in peril.  Similarly, as the
28  managing member of defendant 940 HILL, defendant LEE owed a fiduciary

duty to the minority shareholders.  In paying an illegal bribe and doctoring 940 HILL's records, he violated that duty and placed the minority shareholders in a financially precarious situation.  Thus, defendant not only violated the law, but also violated the trust placed him by his employees and defendant 940 HILL's minority shareholders.[9]

Ultimately, for all of these reasons, defendant LEE's egregious, calculated conduct, the magnitude of the bribe (half a million dollars), and defendant's other aggravating conduct in seeking to cover up his crimes collectively justify a near low-end Guidelines sentence of 84 months.

2.    Defendant LEE's History and Characteristics and the Need to Protect the Public Justify the Recommended Sentence

Defendant's history and characteristics, and the need to protect the public, support the government's recommended sentence.  See § 3553(a)(1), (a)(2)(C).

Before his criminal conduct in this case, defendant LEE's story in many ways appeared to embody of the American dream.  Born in Korea, defendant LEE and his family emigrated to Brazil in his childhood in search of greater economic opportunity.  Yet Brazil, while defendant LEE and his family had some economic opportunity, they also faced challenging, dangerous situations and even violence. (LEE PSR ¶¶ 106-110.)  Despite these difficult circumstances, defendant LEE's parents were "good," and his family was supportive and close-knit.  Id.

---

[9] Defendant 940 HILL's shareholders trusted defendant LEE so completely that they authorized him to make payments up to $100 million without any prior approvals.  (940 HILL PSR ¶ 76.)

In 1984, defendant LEE and his sister were able to obtain student visas to attend school in the United States (New York), where defendant LEE also worked part-time. Id. ¶ 109. In 1987, defendant LEE's parents and family emigrated from Brazil to Los Angeles, and defendant LEE and his sister joined them in Koreatown. Id. ¶¶ 110-111. From there, defendant LEE worked hard, like his parents, starting with selling clothing at swap meets and graduating to opening his own retail store, JOIA Accessories (JOIA), which became a thriving business that employed around 100 full-time employees. Id. ¶¶ 114, 116. Over time, defendant LEE became a highly successful, seasoned businessman, involved in an array of business ventures, and a real estate investor and developer. He purchased his first building in 1998 and has since invested in and managed properties and development projects collectively worth $180 million.

Defendant LEE's personal life similarly appeared to be a success: he obtained citizenship in the United States, married, and had three children, all of whom are now successful adults, educated at excellent schools. PSR ¶¶ 115, 150. Defendant LEE was able to buy a luxurious $7 million home for his family in a well-heeled Los Angeles superb and enjoyed a lifestyle free from material want. Defendant LEE also reported having a deep, years-long involvement with his church, where he was an ordained deacon. PSR ¶ 111.

While defendant LEE undoubtedly will point these facts as mitigating, they also cut against him, because despite having so much to lose and enjoying a life of privilege and abundance, he chose to violate the law and, when confronted with the prospect of being caught, doubled down by lying and obstructing justice. Thus, unlike so many defendants who appear before this Court for sentencing,

defendant LEE was not someone who was driven by desperation or trauma or deep-seated addiction; he was driven by greed and self-interest. Thus, his background and circumstances provide no explanation for-- and certainly no mitigation for--his serious crimes; indeed, they can also be fairly seen to be aggravating given they did not stop him from making repeated criminal choices that he did not need to make.

Further, defendant LEE has never expressed remorse and instead has avoided responsibility and sought to minimize his conduct. During his conversations with Kim, defendant LEE suggested that his frequent IRS audits caused him to become "nonchalant," which is consistent with his advice that he and Kim align false stories and blame Huizar.  Defendant LEE's participation in the bribery scheme and payment of a large cash bribe was brazen and devised and carried out with impunity because defendant LEE was a careful, calculated operator who did not think he would get caught.  And when he did, he sought to avoid responsibility at all costs.

The evidence at trial also showed that defendants LEE/940 HILL stood to gain many millions from the 940 HILL Project and that the entitlements alone would have allowed them to reap more than $20 million in profits on the sale of the Property and saved many millions by expeditiously resolving the appeal.  Thus, if anything, the amount of bribe here understates the seriousness of the offense because the amount they paid to resolve the appeal dwarfs the profits defendants LEE/940 HILL stood to gain (and the amount they stood to save).  That fact not only was supported by evidence at trial but also is consistent with common sense: despite carrying a very high risk, the $500,000 illegal cash bribe was so good a financial deal that defendant LEE chose to make it.

On balance, considering the aggravating and mitigating factors here, a substantial sanction is warranted, including a significant term of imprisonment and the maximum fine, the latter of which reflects a fraction of defendant LEE's personal wealth and vast holdings.  (See PSR ¶¶ 149, 159-163.)  The maximum fine is particularly warranted where, as here, because defendant drew upon his vast wealth to pay the cash bribe.

### 3.   Just Punishment and Deterrence

An 84-month sentence constitutes just punishment because it is commensurate with the nature, scope, and seriousness of defendant's crime as discussed above.  See § 3553(a)(2)(A).  The recommended punishment will also serve the purposes of both specific and general deterrence.  In terms of specific deterrence, sentence of imprisonment will underscore that defendant cannot violate the law without consequence.  While defendant's obstruction suggests he is willing to go to great lengths to hide his criminal conduct, he has abided by the terms of his pretrial release and voluntarily sought out treatment of alcohol use.  As such, a near low-end sentence of 84 months is sufficient but not greater than necessary to specifically deter defendant.

The strong need for *general* deterrence in this case also supports the government's recommended sentence and will provide general deterrence to developers and others who may believe that they can pay bribes to enrich themselves without impunity.  It is widely accepted that public corruption cases like this demand strong general deterrence.  As one court noted:

> Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable.  The only way to

> protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all — not only to the average citizen, but to all elected and appointed officials.

Spano, 411 F. Supp. 2d at 940.  General deterrence is a particularly effective tool in corruption and white-collar cases because white-collar offenders often premeditate their crimes and engage in a cost-benefit analysis.  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").  That was certainly the case here, where defendant LEE carefully weighed the legal and illegal options for resolving the appeal before choosing to pay a bribe because he stood to make much more money, much more quickly.

Further, by their nature, white-collar crimes are often difficult to detect, thereby making enhanced general deterrence even more necessary.  See United States v. Brown, 880 F.3d 399, 405 (7th Cir. 2018) (district court did not err in relying on the notion that white-collar criminals were prime candidates for general deterrence; district court was entitled to conclude that where there was a lower likelihood of getting caught, a serious penalty was necessary to ensure deterrence).  This is especially in cases where, as here, the defendant takes great pains to avoid law enforcement detection.

Congress too has deemed deterrence a crucial factor in sentencing decisions for economic and public corruption crimes such

as this one.  See S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("[A] purpose of sentencing is to deter others from committing the offense.  This is particularly important in the area of white-collar crime.  Major white-collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing importance of "the deterrence of white-collar crime (of central concern to Congress)").

A significant custodial sentence will aid in achieving the critical need for general deterrence, while also rejecting the notion of a two-tier system of justice wherein there is a more flexible, lenient, variance-laden tier for wealthy white-collar defendants, and a more rigid, severe, and guidelines-based tier for "other" defendants.  See United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) (central reason for sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." (citation omitted)).  Such a dichotomy is inconsistent with the Constitution, fundamental fairness, and the statutory goals of sentencing, and has been repudiated by the courts repeatedly.  See United States v. Treadwell, 593 F.3d 990, 1012-13 (9th Cir. 2010) (overruled on other grounds) (rejecting the principle that a defendant of means should be afforded a lower prison sentence to enable him to pay restitution to his fraud victims, and noting the critical importance of "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those

28

with money or earning potential to buy their way out of jail"
(citation omitted)); United States v. Stefonek, 179 F.3d 1030, 1038
(7th Cir. 1999) (white-collar criminals are "not to be treated more
leniently than members of the 'criminal class'"); United States v.
Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for
a court to impose a lighter sentence on white-collar defendants than
on blue-collar defendants because it reasons that white-collar
offenders suffer greater reputational harm or have more to lose by
conviction.").  Disparate treatment favoring certain classes of
defendants is improper.  For example, collateral consequences
"related to a defendant's humiliation before his community,
neighbors, and friends--would tend to support shorter sentences in
cases with defendants from privileged backgrounds, who might have
more to lose along these lines.  And '[w]e do not believe criminals
with privileged backgrounds are more entitled to leniency than those
who have nothing left to lose.'"  United States v. Bistline, 665 F.3d
758, 765-66 (6th Cir. 2012) (citation omitted).

Ultimately, individuals, like defendant LEE, who have earned
significant levels of professional success and thus are able "to make
a decent living without resorting to crime are more rather than less
culpable than their desperately poor and deprived brethren in crime."
Stefonek, 179 F.3d at 1038 (emphasis added); see also United States
v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing
Guidelines authorize no special sentencing discounts on account of
economic or social status.").  For these reasons, a meaningful and
Guidelines-based custodial sentence in this case thus will serve the
important sentencing purpose of general deterrence.

1          4.   <u>Avoiding Unwarranted Disparities</u>

2          Section 3553(a)(6) requires the Court to minimize sentencing

3     disparities among similarly situated defendants.  One way of doing so

4     is to correctly calculate the Guidelines range.  See Treadwell, 593

5     F.3d at 1011 ("Because the Guidelines range was correctly calculated,

6     the district court was entitled to rely on the Guidelines range in

7     determining that there was no 'unwarranted disparity' . . . ."); see

8     also Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of

9     unwarranted disparities was clearly considered by the Sentencing

10    Commission when setting the Sentencing Guidelines ranges.  Since the

11    District Judge correctly calculated and carefully reviewed the

12    Guidelines range, he necessarily gave significant weight and

13    consideration to the need to avoid unwarranted disparities.").

14         Defendant LEE is the first individual defendant to be sentenced

15    in this case.  With respect to the defendants' relative culpability,

16    the indictment in this case distinguishes among defendants based upon

17    culpability.  For example, unlike defendants like Huizar, Esparza,

18    and George Chiang, defendant LEE was charged only with bribery and

19    honest services fraud violations, instead of violations of

20    Racketeering Conspiracy and money laundering.  Similarly, a more

21    culpable defendant like Huizar will face a much higher guidelines

22    range based upon enhancements for the amount of the bribes, engaging

23    in more than one bribe, and being a leader.  Defendant LEE's

24    guideline range appropriately reflects his conduct and role, as well

25    as his lack of acceptance of responsibility.  Indeed, unlike other

26    defendants who paid or received bribes, defendant LEE has never

27    accepted responsibility for his crimes nor expressed any remorse.

28    And unlike many other defendants in this case, defendant LEE has not

                                    30

cooperated, so is not eligible for any reductions to his sentence for substantial assistance.  Thus, defendant LEE cannot be said to be similarly situated to those other defendants.

A below Guidelines sentence here would create unwarranted sentencing disparities, perpetuating notions of a two-tiered system of justice for white-collar defendants.  Tellingly, the USPO provides little justification for its recommendation of 60 months--a striking 37-month downward variance that represents an almost 40% discount from the low-end of the Guidelines range they calculated (97 months).  Indeed, such a recommendation is inconsistent with other corruption sentences for bribery schemes of a similar scope and magnitude.[10]  At best (and the only time the USPO mentions mitigation), the USPO attempts to justify the substantial downward variance by suggesting that the Guidelines fail to account for defendant LEE's "untreated history of alcohol use."  (LEE PSR Ltr. at 6.)  But nothing in the record or defendant LEE's interview suggests that defendant LEE's use of alcohol contributed to his greed-driven, self-serving crimes,

---

[10] See, e.g., United States v. Rezko, No. CR 05-00691-AJS-4 (N.D. Ill. 2011) (businessman and political fundraiser sentenced to 126 months for bribery and fraud; court focused on need for general deterrence at sentencing, saying: "Enough is enough.  Corruption in Illinois has to stop."); United States v. Mangano, No. CR 16-00540-JMA (E.D.N.Y. 2022) (Nassau County Executive sentenced to 12 years in bribery case for accepting five vacations, hardwood flooring, custom-made office chair, massage chair, a watch, and over $450,000 for his wife's no-show job); United States v. Esquenazi, No. CR 09-21010-JEM (S.D. Fla. 2011) (executive sentenced to 15 years for scheme involving $890,000 in bribes paid to officials at a Haitian state-owned telecommunications company); United States v. Toy, No. CR 14-00023-RBS (E.D. Va. 2014) (naval manager sentenced to 96 months for bribery scheme in which he accepted more than $265,000 in cash); United States v. Jument, No. CR 09-00397-HEH (E.D. Va. 2010) (businessman sentenced to 87 months for offering $200,000 in bribes to Panamanian officials for government contracts); United States v. Nuru, No. CR 21-490-WHO (N.D. Cal. 2022) (San Francisco Public Works director sentenced to 84 months for a 12-year bribery scheme).

31

which to this day, defendant has failed to take responsibility for. As such, his continued use of alcohol after suffering a conviction for driving under the influence is, if anything, aggravating, not mitigating.  Moreover, the courts in this district regularly sentence defendants with much more tangible substance abuse issues and facing drug charges to substantial custodial sentences and consistent with the Guidelines.

Put simply, the government sought to avoid disparities in sentencing through its charging of this case and by recommending a sentence within the Guidelines.  The government's recommended near low-end sentence balances the relevant aggravating and mitigating factors and accounts for the various likely dispositions for the other co-defendants in this case.

### 5.   The Court Should Impose the Maximum Fine

In addition to the custodial sentence discussed above, the Court should order defendant LEE to pay the maximum fine permitted by law. PSR ¶ 120.  U.S.S.G. § 5E1.2(a) states that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  The government agrees that defendant LEE has the ability to pay the maximum fine of $750,000 immediately.  The maximum fine here is necessary to promote respect for the law and afford deterrence, especially because defendant LEE used his enormous wealth and access stores of cash to effectuate the crime.

**B.   The Government's Sentencing Recommendation with Respect to Defendant 940 HILL**

When it comes to sentencing, "[c]orporate criminal defendants present a special problem because they cannot be incarcerated."

32

Mitsubishi, 677 F.2d at 788 (upholding sentence requiring corporations to loan executives for one year to a community organization and to contribute of $10,000 for each violation to said organization).  Monetary penalties often offer insufficient deterrence as wealthy or large corporate defendants can "just write a check and walk away."  Id.  For this reason, courts must frequently "adopt 'unique and creative' sentences" when it comes to the punishment of corporate defendants.  United States v. Danilow Pastry Co., 563 F. Supp. 1159, 1166 (S.D.N.Y. 1983) (quoting Mitsubishi, 677 F.2d at 788).

Additionally, 18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary . . . to reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence," and "protect the public from further crimes of the defendant."  In fashioning the sentence, courts must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  USPO's sentencing recommendation, along with the government's additional recommended condition of probation and imposition of the costs of prosecution, meets these goals.

### 1.   The Court Should Impose the Full $1,500,000 Fine

Both the government and USPO recommend a $1,500,000 fine, and nothing less than that full amount should be imposed, which reflects a mere fraction of the $16 to $32 million fine that the Guidelines otherwise recommends based on defendant 940 HILL's culpability.  Due to the operation of the statutory maximum, the $1,500,000 fine is less than 10% of the amount required by the base fine with the

33

minimum multiplier, and less than 5% of the amount required based on the maximum multiplier calculation.

The full $1,500,000 million fine should be imposed, particularly given the seriousness of the conduct at issue and the history and characteristics of the main culpable actor, defendant LEE, as discussed at length above.  The bribery scheme was devised and carried out by defendant LEE, defendant 940 HILL's majority owner and managing partner, and the person who had the highest authority in the LLC and directed other employees and associates acting under his direction.  The minority shareholders trusted defendant LEE with almost unfettered discretion, allowing him to make up to $100 million in expenditures without prior approval.  Of particular aggravation is 940 HILL's false alteration of its accounting and tax records in an effort to conceal the bribe.  That is, when faced with an investigation that would reveal defendants LEE/940 HILL's crimes, defendants chose to obstruct justice by doctoring 940 HILL's accounting and tax records.  Defendant LEE apparently remains a majority shareholder of 940 HILL and the PSR reveals no information regarding who currently manages the company.  (940 HILL PSR ¶¶ 75-76 (noting that defendant 940 HILL implemented some minimal reforms relating to the transfer of third party funds and discretionary spending by defendant LEE.)

Importantly, by paying the bribe to circumvent normal City processes, defendant 940 HILL stood to save tens of millions by avoiding a protracted fight with the labor union, make tens of millions by merely entitling the Property (if it chose to sell the Property after entitlement), and make scores of millions more once the Property was developed (if it chose not to sell the Property

after entitlement).  The maximum fine reflects a significant sanction but one that is a mere fraction of defendant LEE's wealth.[11]  (See LEE PSR ¶¶ 149-168.)  In light of these aggravating facts, a fine of $1,500,000 is warranted.

The imposition of the maximum fine of $1,500,000 will not result in unwarranted sentencing disparities, rather the fine is justified by the unique circumstances of this case which include the presence of significant aggravating factors outline above.  The Court previously imposed a fine of $4,000,000 on defendant SZNW.  While defendant SZNW paid a stream of benefits over a prolonged period, which is aggravating, but that aggravating conduct is reflected in the higher fine imposed.  Moreover, defendant SZNW did not engage in obstruction of justice through falsification of its records, as did defendant 940 HILL.  Similarly, imposing the maximum fine here would not create sentencing disparities with other corporations, like Hazens and Carmel Partners, with which the government entered into non-prosecution agreements and negotiated fines of $1,050,000 and $1,200,000, respectively.  As a preliminary matter, the fine recommended here is only marginally higher than those fines.  Further, defendant 940 HILL is not similarly situated to Hazens or Carmel Partners for several reasons.  First, Hazens and Carmel Partners cooperated with the government while defendant 940 HILL did not and proceeded to trial.  Second, neither Hazens nor Carmel Partners obstructed justice by falsely altering their records in response to the government's investigation Accordingly, a maximum fine of $1,500,000 reflects not only the seriousness of the offense

---

[11] The government understands that defendant LEE intends to pay fully any bribe imposed on defendant 940 HILL.

1  but also promotes respect for the law and provides just punishment

2  for the offense and also affords deterrence to criminal conduct.

3        2.    The Court Should Impose a Five-Year Term of Probation

4  USPO's recommended five-year term of probation should be

5  imposed.  A five-year term of probation is appropriate and necessary

6  in this case to ensure changes are made and maintained within the

7  organization to reduce the likelihood of future criminal conduct and

8  accomplish the goals of sentencing under 18 U.S.C. § 3553(a).  See

9  U.S.S.G. § 8D1.1.

10  Likewise, the probation conditions identified in the PSR are

11  reasonably related, and in fact necessary, to address the § 3553(a)

12  factors.  Courts have "broad discretion in setting probation

13  conditions," United States v. Lowe, 654 F.2d 562, 567 (9th Cir.

14  1981), so long as they "are reasonably related to the factors"

15  identified above, 18 U.S.C. § 3563(b).  The government joins in all

16  of USPO's recommended terms and conditions (Conditions 1-17), as set

17  forth in its recommendation letter.  (CR 1024 ("940 HILL PSR Ltr.")

18  at 1-3.)  The government provides its position, explanation, and

19  expansion on certain of these conditions below.

20        a.    Publication (Condition 13)

21  As a condition of probation, "The defendant organization shall

22  publicize the nature of the offense committed, the fact of

23  conviction, the nature of the punishment imposed, and the steps that

24  will be taken to prevent the recurrence of similar offenses, in the

25  Los Angeles (L.A.) Times."  (940 HILL PSR Ltr. at 3.)  The government

26  strongly supports Condition 13, which requires 940 HILL to notify the

27  public of its criminal behavior, what it was convicted of, and

28  changes made within the organization to reduce the likelihood of

1  future criminal conduct and negligence.  (940 HILL PSR Ltr. at 3.)

2  The USPO's proposed content of the notification and designation of a

3  publication that is widely read (the L.A. Times)[12] are important to

4  achieve the goals of sentencing.  A statement from the company

5  itself, as opposed to media coverage of the proceedings (which are

6  unlikely to cover the last category prescribed), serves to promote

7  respect for the law and specific and general deterrence.

8              *b.  Compliance and Ethics Program (Conditions 13-14)*

9       The Court has discretion to order a defendant organization to

10 develop and submit an effective compliance and ethics program that

11 would require the defendant 940 HILL to exercise due diligence to

12 prevent and detect criminal conduct and to promote an organizational

13 culture that encourages ethical conduct and a commitment to

14 compliance with the law.  U.S.S.G. §§ 8B2.1, 8D1.4.

15      The government joins USPO's recommendation for defendant 940

16 HILL to develop and submit to the Court an effective compliance and

17 ethics program (Condition 13) and, once approved, to provide notice

18 of the program and its criminal behavior to its shareholders

19 (Condition 14).  (940 HILL PSR Ltr. at 3.)  To this end, the

20 government has submitted as Attachment A hereto, which are general

21 guidelines for the program.

22      The establishment of an effective compliance and ethics program

23 is an indispensable component of defendant 940 HILL's probationary

24 sentence.  Here, defendant 940 HILL's criminal conduct was

25

26      [12] The government recognizes that in lieu of ordering defendant
   SZNW to publicize its offenses in a newspaper, the Court ordered it
27 to publicize the information on its publicly searchable company
   website.  Here, however, 940 HILL does not have such public website.
28 In light of that, publication in a widely read newspaper is an
   appropriate alternative.

facilitated by its managing shareholder and employees and agents working at his direction.  Although the company made some minor changes relating to payments to third parties following the charges in this matter (940 HILL PSR ¶¶ 75-76), a compliance and ethics program is necessary to prevent further criminal conduct.  (940 HILL PSR ¶ 40.)  To the extent defendant 940 HILL continues its operations, the implementation of a compliance program also sends the much-needed message to the residents and other businesses of Los Angeles that 940 HILL now abides by the law and operates on an even playing field.

<em>c.   Submissions Regarding Financial Information<br>(Conditions 4, 16, 17)</em>

For many of the foregoing reasons, the government joins USPO's recommendation of conditions requiring defendant 940 HILL to submit information relating to its finances and to submit to a reasonable number of examinations of its books (Conditions 4, 16, 17).  (See 940 HILL PSR Ltr. at 2, 3); see also U.S.S.G. § 8D1.4(b) (recommending these financial information conditions when appropriate).  The government agrees with the USPO that these conditions are "needed to give the Probation Officer the ability to monitor business activities to prevent further fraud and bribery from reoccurring."  (940 HILL PSR Ltr. at 5.)

The reasonable monitoring of defendant 940 HILL's finances is particularly necessary and appropriate here because defendant 940 HILL falsely altered its accounting and tax records in an effort to paper over the bribe paid to Huizar.  During defendant 940 HILL's probationary period, these conditions will provide oversight by USPO of any potential malfeasance or improper use of 940 HILL's finances.

The conditions also obligate defendant 940 HILL to be accountable to USPO, based on the knowledge that USPO will periodically review its finances and records (and will have the ability to review and query its finances and records).  These conditions will serve to prevent and deter defendant 940 HILL from misusing or diverting any of its funds for criminal purposes, consistent with the goals of § 3553(a).

### 3.   The Court Should Impose the Costs of Prosecution

Pursuant to 28 U.S.C. § 1918, the court may order the defendant company to pay the costs of prosecution.  See U.S.S.G. § 8E1.3; United States v. Patel, 762 F.2d 784, 795-96 (9th Cir. 1985).  The court has discretion to award costs and determine the appropriate amount, as long as the items of cost are authorized by the statutes and are imposed only on non-indigent defendants in a non-discriminatory manner.  United States v. Gering, 716 F.2d 615, 626 (9th Cir. 1983)  This is true even if the defendant is convicted under a substantive criminal statute that does not specifically authorize an award of the costs of prosecution.  Id. (collecting cases).  As the Ninth Circuit stated in United States v. Bussell, 504 F.3d 956 (9th Cir. 2007), the government need not establish that the costs were reasonable and necessary.  Id. at 968.

The Court previously held that Local Rule 54-3, which governs items taxable as costs in civil cases, further constrains the imposition of costs here.  Local Criminal Rule 57-1 provides that, when applicable, directly or by analogy, the Local Civil Rules of the Central District of California shall govern the conduct of criminal proceedings before the District Court, unless otherwise specified.  L. Cr. R. 57-1.  In light of this, the Court held that the following costs were taxable: (1) transcripts of the court hearings and trial

39

proceedings directly related to the defendant; (2) interpretation services provided in any court proceedings; and (3) witness costs, including travel.  05/12/23 Hr'g Tr. at 27-35.

The government's prosecution of this complex, contested matter necessitated the expenditure of significant government resources. The government is gathering a final accounting of itemized costs relating to defendant 940 HILL, consistent with Local Civil Rule 54-3 and the Court's prior order on this issue, and will submit a bill of costs at least two weeks before the sentencing hearing (on or before July 7).

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court sentence (1) defendant LEE to (a) 84 months' imprisonment; (b) a three-year term of supervised release; (c) the maximum fine of $750,000; and (d) a special assessment of $300; and (2) defendant 940 HILL to (a) a $1,500,000 fine; (b) a 5-year term of probation with all the terms and conditions set forth in the 940 HILL PSR Letter; (c) the mandatory special assessment of $1,200; and (c) an order to pay the costs of prosecution pursuant to 28 U.S.C. § 1918(b) and Local Civil Rule 54-3, as reflected in the government's forthcoming bill of costs.

**ATTACHMENT A**

Based on defendant 940 HILL, LLC's (referred to below as "the Company") conduct, the government requests at least the following specific terms be mandated by the Court-ordered compliance and ethics program:

**A.   Policies and Procedures**

The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-bribery/anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support compliance by personnel at all levels and locations of the Company.  These anti-bribery/anticorruption policies and procedures shall apply to all executives, directors, officers, and employees regardless of location.  It shall also apply to other current and future affiliates of the Company.  The Company shall notify all members and any employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.  Such policies and procedures shall address (with particular focus on public and elected officials):

(a) gifts;

(b) hospitality, entertainment, and expenses;

(c) customer travel;

(d) political contributions to individuals and Political Action Committees (including prohibitions on conduit and foreign national contributions);

(e) charitable donations and sponsorships;

(f) facilitation payments; and

(g) solicitation and extortion.

**B.   Proper Oversight and Independence**

The Company will designate an officer or employee to serve as the Company's Chief Compliance Officer for the implementation and oversight of the Company's anti-bribery/anticorruption compliance code, policies, and procedures, including for guidance and advice about compliance with such code, policies, and procedures.  The Chief Compliance Officer shall have direct reporting obligations to independent monitoring bodies and shall have an adequate level of autonomy from management, as well as sufficient resources and authority to maintain such autonomy.

**C.   Training and Guidance**

The Company will implement mechanisms designed to ensure that its anti-bribery/anticorruption compliance code, policies, and procedures are effectively communicated to all executives, directors, officers, employees, and, when necessary and appropriate, agents and business partners.  These mechanisms shall include periodic training for the following employees:

(a) all executives, directors, and officers;

(b) all employees in positions of leadership or trust;

(c) all employees in positions that require such training, such as corporate, community, government and congressional affairs, internal audit, accounting, sales, real estate, legal, compliance, and finance; and

(d) employees of agents and business partners in the above positions, when necessary and appropriate.

The Company will also require that all people in the above-described categories annually certify that they have received

the necessary training and have complied with the law and the
Company's anti-bribery/anti-corruption compliance code,
policies, and procedures.

    **D.   Internal Reporting and Investigation**

The Company will maintain, or when necessary, establish, an
effective system for internal reporting and, when possible,
confidential reporting by, executives, directors, officers,
employees, and, when appropriate, agents and business partners
concerning violations of the anti-bribery/anticorruption laws or
the Company's anti-bribery/anti-corruption compliance code,
policies, and procedures.  The Company will maintain, or when
necessary, establish, mechanisms to prevent any personnel action
from being taken against any individual making such a report.

The Company will also maintain, or when necessary,
establish, an effective and reliable process with sufficient
resources for responding to, investigating, and documenting
allegations of violations of the anti-bribery/anti-corruption
laws or the Company's anti-bribery/anti-corruption compliance
code, policies, and procedures.

    **E.   Enforcement and Discipline**

The Company will implement mechanisms designed to
effectively enforce its compliance code, policies, and
procedures, including appropriately incentivizing compliance,
disciplining violations, and re-assessing its compliance code,
policies, and procedures to identify modifications necessary to
ensure that the overall anti-bribery/anti-corruption compliance
program is effective.  Such procedures should be applied
consistently and fairly, regardless of the position held by, or

perceived importance of, the executive, director, officer, or employee.  The Company shall implement procedures to ensure that, when misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct and to ensure that appropriate steps are taken to prevent further similar misconduct.

### F.    Third-Party Relationships

The Company will institute risk-based due diligence and compliance requirements pertaining to the retention and oversight of agents and business partners, including:

(a) conducting properly documented due diligence pertaining to the hiring, and appropriate and regular oversight of, agents and business partners;

(b) informing agents and business partners of the Company's commitment to abiding by anti-bribery/anti-corruption laws, and of the Company's anti-bribery/anticorruption compliance code, policies, and procedures; and

(c) seeking a reciprocal commitment from agents and business partners.