Ariel A. Neuman - State Bar No. 241594
    aneuman@birdmarella.com
Ray S. Seilie - State Bar No. 277747
    rseilie@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendants 940 Hill, LLC
and Dae Yong Lee

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,, | CASE NO. 20-CR-0326-JFW |
| Plaintiff, | **DEFENDANTS DAE YONG LEE AND 940 HILL, LLC'S CONSOLIDATED RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION** |
| vs. | |
| JOSE LUIS HUIZAR, et al., | |
| Defendant. | Date:    July 21, 2023<br>Time:    8:00 a.m.<br>Place:   Courtroom 7A |
| | Assigned to Hon. John F. Walter |

3876671.6

# **TABLE OF CONTENTS**

**Page**

INDEX OF EXHIBITS ................................................................................................ 4

I.     INTRODUCTION ............................................................................................ 5

II.    MR. LEE'S RESPONSE TO GOVERNMENT'S SENTENCING
       POSITION ......................................................................................................... 5

       A.     The Government's Demand for a Within-Guidelines Sentence
              Would Create Unwarranted Sentencing Disparities In This Case ......... 5

       B.     The Government's 84-Month Sentencing Recommendation
              Would Create Unwarranted Disparities With Far More Culpable
              Defendants Nationwide .......................................................................... 8

       C.     Mr. Lee's Recommended Sentence Is "No Greater than
              Necessary" to Promote Deterrence ...................................................... 12

       D.     The Government's Disparate Approach to Mr. Lee Would
              Impose An Unconstitutional Penalty on Mr. Lee for Exercising
              His Right to Trial ................................................................................. 13

       E.     The Government's Position is Based on Mischaracterizations of
              the History and Characteristics of the Defendant and Nature and
              Circumstances of the Offense .............................................................. 14

              1.     Mr. Lee Was Not The Driving Force Behind the Bribe
                     Payment .................................................................................... 14

              2.     Mr. Lee Did Not Seek to Convince Justin Kim to Lie to
                     the Government ........................................................................ 18

III.   940 HILL'S RESPONSE TO GOVERNMENT SENTENCING
       POSITION ....................................................................................................... 20

       A.     The Government's Proposed Fine Fails to Engage With Section
              3553(a)'s "No Greater than Necessary" Requirement .......................... 20

       B.     The Proposed Publication and Compliance Plan Conditions of
              Probation Make No Sense for a Holding Company Like 940 Hill ....... 21

IV.    CONCLUSION .............................................................................................. 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*United States v. Esparza,*
    No. 20-cr-00208-JFW (May 27, 2020) ................................................. 8

*United States v. Esquenazi*
    Case No. 09-cr-21010-JEM (S.D. Fla. Dec. 8, 2009) ....................................... 11

*United States v. Hernandez,*
    894 F.3d 1104 (9th Cir. 2018) ................................................................ 14

*United States v. Jumet*
    Case No. 09-cr-00397-HEH (Mar. 12, 2010) ............................................ 13

*United States v. Kim,*
    No. 20-cr-00154 (Mar. 19, 2020) .......................................................... 8

*United States v. Mangano*
    Case No. 2:16-cr-00540-JMA (Mar. 10, 2022) .................................... 11

*United States v. Nuru*
    Case No. 21-cr-00490-WHO (Aug. 18, 2022) .................................... 12

*United States v. Rezko,*
    Case No. 1:05-cr-00691 (Nov. 3, 2011) ........................................... 11

*United States v. Silver,*
    No. 15-cr-00093 (S.D.N.Y. July 30, 2018) ....................................... 10

*United States v. Toy*
    Case No. 2:14-cr-00023-RBS (E.D. Va. June 13, 2014) ................................. 12

**Federal Statutes**

18 U.S.C. § 3553(a), *et. seq.* ................................................................. 6, 10, 13, 21

U.S.S.G. ch. 5, pt. A ............................................................................ 7, 8

U.S.S.G. § 3E1.1 ................................................................................. 14

1

**INDEX OF EXHIBITS**

| Ex. # | Description |
|-------|-------------|
| 1. | Cited Excerpts of Trial Transcript |
| 2. | Trial Exhibit 88 |
| 3. | Trial Exhibit 118A |
| 4. | Trial Exhibit 119A |
| 5. | Trial Exhibit 119C |
| 6. | Trial Exhibit 118B |
| 7. | Trial Exhibit 119E |

## I.   INTRODUCTION

Mr. Lee and 940 Hill respectfully submit their responses to the government's sentencing briefs. They use this filing to respond to specific issues presented by the government's sentencing position without repeating points and arguments made in their initial filings. This filing largely addresses the sentencing disparities that would result from following the government's recommendations and rebuts certain factual assertions made by the government that it uses to stretch Mr. Lee's conduct beyond the evidence. Mr. Lee emphasizes that his efforts to address these assertions are not meant to diminish the seriousness of the offenses for which he was convicted or the remorse with which he approaches this Court for sentencing. Rather, the effort is meant to ensure that Mr. Lee is sentenced based on the conduct for which he was actually convicted, which he has acknowledged was a serious mistake worthy of punishment. There is no need to stretch the evidence to inaccurately depict him as a criminal mastermind or witness tamperer, as the government suggests, in order to reach the appropriate sentence in this case. Nor is there a need to impose on 940 Hill conditions which would not be rationally related to its operations and structure.

Mr. Lee and 940 Hill submit that the sentences that they have recommended appropriately and adequately address the factors set forth in 18 U.S.C. § 3553(a), and respectfully request that the Court impose the sentences set forth in their sentencing briefs.

## II.   MR. LEE'S RESPONSE TO GOVERNMENT'S SENTENCING POSITION

### A.   The Government's Demand for a Within-Guidelines Sentence Would Create Unwarranted Sentencing Disparities In This Case

The government asks the Court to impose on Mr. Lee an extraordinary seven-year prison sentence, arriving at that recommendation largely because it is within

1 the applicable Guidelines range.[1] In doing so, the government inexplicably singles

2 out Mr. Lee as the only individual in this case for whom it believes that a within-

3 Guidelines sentence is appropriate or necessary. Even as to Jose Huizar, the corrupt

4 center of a years-long RICO conspiracy, the government has already agreed that a

5 sentence well below the applicable Guidelines range is "appropriate." Dkt. 910 at

6 14. Indeed, the government's position as to Mr. Lee is inconsistent not only with the

7 positions it has taken in this prosecution, but with positions that it and other courts

8 have taken in cases involving the most corrupt politicians nationwide. While the

9 government ignores the disparity that would result from its recommended sentence,

10 the Court should not.

11      The specific disparity between the government's approaches to Mr. Lee's and

12 Huizar's respective sentencings is striking. The government's plea agreement with

13 Huizar has an agreed-upon offense level of 39. *See* Dkt. 910 at 14. The Guidelines

14 range for such an offense (assuming no criminal history) is 262 to 327 months. *See*

15 U.S.S.G. ch. 5, pt. A. Yet the government agreed that "an appropriate disposition"

16 of the case would involve a sentence of between 108 and 156 months' custody. Dkt.

17 910 at 14. Thus as to Huizar—the center around which all corruption for all

18 defendants swirled—the government agrees that a sentence *13 years less than the

19 low end of the applicable Guidelines range* is "appropriate."[2] In light of that

20 position, the government's insistence as to Mr. Lee that "Guidelines sentences are

21 imperative in this case," Dkt. 1086 ("Gov't. Br.") at 3, is inexplicable. Indeed, the

22 government makes no effort to explain why Mr. Lee must be sentenced at a mid-

24 [1]   Although the government characterizes its recommendation as "toward the low-
25 end of the Sentencing Guidelines range," Gov't. Br. at 3, it is actually six months
26 more than the Guidelines-recommended minimum and is effectively a mid-range
sentence.

27 [2]   Even the high end of the government's "appropriate" range is almost nine years
28 less than the *low end* of the Guidelines range.

point in his Guidelines range while an "appropriate" sentence for the most culpable defendant includes such a significant reduction from the applicable Guidelines range.

The government's position as to other individual defendants in this case only confirms the government's disparate approach to Mr. Lee. The appellate waiver provisions in George Esparza's and Justin Kim's respective plea agreements—which typically denote the highest potential sentence the government expects to potentially recommend—are telling. Esparza's plea agreement provides for a baseline offense level of 32, which provides for a Guidelines range of 121 to 151 months (assuming no criminal history). *See* Plea Agreement, Dkt. 9, *United States v. Esparza*, No. 20-cr-00208-JFW (May 27, 2020) ("Esparza Plea Agreement") at ¶ 14; U.S.S.G. ch. 5, pt. A. Yet the government only required Esparza to waive his right to appeal if he receives a sentence exceeding 87 months, nearly 30 percent lower than the Guidelines minimum. Esparza Plea Agreement ¶ 19. Likewise, Kim's plea agreement specifies a baseline offense level of 28, which implies a Guidelines range of 78 to 97 months (assuming no criminal history). *See* Plea Agreement, Dkt. 7, *United States v. Kim*, No. 20-cr-00154 (Mar. 19, 2020) at ¶ 14. His appellate waiver is limited to sentences below 57 months. *Id.* ¶ 19. Although the maximum sentence for an appellate waiver is obviously different from a formal sentencing recommendation, it is difficult to reconcile these lower appellate-waiver limits with the government's contention as to Mr. Lee that Guidelines sentences are "imperative in this case." And the answer cannot be that these two defendants cooperated: as both defendants testified in this case, neither of them received any kind of promise about what kind of sentencing recommendation they would receive from the government. Ex. 1 ("Trial Tr.") (Kim) at 1530:6–9; *id.* (Esparza) at 1083:16–21. Thus, these appellate waiver limits appear to reflect the highest sentence the government expected it would consider appropriate, without taking either defendant's cooperation into consideration.

The government's position as to Mr. Lee is purportedly driven in part by a professed concern about "well-heeled" defendants being sentenced to terms of incarceration outside the Guidelines range as compared to defendants of lesser means. Gov't Br. at 17. But the correct disparity analysis is whether defendants convicted of the *same or similar* offenses are sentenced consistently, which is exactly the analysis presented in Mr. Lee's and 940 Hill's sentencing positions. The government's position in this regard is thus not only based on a flawed premise, but it is also not supported by evidence: the government offers no evidence that a poor defendant would receive a Guidelines sentence in this case (and in fact has agreed that a below-Guidelines sentence is "appropriate" for Huizar, who is represented by the Federal Public Defenders). Rather, its position appears to be based on a desire to *punish* Mr. Lee because he has earned financial success.[3] This is not, as the government contends, consistent with the Constitution or the statutory goals of sentencing. Rather, Mr. Lee should be evaluated in the context of other defendants who have committed the same or similar offenses. It is for that reason that Mr. Lee's sentencing memorandum points to the government's position as to other defendants in this case, and presents statistics published by the Sentencing Commission to demonstrate that a sentence anywhere near the Guidelines range would result in a significant disparity relative to sentences imposed in other corruption cases. *See* Dkt. 1083 at 29–31.

**B.    The Government's 84-Month Sentencing Recommendation Would Create Unwarranted Disparities With Far More Culpable Defendants Nationwide**

The government's proposed seven-year sentence is also inappropriate when

---

[3]    The government's insistence that the Court follow the Guidelines goes out the window when it comes to a fine for Mr. Lee, where the government requests a fine *2.5 times higher* than the top end of the Guidelines range of $30,000 to $300,000.

compared with sentences received by some of the most corrupt politicians in the nation's recent history. Appropriately, the elected officials at the heart of public corruption schemes generally face the most onerous sentences given that *they* are the defendants who are empowered by the public's trust. Nonetheless, as detailed further in Mr. Lee's sentencing memorandum, Dkt. 1083 at 27–29, some of the most prominent architects of the worst corruption schemes in recent years have received far shorter sentences that what the government is demanding here, all of which involved significant departures from the applicable Guidelines ranges: 24 months for the former governor of Virginia who accepted a series of bribes from a business in exchange for promoting its products; 21 months for a San Diego city councilman who accepted money to repeal public health legislation; 60 months for the former chair of the Ohio Republican party for facilitating a bribery scheme; and 51 months for the corrupt former majority leader of the New York state senate after he was convicted twice. *Id.* Indeed, as recently as June 2023, the government recommended—and the court imposed—a sentence 75 percent lower than the applicable Guidelines range for the former chair of the Ohio Republican Party who was convicted of racketeering activity. *See* Dkt. 1083-13 (Exhibit 13 to Lee Sentencing Memorandum).

The seven-year sentence that the government is requesting for Mr. Lee is the same as was imposed on *Sheldon Silver*, a New York state assembly member who was convicted after two jury trials of running a bribery and extortion scheme that netted *$5 million*. *See* Dkt. 450, *United States v. Silver*, No. 15-cr-00093 (S.D.N.Y. July 30, 2018). The two defendants are not comparable. It would be inconsistent with the mandates of § 3553(a)(6) to impose a seven-year sentence on Mr. Lee, when some of the most prominent politicians to have been convicted of far more extensive corruption involving much more money have received lower sentences.

The government attempts to wave away these obvious disparities by claiming that its recommendation matches "other corruption sentences for bribery schemes of

a similar scope and magnitude." Gov't Br. at 31 & n.10. But it is simply false to describe the cases cited by the government as involving "a similar scope and magnitude" to the offenses here. To the contrary, those cases each involve either offenses that were far larger in scale or defendants who were in far more culpable positions, and even then most of the sentences fell below the applicable Guidelines ranges. Among the cases the government points to:

- *United States v. Rezko* involved a defendant convicted of 16 counts of fraud, bribery, and money laundering based on the operation of an extensive bribery scheme through disgraced former Illinois governor Rod Blagojevich's office. Dkt. 739, *United States v. Rezko*, Case No. 1:05-cr-00691 (Nov. 3, 2011). The intended loss amount was "between $7 million and $20 million," and the Guidelines range was 188 to 235 months. *Id.* at 39. The government asked for a below-Guidelines 11-to-15-year sentence (i.e., 132 to 180 months), *id.* at 48, and the court imposed a below-Guidelines 10.5 year sentence, *id.* Dkt. 745. Thus, the *Rezko* case only demonstrates that even with a much larger sprawling bribery scheme, the government and the court did not find a within-Guidelines sentence appropriate.

- *United States v. Mangano* also involved a much larger corruption scheme and a more culpable defendant who received a below-Guidelines sentence: the former top elected official in Nassau County who was convicted of bribery, honest services fraud, and obstruction of justice. Dkt. 463, Case No. 2:16-cr-00540-JMA (Mar. 10, 2022). In his Guidelines calculation, the defendant received a *20-point enhancement* for a loss amount in excess of $9.5 million. *Id.* at 4. The defendant's overall offense level was 45, *id.*, yielding a Guidelines prison term of life imprisonment. Nonetheless, with a much more culpable defendant whose bribes totaled nearly ten times the amount at issue in this case, the government recommended a below-Guidelines sentence of 210 months. *Id.* at 25. The court ultimately imposed a sentence that was more than five years lower: 144 months. *Id.*, Dkt. 471 at 3.

- *United States v. Esquenazi* is another case whose scale dwarfs this one, yet still undermines the government's insistence on a Guidelines sentence for Mr. Lee. There, the defendant was one of many indicted for a broad conspiracy to bribe Haitian government officials to bilk public funds from the island nation. Dkt. 3, Case No. 09-cr-21010-JEM (S.D. Fla. Dec. 8, 2009). He was

convicted on 21 counts for Foreign Corrupt Practices Act violations, wire fraud, and money laundering. *Id.*, Dkt. 522. The defendant testified at trial for four straight days before he was convicted. *Id.*, Dkt. 646 at 58:10–21. The amount at issue was $2.2 million (the amount he was ordered to pay in restitution). *Id.*, Dkt. 646 at 68:2–5. While many of the court records are sealed, the sentencing transcript reveals that the court ultimately sentenced him to 180 months in prison, which was "below the low end of the advisory guideline range." *Id.* at 67:10–13.

- *United States v. Nuru* also involves a defendant who was a corrupt public official, not a private individual. In his capacity as a Director of San Francisco Public Works, Nuru "used [his] power and influence to shake down multiple City contractors for money and other benefits. After he was arrested, he tipped off numerous individuals to the government's investigation and then lied about that fact to the FBI." Dkt. 111, Case No. 21-cr-00490-WHO (Aug. 18, 2022). The offense level was 33, yielding a Guidelines range of 135 to 168 months. *Id.* Once again, the government asked for a below-Guidelines sentence of 108 months. *Id.* at 6. The court went even further below the Guidelines, ultimately sentencing the defendant to 84 months. *Id.*, Dkt. 125. Here again, there is a significant qualitative difference between the nature of Nuru's crime and the charges against Mr. Lee.

- In *United States v. Toy*, the defendant was sentenced to 96 months in custody for playing a central role in a bribery scheme involving contracts for a branch of the U.S. military. Specifically, the defendant was a program manager for the U.S. Navy who participated in "an extensive bribery scheme that spanned four years, involved multiple co-conspirators, including two different companies, and resulted in hundreds of thousands of dollars in cash bribe payments." Dkt. 23, Case No. 2:14-cr-00023-RBS (E.D. Va. June 13, 2014). In addition to enhancements based on the amount of money he received, the government also sought a 4-level offense level enhancement for the fact that he was a "public official in a high-level decision-making or sensitive position." *Id.*, Dkt. 18, at 2–4. While this defendant was sentenced within the Guidelines range, *id.*, Dkt. 36 at 27, nothing about this case is comparable to Mr. Lee's: in *Toy*, the defendant was at the center of the scheme and the recipient of the bribe. Because he was working for the U.S. Navy, his acts potentially endangered the entire nation's security. The gravity of the offense and the position of the offender render the circumstances in *Toy* readily

1    distinguishable from those here.[4]

2       In sum, the cases on which the government relies to support its request for an

3    84-month sentence each involve criminal activity much more serious than what was

4    presented here because of the nature and circumstances of the offense, the

5    culpability of the individuals, or both. Yet even then, *most of those sentences were*

6    *well below the Guidelines range*, consistent with the approach advocated by Mr. Lee

7    here and agreed to by the government in the case of Jose Huizar. There is simply no

8    reason to depart from that approach as to Mr. Lee.

9    **C.    Mr. Lee's Recommended Sentence Is "No Greater than Necessary"**

10        **to Promote Deterrence**

11       The government also argues that a seven-year sentence is necessary to further

12   Section 3553(a)(2)'s goal of promoting general deterrence. Gov't Br. at 26–29. But

13   other than reciting general statements about the importance of deterring white-collar

14   offenses, the government fails to explain why an 84-month sentence is "no greater

15   than necessary" to promote deterrence in this case. As detailed in Mr. Lee's

16   sentencing memorandum and above, courts have generally found that lower

17   sentences, including sentences well below the applicable Guidelines ranges, are

18   sufficient to deter actual elected politicians from soliciting, accepting, and extorting

19   bribes in the future. Deterrence for those in Mr. Lee's position will be accomplished

20   with a sentence above the national average for corruption defendants: 19 months in

21   2022, and 17 months since 1996. Dkt. 1083 at 30. There is an enormous gulf

22   between these averages and the 84-month sentence proposed by the government for

23   Mr. Lee, and the government fails to explain how such a massive increase is "no

24

25   ───────────────
     [4]   The only case cited by the government that remotely resembles this one is *United*
26   *States v. Jumet*, where a non-politician defendant was sentenced to the low-end of
     the applicable Guidelines range after the government requested a mid-range
27   sentence. Dkt. 13 and 20, Case No. 09-cr-00397-HEH (Mar. 12, 2010). In light of
     all the other cases cited by Mr. Lee and the government, however, this is the outlier.
28

greater than necessary" to promote deterrence. The prospect of spending nearly two years in federal custody—coupled with a lifetime of being a federal felon and a very large financial penalty—is more than sufficient to deter others from acceding to bribe demands from politicians in the future.

### D. The Government's Disparate Approach to Mr. Lee Would Impose An Unconstitutional Penalty on Mr. Lee for Exercising His Right to Trial

The only discernable reason for treating Mr. Lee so differently than Huizar, Esparza and Kim in terms of whether a Guidelines sentence is necessary is that they pled guilty while Mr. Lee did not. This would be inappropriate. First, the difference between a defendant convicted at trial and a defendant convicted by guilty plea is baked into each defendant's Guidelines analysis (*see* U.S.S.G. § 3E1.1), and so cannot explain disparities in departures from the applicable Guidelines ranges. Second, of course, a defendant's sentence cannot be based "upon the fact that a defendant refuses to plead guilty and insists on his right to trial." *United States v. Hernandez*, 894 F.3d 1104, 1109-12 (9th Cir. 2018) (quoting *United States v. Ochoa-Gaytan*, 265 F.3d 837, 842 (9th Cir. 2001)). As the Ninth Circuit explained,

> Enhancing a sentence solely because a defendant chooses to go trial risks chilling future criminal defendants from exercising their constitutional rights. And imposing a penalty for asserting a constitutional right heightens the risk that future defendants will plead guilty not to accept responsibility, but to escape the sentencing court's wrath.

*Hernandez*, 894 F.3d at 1112. The government's failure to provide a plausible explanation for its decision to single out Mr. Lee for a within-Guidelines sentence as compared to Huizar and the other defendants in this case raises the specter of unconstitutionally penalizing Mr. Lee for going to trial. When considered in conjunction with the below-Guidelines sentences imposed nationwide, the concern becomes even more pronounced.

E.    **The Government's Position is Based on Mischaracterizations of the History and Characteristics of the Defendant and Nature and Circumstances of the Offense**

In support of its requested sentence, the government paints a picture of Mr. Lee and his conduct that is inconsistent with the evidence. While Mr. Lee's conduct and convictions are grave, his history and characteristics and the nature and circumstances of the offense should not be distorted in service of a lengthier prison sentence. The suggestions that Mr. Lee somehow masterminded the plan for the bribe at issue or had a history of wrongdoing (with respect to Huizar and otherwise) are not based in any evidence or testimony. Nor did Mr. Lee's recorded conversations with Justin Kim demonstrate efforts to falsify Kim's testimony or otherwise obstruct the government investigation. Pointing this out does not diminish the seriousness of Mr. Lee's conduct, but it should be considered as it was.

1.    **Mr. Lee Was Not the Driving Force Behind the Bribe Payment**

The government's portrayal of Mr. Lee as a calculating criminal mastermind who regularly corruptly engaged with the political levers of local government to get what he wanted is directly at odds with the trial record and even the government's own indictment. Mr. Lee was not charged with being part of Huizar's broader pay-to-play conspiracy, and Esparza confirmed that Mr. Lee had no involvement in corrupt activity before the payment at issue here. Trial Tr. (Esparza) at 1111:23–1112:24. Yet the government tries to suggest otherwise when it cites testimony establishing that Huizar's office considered Justin Kim a "friend of the office," asserts that Huizar "tapped these friends of the office" for bribes, and then cites testimony about Kim's success in obtaining *donations* from Mr. Lee. Gov't Br. at 7. The facts were clear at trial that prior to the CREED appeal, Mr. Lee's communications with Huizar's office amounted to nothing more than a political donor's communications with an elected official whom he had supported. Trial Tr.

(Kim) at 1656:13–1657:1; Trial Tr. (Esparza) at 1125:14–1128:15. The requests to the office were for assistance that was appropriate and legal, and Huizar never requested an illegal *quid pro quo* in exchange in response.

The government's misconception of the evidence is demonstrated by its baseless contention that Mr. Lee was trying to "silence community opponents threatening to thwart his attempts to expand his substantial real estate empire." Gov't Br. at 1. In fact, the community and city were fully behind the 940 Hill project, as demonstrated in Mr. Lee's and 940 Hill's sentencing position and related exhibits. *See* Dkt. 1083 at 18–20; Dkt. 1080 at 9–11. The CREED appeal was without merit and merely an attempt to extort a developer into using union labor. *See* Dkt. 1083 at 20–21. And it was Huizar and Esparza who demanded a bribe to deal with it, not Mr. Lee who sought out the corrupt bargain. *Id.*; *see also* Trial Tr. (Esparza) at 1141:10–16 ("Q. It's not until two days later, January 19, that you go to Huizar's office—or house, excuse me, and you talked about he's picking his feet and he lays out exactly what he wants; right? A. Exactly, yes."); *id.* at 1142:13–20.

Likewise, the government's contention that Mr. Lee was seeking to conceal his dealings with Huizar by going through Kim has no basis in evidence. Indeed, at trial Esparza testified that Kim asked him to "test" Mr. Lee to determine whether Mr. Lee was "loyal" to Kim or willing to deal with Huizar directly. Trial Tr. (Esparza) at 1118:13–1119:17. Mr. Lee *failed* that "test" by expressing a willingness to deal directly with Esparza (and therefore Huizar's office) without going through Kim at all.[5] *Id.* at 1120:14–24.

In fact, it was Kim who kept his relationship with Huizar close in order to

---

[5]    There is also no evidence for the government's contention that Mr. Lee "insist[ed] on discussing matters relating to the bribe in person, rather than on the phone; and avoid[ed] putting anything relating to the bribe in writing." Gov't Br. at 1–2. Nobody testified to that at trial, and the absence of written evidence of the payment does not indicate any deliberate effort by Mr. Lee.

control Mr. Lee's access and maintain personal influence. The only time Kim remembered Mr. Lee and Huizar being in the same room was during the September 2016 karaoke meeting (after a dinner to which Mr. Lee was not invited) that preceded any discussions about a bribe, and which Kim engineered "to show off the relationship that [he was] close with Jose Huizar." Trial Tr. (Kim) at 1674:23–1675:5. Kim and Esparza communicated with Huizar about 940 Hill exclusively outside the presence of Mr. Lee's other associates as well, expressly excluding Mr. Lee and his team from those meetings. Trial Tr. (Kim) at 1684:1–24; Trial Tr. (Esparza) at 1140:13–1141:9. And Kim directly exploited his role as an intermediary when he pocketed cash. Trial Tr. (Kim) at 1725:18–23. Far from being an indication of his status as some kind of criminal mastermind, Mr. Lee's reliance on Justin Kim was entirely of Kim's own design, as a means of preserving and maximizing Kim's ability to control and manipulate Mr. Lee for his own ends.

Moreover, while the government paints a picture of Mr. Lee driving the bribery at issue here, it was, by Esparza's account, Huizar and Esparza who falsely created the appearance that the CREED appeal would be a problem for Mr. Lee. Trial Tr. (Esparza) at 1136:1–1137:23; *id.* at 1140:17–24. It was they, through Justin Kim, who drove the corrupt bargain, conducted the discussions, and made the demands to Mr. Lee. While Mr. Lee ultimately agreed to pay Justin Kim, a decision for which he is deeply remorseful, he certainly was not the driving force behind these arrangements.[6] This is only confirmed by the fact that Esparza got the appeal dismissed by further damaging Mr. Lee's interests, promising CREED that Huizar would support a later, frivolous effort to secure union work on a larger project that

---

[6]   Contrary to the government's argument, Gov't. Br. at 10, it was not even clear that Mr. Lee was the person who suggested cash. While that was Justin Kim's testimony (Trial Tr. (Kim) at 1492:9–11), Esparza's notes from before a bribe was even demanded stated that the payment would have to be in cash, *see* Ex. 2 (Trial Ex. 88) at 3.

Mr. Lee was overseeing. Trial Tr. (Esparza) at 1183:10–1184:9; Gov't Br. at 11. And Kim lied repeatedly to Mr. Lee to obtain more cash payments above and beyond what he had taken out of the portion he gave to Esparza for Huizar. Trial Tr. (Kim) at 1725:18-23.[7]

The government further suggests that Mr. Lee has previously been involved in criminal activity based on the fact that cash from his business was swept up in a series of search warrants conducted in 2014 in the Downtown Los Angeles Fashion District. Gov't Br. at 10 n.3. But as the government acknowledges, Mr. Lee was never charged as part of that sweeping investigation (even though unrelated individuals and entities were), and in a most unusual turn of events, the cash that the government seized was returned to Mr. Lee upon his request. The only thing that series of events shows is that the government cast an overbroad net in its 2014 investigation by stereotyping all Fashion District businesses as potentially linked to criminal activity, leading to the seizure of assets that should not have been seized. The Court should not countenance the government's attempt to re-write history as to Mr. Lee.

Mr. Lee is not seeking to relitigate the trial or to suggest that Mr. Lee's payment to Kim was acceptable—it was wrong. But nothing about the jury's verdict or the trial evidence supports the government's baseless attempt to paint Mr. Lee as the person running this scheme. The sentence that the Court imposes on Mr. Lee should reflect his true history and characteristics, and the accurate nature and circumstances of the offense.

---

[7]   The government also references Kim's testimony that Mr. Lee "immediately got a new phone" after learning that Kim's phone had been seized, as some sort of effort to evade the investigation. Gov't Br. at 16. But Kim admitted this was not true in cross-examination, and that it was he who had obtained a new phone. Trial Tr. (Kim) at 1715:14–1716:8 ("Q. In fact, you were the one with the new number because your phone had been taken; right? A. Yes.").

### 2. Mr. Lee Did Not Seek to Convince Justin Kim to Lie to the Government

The government relies extensively on Mr. Lee's surreptitiously recorded conversations with Justin Kim and cites their contents to argue that Mr. Lee demonstrated a desire to conceal criminal conduct by convincing Justin Kim to lie about their dealings. Gov't Br. at 25. But this again mischaracterizes the evidence to support its excessive sentencing recommendation. If the government believed Mr. Lee had truly sought to tamper with Justin Kim as a witness, he would have been charged with that. Again, while Mr. Lee is not attempting to minimize the conduct in which he actually engaged, the nature and circumstances of the offense should not be stretched into something unsupported by evidence in service of a lengthier custodial sentence.

First, the government wants the Court to interpret Mr. Lee's statements as "exhibit[ing] the demeanor of someone used to government scrutiny of his business practices and someone accustomed to getting away with things." Gov't Br. at 13. While his statements to Kim indicate that Mr. Lee had faced government scrutiny in the past, and that he referenced those incidents to assuage Justin Kim's purported anxieties, there is no evidence that Mr. Lee was "accustomed to getting away with things." The government does not identify a single "thing" that Mr. Lee "got away with" and the government's baseless assertion that he did is improper and should not be considered by the Court.

Worse, the government asserts that during these conversations Mr. Lee attempted to obstruct its investigation by "encourag[ing] Kim to fire his attorney so Kim could change his story to 'match' defendant LEE's story." Gov't Br. at 12. It suggests that he did so because he was "'upset' that Kim had told his attorney the amount of the bribe because it was 'huge.'" *Id.*[8] But in an excerpt of the recorded

---

[8]   This version depends entirely on crediting Justin Kim's testimony (from which

conversation that was not played at trial, it was *Kim* who contemplated the idea of firing his lawyer in order to revise his story and articulate a different payment amount:

> KIM: What I'm saying is … It's my opinion. I think … either go-go and turn myself in, **or get a new lawyer and reduce the *amount*** … The *amount* is too big to erase the the [sic] crime, according to my lawyer.

Ex. 3 (Trial Ex. 118A) at 3. Nowhere in the transcript did Mr. Lee encourage him to do this or agree it was a wise course of action. *See generally id*. Indeed, by the time Kim came to talk to Mr. Lee he had "already told the amount" and "lied" by saying "it was $400,000." Ex. 4 (Trial Ex. 119A); *see also* Ex. 5 (Trial Ex. 119C). There is no basis for the government's suggestion that it was Mr. Lee who encouraged Kim to take these steps.

Lastly, the government claims that Mr. Lee "coached Kim to blame Huizar" when he said, "Now, we were both played by Huizar … Us two … We were played by Huizar … So you would have to blame him." Gov't Br. at 14. Again, this disregards another part of an earlier conversation that was not played at trial. It was *Kim* who first explained to Mr. Lee that Huizar had "played" them both—Mr. Lee was thus repeating the very words that Kim had used previously:

> LEE: You said *union* also gave up.
>
> KIM: Yes. But according to what I-I found out, ***we were played—by George and Councilman Huizar***. [UI] To make money—out of nothing. It was nothing. . . .But I heard they often took advantage if there was a chance.

Ex. 6 (Trial Ex. 118B) at 3 (emphasis added).[9]

---

the government walked away in closing) about an unrecorded meeting that was not contemporaneously documented by anyone and which he only "remembered" years later, and ignoring the subsequently recorded conversation.

[9]   This comment echoes Esparza's testimony that Huizar and Esparza would create

1  The actual transcripts do not establish that Mr. Lee was attempting to

2  manipulate Justin Kim's statements to the government.[10] Mr. Lee's words are best

3  interpreted as not telling Kim to lie, but rather to go meet with the government, tell

4  them what happened and that we were played by Huizar, but tell them what the two

5  had done "because you can't evade the crime." Ex. 7 (Trial Ex. 119E). Thus Mr. Lee

6  was encouraging Kim to go in and incriminate both Mr. Lee and Kim, not to lie.

7  Mr. Lee's obstruction conviction stands as a basis on which to consider his

8  sentence. But that obstructive conduct did not extend to tampering with Justin Kim

9  as a witness in this case.

10  **III.   940 HILL'S RESPONSE TO GOVERNMENT SENTENCING**

11  **POSITION**

12  **A.   The Government's Proposed Fine Fails to Engage With Section**

13  **3553(a)'s "No Greater than Necessary" Requirement.**

14  The government's requested sentence for 940 Hill is similarly based on a

15  largely rote application of the Guidelines without properly engaging with whether

16  such a significant additional sentence is needed to achieve the aims of the

17  sentencing statute. Though the government recognizes that 940 Hill's conviction is

18  based entirely on Mr. Lee's conduct and that he will personally bear the full brunt of

19  any fine the Court imposes on 940 Hill, it fails to grapple with the question that the

20  Court must answer: what additional fine on Mr. Lee is "no greater than necessary"

21  to promote the interests of justice. 940 Hill's sentencing memorandum, together

22  with Mr. Lee's, explains why an effective $2.25 million fine on Mr. Lee is not

23  warranted. The fact that very large fines were imposed on other companies in this

24  

25  _____

26  problems out of nothing to extort developers. Trial Tr. (Esparza) at 925:22–926:5.
   Given the lack of merit to the CREED appeal, that is exactly what happened here.

27  [10]   Acknowledging this does not excuse the offense, but it is relevant to the nature

28  and circumstances.

3876671.6

case is of no moment, as those large companies with diverse real estate portfolios and many employees and levels of management are entirely differently situated than 940 Hill, with its single parcel of property, three owners, and no employees. Even though Mr. Lee is the majority shareholder and manager of the company, those roles with respect to 940 Hill are different from the corresponding role at the other entities. Mr. Lee's role at 940 Hill does not have the same operational significance as a managerial role at a company like Shen Zhen New World, or one of the massive real estate conglomerates with whom the government signed non-prosecution agreements (and for which the government did not prosecute any individuals). Instead, in this instance the fine imposed on Mr. Lee and 940 Hill should be considered in tandem, and a total financial penalty consistent with the sentencing statute's goals should be imposed.

**B.      The Proposed Publication and Compliance Plan Conditions of Probation Make No Sense for a Holding Company Like 940 Hill.**

940 Hill has largely accepted the Probation Office's recommended terms of probation. However, the government's insistence on a publication requirement that the Court already rejected for Shen Zhen New World and an unnecessarily burdensome compliance plan that makes no sense for a holding company without any employees or ongoing public operations does not fully take into account the type of entity that is being sentenced.

As to the "publication" probation condition, 940 Hill explained in its initial sentencing memorandum why it is inappropriate for the same reasons that the Court articulated when it rejected a similar request for Shen Zhen. The fact that 940 Hill does not have a website, as the government points out, only highlights what a small operation this entity really is. Requiring 940 Hill to publish an ad in the *Los Angeles Times* will serve no purpose in light of the extensive publicity this case has already received and will no doubt continue to receive.

As to the compliance program, the government dismisses the plan that 940

1    Hill put in place months ago, and instead asks the Court to impose the boilerplate

2    compliance program contained in its attachment. But that extensive program makes

3    no sense in this case. 940 Hill is an organization with no employees and no

4    operations other than its ownership and maintenance of the 940 Hill property. That

5    fact alone makes many of the government's proposed terms outright inapplicable.

6    For example, there are no "executives, directors, officers, [or] employees" that

7    would require the "periodic training" described in Part C of the proposed

8    compliance plan. Gov't. Br., Attachment A, at ii.

9         And to the extent the government's proposed terms could theoretically be

10   implemented, they would simply create an unnecessary burden on the company's

11   innocent owners without actually doing anything to prevent further offenses. For

12   example, there is no reason for the Court to require the company to hire a new

13   "chief compliance officer" to ensure compliance with the law, especially where 940

14   Hill is not objecting to the other proposed conditions of probation which already

15   require full disclosure of financial activities to the Probation Office and where most

16   transactions are happening under the watchful eye of counsel. *Id.* Nor would it serve

17   any purpose to "maintain, or when necessary, establish, an effective system for

18   internal reporting" given that there are no employees. *Id.*

19        The government does not offer any explanation why the existing compliance

20   program—one fully articulated in the PSR, Dkt. 1025 ¶¶ 75–76—is insufficient to

21   ensure future compliance with all laws. Although the government characterizes the

22   program as implementing "some minimal reforms relating to the transfer of third

23   party funds and discretionary spending by defendant LEE," it fails to identify any

24   specific deficiencies with the program. The compliance plan is directed exactly

25   toward the activities that caused the problems here, and covers essentially all

26   operations of 940 Hill. Given that the company exists for no purpose other than to

27   own and maintain a single property, there is no meaningful threat that a broader

28   compliance program—seemingly designed for more active companies—would

1  actually address.

2  **IV.    CONCLUSION**

3        For these reasons and those set forth in their initial sentencing memoranda,

4  Mr. Lee and 940 Hill respectfully request that the Court (1) impose a custodial

5  sentence on Mr. Lee that does not exceed 20 months; (2) impose a fine that

6  collectively totals $750,000 on Mr. Lee and 940 Hill; (3) reject proposed Probation

7  Condition 13; and (4) order the continued implementation of the compliance

8  program that 940 Hill has already submitted to the Probation Office.

9

10  DATED:  July 7, 2023                    Ariel A. Neuman

11                                           Ray S. Seilie
                                            Bird, Marella, Boxer, Wolpert, Nessim,
12                                           Drooks, Lincenberg & Rhow, P.C.

13

14

15                                   By:  _____

16                                           Ariel A. Neuman
                                            Attorneys for Defendants 940 Hill, LLC
17                                           and Dae Yong Lee

18

19

20

21

22

23

24

25

26

27

28