# EXHIBIT 1

1          Q.     And in your own words, what does a pay-to-play

2     scheme mean to you?

3          A.     Uh, it's -- you're -- you're receiving favorable

4     treatment for, you know, pay-to-play.  So you're asking

11:26AM  5     something in return for a vote or for access.  Yeah.  Yeah,

6     pay-to-play.

7          Q.      In other words, if you pay some type of benefit,

8     you're then allowed to play or get something in return; is that

9     accurate?

11:26AM  10          A.     Yes.

11          Q.     And what types of things would -- and you yourself

12     personally have knowledge about this type of pay-to-play scheme

13     in Council District 14; is that correct?

14          A.     Yes.

11:27AM  15          Q.     How?

16          A.     Can you repeat the question again, please?

17          Q.     How do you know that there was a pay-to-play scheme

18     in Council District 14?

19          A.     Um, because I was the -- because I was the closest

11:27AM  20     confidant to Councilmember Huizar, I was trained by him early

21     on definitely how to establish pay-to-play schemes.

22          One of his -- one of his first rules or trainings

23     was that we need to create -- we need to -- in order to create

24     leverage, we need to create problems that don't even exist so

11:27AM  25     that we could come in and then become a savior of those certain

UNITED STATES DISTRICT COURT

1    problems and solve them, even though they never existed.

2            So he was always -- my training was to size people

3    up as soon as they came into certain -- certain meetings, to

4    see if they would be willing to play.  And it just started off

11:28AM  5    with certain -- certain -- certain requests.

6       Q.    And what types of requests did Councilman Huizar

7    make?

8       A.    Um, well, it just -- it depended on who the -- the

9    stakeholder was.  So if it was a developer with a -- a new

11:28AM  10   hotel, a new housing project, then it would start off very --

11   it would start off very small.

12            So one request was Katy Perry tickets, and anywhere

13   from Katy Perry tickets to golf clubs to sporting events to

14   donations, campaign donations, to hiring certain consultants

11:28AM  15   that were friends of the office to be on certain projects.

16      Q.    I'll stop you there.  We'll put up on the screen

17   Exhibit 133, page 2.

18            Now, you said your boss, Councilman Huizar, trained

19   you on this; is that correct?

11:28AM  20      A.    Yes.

21      Q.    And you just used the term "friends of the office."

22   Is that a term that you used during the time that you worked in

23   Council District 14?

24      A.    Yes.

11:29AM  25      Q.    And you mentioned certain types of benefits that

**UNITED STATES DISTRICT COURT**

1        A       Yes, I did.

2        Q       Did you admit to other conduct in furtherance of

3    the overall pay-to-play scheme that you described for the jury?

4        A       I did.

08:56AM  5        Q       Did you admit in your factual basis that you lied

6    to the FBI in your interviews in the summer of 2017?

7        A       Yes, I did.

8        Q       Did you also admit that you did not disclose

9    those bribes on your Form 700?

08:57AM  10       A       That is correct.

11       Q       Mr. Esparza, do you hope to receive a

12   recommendation from the Government for a lower sentence in

13   exchange for your cooperation?

14       A       Yes.  I'm keeping the faith and trusting in the

08:57AM  15   process that everything will go well.

16       Q       Has the Government made any promises to you about

17   what specific sentence the Government will recommend?

18       A       No.

19       Q       Has anyone made you any promises about what

08:57AM  20   specific sentence you will get?

21       A       No.

22       Q       Who ultimately is going to decide your sentence?

23       A       Judge Walter.

24       Q       Now, after the summer 2017 interviews where you

08:57AM  25   lied to the FBI, did you decide to do anything with the cash

1      Q      Stayed at luxury hotels around the world for

2   free?

3      A      Yes.

4      Q      And you accepted all kinds of things -- fancy

09:35AM  5   meals, booze, spa services, tickets to events, all kinds of

6   gifts, let's call them; right?

7      A      That's correct.

8      Q      And all of that is in exchange for favors for

9   people that they were asking you to do; is that right?

09:35AM  10     A      Yes.

11     Q      You also helped Huizar -- well, you helped a

12   developer funnel $600,000 to Huizar to help him settle a sexual

13   harassment lawsuit; right?

14     A      That is correct.

09:36AM  15     Q      You went through some pretty complicated steps to

16   try to conceal the fact that the money was coming from a

17   Chinese billionaire; right?

18     A      Yes.

19     Q      It involved all kinds of bank loans and lawyers

09:36AM  20   and different kinds of maneuvers to hide what was going on;

21   correct?

22     A      Yes.

23     Q      And all of that stuff, these trips and these

24   gifts and the casino chips and the luxury hotels, everything

09:36AM  25   that had to do with the RICO enterprise, none of that has

1112

```
 1         anything to do with Mr. Lee; right?

 2              A      The trips and --

 3              Q      Everything I just talked about, nothing to do

 4         with Mr. Lee; right?

 5              A      Can you say what you just said right now?

 6              Q      Well, we can keep going.

 7                     You have no reason to think, prior to 2016,

 8         Mr. Lee knew anything about how corrupt you guys were; right?

 9              A      Not that I'm aware of, no.

10              Q      And in 2017 you're personally accepting 8- to

11         $10,000 in cash from some businessman in order to arrange

12         business meetings for him; right?

13              A      That's correct.

14              Q      And you're taking money in the bathroom; right?

15              A      Yes.

16              Q      Part of that is the effort to conceal what you're

17         doing, taking it in the bathroom, trying to hide what's going

18         on; right?

19              A      Yes.

20              Q      Same thing, when you and others traveled to Vegas

21         in 2017 and accepted gifts of hotel rooms, casino chips,

22         drinks, bottle service, Mr. Lee doesn't have anything to do

23         with that; right?

24              A      No.

25              Q      Now, there was another councilman,
```

```
 1    agreed to do so?

 2         A     Not exactly.

 3         Q     Mr. Lee isn't one of these guys who asked for

 4    Katy Perry tickets, was he?

 5         A     No.

 6         Q     You referred to those kinds of asks as a test to

 7    see if the developer was ready to play; right?

 8         A     Correct.

 9         Q     You never had that kind of test with Mr. Lee;

10    right?

11               Well, let me ask you.  You talked about the test.

12    Let's talk about the test you did have.  All right?

13               Justin Kim gave him a different kind of test;

14    right?

15         A     Yes.

16         Q     Right?

17               You testified -- and this is what we were just

18    talking about -- about this telephone conversation you had with

19    Mr. Lee asking for a political donation; right?  Did you hear

20    me?  I guess when I turned --

21         A     I heard you.

22         Q     Political donation; right?

23         A     Yes.

24         Q     And this is before the CREED appeal, nothing to

25    do with the CREED appeal; right?
```

```
 1              A       Yes.

 2              Q       This just sounds like a fundraising call; right?

 3              A       That is correct.

 4              Q       But Justin Kim is secretly listening in, isn't

09:43AM  5      he?

 6              A       Yes.

 7              Q       He wants to do what he calls a loyalty test;

 8      right?

 9              A       Yes.

09:44AM 10              Q       And the idea is to see if Mr. Lee is loyal to

11      Justin Kim or is willing to make a fundraising -- a political

12      donation without going through him; right?

13              A       Yes.

14              Q       That's the purpose of the call; right?

09:44AM 15              A       The purpose was to, yes, see if he was loyal to

16      Justin and also if he would cut Justin out to make a donation,

17      yes.

18              Q       Right.  And you hid the fact that Justin Kim was

19      listening; right?

09:44AM 20              A       Yes.

21              Q       Justin Kim hid the fact that he was listening;

22      right?

23              A       Yes.

24              Q       And he stayed silent the whole time; right?

09:44AM 25              A       He did.
```

1       Q       Didn't want Mr. Lee to know he was on the line;

2   right?

3       A       Correct.

4       Q       He told you not to tell Mr. Lee he was on the

09:44AM   5   phone; right?

6       A       Yes.

7       Q       This is essentially Justin Kim playing a secret

8   trick on Mr. Lee; right?

9       A       I don't know if it was a secret trick, but he --

09:44AM   10      Q       Well, it's a secret.

11      A       Okay.

12      Q       Right?  Is it?

13      A       He didn't know about it so, yeah, it's a secret.

14      Q       And Mr. Lee failed that loyalty test, didn't he?

09:45AM   15   He agreed to make the donation directly; right?

16      A       Yes.

17      Q       He did not say I've got to talk to Justin Kim;

18   right?

19      A       Correct.

09:45AM   20      Q       He didn't do what Justin Kim hoped he would do

21   and say let me talk to Justin Kim; right?

22      A       That is correct.

23      Q       So he failed the loyalty test; right?

24      A       He did.

09:45AM   25      Q       2013 to 2016 we just talked about a little bit.

1    these guys are going to ask me for a bribe; right?

2         A    Correct.

3         Q    If we go to Exhibit 105 and we just scroll --

4    zoom in on the top part, you actually forward it to Shawn Kuk;

09:49AM   5    right?

6         A    Yes.

7         Q    Shawn Kuk is a guy in your office who is not

8    involved in the racketeering conspiracy; right?

9         A    That's correct.

09:49AM  10         Q    So when you sent this to Mr. Kuk, fair to say

11   you're trying to see if there's a way you can help out your

12   friend Justin Kim with one of his big clients; right?

13         A    Correct.

14         Q    Now, he had -- we talked about it and I asked you

09:50AM  15   and you said you weren't sure.  But he did actually ask you

16   previously for favors related to 940 Hill.  Do you remember

17   that or no?

18         A    Refresh my memory.

19         Q    Sure.

09:50AM  20              Why don't we show you Exhibit 102.  If you want,

21   it is in a binder next to you, Mr. Esparza, but it's going to

22   be on the screen.

23         A    Okay.

24         Q    This is an e-mail from Justin Kim to you in July

09:50AM  25   of 2016, so two months before the CREED appeal, forwarding to

```
 1    you information about the TFAR payment related to 940 Hill;
 2    right?
 3         A      Yes.
 4         Q      And you helped him with this without any demand
 5    for payment; correct?
 6         A      I don't remember exactly what we did for -- how
 7    we helped him.
 8         Q      Do you remember helping him get meetings with the
 9    office?
10         A      Yeah.  I helped him get meetings with the office.
11         Q      Right.  And you didn't charge him for that;
12    right?
13         A      No.
14         Q      All right.  Let's put up Exhibit 34.
15                This is his request to you for your help with a
16    letter of support for 940 Hill to be considered an EB-5
17    development project.  Do you remember that now, looking at
18    this?
19         A      I don't remember exactly that.
20         Q      But you see it in front of you?
21         A      I see it in front of me.  I just don't remember
22    the specifics.
23         Q      This is August 2015; right?
24         A      Yes.
25         Q      And EB-5 development project is just some sort of
```

```
 1   tax benefits that if a project -- we don't need all the
 2   details, but you get -- you get classified as EB-5, there's
 3   certain benefits; right?
 4         A      That's correct.
 5         Q      Okay.  And you say, "Got it, I'll take care of
 6   you."  Do you see that?
 7         A      Yes.  "Take care of this for you."
 8         Q      All right.  And Justin Kim at the top part of
 9   that e-mail forwards it to Mr. Lee, referring him to the e-mail
10   below.
11                When you took care of this for Justin Kim, you
12   didn't ask him for payment; right?
13         A      No.
14         Q      He also asked for your help on 940 Hill regarding
15   the Sign District.  Do you recall that, the Sign, S-i-g-n,
16   Sign District.  Do you recall that, Mr. Esparza?
17         A      Yes.
18         Q      And that meant that the project should be part of
19   the Broadway Sign District so it could have certain lighting on
20   the building; right?
21         A      Yes.
22         Q      You agreed to help him.  You didn't demand any
23   payment for that either, did you?
24         A      It was probably donation -- donation --
25         Q      You don't remember that, do you, Mr. Esparza,
```

09:51AM 5
09:52AM 10
09:52AM 15
09:52AM 20
09:53AM 25

1   that there was a donation in exchange for the Sign District

2   help?

3         A       Oh.  For the Sign District help.  No.

4         Q       All right.  What's going on here that we're

09:53AM  5   seeing in the e-mails is pretty common in the political world;

6   right?  A fundraiser has a client, contacts the guy in the

7   Councilman's office who may be able to get things done, and

8   that guy agrees to help if he can; right?

9         A       Yes.

09:53AM  10        Q       That happens every day; right?

11        A       Every day.

12        Q       That's why people hire someone like Justin Kim,

13   right?  That's what he's going for, to be that consultant who

14   has that access to guys like you; right?

09:53AM  15        A       Correct.

16        Q       The e-mail comes to you in August of 2016 asking

17   for help on the CREED appeal; right?  We just saw that?

18        A       Yes.

19        Q       It's not until a month later that Justin Kim asks

09:54AM  20   Huizar for help on the CREED appeal; correct?

21        A       Correct.

22        Q       This is at that Korean barbecue restaurant you

23   were talking about?

24        A       Yes.

09:54AM  25        Q       That dinner was on September 1, 2016.  Let's put

```
 1              Q        And the plan is to lie to Justin Kim; right?
 2                       You talked about the fact that Huizar -- the plan
 3     was to tell Kim that this is going to take a lot of effort for
 4     Huizar; right?
10:01AM    5    A        Correct.
 6              Q        That wasn't true, was it?  It was actually going
 7     to be fairly easy for Huizar to call Chris Modrzejewski and ask
 8     him to back off; right?  That was your testimony last week,
 9     Mr. Esparza.
10:02AM   10             MS. DRAGALIN:  Objection.  Misstates prior
11     testimony.
12                       THE COURT:  Sustained.
13              Q        BY MR. NEUMAN:  Mr. Esparza, tell us, isn't this
14     one of those situations of creating a problem so that you can
10:02AM   15    solve it?
16              A        Yeah, this was one of those situations where Jose
17     wanted to make sure that they knew the lift that he was doing
18     or the work that he was doing to get this project -- or get the
19     appeal dropped.
10:02AM   20             Q        Right.  And you were supposed to convey that to
21     Justin Kim; right?
22              A        Correct.
23              Q        And that wasn't entirely true, was it, that it
24     was a huge lift for Huizar?
10:02AM   25    A        I guess how you define "huge lift" for him.
```

1  Q      This wasn't a big ask at the end of the day for

2  Jose Huizar to Chris Modrzejewski -- I'm sorry.  This wasn't a

3  big ask in reality for you or Mr. Huizar, to call

4  Chris Modrzejewski and ask him to back off; right?

10:02AM  5  A      I mean, the relationship -- it's kind of a hard

6  question to ask because I'm not sure if other elected officials

7  can make it happen like that or --

8  Q      Not my question.  My question is Jose Huizar.

9       In fact, Huizar had a prior relationship with

10:03AM  10  Chris Modrzejewski.  That's what you've told the Government in

11  the past; right?

12  A      Relationship with Chris Modrzejewski, yes.

13  Q      Right.  And, Mr. Esparza, isn't it the case that

14  Huizar instructed you to tell Kim that the CREED appeal was

10:03AM  15  very difficult to overcome and that it would take some effort

16  on Huizar's part to resolve?  In reality, Huizar had a

17  relationship with Chris Modrzejewski and it would not be a hard

18  ask for CREED to withdraw this appeal.  That's what you told

19  the Government; right?

10:04AM  20  A      Correct.

21  Q      And as we said, this is all part of the game;

22  right?  Lie to people and create problems to get money; right?

23  A      That's correct.

24  Q      And even if it's your good friend Justin Kim,

10:04AM  25  Jose Huizar asks you to lie to him, you're going to do it?

```
 1          Q       I said no one had told him between September and

 2    this time what Justin Kim was supposed to do to resolve this

 3    appeal; right?

 4          A       I think he was waiting on the next steps from

 5    David.

 6          Q       Nothing for him to say "yes" or "no" to really --

 7          A       Correct.

 8          Q       -- because there's no request, no specific

 9    request; right?

10          A       Correct.

11          Q       And then after -- you can take this down.  Thank

12    you.

13                  After the Little Tokyo meeting, you, Justin Kim,

14    and Huizar go separately into a private office you talked

15    about; right?

16          A       Yes.

17          Q       And, again, you tell him it's going to be a big

18    lift for the councilman; correct?

19          A       That's correct.

20          Q       In fact, again, you lie to him the same thing,

21    essentially; right?  Big lift, it's going to cost something.

22    It's going to be hard for the congressman -- or councilman,

23    excuse me, to do this.

24          A       Correct.

25          Q       And, again, at that meeting -- at that meeting
```

```
 1              Huizar just indicates he can help; right?

 2                   A       He indicates he can help, yes.

 3                   Q       At that meeting you guys kicked out everybody

 4              else from Mr. Lee's team, right, didn't have them in the room?

10:08AM  5                   A       It was just Justin, myself, and the

 6              councilmember.

 7                   Q       Right.  You specifically went to a separate

 8              meeting from the development team for Little Tokyo.

 9                   A       Yes.

10:08AM 10                   Q       So that meeting is January 17 of 2017; right?

11                   A       Correct.

12                   Q       It's not until two days later, January 19, that

13              you go to Huizar's office -- or house, excuse me, and you

14              talked about he's picking his feet and he lays out exactly what

10:08AM 15              he wants; right?

16                   A       Exactly, yes.

17                   Q       And that's January 19, then; right?

18                   A       Yes.

19                   Q       So if we go to Exhibit 144, which is a

10:09AM 20              demonstrative the Government has been using, page 5.  This is

21              January 17th; right?

22                   A       Yes, it is.

23                   Q       So this is before that picking-the-feet meeting;

24              right?

10:09AM 25                   A       Yes.
```

1        Q        All right.  The bottom there where Justin Kim

2    texts Mr. Lee, "Please give me a call at your convenience.

3    Very important."  Right?

4                    MS. DRAGALIN:  Objection.  Lacks foundation.

10:09AM  5          THE COURT:  Overruled.

6        Q        BY MR. NEUMAN:  That is before Councilman Huizar

7    has laid out his specific request; right?  That's January 17th.

8        A        I have never seen this text.

9        Q        I understand.

10:09AM  10                 But if this happened on January 17th, that's

11   before Huizar has laid out his specific request; right?

12       A        Was it the 18th?  19th?

13       Q        If you want to go back, we can look at -- why

14   don't we look at Exhibit 88, page 3.  This is what I call the

10:10AM  15  picking-the-feet meeting; right?  The notes.  This is

16   January 19th.

17       A        Yes.

18       Q        You see that on the top left there.  This is the

19   first time he lays out his demand to you; right?

10:10AM  20      A        Yes.

21       Q        It's just you and him at that meeting; right?

22       A        Correct.

23       Q        If we go back, then, to 144, page 5,

24   January 17th, that text message from Justin Kim to Mr. Lee if

10:10AM  25  it happened -- I know you don't know.  But assuming it did

1    The Standard.  I remember what his drink was.  I remember me

2    expressing to him what the councilman was asking me to do.

3         Q       What you told him was that Huizar has to support

4    the project and go against CREED's appeal; right?

11:25AM  5    A       Correct.

6         Q       You didn't tell him Huizar was going to vote

7    against the project; right?  You didn't need to because he came

8    back with this idea about Little Tokyo; right?

9         A       Correct.

11:26AM  10        Q       So it was actually this agreement, you're saying,

11   to swap unions on Little Tokyo for unions on 940 Hill.  That

12   was what got CREED to drop the appeal; correct?

13        A       That's correct.  Yes.

14        Q       There's nothing happening with Little Tokyo and

11:26AM  15   unions at that point; right?

16        A       Not that I was aware of.

17        Q       There were no appeals pending or anything that

18   you knew of; right?

19        A       Correct.

11:26AM  20        Q       You said it was for one of those things we could

21   just wave off in the future if we needed to; right?

22        A       That is true, yes.

23        Q       In fact, Little Tokyo is a much bigger project

24   than 940 Hill; correct?

11:26AM  25        A       Yes.

```
 1          Q       It was actually a pretty bad deal that you were

 2    agreeing to for Mr. Lee, at least in terms of unions on

 3    Little Tokyo would be a lot more expensive than unions on

 4    940 Hill; right?

11:26AM  5          A       I wasn't doing that assessment at that time.

 6          Q       You said you told Justin Kim about this agreement

 7    on Little Tokyo.  You have no idea if he ever told Mr. Lee;

 8    right?

 9          A       No.

11:27AM 10          Q       I want you to look at Exhibit 511 in your binder,

11    please.

12                  MR. NEUMAN:  Your Honor --

13          Q       This is an e-mail, Mr. Esparza, between you

14    and --

11:27AM 15                  THE COURT:  When you're away from the

16    microphone --

17                  MR. NEUMAN:  I'm sorry.

18                  MS. DRAGALIN:  Objection to reading or describing

19    the content of an exhibit that has not been admitted.

11:27AM 20          Q       BY MR. NEUMAN:  Mr. Esparza, is this an e-mail

21    you received?

22          A       Is it going to be on the screen or --

23          Q       No.  You need to flip to it in your binder.

24          A       Okay.  What's the number?

11:28AM 25          Q       511.
```

| | | |
|---|---|---|
| | 1 | about the counteroffer from David Lee took place? |
| | 2 | A        At his office. |
| | 3 | Q        Is that the office on Crocker Street? |
| | 4 | A        Yes. |
| 12:20PM | 5 | Q        Where? |
| | 6 | A        On the third floor. |
| | 7 | Q        Was anyone else there? |
| | 8 | A        No. |
| | 9 | Q        What was the counteroffer Defendant Lee told you |
| 12:21PM | 10 | to take back to Huizar and Esparza? |
| | 11 | A        500,000 in cash. |
| | 12 | Q        Did you have an understanding of why David Lee |
| | 13 | would want to pay a bribe in cash? |
| | 14 | A        Basically my understanding was no one would know. |
| 12:21PM | 15 | Q        There would be no trace? |
| | 16 | A        Yeah.  No trace. |
| | 17 | Q        Did you know Defendant Lee to have lots of cash |
| | 18 | at that location where you're having the meeting? |
| | 19 | A        Yes. |
| 12:21PM | 20 | Q        At that point in time, did you discuss with |
| | 21 | David Lee where the $500,000 in cash would go, like who was |
| | 22 | going to get it? |
| | 23 | A        There was no such discussion. |
| | 24 | Q        At some point -- let's look at some more |
| 12:21PM | 25 | timelines.  Let's do Exhibit 146.  Before I go there, let's |

```
 1    potentially testify at those?

 2         A     Yes.

 3         Q     Will you have to testify potentially against

 4    Jose Huizar if there's a trial?

 5         A     Yes.

 6         Q     In return for that cooperation and this

 7    testimony, potential testimony, are you provided any specific

 8    promise of a specific benefit from the Government?

 9         A     None.

10         Q     And you're not provided any specific promise, but

11    what are you expecting?  What do you want out of cooperating?

12         A     I'm hoping for lower sentencing.

13         Q     Ultimately do you understand who is the final

14    decider of your sentence?

15         A     Yes.  The judge.

16         Q     Is it the judge sitting to your left?

17         A     Yes.

18         Q     And if you are found to have provided false

19    statements or perjured yourself or testified on the stand

20    falsely and that's proven against you, do you have an

21    understanding what happens to your plea agreement?

22         A     The plea agreement becomes void.

23         Q     It goes away?

24         A     It goes away.

25         Q     And at that point you probably don't get a
```

```
 1          A       Yes.

 2          Q       That's the reason he needs you; right?

 3          A       Yes.

 4          Q       You're the expert who can come in and get things

 5   done.

 6          A       I wouldn't call it "expert," but I could get

 7   things done.

 8          Q       Nothing illegal about that; right?

 9          A       Yes.

10          Q       No contract for this work either; right, Mr. Kim?

11          A       Yes.

12                  MR. NEUMAN:  You can take that down.

13          Q       Now, for all of these things we just looked at

14   and the other work that you did for Mr. Lee before the CREED

15   appeal, right, you didn't do anything illegal; right?

16          A       Yes.

17          Q       Nothing illegal about asking for these favors;

18   correct?

19          A       Yes.

20          Q       Nothing illegal about asking for these meetings;

21   correct?

22          A       Yes.

23          Q       This is basically what a political consultant

24   does; right?  They use their connections to get things done for

25   the client.
```

09:34AM (lines 4-5, 10, 15, 20, 25)

1       A       Yes.

2       Q       And, in fact, this is exactly the relationship

3   with Mr. Lee that you had been working to develop; correct?

4       A       Can you repeat that question once more?

09:35AM   5       Q       I said this is exactly the relationship with

6   Mr. Lee that you had been working to develop; correct?

7       A       Correct.

8       Q       Except one problem.  You're not getting paid;

9   right?

09:35AM   10       A       Yes.

11       Q       As part of your work, you were in communication

12   with people on the development team; right?

13       A       Yes.

14       Q       You went to meetings with Fred Shaffer.  You were

09:35AM   15   in touch with Joon Cheon; correct?

16       A       Yes.

17       Q       None of them had the political connections you

18   had.

19       A       I don't know that.

09:35AM   20       Q       None of them were in the position to help the way

21   you could help of opening doors; right?

22       A       Most likely.

23       Q       Well, that's why they came to you for help

24   getting those meetings, because they couldn't get them

09:36AM   25   themselves; right?

| | | |
|---|---|---|
| 1 | Q | Do you remember reviewing that plea agreement |

1   Q      Do you remember reviewing that plea agreement

2  carefully with your lawyer who is sitting right here?

3   A      Yes.  I said it.  I asked at the restaurant.

4   Q      That's what you swore under oath; right, Mr. Kim?

09:56AM  5   A      Yes.

6          MR. JENKINS:  I'm going to object to the tone and

7  volume of the questions.

8          THE COURT:  Overruled.

9          MR. NEUMAN:  I'm restraining my comments,

09:57AM  10  Your Honor.

11   Q      You swore under oath --

12          THE COURT:  At least we can hear you.

13          MR. NEUMAN:  I've been told that's an issue.

14          THE COURT:  When you walk away from the

09:57AM  15  microphone, your voice trails down and the court reporter has a

16  hard time picking up what you're saying.

17          MR. NEUMAN:  Yes, Your Honor.

18   Q      Mr. Kim, you swore under oath -- you swore under

19  oath that, during the dinner, you asked for help; right?

09:57AM  20   A      Yes.

21   Q      But today you can't remember?

22   A      I didn't say I didn't remember.

23   Q      Mr. Lee was not present at the dinner; correct?

24   A      Yes.

09:57AM  25   Q      You invited him to the group -- to join the group

1     after the discussion was over; right?

2          A     Right.

3          Q     And as you testified yesterday, that's to show

4     off the relationship that you're close with Jose Huizar; right?

09:58AM    5          A     Right.

6          Q     Now, yesterday you were cut off when you answered

7     this question, I think, but let me ask you.  You were saying

8     you weren't even sure whether Mr. Lee understood that night

9     that Huizar had agreed to help; right?

09:58AM    10          A     I don't remember 100 percent exactly what all the

11     conversation that night at that particular time.

12          Q     You weren't there at that karaoke bar that long;

13     right?  It was about 45 minutes, an hour, that Mr. Lee -- well,

14     let's put it this way.  Mr. Lee wasn't there that long; right?

09:58AM    15          A     Agree.

16          Q     He left alone, as far as you know; correct?

17          A     I'm not sure about that.

18          Q     You have no information that he left with

19     somebody else, do you?

09:58AM    20          A     Yes.

21          Q     Yes, you have no information?

22          A     I have no information.

23          Q     Okay.  The next day you meet with George Esparza;

24     right?

09:59AM    25          A     Yes.

1684

1       Q       BY MR. NEUMAN:  Now, instead, you set up a

2  meeting about the Little Tokyo Project with Huizar's staff.  We

3  heard about that, right, January 17th; right?

4       A       Right.

10:11AM  5       Q       Now, no reason, as far as you knew, for anyone to

6  think there's anything illegal just because you're talking to

7  the councilman's staff; right?

8       A       Right.

9       Q       This is, again, your typical role as a political

10:11AM 10  consultant for Mr. Lee; right?

11       A       Yes.

12       Q       Except you're not getting paid; right?

13       A       Yes.

14       Q       And you don't bring up the CREED appeal in that

10:11AM 15  larger meeting with the Little Tokyo Galleria development team;

16  right?

17       A       Can you repeat that, please?

18       Q       You don't bring up the CREED appeal in that

19  larger meeting with the Little Tokyo Galleria team, do you?

10:11AM 20       A       Yes.

21       Q       You wait.  You wait until you're in a private

22  meeting with Huizar and Esparza and no one else from Mr. Lee's

23  team; right?

24       A       Yes.

10:11AM 25       Q       Now, you testified that it was your understanding

1    Q      That's the report of your interview that day.

2    There is nothing about any of the things you just told me in

3    that report; correct?

4    A      Correct.

11:17AM   5    Q      And if you look at the bottom, it says,

6    investigation on March 19, 2019.

7    A      Yes.

8    Q      Date drafted April 15, 2022; right?

9    A      Yes.

11:17AM  10    Q      So if this is the only report I have, I don't

11    have a report of what you said that day, do I?

12    A      Yes.

13    Q      Now you can put that away, Mr. Kim.

14           Yesterday you claimed that Mr. Lee had asked you

11:17AM  15    before this meeting to call him on a different number.  Do you

16    remember saying that?

17    A      Yes.

18    Q      You have never said that in a single interview

19    with the FBI before yesterday, have you?

11:17AM  20    A      My memory is I did.

21    Q      Your memory is you did say that during that first

22    meeting; right?

23    A      Yes.

24    Q      And you provided that number during that first

11:18AM  25    meeting; right?

```
 1              A       I did not have the number.  All I told him was

 2    David Lee gave me a number to contact him.

 3              Q       That's nowhere in the report we just looked at,

 4    is it, Mr. Kim?

 5              A       Yes.

 6              Q       In fact, you were the one with the new number

 7    because your phone had been taken; right?

 8              A       Yes.

 9              Q       Your new number ended -- I'm not going to read it

10    out -- but it ended in 3963; right?

11              A       Yes.

12              Q       For that meeting on March 19, your first meeting

13    with these prosecutors and the agents where you talked about

14    all those things, you never refused to have it recorded; right?

15              A       Yes.

16              Q       Yes meaning you did not refuse; correct?

17              A       Yes.

18              Q       They never asked you, did they?

19              A       I don't think they asked.

20              Q       George Esparza also got a new number; right?

21              A       Yes.

22              Q       Now, the next day you go out and you record

23    Mr. Lee; right?

24              A       Yes.

25              Q       That was at your suggestion?
```

11:18AM (line 5)
11:18AM (line 10)
11:18AM (line 15)
11:19AM (line 20)
11:19AM (line 25)

1       A       They did not ask.

2       Q       Are you aware that a few months ago the defense

3   asked to get access to the full copies of the original phone

4   that you had that they had taken from you?

11:29AM   5               MR. JENKINS:  Objection.  403.  Prior court

6   order.

7               THE COURT:  Sustained.

8       Q       BY MR. NEUMAN:  Mr. Kim, you understand that, as

9   part of your plea agreement, you have to give the Government

11:29AM  10   any evidence that they ask you for; right?

11      A       Right.

12      Q       You were never asked to give your phone to the

13   defense so we could examine it; correct?

14               MR. JENKINS:  Objection.  Foundation.  403.

11:29AM  15   Prior court order.

16               THE COURT:  Sustained.

17               MR. NEUMAN:  I'm not sure what order, but okay.

18      Q       Mr. Kim, you admit that you lied to Mr. Lee in

19   July of 2017 to get $100,000 out of him; right?

11:30AM  20      A       Right.

21      Q       You admit that you lied to Mr. Lee in August 2017

22   to get another $150,000 out of him; right?

23      A       Right.

24      Q       But you claim you told him the truth about the

11:30AM  25   first 400,000; right?