E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091 / 0363
    Facsimile: (213) 894-6436
    E-mail:   Mack.Jenkins@usdoj.gov
             Cassie.Palmer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>DAE YONG LEE,<br><br>      Defendant. | No. CR 20-326(A)-JFW-5<br><br>GOVERNMENT'S OPPOSITION TO<br>DEFENDANT DAE YONG LEE'S MOTION<br>FOR BAIL PENDING APPEAL<br><br>Hearing Date: October 27, 2023<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of the<br>             Hon. John F. Walter |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins and Cassie D. Palmer, hereby files its opposition to defendant Dae Yong Lee's Motion for Bail Pending Appeal (Dkt. No. 1169).

//

//

1       This opposition is based upon the attached memorandum of points

2   and authorities, the files and records in this case, and such further

3   evidence and argument as the Court may permit.

4   Dated: October 2, 2023          Respectfully submitted,

5                                   E. MARTIN ESTRADA
                                    United States Attorney
6
                                    MACK E. JENKINS
7                                   Assistant United States Attorney
                                    Chief, Criminal Division
8

9   _____

10  CASSIE D. PALMER
    MACK E. JENKINS
11  Assistant United States Attorneys

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION.....................................................1

II.   Procedural Background............................................3

      A.    Trial and Sentence.........................................3

      B.    Imposition of a Heightened Bond Pending Sentencing........3

      C.    The Court Summarily Rejected Defendant's Post-Trial
            Motions...................................................6

      D.    Defendant's Sentence and Instant Motion...................7

III.  Legal Standard for Bail Pending Appeal...........................8

IV.   Defendant Has Not Established By Clear and Convincing
      Evidence That He Is Not Likely to Flee..........................9

V.    Defendant Fails to Establish Any Substantial Question of
      Fact or Law Likely to Result in Reversal or a New Trial.......11

      A.    Defendant Fails to Raise a Substantial Question as to
            the Court's Denial of His Batson Challenge...............11

            1.    Facts Relating to *Batson* Challenge................11

            2.    Legal Standard for *Batson* Challenges..............13

            3.    Defendant Failed to Establish a Prima Facie Case....14

            4.    The Court Correctly Concluded the Government
                  Offered an Adequate Race-Neutral Explanation for
                  Exercising Its Peremptory Challenge.................20

      B.    Defendant Fails to Raise a Substantial Issue as to the
            Court's Denial of His Request to Admit Defendant's
            Self-Serving Hearsay Statements..........................20

            1.    118A & 118B Were Properly Excluded As
                  Inadmissible, Self-Serving Hearsay..................21

            2.    118A & 118B Were Not Admissible Under the Rule of
                  Completeness.......................................27

            3.    The Court Properly Sustained Hearsay Objections
                  to Defense's Cross-Examination of Kim Because
                  Defendant Sought to Elicit the Same Self-Serving
                  Hearsay Via Kim....................................28

      C.    Defendant Fails to Raise a Substantial Issue as to the
            Court's Formulation of the Jury Instructions.............29

1.   The Jury Instruction for Count Five.................29

2.   Jury Instruction for Count Twenty-Five.............34

3.   Defense Theory-of-the-Case Instruction.............36

VI.   There Was No Cumulative Error...............................38

VII.  Defendant Fails to Establish that His Appeal Is Not For the
      Purpose of Delay.........................................38

VIII. CONCLUSION ...............................................39

# TABLE OF AUTHORITIES

**Federal Cases**

Batson v. Kentucky,
  476 U.S. 79 (1986) ........................................ passim

Boyd v. Newland,
  467 F.3d 1139 (9th Cir. 2006) ............................ 14-15

Briseno v. Henderson,
  998 F.3d 1014 (9th Cir. 2021) ............................... 21

Cooperwood v. Cambra,
  245 F.3d 1042 (9th Cir. 2001) ............................... 14

Fernandez v. Roe,
  286 F.3d 1073 (9th Cir. 2002) ............................... 17

Flowers v. Mississippi,
  588 U.S. ----, 139 S. Ct. 2228 (2019) ....................... 16

Jamerson v. Runnels,
  713 F.3d 1218 (9th Cir. 2013) ............................... 19

Johnson v. California,
  545 U.S. 162 (2005) ..................................... passim

Johnson v. Campbell,
  92 F.3d 951 (9th Cir. 1996) ................................. 18

Jordan v. Lefevre,
  206 F.3d 196 (2d Cir. 2000) ................................. 19

McDonnell v. United States,
  579 U.S. 550, 572 (2016) ........................... 31, 32, 33

Miller-El v. Dretke,
  545 U.S. 231 (2005) ........................................ 14

Nguyen v. Frauenheim,
  45 F.4th 1094 (9th Cir. 2022) .................... 16, 17, 19

Park v. Huff,
  493 F.2d 923 (5th Cir. 1974) ........................... 23, 24

Shirley v. Yates,
  807 F.3d 1090 (9th Cir. 2015) ............................... 17

Sims v. Brown,
  425 F.3d 560 (9th Cir. 2005) ............................... 19

<u>States v. Ortega</u>,
   203 F.3d 675 (9th Cir. 2000) ................................ 22

<u>Tolbert v. Gomez</u>,
   190 F.3d 985 (9th Cir. 1999) ........................... 14, 15

<u>United States v. Castro</u>,
   813 F.2d 571 (2d Cir. 1987) ............................... 27

<u>United States v. Castro-Cabrera</u>,
   534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008) ................. 27

<u>United States v. Chi</u>,
   936 F.3d 888 (9th Cir.) ................................... 29

<u>United States v. Collazo</u>,
   984 F.3d 1308 (9th Cir. 2021) ............................. 29

<u>United States v. Collins</u>,
   551 F.3d 917 (9th Cir. 2008) .............................. 15

<u>United States v. Fontenot</u>,
   14 F.3d 1364 (9th Cir. 1994) .............................. 25

<u>United States v. Gibson</u>,
   690 F.2d 697 & n.1 (9th Cir. 1982) ........................ 22

<u>United States v. v. Handy</u>,
   761 F.2d 1279 (9th Cir. 1985 ............................ 8, 9

<u>United States v. Hernandez-Garcia</u>,
   44 F.4th 1157 (9th Cir. 2022) ............................. 19

<u>United States v. Hernandez-Quintania</u>,
   874 F.3d 1123 (9th Cir. 2017) ............................. 17

<u>United States v. Hsieh Hui Mei Chen</u>,
   754 F.2d 817 (9th Cir. 1985) .............................. 32

<u>United States v. Jackson</u>,
   780 F.2d 1305 (7th Cir. 1986) ............................. 26

<u>United States v. Kimbrew</u>,
   944 F.3d 810 (9th Cir. 2019) ....................... 31, 32-33

<u>United States v. Lewis</u>,
   641 F.3d 773 (7th Cir. 2011) .............................. 27

<u>United States v. Lopez</u>,
   4 F.4th 706 (9th Cir. 2021) ............................... 21

<u>United States v. Lonich</u>,
   23 F.4th 881, 907 (9th Cir. 2022) ......................... 38

United States v. Lopez-Alvarez,
    970 F.2d 583 (9th Cir. 1992) .................................. 36

United States v. Mitchell,
    502 F.3d 931 (9th Cir. 2007) .................................. 21

United States v. Perdomo-Espana,
    522 F.3d 983 (9th Cir. 2008) .................................. 36

United States v. Ponticelli,
    622 F.2d 985 (9th Cir. 1980) ............................. 24, 25

United States v. Shoffner,
    791 F.2d 586 (7th Cir. 1986) .................................. 38

United States v. Steele,
    298 F.3d 906 (9th Cir. 2002) .................................. 14

United States v. Summers,
    414 F.3d 1287 (10th Cir. 2005) ............................... 23

United States v. Torres,
    794 F.3d 1053 (9th Cir. 2015) ................................ 23

United States v. Vallejo,
    237 F.3d 1008 (9th Cir. 2001) ................................ 29

United States v. Wilkes,
    62 F.3d 524 (9th Cir. 2011 ................................... 38

Wade v. Terhune,
    202 F.3d 1190 (9th Cir. 2000) ............................ 15, 18

Weeks v. Angelone,
    528 U.S. 225 (2000) .......................................... 37

Williams v. Rhoades,
    354 F.3d 1101 (9th Cir. 2004) ................................ 14

Williams v. Runnels,
    432 F.3d 1102 (9th Cir. 2006) ................................ 15

**Federal Statutes**

18 U.S.C. § 3143 ...................................... 1, 2, 8, 9

**Other**

Fed. R. Evid. 106........................................ 27, 28
Fed. R. Evid. 801 ........................................... 22
Fed. R. Evid. 803 ........................................... 24
Fed. R. Crim. P. 29 .......................................... 6

```
Fed. R. Crim. P. 33 ...............................................  6
Ninth Circuit Rule 27-9.1 ........................................  7
```

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.    INTRODUCTION**

3       Following a nine-day jury trial, defendant DAE YONG LEE

4   ("defendant" or "defendant LEE") was convicted of all counts against

5   him: honest services wire fraud (Count Five); bribery concerning

6   programs receiving federal funds (Count Twenty-Five); and obstruction

7   of justice -- alteration, or falsification of records in federal

8   investigations (Count Thirty-Eight).  (Dkt. No. 589.)  At trial, the

9   government proved that defendant paid a $500,000 cash bribe in

10  exchange for Los Angeles City Councilmember Jose Huizar and his aide

11  George Esparza using their official positions to resolve an appeal

12  that a union had filed against defendant's lucrative real estate

13  development project.  After defendant paid the bribe, the union

14  dropped its appeal, and defendant's project was approved.  When the

15  FBI closed in on defendant, he obstructed justice by falsifying

16  accounting records at his company, defendant 940 HILL, LLC, to cover

17  up the bribe.  For defendant's conduct, the Court sentenced him to 72

18  months' imprisonment and imposed the maximum fine of $750,000.  (Dkt.

19  Nos. 1128, 1129.)

20      Defendant now moves for bail pending appeal (the "Motion").

21  (Dkt. No. 1169.)  Detention is <u>mandatory</u> for defendants who have been

22  convicted and sentenced to a term of imprisonment.  18 U.S.C.

23  § 3143(b)(1).  A court may deviate from this mandate only when it

24  makes two affirmative findings: (1) that "by clear and convincing

25  evidence [] the person is not likely to flee or pose a danger to the

26  safety of any other person or the community;" <u>and</u> (2) "that the

27  appeal is not for the purpose of delay and raises a substantial

28  question of law or fact likely to result in (i) reversal, (ii) an

order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."   18 U.S.C. §§ 3143(b)(1)(A), (B). Defendant fails to meet his burdens here.

First, defendant fails to show by clear and convincing evidence that he is unlikely to flee, given his admitted prior contemplation of flight to Korea in the face of law enforcement scrutiny; access to large stores of cash that could aid his flight; willingness to flout the law and deceive law enforcement by obstructing justice; and, importantly, his motive to avoid serving the lengthy term of imprisonment that the Court recently imposed.

Second, defendant fails to identify a substantial issue of fact or law likely to result in reversal or a new trial.  Defendant points to three categories of errors he claims satisfy this burden: (1) the Court's denial of his Batson motion (Dkt. 1169 at 4-6); (2) the Court's exclusion of "evidence suggesting" defendant "did not know the money he gave Kim would be used as a bribe," including defendant's self-serving hearsay in conversations with Kim (id. at 6-11); and (3) the Court's formulation of the honest services wire fraud and bribery jury instructions and its rejection the defendant's so-called "theory-of-the-defense" instruction.  (Id. at 11-14.)  None of these issues presents a substantial question of law or fact likely to result in reversal or a new trial.

With respect to defendant's Batson challenge, his counsel failed to make a prima facie case of discrimination because government counsel did not perceive the stricken alternate juror as Asian, a contention defense counsel declined to respond to, and struck no

2

other Asian juror during jury selection, while defendant struck one or more Asian jurors.  Even if defendant had satisfied the threshold burden, the Court correctly found no discriminatory intent because the government offered several permissible race-neutral justifications for its single strike of a possibly Asian alternate juror.

Next, defendant's contention that the Court erred in refusing to admit his self-serving hearsay statements is unsupported by the case law, and, in any case, unlikely to result in reversal or a new trial, given the deferential standard of review for such challenges. Finally, defendant's challenges to the jury instructions primarily rest on an incorrect reading of the official act requirement, which defendant seeks to apply to both honest services wire fraud and bribery, the latter of which has no official act requirement.  The Court's ruling on these issues was well-reasoned and supported by prevailing case law.

For these reasons and those discussed herein, the Court should deny defendant's Motion.

## II.  Procedural Background

### A.   Trial and Sentence

Following a nine-day jury trial, defendant was convicted of all counts against him including honest services wire fraud; bribery; and obstruction of justice.  (Dkt. No. 589.)  On July 12, 2023, the Court sentenced defendant to 72 months' imprisonment and set a surrender date of October 4, 2023.  (Dkt. Nos. 1128, 1129.)

### B.   Imposition of a Heightened Bond Pending Sentencing

Defendant was released pretrial on an unsecured appearance bond of $300,000.  (Dkt. No. 132.)  Contrary to defendant's assertion

3

1  (Dkt. No 1169 at 7), the Court did not simply order him to return for

2  sentencing under the terms of his original bond.  (Dkt. No. 1169 at

3  7.)  Instead, the Court's "initial conclusion" following the jury's

4  verdicts was that defendant "should be detained," due to his risk of

5  flight.  (Trial Tr. 2087-88.)  Defendant's claim that the government

6  did not move to modify the conditions of defendant's release (Dkt.

7  No. 1169 at 7) is also wrong: as explained below, the government

8  expressed serious concerns about defendant's risk of flight and

9  requested the imposition of strict conditions of release pending

10 sentencing.  Ultimately, the Court reluctantly allowed defendant to

11 remain on bond after imposing strict conditions of release pending

12 the forthcoming sentencing.

13      The details of that discussion are relevant and illuminating

14 here.  Following the jury's convictions of defendant on all counts,

15 the Court expressed serious concerns about defendant's risk of

16 flight: "[M]y concern is the statement that [defendant] made during

17 the course of the conversation when they were involved in the search

18 which discovered the $3 million or $4 million in a safe, that he

19 thought he was going to have to run -- run away and go back to

20 Korea."  (Trial Tr. 2087.)[1]  While defense counsel clarified that

21 defendant's comment "was in reference to one of the IRS audits," he

22 did not deny that defendant admitted to contemplating international

23 flight.  (Id.)  The Court also expressed concern about defendant's

24 ready access to large sums of cash, reasoning defendant "certainly

25 has the ability to -- as he put it during the course of that

26

27      [1] Specifically, in a surreptitiously recorded conversation with
   coconspirator Justin Kim, defendant said, "The first time I was hit,
28 I really thought I had to run away to Korea."  (Trial Tr. 1549; Trial
   Ex. 118C.)

4

1  conversation, run back to Korea.  And he certainly has . . . the

2  resources, if anybody keeps [$]3 or $4 million of cash in a safe."

3  (Trial Tr. 2087-88.)  The Court concluded: "So it's my . . . initial

4  conclusion that . . . he should be detained."  (Trial Tr. 2088.)

5      In response, defense counsel argues that several facts mitigated

6  defendant's risk of flight, including: (1) defendant had not visited

7  Korea since childhood; (2) defendant presently did not have strong

8  familial or other connections in Korea; (3) defendant had strong

9  connections to the Central District; and (4) defendant had known

10  about the investigation "since 2018 and 2019 when he got the

11  subpoena" but had never attempted to flee.  (Trial Tr. 2088.)  The

12  Court responded, "But it's a lot different now that he's been

13  convicted."  (Id.)

14      The government agreed with the Court's concerns about flight

15  risk and highlighted additional factors, including that: (1)

16  defendant had been convicted of obstruction of justice, which

17  "heightens the concern of further efforts to evade accountability";

18  and (2) the "drastic shift in circumstances" from pretrial, that is,

19  defendant had been convicted of all counts and accordingly was facing

20  "a significant custodial sentence," which provided a greater

21  motivation to flee.  (Trial Tr. 2088-89.)  Given defendant's strong

22  ties to his family in the Central District, however, the government

23  agreed that the risk of flight potentially could be mitigated with

24  strict conditions of release.  (Trial Tr. 2089.)  The government

25  specifically suggested several stringent conditions, including "a

26  significant cash bond and home detention with electronic monitoring"

27  to mitigate such risk.  (Id.)

28

1    The Court provisionally agreed that defendant could remain on

2    bond, subject to the parties meeting and conferring and submitting

3    for the Court's approval modified conditions of release, concluding:

4    "But I do have some concerns and I want to make sure, unlike the

5    other defendant in this case who has exercised his jurisdictional

6    defense and remains in China."  (Trial Tr. 2089.)

7    In accordance with the Court's order, the parties met and

8    conferred and submitted a stipulation to modify defendant's

9    conditions of release to impose strict conditions, including home

10   detention with location monitoring and a $1.7 million secured bond.

11   (Dkt. No. 603.)  The Court imposed those modified conditions on July

12   12, 2022, which added five new conditions: (1) defendant's wife would

13   surrender her passport "until Mr. Lee's sentencing hearing"; (2)

14   defendant would participate in a Location Monitoring Program; (3)

15   defendant would not enter the premises of any airport, seaport, bus

16   terminal, or train station; (4) defendant would be restricted to his

17   residence every day from 8 p.m. to 8 a.m.; and (5) defendant would

18   post a bond totaling $1,700,000 secured by cash and property.  (Id.)

19   **C.  The Court Summarily Rejected Defendant's Post-Trial Motions**

20   Following trial, the parties engaged in extensive post-trial

21   briefing.[2]  On June 24, 2022, defendants LEE/940 HILL filed a Motion

22   to Dismiss Count Five pursuant to Federal Rule of Criminal Procedure

23   29(a) ("Motion to Dismiss") (Dkt. No. 539); the government filed its

24   opposition to the Motion to Dismiss on July 6, 2022 (Dkt. No. 599);

25   and defendants filed their reply on July 12, 2022 (Dkt. No. 605).  On

26   July 14, 2022, the Court denied the Motion to Dismiss, concluding

27   _____

28        [2] As illustrated by the docket, the parties also engaged in
     extensive pretrial briefing in this case.

6

1  "the jury's verdict was entirely rational and based on more than

2  sufficient evidence to find the Defendants guilty of wire fraud

3  beyond a reasonable doubt."  (Dkt. No. 611.)

4      On August 5, 2022, defendants LEE/940 HILL filed a Motion for

5  Acquittal Pursuant to Federal Rule of Criminal Procedure 29(a) & (c)

6  and Motion for a New Trial Pursuant to Federal Rule of Criminal

7  Procedure 33(a) ("Motion for Acquittal or New Trial") (Dkt. No. 627);

8  the government filed its opposition on September 9, 2022 (Dkt. No.

9  677); and defendants filed their reply on September 23, 2022 (Dkt.

10  No. 692).  The government's opposition details the evidence presented

11  at trial, which it will not repeat but incorporates here by

12  reference.  (Dkt. No. 677 at 3-15.)  On December 5, 2022, the Court

13  denied defendants' Motion for Acquittal or New Trial, concluding "the

14  evidence was more than sufficient for a rational trier of fact to

15  find the essential elements of each of the crimes charged against

16  Defendants beyond a reasonable doubt" and "there was no error, and in

17  any event, even if there were any errors, the cumulative effect of

18  those alleged errors did not prejudice Defendants in light of the

19  entire trial record."  (Dkt. No. 848 at 2, 14.)

20     **D.   Defendant's Sentence and Instant Motion**

21      On July 21, 2023, the Court sentenced defendant to 72 months'

22  imprisonment, imposed the maximum fine of $750,000, and set a

23  surrender date of no later than October 4, 2023.  (Dkt. Nos. 1128,

24  1129 (defendant LEE).)  On August 3, 2023, defendants LEE/940 HILL

25  filed notices of appeal.  (Dkt. Nos. 1140 & 1141.)  On August 23,

26  2023, defendants filed motions to voluntarily dismiss their appeals.

27  (9th Cir. No. 23-1687 (defendant LEE), Dkt. No. 3.1; 9th Cir. No. 23-

28  1688 (defendant 940 HILL), Dkt. No. 3.1 .)  On August 28, 2023, the

1  Ninth Circuit denied defendant LEE's motion to dismiss his appeal
2  without prejudice due to a filing deficiency, because defendant LEE
3  failed to include a written consent from defendant LEE with the
4  motion, as required by Ninth Circuit Rule 27-9.1.  (9th Cir. No. 23-
5  1687, Dkt. No. 4.1.)  Following the Ninth Circuit's denial of
6  defendant LEE's motion to dismiss, he "reconsidered his decision and
7  determined that he no longer wished to dismiss his appeal and filed
8  requests to withdraw the motions to dismiss.  (9th Cir. No. 23-1687,
9  Dkt. Nos. 5.1, 6.1; 9th Cir. No. 23-1688, Dkt. No. 5.1, 6.1.)

10       On September 7, 2023, counsel for defendants LEE/940 HILL moved
11  to withdraw as counsel and to substitute new counsel, which the Court
12  granted the same day.  (Dkt. Nos. 1158, 1159.)  The following day,
13  defendant's new counsel filed an <u>ex parte</u> application to continue
14  surrender date from October 4 to November 3, 2023 and set a briefing
15  schedule for motion for bail pending appeal (Dkt. No. 1160), which
16  the Court granted on September 14, 2023.  (Dkt. No. 1166.)  On
17  September 18, 2023, defendant filed the instant Motion.  (Dkt. No.
18  1169.)

19  **III. Legal Standard for Bail Pending Appeal**

20       Defendant is <u>ineligible</u> for bail pending appeal unless he
21  establishes, by clear and convincing evidence that he is not likely
22  flee and, <u>inter alia</u>, that his appeal is "not for the purpose of
23  delay" and "raises a substantial question of law or fact likely to
24  result in-- (i) reversal, (ii) an order for a new trial, (iii) a
25  sentence that does not include a term of imprisonment, or (iv) a
26  reduced sentence to a term of imprisonment less than the total of the
27  time already served plus the expected duration of the appeal
28  process."  18 U.S.C. § 3143(b)(1).

1     A "substantial question of law or fact" may involve "new or

2  novel" legal issues, "unique facts not plainly covered by controlling

3  precedents," or "important questions concerning the scope and meaning

4  of decisions of the Supreme Court."  United States v. Handy, 761 F.2d

5  1279, 1281 (9th Cir. 1985).  At the very least, a "substantial

6  question" must involve an issue that is "fairly debatable" or "fairly

7  doubtful.  Id.  While this standard does not require that reversal be

8  more likely than not, id. at 1280-81, neither is it so toothless that

9  it eviscerates Congress's intent to "tighten[] the standards for bail

10  pending appeal," id. at 1283.  Beyond that, the "substantial

11  question" must be one that is "likely" to result in a reversal, new

12  trial, or reduced sentence.  18 U.S.C. § 3143(b)(1)(B).

**IV.  Defendant Has Not Established By Clear and Convincing Evidence That He Is Not Likely to Flee**

As discussed in Section II.B supra, defendant's release pending

sentencing was a very close call.  Indeed, the Court initially

concluded that defendant should be detained and provisionally

permitted defendant to remain on bond only after requiring a

significant tightening of the conditions of his release, including a

$1.7 million secured bond, home detention with location monitoring,

and the surrender his wife's passport, among other conditions.

The factors that established defendant's serious risk of flight

following his convictions are even more pronounced after sentencing,

in light of the significant term of incarceration defendant faces.

First, defendant previously contemplated fleeing to Korea when he

faced law enforcement scrutiny.  Second, defendant has substantial

financial holdings, including significant sums of cash, that he could

use to easily facilitate such flight.  Third, defendant was convicted

1  of obstruction of justice through falsification of records, which
2  demonstrates his willingness to seek to evade responsibility for his
3  crimes and to avoid law enforcement detection.  And in addition to
4  obstructing justice through falsifying documents, defendant
5  encouraged match his story with defendant's false story in order to
6  avoid law enforcement detection, as captured in surreptitiously
7  recorded conversations.

8      These facts led to a very close call following defendant's
9  convictions.  Now that the Court has sentenced defendant to a
10  significant term of six and a half years in prison, defendant has a
11  substantially higher incentive to flee.  Previously, whether
12  defendant would face a years-long period of imprisonment was only
13  theoretical; now, however, it is a stark reality because the Court
14  sentenced defendant to six and a half years.  This is a drastic
15  change in circumstances from post-verdict/pre-sentencing to post-
16  sentencing that favors detention.[3]

17      Notwithstanding defendant's substantial ties to this District
18  and compliance with the terms of his release to date, his behavior
19  leading up to sentencing is hardly proof by clear and convincing
20  evidence to overcome the presumption of detention.  That defendant
21  was compliant before he knew of this fate, especially before he knew
22  whether the Court would exercise the substantial leniency he sought,
23  does not establish by clear and convincing evidence that he will not
24  flee now that the Court has imposed a substantial term of

25
26
27      [3] As an enhanced condition of defendant's post-verdict release,
defendant's wife was required to surrender her passport until
28  defendant's sentencing hearing, which condition presumably lapsed
when defendant was sentenced and potentially could be reimposed.

imprisonment.[4]  This is especially true in light of defendant's admitted contemplation of flight previously, his substantial cash and other financial resources to facilitate such flight, and his history of obstructing justice.  For these reasons, defendant has failed to establish by clear and convincing evidence that he is unlikely to flee.

**V.    Defendant Fails to Establish Any Substantial Question of Fact or Law Likely to Result in Reversal or a New Trial**

**A.    Defendant Fails to Raise a Substantial Question as to the Court's Denial of His <u>Batson</u> Challenge**

1.    Facts Relating to *Batson* Challenge

Defendant is Asian American.  (Dkt. No. 1169 at 9.)  At trial, the parties selected twelve jurors and six alternates.  (Trial Tr. 121.)  With respect to the twelve jurors selected for the regular jury, defendant was given ten peremptory challenges, and the government was given six.  (Trial Tr. 7:6-8.)  The parties each exercised all but one of their peremptory challenges[5] before accepting the panel.  (Trial Tr. 118:9-21.)  For the regular panel, the government struck no Asian juror, and defendant apparently struck one or more Asian jurors.  (<u>See</u> Trial Tr. 135:7-9, 16-17.)

---

[4] While the government agreed to allow defendant to remain on bond pending his self-surrender date, according to terms of post-trial release, that was for a period of slight over two months, as opposed to the period of years likely to pass until defendant's appeal is resolved, that latter of which would allow defendant significantly more time and opportunity to plan and carry out his flight.

[5] The government exercised the following peremptories: 1 (Trial Tr. 65:23-66 (Juror No. 8-R)), 2 (79:4-7 (Juror No. 7-A)), 3 (91:4-7 (Juror No. 18-A)), 4 (95:22-25 (Juror No. 22-A)), 5 (115:2-6 (Juror No. 23-O)).  Defendant exercised the following peremptories: 1 (Trial Tr. 68:8-11 (Juror No. 4-B)), 2 (71:8-13 (Juror No. 12-M)), 3 (82:21-23 (Juror No. 13-C)), 4 (87:14-18 (Juror No. 11-P)), 5 (92:19-21 (Juror No. 20-R)), 6 (94:9-12 (Juror No. 19-M)), 7 (103:11-15 (Juror No. 1-H)); 8 (110:17-20 (Juror No. 25-M)); 9 (116:5-13 (Juror No. 3-M)).

After the Court swore in the panel of twelve regular jurors, it began selection of the six alternate jurors.  The government exercised only one peremptory challenge to a juror who government counsel did not believe was Asian.  (See Trial Tr. 132:15-19 (Juror No. 30-T); see Trial Tr. 135:3-6 ("One, I disagree that that juror was Asian.").)  Following the government's exercise of this peremptory, defendant raised a Batson challenge, as follows:

> MR. NEUMAN: Your Honor, while we're here -- not with you. Just with us.
>
> Your Honor, we have a concern, I guess, a Batson challenge at this point regarding the fact that the only Asian juror was just struck by the Government.  I just noticed that there's no Asian jurors left, and there seemed to be nothing about that juror that was interesting. So --
>
> THE COURT: All right. Which -- which juror number was it?
>
> MR. NEUMAN: I don't have it with me. I can get it.
>
> THE COURT: Okay.
>
> MR. NEUMAN: It was Juror No. 30, who was Alternate No. 2.
>
> THE COURT: All right. Do you have a -- and what's your prima facie case?
>
> MR. NEUMAN: At this point, Your Honor, I believe all the Asian jurors have been struck.  I'm not sure, but there appears to be nothing other than the fact that he was Asian.

(Trial Tr. 134:12-135:2 (emphases added).)

Government counsel first responding by clarifying that he did not perceive the juror as Asian: "One, I disagree that that juror was Asian."  (Trial Tr. 135:3-4.)  The Court appeared to agree: "That's my concern."  (Trial Tr. 135:5.)  Defense counsel declined to elaborate further on this point or respond. (Trial Tr. 135:16-17.)

Government counsel then made a further record:

> MR. JENKINS: Just for the record.

12

1    Number 2, we've made no other strikes of any other Asian
     jurors.  The defense has struck Asian jurors.  So if
2    there's no Asian jurors left, it's because of the defense.

3    And the reason we struck that juror is because he is a
     young student, provided very little information.  He's a
4    computer scientist, studying computer science.  And we are
     typically uncertain of how computer scientists and college
5    students will react to deliberating with other jurors.

6    For those reasons, that was -- we –

7    (Trial Tr. 135:6-15.)  The Court offered defense counsel an

8    opportunity to respond to the government's various arguments, but

9    defense counsel chose not to respond either to the government's

10   attack of the prima facie case or to the government's proffered non-

11   discriminatory justifications for striking the alternate juror.

12   (Trial Tr. 135:16-17 ("THE COURT: Okay. Do you want to respond? MR.

13   NEUMAN: No, Your Honor.").)  Put differently, defense counsel did not

14   dispute government counsel's (or the Court's) perception of the

15   stricken juror's race as non-Asian, did not dispute that defendant

16   had struck Asian jurors, and did not challenge the government's

17   stated reasons for striking the juror as pretextual.

18       Following defense counsel's silence, the Court concluded: "I

19   find that the strike was -- that the Government struck that witness

20   for a nondiscriminatory reason."  (Trial Tr. 135:18-20.)  Thereafter,

21   defendant exercised two peremptory challenges (Trial Tr. 135:25-136:5

22   (No. 35, seat 1-F), 139:7-13 (No. 32, seat 4-C))), while the

23   government passed until defendant also passed on alternates, and the

24   alternates were sworn in.  (Trial Tr. 139:5-9, 145:1-22.)

25       2.   Legal Standard for *Batson* Challenges

26       "Purposeful racial discrimination in selection of the venire

27   violates a defendant's right to equal protection because it denies

28   him the protection that a trial by jury is intended to secure."

                                   13

1   Batson v. Kentucky, 476 U.S. 79, 86  (1986).  To determine when the

2   use of peremptory strikes amounts to unconstitutional discrimination,

3   the Supreme Court in Batson established a three-part, burden-shifting

4   test.  First, the defendant must make a prima facie showing that the

5   totality of the circumstances give rise to an inference of

6   discrimination.  Johnson v. California, 545 U.S. 162, 168 (2005)

7   (citing Batson, 476 U.S. at 93-94).  Second, the "'burden shifts to

8   the [government] to explain adequately the racial exclusion' by

9   offering permissible race-neutral justifications for the strikes."

10  Id. (quoting Batson, 476 U.S. at 94).  Third, the trial court

11  evaluates the prosecution's explanation for pretext and determines if

12  the defendant established purposeful discrimination.  See id.;

13  Miller-El v. Dretke, 545 U.S. 231, 252 (2005).  "If the defendant

14  fails to establish a prima facie case, the burden does not shift to

15  the prosecution, and the prosecutor is not required to offer an

16  explanation for the challenge."  Tolbert v. Gomez, 190 F.3d 985, 988

17  (9th Cir. 1999).

18              3.   Defendant Failed to Establish a Prima Facie Case[6]

19       The Court's denial of defendant's Batson challenge does not

20  present a substantial issue because he failed to establish a prima

21  facie case.

22       The Ninth Circuit has established a separate three-part test for

23

24       [6] Although the Court did not explicitly deny defendant's Batson
    claim for failure to state a prima facie case, a reviewing court
25  analyzes such claims under either a de novo or clear error standard.
    See Cooperwood v. Cambra, 245 F.3d 1042, 1047 (9th Cir. 2001)
26  (reviewing de novo the state court's ruling on the Batson prima facie
    issue); Williams v. Rhoades, 354 F.3d 1101, 1107 (9th Cir. 2004)
27  (reviewing de novo the facial validity of prosecutor's proffered
    reasons); United States v. Steele, 298 F.3d 906, 910 (9th Cir. 2002)
28  (whether defendant has made a prima facie showing of racial
    discrimination is reviewed for clear error).

step one.  Under that test, to show a prima facie case: (1) the prospective juror must be a member of a cognizable group, (2) the prosecutor must use a peremptory strike to remove that juror, and (3) the totality of the circumstances must raise an inference that a protected trait motivated the prosecutor to strike.  See Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir. 2006).  "[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  Johnson, 545 U.S. at 170.  In addition to statistics, a court "consider[s] any other relevant circumstances brought to [its] attention that may support or refute an inference of discriminatory purpose."  Williams v. Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006) (internal quotation marks omitted). Comparing challenged and unchallenged jurors is a "tool for conducting meaningful appellate review of whether a prima facie case has been established."  United States v. Collins, 551 F.3d 917, 921 9th Cir. 2008).  Courts can look to the entire trial record, even after defense counsel made the motion.  See Wade v. Terhune, 202 F.3d 1190, 1198 (9th Cir. 2000) ("[W]e do not believe that the only relevant time at which to assess the would-be prima facie case is the time of the challenge.").

Defendant failed to establish a prima facie case of discrimination, such that the burden never shifted to the prosecution.  See Tolbert, 190 F.3d at 988 ("If the defendant fails to establish a prima facie case, the burden does not shift to the prosecution, and the prosecutor is not required to offer an explanation for the challenge.").  First, the record demonstrates that government counsel did not perceive the stricken alternate juror

15

as Asian, and that the Court shared the same "concern."
Specifically, defense counsel stated he believed that the government
had just struck the last Asian juror, but government counsel
responded that he did not believe the juror as Asian, to which the
Court responded, "That's my concern."  (Trial Tr. 135:3-6.)  A Batson
challenge focuses on the perception of the race or ethnicity of the
prospective jurors, not their actual race or ethnicity.  Nguyen v.
Frauenheim, 45 F.4th 1094, 1102 n.3 (9th Cir. 2022) (citing United
States v. Guerrero, 595 F.3d 1059, 1063 n.3 (9th Cir. 2010)).  Thus,
the government's perception that the alternate juror was not Asian,
and the Court's statement supporting that perception, defeats the
prima facie case.

Further, defense counsel's response in the face of the
government's assertion that the juror was not Asian -- or, more
accurately, his lack of any response -- further undermines his prima
facie case.  Specifically, after the government and the Court
expressed doubts that the juror was Asian, defense counsel declined
to respond further.  Thus, under the Ninth Circuit's three-part
analysis of the first Batson requirement, defendant fails from the
beginning because he failed to establish that the prospective juror
was a member of a cognizable group.[7]

Second, even if government counsel and the Court perceived the
juror as *potentially* Asian, the totality of the circumstances here
did not "raise an inference that race motivated the prosecutor to
strike."  Nguyen, 45 F.4th at 1101 (citing Boyd, 467 F.3d at 1143).

---

[7] The juror's surname indeed appears to be Thai, or South Asian,
but the parties did not appear to realize the origin of this surname
at the time.

16

1    While defendant is correct that "[t]he   juror for a discriminatory
2    purpose," <u>Flowers v. Mississippi</u>, 588 U.S. ----, 139 S. Ct. 2228,
3    2244 (2019), "generally striking only one prospective juror who
4    belongs to a protected group is not enough to draw an inference
5    without other evidence." <u>Nguyen</u>, 45 F.4th at 1101 (citing <u>Wade</u>, 202
6    F.3d at 1198); <u>United States v. Hernandez-Quintania</u>, 874 F.3d 1123,
7    1129 (9th Cir. 2017) (nor is striking two prospective jurors).

8         Here, the record is uncontested that the government did not
9    strike any Asian jurors during selection of the regular jury and
10   struck only one alternate juror that counsel did not perceive to be
11   Asian.  By contrast, defendant apparently struck at least one or more
12   Asian jurors during selection of the regular jury.  Under these
13   circumstances, a single stricken juror is simply too small a sampling
14   "to rely on alone" to establish a prima facie case here.  <u>Nguyen</u>, 45
15   F.4th at 1102 n.3 (evidence that prosecutor used three of his first
16   five peremptory challenges to strike Hispanic prospective jurors was
17   not sufficient to support inference of race discrimination, as
18   required to establish prima facie <u>Batson</u> claim, where three other
19   Hispanic persons were not struck and were seated on the jury panel,
20   other race-neutral reasons supported removal of the Hispanic
21   prospective jurors, and no available statistics, comparisons, or
22   other evidence suggested an inference of race discrimination);
23   <u>Fernandez v. Roe</u>, 286 F.3d 1073, 1078 (9th Cir. 2002) ("[t]wo
24   challenges out of two [African American] venirepersons are not always
25   enough to establish a prima facie case" because "the numbers are so
26   small (and, hence, potentially unreliable)"); <u>Shirley v. Yates</u>, 807
27   F.3d 1090, 1101 n.7 (9th Cir. 2015) ("[W]hen a <u>Batson</u> challenge is
28   made after the first minority to be called into the jury box is

                                    17

peremptorily struck but well before jury selection concludes, it would be erroneous to find that a prima facie case had been made merely because at the time of the challenge the prosecutor had struck 100% of minority veniremembers.").

At the time of the Batson motion in this case, the parties had already selected the regular jury, during which government used five peremptories, none of which was to excuse an Asian juror.  (See Trial Tr. 65:23-66 (No. 8)), 79:4-7 (No. 7), 91:4-7 (No. 18), 95:22-25 (No. 22), 115:2-6 (No. 23).)  Defendant's counsel, by contrast, apparently had stricken one or more Asian jurors from the venire.[8]  Only during selection of alternate jurors did the government make its first, and only, challenge to the juror the government did not perceive to be Asian.  Although the jurors' surnames do not illuminate the eventual composition of the jury, this single instance is not sufficiently reliable to establish prima facie discriminatory intent.  See Fernande, 286 F.3d at 1078.

Finally, although relevant to the later steps of the Batson inquiry, there were obvious, nondiscriminatory reasons for removing Juror No. 30.  See Wade, 202 F.3d at 1198-99 (considering reasons in the record for strikes at step one); Johnson v. Campbell, 92 F.3d 951, 953 (9th Cir. 1996) (in finding no prima facie case, court relied on the "obvious neutral reason for the challenge," that the challenged juror had served in a previous trial involving similar allegations of excessive police force and outcome of that trial was unknown).  Specifically, the government noted several plainly neutral

---

[8] The defense did not respond to the government's factual statement that "The defense has struck Asian jurors. So if there's no Asian jurors left, it's because of the defense"  (Trial Tr. 135:8-9.)

reasons for excusing Juror No. 30: he was a "young student who provided very little information" and was studying computer science. The government further explained: "[W]e are typically uncertain of how computer scientists and college students will react to deliberating with other jurors." (Trial Tr. 135:10-14.)[9]  These characteristics have been recognized by the Ninth Circuit as nondiscriminatory reasons for peremptory strikes.  See Nguyen, 45 F.4th at 1103 ("Lack of maturity and life experience are nondiscriminatory reasons for a peremptory strike."); Jamerson v. Runnels, 713 F.3d 1218, 1235 (9th Cir. 2013) ("A prosecutor may strike a potential juror on the basis of his or her occupation if the prosecutor can state a genuine, race-neutral reason for believing that the occupation would make the juror unfavorable."); United States v. Hernandez-Garcia, 44 F.4th 1157, 1167 (9th Cir. 2022) (striking juror based on occupation as research scientist was permissible because prosecution stated race-neutral reason for believing that the occupation would make the juror unfavorable—i.e., the concern that engineers used to dealing with hard numbers and objective facts would be skeptical of the government's case built on circumstantial evidence); Sims v. Brown, 425 F.3d 560, 574-76 (9th Cir. 2005) (youth and lack of life experience were race-neutral reasons for peremptory challenges), amended by, 430 F.3d 1220 (9th Cir. 2005); Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000) ("[A]ge [and] life experience ... have been found to be acceptable race neutral bases for peremptory challenges.").

Put simply, the Court correctly denied defendant's Batson

---

[9] The record further reflected that Juror No. 30 also was unmarried and had no children.

19

1  challenge because he failed "to produc[e] evidence sufficient to

2  permit the trial judge to draw an inference that discrimination has

3  occurred."  Johnson, 545 U.S. at 170.

4          4.    The Court Correctly Concluded the Government Offered
               an Adequate Race-Neutral Explanation for Exercising
5              Its Peremptory Challenge

6      As discussed above, even if defendant did establish a prima

7  facie case (which he did not), the government offered adequate race-

8  neutral explanations for striking the alternate juror.  The juror's

9  youth, lack of life experience, and occupation in a field the

10 government explained would be unfavorable are all traits the Ninth

11 Circuit and other courts of appeal have been found to be acceptable,

12 race-neutral bases for peremptory challenges.  See supra at 19.

13     For all of these reasons, defendant's Batson challenge does not

14 raise a substantial question likely to result in reversal or a new

15 trial.

16     **B.    Defendant Fails to Raise a Substantial Issue as to the
           Court's Denial of His Request to Admit Defendant's Self-
17          Serving Hearsay Statements**

18     Next, defendant argues that the Court's exclusion of evidence

19 containing his self-serving hearsay statements raises a substantial

20 issue justifying bail pending appeal.

21     Exhibits 118A through 118D and Exhibits 119B through 119F were

22 agreed-upon translated transcripts of recorded meetings between

23 defendant and government cooperator Justin Kim from March 20, 2019

24 and March 27, 2019, respectively.  During the testimony of FBI

25 Special Agent Civetti, the Court admitted Exhibits 118C and 118D

26 against defendant as party-opponent admissions.  (See Trial Tr. 421,

27 1304-12; Dkt. Nos. 524 at 4 & 586 at 13.)  In response, defendant

28 sought to admit the remaining exhibits – that is, Exs. 118A-B & 119A

-- but later withdrew his request to admit 119A, and the government objected that all such statements were inadmissible hearsay without an exception when offered by defendant. (Trial Tr. 421.) The Court sustained the government's objection but agreed to consider the issue during Kim's testimony and also agreed to consider defendant's rule of completeness arguments. (Trial Tr 421-22.) The parties briefed at length the admissibility of these exhibits. (See Dkt. No. 476 (Gov't Trial Memo); Dkt. No. 524 (Def's Response to Trial Memo); 529 (Gov't Reply).) Ultimately, the Court denied defendant's request to admit the remaining portions of the transcripts because the statements were self-serving hearsay assertions of defendant's "belief [of] what had happened in 2017" without subjecting defendant to cross-examination and admission was not required under the rule of completeness. (Trial Tr. 1304-1312.)

The Court did not err in refusing to admit defendant's self-serving hearsay statements and certainly did not clearly error. See United States v. Mitchell, 502 F.3d 931, 964 (9th Cir. 2007) (exclusion of evidence under the hearsay rule is reviewed for an abuse of discretion); United States v. Lopez, 4 F.4th 706, 717 (9th Cir. 2021) (application of the rule of completeness is a matter for the trial judge's discretion); Briseno v. Henderson, 998 F.3d 1014, 1022 (9th Cir. 2021) ("A district court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact.").

    1.   118A & 118B Were Properly Excluded As Inadmissible, Self-Serving Hearsay

In the Motion, defendant recycles arguments he raised during

1    trial, including that defendant's excluded statements about where the

2    bribe money went were not hearsay because they were (1) not

3    assertions, but rather questions, to prove that the statements were

4    made, and (2) utterances "not offered for the truth of assertions."

5    (See Dkt. Nos. 524 at 2-4, 1169 at 12).  Defendant contends these

6    exhibits establish defendant's belief that at least part of the money

7    he gave to Justin Kim was paid directly to the union (the Coalition

8    for Responsible Equitable Economic Development) ("CREED" or "CREED

9    LA") to settle the appeal and that, without these two excerpts, the

10   other portions of the conversation give the misleading impression

11   that Kim and Lee shared an understanding that all of the bribe money

12   was to go to Huizar instead of to CREED.

13       The Court properly admitted defendant's self-inculpatory

14   statements to Kim contained in Exhibits 118C and 118D as non-hearsay

15   admissions by a party opponent.  See Fed. R. Evid. 801(d)(2); United

16   States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).  But while the

17   government may present such non-hearsay evidence of defendant's

18   statements, statements offered by defendant, either through the

19   introduction of evidence or through cross-examination of government

20   witnesses are inadmissible hearsay.  Ortega, 203 F.3d at 682 (non-

21   self-inculpatory statements, even if made  contemporaneously with

22   other self-inculpatory statements, are inadmissible hearsay).

23       Because such statements are hearsay, they are admissible only if

24   they fall under any exceptions to the hearsay rule or are otherwise

25   admissible.  No such exception exists here.  Defendant first argues

26   that the statements in Exhibits 118A and 118B are not hearsay because

27   defendant did not intend them as assertions.  But aside from making

28   this argument, defendant cites no authority, persuasive or otherwise,

1   to support this proposition.  (See Dkt. No. 1169 at 12-13.)  The

2   authorities defendant cited in his trial briefing to support this

3   contention were plainly distinguishable because in those cases, "the

4   fact that the statements were made was not used to prove the truth of

5   the content of the statements" and the admitting party sought to show

6   their falsity through independent evidence.  See, e.g., United States

7   v. Gibson, 690 F.2d 697, 700 & n.1 (9th Cir. 1982).  Of course, by

8   contrast here, defendant seeks to use the fact that defendant made

9   statements about the bribe payment to prove the truth of the

10  statements, that is, his purported understanding of the bribe payment

11  and the reasons for that understanding.

12      That defendant's statement appear as questions does not alter

13  this analysis because "the grammatical form of a verbal utterance

14  does not govern whether it fits within the definition of hearsay."

15  United States v. Torres, 794 F.3d 1053, 1060-62 (9th Cir. 2015)

16  ("Because there may be instances where a party attempts to admit

17  hearsay by cloaking statements under the guise of a question, the

18  focus of the inquiry should be on what the declarant intended to say,

19  whether implied or directly asserted.").  In Torres, for example, the

20  Court held that three separate questions by defendant's friend

21  constituted hearsay because they were intended as implied assertions

22  that "it was the [friend] who was calling the shots."  Id.; see Park

23  v. Huff, 493 F.2d 923, 928 (5th Cir. 1974), on reh'g, 506 F.2d 849

24  (5th Cir. 1975) (holding that because of the potential to otherwise

25  circumvent the hearsay rule "through clever questioning and coaching

26  of witnesses," it is essential that "an out of- court statement which

27  implies the existence of the ultimate fact in issue [] made with

28  assertive intent . . . be treated as hearsay" just as if it were a

23

1  direct declaration of that fact); <u>United States v. Summers</u>, 414 F.3d

2  1287, 1299-1300 (10th Cir. 2005) (co-defendant's question to law

3  enforcement was intended as an assertion and therefore constituted

4  hearsay because rather than "exclusively" seeking to elicit a literal

5  response and information, the question "clearly contained an

6  inculpatory assertion" in that it "intimated both guilt and

7  wonderment at the ability of the police to apprehend the perpetrators

8  of the crime so quickly").

9      Here too, as even the defense tacitly admits, defendant's

10  "questions" in Exhibit 118A are implied assertions.  Namely,

11  defendant intended to use Exhibit 118A to demonstrate defendant's

12  asserted 2019 belief that some of the money had been given to the

13  union.  For example, the question, "How much was given to the union"

14  is no different in effect than the statement "I thought some of the

15  money was given to the union."  There would be no question that the

16  latter form of the assertion constitutes self-serving, inadmissible

17  hearsay.  Thus, because defendant's "questions" were made with

18  assertive intent, they must "be treated as hearsay" just as if they

19  were a direct declaration of that fact.  <u>Park</u>, 493 F.2d at 928.

20      Nor were, as defendant argues, his statements admissible as non-

21  hearsay expressions of defendant's state of mind the day he talked to

22  Kim.  Federal Rule of Evidence 803(3) provides that the rule against

23  hearsay does not preclude admission of "a statement of the

24  declarant's then existing state of mind, such as motive, intent, or

25  plan or emotional, sensory, or physical condition (such as mental

26  feeling, pain, or bodily health) <u>but not including a statement of</u>

27  <u>memory or belief to prove the fact remembered or believed unless it</u>

28

relates to the validity or terms of the declarant's will." Fed. R.
Evid. 803(3) (emphasis added).

In making the foundational inquiry on admissibility under the
state of mind exception, courts must evaluate three factors:
contemporaneousness, chance for reflection, and relevance. United
States v. Ponticelli, 622 F.2d 985, 991 (9th Cir. 1980). "The state
of mind declaration has probative value, because the declarant
presumably knows what his thoughts and emotions are at the time of
his declarations." Id. As such, "the more time that elapses between
the declaration and the period about which the declarant is
commenting, the less reliable is his statement, because the greater
chance there is that his memory is erroneous." Id. The state of
mind declaration also rests on the premise that "the declarant
presumably has no chance for reflection and therefore for
misrepresentation." Id.

Where, as here, a defendant's "state of mind itself is an issue,
the court must determine if the declarant's state of mind at the time
of the declaration is relevant to the declarant's state of mind at
the time at issue." Id.; United States v. Fontenot, 14 F.3d 1364,
1371 (9th Cir. 1994) ("The state-of-mind exception does not permit
the witness to relate any of the declarant's statements as to why he
held the particular state of mind, or what he might have believed
that would have induced the state of mind," and instead "limit[s]
those admissible statements to declarations of condition—'I'm
scared'—and not belief—'I'm scared because [someone] threatened me."
(cleaned up)).

Applying these principles to Exhibits 118A and 118B, the Court
correctly concluded that defendant's statements to Kim were "neither

contemporaneous, relevant, nor reliable" because defendant "made these statements more than two years after committing the alleged crime of bribery." (Trial Tr. 1308.) Put different, evidence of defendant's state of mind the day of the meeting, on March 20, 2019, had "no probative value" and simply was "not relevant to his state of mind in February and March of 2017." (Id.) Defendant's chance for reflection here is especially probative, because defendant "spoke to Mr. Kim after he knew about the ongoing investigation and had an opportunity for reflection and misrepresentation." (Id. (emphasis added).) Further, Kim testified that defendant sought to persuade Kim to falsely align his story with defendant's.[10] Thus, rather than being offered for the fact that defendant remembered the statements or the fact that the statements were made, defendant's statements to Kim about payments to the union "are clearly self-serving explanation of past events and specifically statements of his memory or belief about what happened during the relevant time period. See Jackson, 780 F.2d at 1313-14 (holding district court did not abuse its discretion in refusing to admit coconspirators' statements as inadmissible hearsay where they denied participation in conspiracy nearly two years after the alleged theft and after they were aware that employee had been contacted by FBI).

For these reasons, the Court did not abuse its discretion in concluding that "without subjecting himself to cross-examination, defendant[] seek[s] to introduce his out-of-court statements to prove

---

[10] For these same reasons, defendant's contention that the recordings are "reliable" because they are recordings (Dkt. No. 1169 at 14) is misplaced because "the fidelity of the recordings themselves" does not bear on "the underlying truthfulness of the statements made." United States v. Jackson, 780 F.2d 1305, 1316 (7th Cir. 1986).

that he had no knowledge of the bribe Kim paid to Huizar in connection with the CREED appeal.  And, therefore, his statements go to the truth of the matters asserted and those statements are hearsay."  (Trial Tr. 1309.)

### 2.    118A & 118B Were Not Admissible Under the Rule of Completeness

The Court also correctly concluded that Exhibits 118A and 118B were not admissible under the Rule of Completeness because the admitted exhibits did not contain a "misleading tailored snippet" of a statement.  (Trial Tr. 1310.)  Specifically, the hearsay statements defendant sought to admit were "not necessary to understand or clarify portions of the recorded meeting the government introduced into evidence."  (Trial Tr. 1311.)

"Statements are inextricably intertwined when the meaning of a statement, if divorced from the context provided by the other statement, is different than the meaning the statement has when read within the context provided by the other statement."  United States v. Castro-Cabrera, 534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008).  In such a case, fairness requires that the statement as a whole be admitted, notwithstanding that they would otherwise be hearsay if offered by the defendant.

Importantly, however, the rule of completeness does not compel admission of a defendant's statements merely because they support his theory of the defense, where, as here, the statements are neither explanatory nor relevant to the admitted passages.  See United States v. Lewis, 641 F.3d 773, 785 (7th Cir. 2011) (rejecting defendant's theory that Federal Rule of Evidence Rule 106 required admission of additional portions of his post-arrest statement that showed "lack of

27

connection" with gang); <u>United States v. Castro</u>, 813 F.2d 571, 577
(2d Cir. 1987) (holding trial court did not abuse its discretion in
redacting exculpatory statements from defendant's confession where
defendant made inculpatory statements and then later made exculpatory
statements because the meaning of the inculpatory statement did not
depend on the context of the exculpatory statement).

Here, as the Court found, the hearsay statements defendant
"seeks to admit are not necessary to understand or clarify the
portions of the recorded meeting the Government introduced into
evidence" because "[t]here's nothing confusing or unclear about Lee
and Kim's exchanges in Exhibits 118C and D, nor are the statements
defendants seek to admit necessary to prevent a different or
distorted meaning."  (Trial Tr. 1311.)  Thus, the Court did not abuse
its discretion in concluding that, "because the statements the
defendant seeks to admit are not necessary for clarification or
completeness, they remain inadmissible and are not admissible under
Rule 106."  (<u>Id.</u>)

3. <u>The Court Properly Sustained Hearsay Objections to
Defense's Cross-Examination of Kim Because Defendant
Sought to Elicit the Same Self-Serving Hearsay Via Kim</u>

For the same reasons that defendant's self-serving statements
were inadmissible as exhibits, they also were inadmissible when
defense counsel attempted to elicit such statements during Kim's
cross-examination.  Contrary to defendant's contention, his questions
to Kim called for hearsay because they sought to elicit the topics
discussed during Kim's meetings with defendant, including their
discussion of "where the money was going," whether Kim understood
defendant "thought that the money had gone to [Kim] and CREED," and
defendant's repeated inquiry whether defendant knew that "no money

28

had gone to CREED."  (Dkt. No. 1169 at 15 (citing transcript references).)[11]  Here, defendant was not eliciting this information for non-hearsay impeachment purposes, but for the truth of his own out of court statements.

     For these reasons, defendant has failed to raise a substantial question as the Court's exclusion of hearsay evidence, and certainly not one likely to result in reversal or a new trial.

### C.   Defendant Fails to Raise a Substantial Issue as to the Court's Formulation of the Jury Instructions

     Defendant claims that the Court's formulation of the honest services fraud and bribery jury instructions raises substantial issues likely to result in reversal or a new trial.  This argument fails too because the instructions fairly and adequately covered the elements of the offenses and were sufficient as a whole to guide the jury's deliberations.[12]

### 1.   The Jury Instruction for Count Five

     With respect to Count Five, defendant makes three arguments: (1) the jury instruction was not limited to the government's vote-promise theory and accordingly permitted the jury to convict defendant on a union-pressuring theory; (2) references to Esparza should have been

---

     [11] The latter two lines of questioning also were improper because they called for speculation as to what defendant thought or knew.
     [12] The court reviews de novo whether jury instructions omit or misstate elements of a statutory crime.  See United States v. Collazo, 984 F.3d 1308, 1318 (9th Cir. 2021) (as amended); United States v. Vallejo, 237 F.3d 1008, 1024 (9th Cir. 2001), amended by 246 F.3d 1150 (9th Cir. 2001) (If "the instructions 'fairly and adequately covered the elements of the offense,' we review the instruction's precise formulation for abuse of discretion.'").  Whether jury instructions adequately cover a defendant's proffered defense or theory of the case is also reviewed de novo.  See United States v. Chi, 936 F.3d 888, 893 (9th Cir.), amended sub nom. United States v. Heon-Cheol Chi, 942 F.3d 1159 (9th Cir. 2019).

1  removed because "as Huizar's staffer, Esparza was not in a position

2  to commit the official act alleged in the" FSI; and (3) the two means

3  of satisfying the official act element (the vote-promise and the

4  union-pressuring) should have been included in the instruction.

5  (Dkt. No. 1169 at 16-20.)  The Court correctly decided each of these

6  issues, which are not fairly debatable or likely to result in

7  reversal or a new trial.

8                          *a.   Official Act*

9       The parties briefed at length before trial and as part of the

10  jury instructions the viability of the government's so-called union-

11  pressuring theory, and the Court largely and properly decided those

12  issues in the government's favor.[13]

13       To begin, the Court agreed pretrial with defendant's premise

14  that "negotiating and exerting pressure on labor unions to resolve

15  issues on projects does not typically, without more, constitute an

16  official act."  (Dkt. No. 324 at 6.)  Here, however, "the specific

17  circumstances and method by which Huizar . . . negotiated and exerted

18  pressure on [CREED], evidences the performance of an 'official act'

19  or an agreement to perform an official act."  (Dkt. No. 324 at 6.)

20  As the government alleged in the FSI and proved at trial, in exchange

21  for a cash bribe from defendant, Huizar communicated to CREED, via

22  George Esparza, that CREED should drop the appeal because Huizar was

23  going to support the developer, who was "friends of the office, by

24  voting against the appeal in PLUM.  (Trial Tr. 963-64.)  In response,

25  CREED asked for Huizar's support on a future development project that

26

27  _____

28       [13] The government will not repeat those arguments here but
     incorporates them by reference.  (See Dkt. Nos. 324 (Order on Motion
     to Strike).)

                                      30

1    was slated to be approved by the City.  (Trial Tr. 964.)  Huizar

2    agreed to these terms, and CREED then dropped its appeal, which

3    allowed defendant's lucrative project to proceed through the approval

4    process.  (Trial Tr. 964.)

5         In other words, on a matter that currently was pending before

6    the City and eventually would be pending before Huizar, Huizar told

7    CREED that he had decided to oppose its appeal.  That may be

8    considered a decision or action on CREED's appeal, or "at the very

9    least, evidences an agreement to make that decision or take that

10   action on CREED's appeal."  (Dkt. No. 324 at 964 (citing McDonnell,

11   579 U.S. 572 ("For example, a decision or action to initiate a

12   research study -- or a decision or an action on a qualifying step,

13   such as narrowing down the list of potential research topics -- would

14   qualify as an official act.") (cleaned up)).)  The instruction that

15   permitted this cognizable union-pressuring theory was not erroneous

16   because Huizar and Esparza used the prospect of an official act

17   (Huizar voting against CREED's appeal), which falls squarely within

18   the definition of official acts articulated in McDonnell v. United

19   States, 579 U.S. 550, 572 (2016),  to exert pressure on CREED to

20   dismiss the appeal.  Id. ("A jury could, for example, conclude that

21   an agreement was reached if the evidence shows that the public

22   official received a thing of value knowing that it was given with the

23   expectation that the official would perform an 'official act' in

24   return.").

25        Thus, defendant has failed to raise a fairly debatable issue

26   with respect to the Court's instructions on official act.

27

28

1

*b.   George Esparza*

2      Defendant's challenge to the inclusion of George Esparza in the

3 instruction to Count 5 is meritless.  Defendant first argues that "as

4 Huizar's staffer, Esparza was not in a position to commit the

5 official acts alleged.  But "[u]nder this Court's precedents, a

6 public official is not required to actually make a decision or take

7 an action on a question, matter, cause, suit, proceeding or

8 controversy; it is enough that the official agree to do so."

9 McDonnell, 579 U.S. at 572 (cleaned up); United States v. Kimbrew,

10 944 F.3d 810, 814 (9th Cir. 2019) ("The bribe recipient need not be

11 the final decisionmaker.")  "Nor must the public official in fact

12 intend to perform the 'official act,' so long as he agrees to do so."

13 McDonnell, 579 U.S. at 572.  Thus, it is immaterial that Esparza was

14 a staffer who ultimately could not vote on appeal, so long as

15 defendant agreed to pay Huizar or Esparza in exchange for an official

16 act.[14]  See United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 825

17 _____

18      [14] Defendant does not appear to challenge the definition of
official act in Count Five, which provides:

19           An "official act" is any decision or action on a

20      question, matter, cause, suit, proceeding, or controversy

         involving the formal exercise of governmental power.  The

21      question, matter, cause, suit, proceeding, or controversy

22      must be pending, or be able by law to be brought, before a

         public official, and the question, matter, cause, suit,

23      proceeding, or controversy must be something specific and

24      focused, rather than a broad policy objective.

25           The official's decision or action may include using his

26      official position to exert pressure on another official to

         perform an official act, or to advise another official,

27      knowing or intending that such advice will form the basis for

28      an official act by another official.  The bribe recipient

*(footnote cont'd on next page)*

32

1    (9th Cir. 1985) (concluding that "a person may be convicted of

2    bribery [under § 201(b)(2)] even though the action requested is not

3    within the official's power to perform"); Kimbrew, 944 F.3d at 815

4    (affirming staffer's § 201 bribery conviction where he claimed not to

5    have had actual influence over a city attorney and congressman and

6    reasoning that the prosecution was not required to prove the

7    defendant "could achieve the outcome he promised"; "Nowhere in the

8    statute or in the governing case law is there a requirement that the

9    bribe recipient be able to succeed in exerting that pressure or

10   persuading through his advice to realize the desired result.").

11       Thus, the inclusion of George Esparza in the jury instruction

12   did not risk an improper verdict and was not fairly debatable.

13                         c.   Means

14       Defendant's argument that the Count Five instruction should have

15   specified the two official acts alleged by the government also fails.

16   Here, the record established that Huizar and Esparza had two avenues

17   for accomplishing the promise/agreement they made to defendant to

18   resolve the CREED appeal: by Huizar voting against the appeal or by

19   pressuring CREED to dismiss its appeal by leveraging Huizar's vote.

20   Either way, they would use their office to resolve the appeal in

21   defendant's favor.

22       These two avenues for accomplishing Huizar's promise/the

23   _____

24       need not be the final decisionmaker.

25       The government does not need to prove that the official
     ever actually intended to perform an official act or that the
26   official ever did, in fact, perform an official act, provided
     that he agreed to do so.
27

28       Merely arranging a meeting, hosting an event, or giving a
     speech do not qualify as the taking of a specific action.

                                     33

agreement were simply different means of meeting the "official act" element, not two sets of facts requiring unanimity. The CREED appeal was the specific matter that was pending and capable of being brought before Huizar and was filed and appealable to PLUM and City Council. Huizar and Esparza agreed to help resolve the appeal in exchange for cash. Under McDonnell, Huizar and Esparza did not need to specify, and the co-schemers did not need to agree upon, how they would accomplish that promise. 579 U.S. at 572 ("The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain."). Thus, because the government was not required to include the means in the jury instruction or require unanimity, this issue is neither fairly debatable not likely to result in reversal or a new trial. And, given that the instruction plainly defined what was and what was not an official act (with which defendant takes no issue), defendant's claim that the jury may have convicted on another, unspecified "impermissible basis" that was never presented by the government is unfounded.

### 2.   Jury Instruction for Count Twenty-Five

Defendant next argues that Count Twenty-Five is similarly infirm because it "arguably allowed a conviction without a bribe intended to influence or reward an agent in connection with government business." (Dkt. No. 1169 at 18.)

The Court instructed the jury to this element as follows:

Third, the defendant acted corruptly, that is, with an intent to influence or reward Jose Huizar or George Esparza in connection with any business, transaction, or series of transactions of the City involving anything of value of $5,000 or more. Specifically, the Government must prove that the defendant intended to influence or reward Jose Huizar or George Esparza in connection with the 940 Hill Project, including in

34

(1) pressuring CREED LA to dismiss its appeal against the 940
Hill Project, or (2) voting to deny CREED LA's appeal against
the 940 Hill Project in the PLUM Committee;
(Dkt. No. 584 at 29; Trial Tr. 2058.)

In crafting this argument, defendant repeats his contention from Count Five that the jury should have been instructed that it could convict only on the "vote-promise theory, not the union-pressuring theory." (Dkt. No. 1169 at 18.)  The Court correctly rejected this argument for several reasons.  First, as discussed at length in the Court's order on defendant's Motion to Strike and during the jury instruction conference, defendant's proposed instruction would have improperly imputed the official act requirement into Section 666, which does not have an official act requirement.  The Court analyzed at length why the official act requirement should not be imputed to § 666, and its conclusion was well supported by statutory construction and relevant case law.  (Dkt. No. 324 at 7-14 (analyzing authorities interpreting § 666 and concluding; "Not only does the statutory language of Section 666 not support [defendant's] construction, [but] the Court concludes that the constitutional concerns raised in McDonnell are not implicated by Section 666.").)

Second, defendant's argument that "[t]he government's Huizar-pressuring-CREED theory is not covered by § 666(a)(2) because CREED was not a federally funded or a local-government agency" is misplaced.  Relying on Ninth Circuit precedent, the Court reasoned that "the bribery proscribed by § 666 need not pertain directly to the business or transactions of an organization receiving federal funding; it need only be 'in connection with' it."  (Dkt. No 324 at 11 (quoting United States v. Ng Lap Seng, 934 F.3d 110, 133 (2d Cir. 2019), cert. denied, 141 S. Ct. 161 (2020)).)  Here, the pressure

35

1   adopted in jury instruction refers to Huizar and Esparza using their
2   official positions to pressure CREED to drop its appeal against 940
3   HILL's lucrative development project, which <u>was pending</u> before the
4   City of Los Angeles.  Defendant's payment of a $500,000 bribe in
5   exchange for Huizar and Esparza resolving the appeal therefore both
6   <u>pertained to and was in connection with</u> City of Los Angeles business.

7       Defendant thus fails to raise a substantial issue as to Count
8   Twenty-Five.

9           3.   <u>Defense Theory-of-the-Case Instruction</u>

10      Defendant's final argument is that the Court's failure to give
11  his requested "theory-of-the-defense" instruction[15] "was at least
12  debatable" and, "if erroneous, <u>per se</u> consequential."  (Dkt. No. 1169
13  at 19.)  Not so.  While "[a] defendant is entitled to have the jury
14  instructed on his or her theory of defense, as long as the theory has
15  support in the law and some foundation in the evidence," <u>United</u>
16  <u>States v. Perdomo-Espana</u>, 522 F.3d 983, 986-87 (9th Cir. 2008), "the
17  instruction need not be given in the form requested, nor if it merely
18  duplicates what the jury has already been told."  <u>United States v.</u>
19  <u>Lopez-Alvarez</u>, 970 F.2d 583, 597 (9th Cir. 1992).

20  _____
21      [15] Defendant requested the following instruction, which it
    characterized as a "theory of the case" instruction:

22          If you conclude that either defendant intended to pay
23      Justin Kim and/or CREED LA in exchange for dismissal of CREED
        LA's appeal, and did not intend for money to go to George
24      Esparza or Jose Huizar in exchange for an official act, you must
        find that defendant not guilty of Count 5.

25          If you conclude that either defendant intended to pay
26      Justin Kim and/or CREED LA in exchange for dismissal of CREED
        LA's appeal, and did not intend for money to influence or reward
27      George Esparza or Jose Huizar in connection with any business,
        transaction, or series of transactions of the City of Los
28      Angeles, you must find that defendant not guilty of Count 25.
    (Dkt. No. 484 at 38.)

The latter is precisely the situation here: the substantive instructions for Counts Five and Twenty-Five adequately informed the jury of all of the elements the government was required to prove beyond a reasonable doubt.  (See Trial Tr. 1586 (properly concluding that this instruction was inappropriate because "the substantive instructions for the charged offenses already provide the elements that the Government must prove beyond a reasonable doubt, and this instruction adds nothing new.  And, moreover, defendants can argue they're -- obviously they're going to argue their theory of the case in closing argument.").)

More specifically, with respect to Count Five, the jury was required to find that "the scheme or plan consisted of a bribe in exchange for at least one official act by Jose Huizar or George Esparza on the CREED LA appeal filed against the 940 Hill Project." (Dkt. No. 584 at 24.)  With respect to Count Twenty-Five, the jury was instructed that "defendant gave, offered, or agreed to give a thing of value to Jose Huizar, George Esparza, or Justin Kim-- namely, cash" and that defendant acted "with an intent to influence or reward Jose Huizar or George Esparza."  (Dkt. No. 584 at 29.) According to these instructions, which the jury is presumed to have followed (see Weeks v. Angelone, 528 U.S. 225, 234 (2000)), the jury would have been required to find defendant not guilty if they found the facts defendant advanced in defendant's proposed instruction, which they argued during closing argument.  Thus, the Court's denial of the so-called "theory-of-the-defense" instruction was not erroneous because the legal principles articulated in the instruction were already covered in the substantive instructions for Counts Five and Twenty-Five.

1   As such, the Court's refusal to give defendant's proposed

2   instruction was not in error and accordingly not a substantial issue

3   likely to result in reversal or a new trial, because the instruction

4   contained no new <u>cognizable</u> legal theories that were not otherwise

5   covered in the instructions and instead simply constituted

6   application of the law to specific factual scenarios.

7   **VI.   There Was No Cumulative Error**

8   Because defendant fails to identify any error, let alone a plain

9   one, "the cumulative error doctrine does not apply." <u>United States</u>

10  <u>v. Lonich</u>, 23 F.4th 881, 907 n.5 (9th Cir. 2022).  Moreover, any

11  alleged errors were not prejudicial, cumulatively or otherwise,

12  because defendant's guilt was overwhelming as set forth in the

13  government's Rule 29/33 opposition.  (<u>See</u> Dkt. No. 677 at 3-15; Dkt.

14  No. 848 at 2, 14 (concluding "the evidence was more than sufficient

15  for a rational trier of fact to find the essential elements of each

16  of the crimes charged against Defendants beyond a reasonable doubt"

17  and "there was no error, and in any event, even if there were any

18  errors, the cumulative effect of those alleged errors did not

19  prejudice Defendants in light of the entire trial record."); <u>see</u>

20  <u>United States v. Wilkes</u>, 662 F.3d 524, 542 (9th Cir. 2011) (rejecting

21  cumulative error where evidence of guilt was "ample").)

22  **VII. Defendant Fails to Establish that His Appeal Is Not For the**
       **Purpose of Delay**

23  Aside from a conclusory assertion, defendant makes no effort to

24  demonstrate that his appeal is not for the purpose of delay. For this

25  reason alone, defendant has failed to meet his burden on this prong.

26  As discussed at sentencing, defendant has not accepted, and continues

27  not to accept, accept full responsibility for his serious conduct.

28

For these reasons, it is reasonable for the Court to infer that defendant is attempting to avoid as long as possible the service of his sentence.  However, delay is no longer appropriate.  In enacting the Bail Act, Congress made a clear policy choice that bail pending appeal should be confined to exceptional circumstances:

> Congress' desire to reverse what it perceived as a "presumption in favor of bail even after conviction" under prior bail law demonstrates its recognition that harm results not only when someone is imprisoned erroneously, but also when execution of sentence is delayed because of arguments that in the end prove to be without merit. Some showing is therefore necessary to assume that post-conviction bail is confined to those who are among the more promising candidates for ultimate exoneration.

United States v. Shoffner, 791 F.2d 586, 589 (7th Cir. 1986).  No such exceptional circumstances exist here.

**VIII.      CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's Motion for Bond Pending Appeal.